## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Katie Wood *et al.*,

*Plaintiffs*

v.                                        No. 4:23-cv-00526-MW-MAF

Florida Department of Education *et al.*,

*Defendants*.

_____/

## <u>PLAINTIFF KATIE WOOD'S</u>
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Katie Wood ("Ms. Wood") respectfully requests that the Court preliminarily enjoin Defendants Florida Department of Education ("FDOE"), State Board of Education ("SBOE"), Education Practices Commission ("EPC"), Commissioner of Education ("Commissioner"), Members of Defendant SBOE, and Members of Defendant EPC (collectively, "State Defendants"), and Hillsborough County School Board (collectively with State Defendants, "Defendants"), their officers, agents, servants, employees, attorneys, and successors, and other persons who are in active concert or participation with any such person, from enforcing subsection 3 of Florida Statutes ("Fla. Stat.") § 1000.071 (2023) ("subsection 3").

Subsection 3 prohibits Ms. Wood, a transgender teacher, from sharing with

students her title Ms. or that she uses she/her pronouns because those do not, in the state of Florida's view, correspond to her sex assigned at birth. Subsection 3 discriminates against Ms. Wood on the basis of sex under Title VII by treating her differently from women who are not transgender. It violates her First Amendment right to free speech by applying a content- and viewpoint-based prior restraint on her private speech. She is entitled to a preliminary injunction on these claims to end the ongoing injury to her caused by these discriminatory policies because she is likely to succeed on the merits of these claims, her injury is ongoing and irreparable, and her interest in ending that injury outweighs Florida's interest in continuing its discriminatory policy.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K), Plaintiffs respectfully request oral argument on this motion, which they estimate would take one hour.

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(B), counsel for the Plaintiffs conferred with counsel for all the Defendants against whom relief is sought in this motion on December 20th and 21st. Counsel for Defendants indicated that they oppose the relief sought. The parties have agreed to propose that Defendants be permitted to file their opposition no later than Feb 2, 2023 and are discussing a complete proposed briefing schedule to be submitted at a later date.

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

Ms. Wood is a public-school teacher and transgender woman who uses the title Ms. and she/her pronouns. Ex. 1, Declaration of Katie Wood ("Wood Decl.") ¶¶ 2–3. She challenges subsection 3, which states that she may not "provide" her title Ms. and she/her pronouns to any students. Subsection 3 unlawfully requires Ms. Wood to stay silent about or misrepresent a basic element of how she presents herself to the world and conceives of herself—one as fundamental as her name, race, or religion. *Id.* ¶¶ 2, 7, 9–21. In addition to the distress this restriction has caused her, the new regime has disrupted her classroom and confused her students. *Id.* ¶¶ 10–11, 14–21.

Subsection 3 violates Title VII of the Civil Rights Act of 1964 and the Free Speech Clause of the First Amendment to the U.S. Constitution. It violates Title VII because it discriminates against Ms. Wood with respect to the terms, conditions, or privileges of her employment because of her sex. Under subsection 3's regime, although Ms. Wood, as a transgender woman, uses the title Ms. and she/her pronouns in every other aspect of her life, *id.* ¶ 2, she faces revocation of her license and loss of her job for identifying herself as who she is because her sex is deemed male under the statute. Yet she would be free to use that same title and those same pronouns if her sex were deemed female. This sex-dependent outcome is precisely what Title

3

VII prohibits. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738, 1741 (2020) (holding it was unlawful sex discrimination for a funeral home to fire a transgender woman because she "planned to 'live and work … as a woman,'" including by using she/her pronouns).

Subsection 3 also violates the First Amendment because it unconstitutionally restrains Ms. Wood's speech by requiring her to conceal or misrepresent who she is in all interactions with students inside and outside of school. "[T]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.* 142 S. Ct. 2407, 2423 (2022) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Although governments may exercise considerable control over teachers' speech, that does not mean that "everything teachers … say in the workplace [i]s government speech subject to government control." *Id.* at 2425. To hold otherwise would mean "a school could fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." *Id.*

The Court made clear that prohibiting such expressive activity would violate not only the Free Exercise Clause, but also the Free Speech Clause "under any" applicable standard, *id.* at 2426, notwithstanding the fact that a Muslim teacher's choice to wear a headscarf will inevitably result in students' learning about that

teacher's deeply held commitments. Just as Florida cannot constitutionally require Black employees to wear makeup to lighten their skin to conceal their race, bar Latino employees from using certain names in order to conceal their national origin, or require pregnant employees to take leave to conceal their pregnancies, it cannot require Plaintiffs to conceal their titles and pronouns.

Subsection 3 has inflicted and continues to inflict irreparable harm upon Ms. Wood. She loves to teach, but subsection 3 has forced her to choose between living a lie about who she is and giving up that calling. Wood Decl. ¶ 21. That is precisely its goal: to drive her out of the workplace because of who she is. Until subsection 3's enforcement is enjoined, she will continue to suffer daily sex discrimination and prior restraint on her speech under threat of termination and delicensing. The Constitution and federal law do not tolerate Florida's assault on Ms. Wood's dignity and expressive freedom. A preliminary injunction is needed to protect her rights.

## BACKGROUND

### I. Subsection 3's impact on Ms. Wood

Ms. Wood is a Florida public-school teacher and a transgender woman. Wood Decl. ¶¶ 2–3. Ms. Wood lives, dresses, and presents as a woman everywhere in life, including at work. *Id.* ¶ 2. She uses the title Ms. and she/her pronouns in all aspects of her life. *Id.* Being able to express herself as a woman is necessary for her to feel that she is living truthfully as herself. *Id.*

Ms. Wood received her teaching certificate under her legal name, Katie Wood, in 2021, *id.* ¶ 4, and has taught the second half of Algebra I to tenth-grade students who need additional support at Lennard High School in Hillsborough County since the 2021–2022 school year. *Id.* ¶ 5. She has received "effective" performance evaluations in each year of her employment. *Id.*

Until this school year, Ms. Wood referred to herself using the title Ms. and wrote "Ms. Wood" and "she/her" in the corner of her whiteboard in her classroom and on her syllabi. *Id.* ¶ 7. She also introduced herself as Ms. Wood and put a pin with her she/her pronouns on her lanyard. *Id.* If a student who did not know her was unsure of what to call her or used the wrong title or pronouns for her, Ms. Wood was free to explain her title and pronouns. *Id.*

That all changed this school year. After the enactment of subsection 3, Ms. Wood was informed by her principal that she could no longer use the title Ms. or inform students that she uses she/her pronouns. *Id.* ¶ 9. She was told she could refer to herself using the title Teacher, Coach, or Mr. *Id.* Of these options, she felt that Teacher is the least offensive, but it is unnatural to be called Teacher Wood and extremely painful to use because no other female teacher at her school is prohibited from using Ms. and forced to use the title Teacher instead. *Id.* ¶¶ 9, 17. After this meeting, Ms. Wood missed several days of work and was so upset she became physically ill. *Id.* ¶ 10. It pained Ms. Wood to erase her title and pronouns from her

6

classroom whiteboard because it felt like she was erasing the work she had done to be open and accepting about her gender. *Id.* ¶¶ 11, 14. She replaced her title and pronouns with "Teacher Wood" only after her principal told her she could lose her teaching license if she did not. *Id.* ¶¶ 11, 13–14.

This change confused her students and disrupted her classroom. *Id.* ¶ 15. Instructional time was spent on attempting to respond to students who questioned her about why she had changed her title. *Id.* Some students still call her Ms. Wood, others Teacher Wood, and she has also been referred to by Mr. and he/him pronouns. *Id.* She continues to be harmed by being unable to use at work the title and pronouns that match her gender and that she uses in all other areas of her life. In addition, she faces daily fear that she will inadvertently err and lose her job as a result. *Id.* ¶¶ 18–19.

## II.   Content and enforcement of subsection 3 and implementing regulations

Section 1000.071 was enacted by the Florida Legislature as part of Florida House Bill 1069 (2023). Subsection 1 states that "it shall be the policy of every public K-12 educational institution that is provided or authorized by the Constitution and laws of Florida that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Subsection 3 of the statute then states that "[a]n employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred

personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex."[1]

Florida law does not define which titles and pronouns "correspond to" which sex. Under subsection 3, titles like Mrs., Ms., and Miss and pronouns like she and her presumably "correspond to" people whose sex is deemed female under the statute; titles like Mr. and pronouns like he and him presumably "correspond to" people whose sex is deemed male under the statute.

The exact limits of subsection 3's prohibition are not clear. For example, it is unclear whether Ms. Wood would violate the statute by stating "I am a woman" or "I don't go by 'Mr.'" These statements do not state explicitly the speaker's title or pronouns but are arguably proscribed by the statute. Moreover, subsection 3's reach is not limited to the workplace or work hours; it applies wherever, whenever, and however an employee interacts with students.

Following the enactment of subsection 3, the Commissioner and the SBOE issued regulations empowering State Defendants to discipline school employees who violate subsection 3, including by suspending or revoking their certifications to

---

[1] "Sex" under subsection 3 means "the classification of a person as either female or male based on the organization of the body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." Fla. Stat. § 1000.21(9). This definition of sex is referred to as "biological sex" by some or "sex assigned at birth" by others. Plaintiff assumes for purposes of this case that this definition of sex is consistent with the meaning of sex under the federal constitutional provisions and statutes from which her claims arise.

teach—generally an eligibility requirement for employment as a public-school teacher in Florida. Fla. Stat. § 1012.55(b). Specifically, they amended the Principles of Professional Conduct for the Education Profession in Florida (the "Principles"), Fla. Admin. Code r. 6A-10.081, to make violating § 1000.071, including subsection 3, a disciplinary violation, which in turn constitutes grounds for suspension or revocation of a certificate, Fla. Stat. § 1012.795(1)(j).

State Defendants may learn about violations of subsection 3 in several ways, including from school boards,[2] who must report such violations to the FDOE. Fla. Stat. § 1012.796(1)(d)(1). The FDOE is tasked with investigating potential violations of subsection 3. Fla. Stat. § 1012.796(1)(a). It must then advise the Commissioner of its findings, and the Commissioner is tasked with determining whether there is probable cause to find a violation. Fla. Stat. § 1012.796(3). If the Commissioner concludes there is such probable cause, the Commissioner is responsible for filing and prosecuting a complaint. Fla. Stat. § 1012.796(6). The EPC is tasked with reviewing complaints. It must either dismiss the complaint or impose penalties on the respondent, such as by denying any applications for a certificate, revoking or suspending the respondent's existing certificates, imposing an administrative fine up to $2,000 for each offense, placing the respondent on probation, restricting the authorized scope of the respondent's practice, reprimanding the respondent in writing,

---

[2] All references to "school boards" include Hillsborough County School Board.

and barring the respondent, if their certificate has expired, from applying for a new certificate for up to ten years or permanently. Fla. Stat. § 1012.796(7). The FDOE must place the teacher's name on a publicly available list, which it maintains online, if the respondent's certificate is permanently revoked. Fla. Stat. § 1001.10(4)(b).

The Commissioner and SBOE have also empowered school boards to suspend or terminate the respondent's employment for violating subsection 3, both because certification is generally an eligibility requirement to teach in Florida public schools, Fla. Stat. § 1012.55(b), and because the violation of subsection 3 is a violation of the Principles and hence classified as misconduct, Fla. Admin. Code r. 6A-5.056(2), which constitutes just cause for termination, Fla. Stat. § 1012.33(1)(a). School boards also may count violations of subsection 3 against school personnel in performance evaluations, which could also lead to suspension or dismissal. The Commissioner proposed, and the SBOE approved, an amendment to the Florida Educator Accomplished Practices (the "Practices"), Fla. Admin. Code r. 6A-5.065, to provide that teachers comply with § 1000.071, including subsection 3.

The SBOE is tasked with enforcing school boards' compliance with subsection 3. Fla. Stat. §§ 1001.03(8), 1008.32. The Commissioner is tasked with investigating allegations of school boards' noncompliance, with determining probable cause, and with reporting such determinations to the SBOE. Fla. Stat. § 1008.32(2)(a). If a school board is unwilling or unable to comply, the SBOE is

authorized to report that to the Legislature, to withhold funds, to declare the school board ineligible for competitive grants, and to require periodic reporting as to the compliance issues. Fla. Stat. § 1008.32(4).

## ARGUMENT

Ms. Wood seeks a preliminary injunction against the enforcement of subsection 3. "To obtain a preliminary injunction, a movant must show (1) a substantial likelihood that it will ultimately prevail on the merits of the underlying case; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that if issued, the injunction would not be adverse to the public interest." *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1299 (11th Cir. 2022).

## III.   Ms. Wood is substantially likely to prevail on the merits of her claims.

### A.   Ms. Wood has standing.

Ms. Wood seeks only an injunction against enforcement of a single statutory provision—subsection 3, and she has standing to do so. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1271–72 (11th Cir. 2006). Standing requires "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood

that the injury will be redressed by a favorable decision." *Granite State Outdoor Adver., Inc. v. City of Clearwater*, 351 F.3d 1112, 1116 (11th Cir. 2003). In other words, to obtain an injunction against each defendant, Ms. Wood "must show, at the very least, that the [defendant] has the authority to enforce the particular provision that [s]he has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

Florida's adoption of subsection 3 has enlisted all defendants in the perpetration of an ongoing injury: an unjustified, sex-discriminatory limitation on Ms. Wood's expression both inside and outside her workplace. Her injuries are traceable to and redressable by the Hillsborough County School Board, because, pursuant to a district-level directive, her supervisor instructed her that she may not use her title and pronouns. Wood Decl. ¶¶ 9, 12–13. An injunction would remove the threat of discipline that currently hangs over her. The School Board's actions are also fairly attributable to the SBOE, which is tasked with ensuring that school boards follow state laws like subsection 3. Fla. Stat. §§ 1001.03(8), 1008.32. An injunction against the SBOE would prevent such interference with a teacher's employment. Hence, the School Board's actions are at least in part attributable to the SBOE and would be redressed by enjoining the SBOE from enforcing subsection 3, which would include taking action against districts that do not enforce subsection 3.

The Commissioner and FDOE have the power to bring cases against teachers who violate subsection 3 and its implementing regulations before the EPC, which hears such charges. Fla. Stat. § 1012.796(6)–(7). An injunction would therefore prevent them from taking action together to revoke Ms. Wood's license if she were to violate subsection 3. Importantly, enjoining only the School Board and the SBOE, but not the Commissioner, FDOE, and EPC (or vice versa) would not fully redress Ms. Wood's injuries because either set of entities may independently take action to discipline her or remove her from the classroom.

**B.    Ms. Wood is likely to succeed on the merits of her claim that she is being discriminated against on the basis of sex in violation of Title VII of the Civil Rights Act of 1964.**

**1.    Subsection 3 discriminates "because of sex."**

This is the rare case challenging a law that explicitly and openly "creates a facial classification based on gender." *United Autoworkers v. Johnson Controls, Inc.*, 499 U.S. 187, 197 (1991). That is direct evidence of unlawful discrimination, *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015), and the burden is therefore on Defendants to establish an affirmative defense to rebut the presumption of unlawfulness. *Johnson Controls*, 499 U.S. at 197–200; *see also Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir. 1986) (once a policy of sex-based discrimination is established, "a rebuttable presumption that plaintiff was discriminated against because of her sex and is entitled to recovery obtains"); *Hardy v.*

*Porter*, 613 F.2d 112, 114 (5th Cir. 1980)[3] (evidence of a policy of segregation "shifted to the defendants the burden of proving by clear and convincing evidence" that their conduct was not discriminatory).

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] … terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1). "[A]n employer who intentionally treats a person worse because of sex—*such as by firing the person for actions or attributes it would tolerate in an individual of another sex*—discriminates against that person in violation of Title VII." *Bostock*, 140 S. Ct. at 1740 (emphasis added). Even policies that apply to all genders are still discriminatory if employees are discriminated against on account of their sex at the individual level. *Id.* at 1748 ("Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups; an employer who fires both lesbians and gay men equally doesn't diminish but doubles its liability.").

Subsection 3 violates Title VII under *Bostock*: "[I]f changing the employee's sex would … yield[] a different choice by the employer[, ]a statutory violation has occurred." *Id.* at 1741. Subsection 3 prohibits Ms. Wood from providing her Ms. title and she/her pronouns solely because Florida has deemed her sex male. Had

---

[3] Decisions of the Fifth Circuit prior to September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

Florida deemed her sex female, she could use her title and pronouns without risking her job or her license to teach. In *Bostock*, the employer violated Title VII by firing Aimee Stephens for planning to "work full-time as a woman," *id.* at 1738, because, in the employer's words, "[Aimee]'s a man," Brief in Opposition for Respondent Aimee Stephens at 6, *Bostock*, 140 S. Ct. 1731 (No. 18-107). Like Ms. Stephens, Ms. Wood wishes to (and, for some time, did) "work full time" as a woman; she faces a threat of discipline, delicensing, and termination only because of Defendants' insistence that she is not.

Florida's new regime also engages in precisely the sort of sex-stereotyping long condemned as unlawful sex discrimination by the Supreme Court and the Eleventh Circuit: stereotyping that penalizes individuals for "failing to act and appear according to expectations defined by gender." *Glenn v. Brumby*, 663 F.3d 1312, 1316–17 (11th Cir. 2011) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989)); *see also id.* at 1320–21 (holding that an employer fired a transgender woman for dressing as a woman and noting that, "[i]f this were a Title VII case, the analysis would end here"); *Price Waterhouse*, 490 U.S. at 251 ("An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind."). Subsection 3's prohibition and the consequences that befall violators apply to

teachers only when they "fail[] to act … according to expectations defined by" the sex Florida deems them to be. "[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group." *Brumby*, 664 F.3d at 1316–17 (quoting *Price Waterhouse*, 490 U.S. at 251) (cleaned up). But that is precisely what subsection 3 requires.

### 2.    Ms. Wood has been "discriminate[d] against … with respect to [her] … terms, conditions, or privileges of employment."

Ms. Wood has been "discriminate[d] against … with respect to [her] … terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). The Eleventh Circuit has interpreted that phrase to require an "adverse employment action," which need not be an ultimate employment decision, so long as it "alter[s] the employee's compensation, terms, conditions, or privileges of employment, deprive[s] him or her of employment opportunities, or adversely affect[s] his or her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citation omitted).[4] To assess whether an employment practice is adverse, courts in the Eleventh Circuit "use an objective test, asking whether 'a reasonable person in [the plaintiff's] position would view the employment action in question as adverse.'" *Hinson v. Clinch*

---

[4] The Supreme Court is currently reviewing the degree of harm needed to meet this test. *Muldrow v. City of St. Louis*, 143 S. Ct. 2686 (2023). At oral argument, several Justices seemed to suggest that being classified by sex or race could alone impose a dignitary harm sufficient to meet the statutory test. Oral Argument at 10:45, 1:03:35, 1:06:55, 1:10:46, 1:25:00, *Muldrow v. City of St. Louis*, No. 22-193, https://www.oyez.org/cases/2023/22-193.

*Cnty.*, 231 F.3d 821, 829 (11th Cir. 2000) (quoting *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998)).

Title VII "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (quoting *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)). No court has considered whether being prohibited from expressing who one is meets this standard. But many women would find their working conditions dramatically changed if they were suddenly prohibited from introducing themselves to coworkers and clients as Ms. and from using she/her pronouns—as would many others faced with similar restrictions on their most basic expressive choices.

Consider a school that permitted Christian employees to wear religious symbols and to disclose their religious commitments aloud, but which prevented Muslim employees from doing the same, or a school that explicitly prohibited Black employees, but not others, from wearing hairstyles that did not "conform to their race." Such stigmatizing rules are at least as adverse a change to the conditions of employment for those who are subjected to them as other non-financial harms the courts have previously recognized are sufficient to violate Title VII. *See Holland v. Gee*, 677 F.3d 1047, 1058 (11th Cir. 2012) (holding that transfer to a position of equal pay but

less prestige is an adverse employment action); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (holding that employer's policy of assigning employees call lists and scripts based on race is direct evidence of unlawful disparate treatment).

Moreover, there is no question that Ms. Wood would suffer an adverse employment action if she violated the policy and was fired and stripped of her teaching license for doing so. Finding that subsection 3's requirement is not an adverse employment action would require her to risk her job by violating it or to continue to endure it without recourse, "an intolerable and impermissible catch 22." *Price Waterhouse*, 490 U.S. at 251. "Title VII lifts [Plaintiff] out of this bind." *Id.*

### 3.     Defendants are subject to liability under Title VII.

Title VII provides that it is "an unlawful employment practice for *an employer*—(1) to fail or refuse to hire or to discharge *any individual*, or otherwise to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex[.]" 42 U.S.C. § 2000e-2(a) (emphasis added).

As Ms. Wood's direct employer, Hillsborough County School Board is subject to liability when it discriminates against her in violation of Title VII.

The FDOE, SBOE, and EPC are also "employer[s]" within the meaning of Title VII. *See* 42 U.S.C. § 2000e(a)–(b). "It is clear from the language of [Title VII] that Congress intended that the rights and obligations it created under Title VII

would extend beyond the immediate employer-employee relationship." *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988); *see also id.* (quoting *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C. Cir. 1973) ("To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.")). At least one court has held that the FDOE is a proper defendant in a Title VII case brought by teachers directly employed by district school boards because "[the FDOE] was up to its elbows in the allegedly unlawful practice" through its control over school board funding and over the implementation of the discriminatory policy. *Fla. Educ. Ass'n v. Dep't of Educ.*, No. 4:17-CV-414, 2018 WL 10560519, at \*3 (N.D. Fla. Dec. 19, 2018); *accord Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 582 (9th Cir. 2000) ("[I]n addition to controlling local districts' budgets and textbooks and regulating the duties of public school employees, the state dictates whom the districts may and may not hire. That degree of control over districts' hiring decisions subjects Defendants to the coverage of Title VII in this case.").

Here, the SBOE and FDOE are similarly "up to [their] elbows in the allegedly unlawful practice." *Fla. Educ. Ass'n*, 2018 WL 10560519, at \*3. The SBOE

amended the Principles to make violating subsection 3 a "disciplinary violation," Fla. Admin. Code r. 6A-10.081(2)(a)(14), and the Practices to establish that "ensuring that the learning environment is consistent with § 1000.071" is a criterion for being an effective educator, Fla. Admin. Code r. 6A-5.065(2)(a)(2)(h). The SBOE and EPC also directly control the hiring of school boards' teachers. Ms. Wood's performance evaluation must be based upon the indicators outlined in the Practices, including compliance with subsection 3. *See* Fla. Stat. § 1012.34(3)(a)(2).

Further, the "disciplinary violation" created by the SBOE in the Principles is enforceable not only by school boards, but also by the EPC, which may suspend or revoke the educator certificate "of any instructional personnel or school administrator" for disciplinary violations. Fla. Stat. § 1012.795(1)(j). Similar to the California teacher credential at issue in *Association of Mexican-American Educators*, 231 F.3d at 582, Florida's educator certificate is required for public school teachers in the state, but it is not mandatory for private school teachers. *See* Fla. Stat. § 1012.32. Thus, the State Defendants "dictate[] whom the districts may and may not hire," which subjects them to the coverage of Title VII. *Ass'n of Mexican-Am. Educators*, 231 F.3d at 582.

Finally, the SBOE, like the state in *Association of Mexican-American Educators*, also controls funding to school boards. State law gives the SBOE the authority to "oversee the performance of … district school boards," and to "determine[] …

20

[whether] a district school board … is unwilling or unable to comply with law or state board rule." Fla. Stat. § 1008.32. If the SBOE determines that a district school board is not complying with the law, the SBOE is empowered to "[w]ithhold the transfer of state funds, discretionary grant funds, discretionary lottery funds, or any other funds specified as eligible for this purpose by the Legislature" and to "[d]eclare the … school district … ineligible for competitive grants." Fla. Stat. § 1008.32(4)(b)–(c). Thus, because subsection 3 is a law enforceable by the SBOE, all school boards currently operate under the SBOE's threat of withheld funding if they refuse to enforce subsection 3's discriminatory policy. Such control over funding strengthens the conclusion that the SBOE is interfering with Ms. Wood's employment and is subject to liability under Title VII.

### C.   Ms. Wood is likely to succeed on her claim that subsection 3 violates the First Amendment.

The Supreme Court has made clear that the government may not use its power as an employer to censor teachers by denying them the right to engage in core speech activities merely because students might witness them doing so. *Kennedy*, 142 S. Ct. at 2407. Just as the government may not "fire a Muslim teacher for wearing a head-scarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria," *id.* at 2425, Defendants may not prohibit teachers from using in the workplace the titles and pronouns they use in every other aspect of their lives.

Free speech claims by government employees are usually analyzed under the

*Pickering–Garcetti* test. *Kennedy*, 142 S. Ct. at 2423 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) and *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Under the first step, courts ask whether the "employee speaks 'pursuant to … official duties,'" or whether the "employee 'speaks as a citizen addressing a matter of public concern.'" *Kennedy*, 142 S. Ct. at 2423 (quoting *Garcetti*, 547 U.S. at 421, 423). If the public employee's speech implicates a matter of public concern, courts proceed to the second step, at which they evaluate whether the "employee's speech interests are outweighed by 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Garcetti*, 547 U.S. at 417).

> ### 1.  Ms. Wood spoke as a private citizen on a matter of public concern.

*Kennedy* held that a public-school football coach spoke as a private citizen on a matter of public concern when he prayed on the fifty-yard line of the football field after games in view of his players. *Id.* at 2416–20. The Court explained that though Mr. Kennedy "remained on duty" at the time of his prayers and conducted them "'within the office' environment—here, on the field of play," they nonetheless were not within his duties as a government employee. *Id.* at 2425. In other words, although Mr. Kennedy was engaging in expressive conduct that he knew his students (among other members of the public) could not help but witness, and although he did so while undisputedly on the job (interacting with students in his place of work), he

nonetheless spoke as a private citizen. "He was not seeking to convey a government-created message" as he would by "instructing players, discussing strategy, encouraging better on-field performance, or engag[ing] in any other speech the District paid him to produce as a coach." *Id.* at 2424. "Simply put," the Court explained, "Mr. Kennedy's prayers did not 'owe their existence' to Mr. Kennedy's responsibilities as a public employee." *Id.* (quoting *Garcetti*, 547 U.S. at 421) (cleaned up).

Here, too, the fact that Ms. Wood wishes to use her title and pronouns at school does not transform her speech into government speech merely because students will witness or hear it. In a certain sense, the fact that Ms. Wood is in a position to write her title and pronouns on her classroom board and say them to, or within earshot of, students "owe[s its] existence" to her job as a teacher. But in that sense Mr. Kennedy's prayers too "owe[d] their existence" to his job because had he not been employed by the school as a football coach, he would not have been on the field at football games, and no one would have seen him pray. *Kennedy* thus rejects a but-for test under which an employee's speech is protected only if it would have occurred even if they had not been employed by the government.

*Kennedy* instead relied on the fact that the *content* of the speech at issue was not something the government had created or directed. What Mr. Kennedy said when he prayed, to whom he prayed, or the choice to pray at that time instead of engage in other permitted activities, had nothing to do with his duties as a coach. Ms.

Wood's use of her title and pronouns is no different. Like Mr. Kennedy's prayers, Ms. Wood's title and pronouns are not something that the state determines and reflects no state message. Nor may Florida transform them into a state message by legislating about it. As *Kennedy* made explicit, a government may not use ad hoc or "'excessively broad job descriptions' to subvert the Constitution's protections." *Id.* (quoting *Garcetti*, 547 U.S. at 424).

Moreover, like Mr. Kennedy, Ms. Wood's speech is in a context in which other teachers are free to engage in various private forms of speech. Just as some teachers might wish to share their titles and pronouns on their classroom boards or when introducing themselves to students, other teachers are free to share in a private capacity other information about themselves, like the names of their partners, the status of their pets, their favorite sports teams, and the holidays they celebrate. Teachers are not automatons, programmed to speak solely about the contents of their curricula. They interact with their students as human beings with personalities, identities, families, and interests. For the purposes of the Free Speech Clause, singling out Ms. Wood's title and pronouns for a restriction on private speech is as impermissible as it was for the school district in *Kennedy* to "single out private religious speech for special disfavor." *Id.* at 2416.

Nor is the fact that Ms. Wood wishes to speak in a classroom to students dispositive. In *Kennedy*, the Court rejected the argument that Mr. Kennedy's prayers

were part of his official duties simply because they were witnessed by students. The government, when it speaks, may sometimes take positions on controversial topics. But *Kennedy* makes clear that it may not use that power to define its employees' duties so broadly as to suppress protected speech activity undertaken by public school employees in their private capacities. *Id.* at 2424. Moreover, subsection 3 goes further than the restriction at issue in *Kennedy*. It restricts teachers' speech in all interactions with students, at all times—in the classroom, outside the classroom, and outside the schoolhouse altogether.

Even before *Kennedy*, at least one court had concluded that a teacher speaks as a private citizen when answering student questions about the teacher's sexual orientation. *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1281 (D. Utah 1998) (holding it was a First Amendment violation to punish teacher for coming out to students). Since *Kennedy*, another court has already ruled that a coach was speaking in his private capacity on a matter of public concern when he replaced a poster created by his university's athletic department including the phrase "Black Lives Matter" with one of his own design reading "All Lives Matter to Our Lord and Savior Jesus Christ." *Beathard v. Lyons*, 620 F. Supp. 3d 775, 781–82 (C.D. Ill. 2022).

Ms. Wood also spoke on a matter of public concern for purposes of the *Pickering–Garcetti* test. Florida's state-wide policy "that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not

correspond to such person's sex" should alone make clear that Ms. Wood's gender expression is apparently a matter of public concern in Florida. Fla. Stat. § 1000.071(1). And although the parties in *Kennedy* did not dispute that Mr. Kennedy's speech was on a matter of public concern, the Court did not question that fact. Preventing Ms. Wood from using her title and pronouns is no more permissible on public concern grounds than banning Mr. Kennedy from praying or a Muslim teacher from wearing a headscarf.

### 2.    The balance of interests favors Ms. Wood.

The second step of the *Pickering–Garcetti* test, interest balancing, is almost automatically resolved in Ms. Wood's favor to the extent that the government is attempting to compel her to speak the government's message. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018) ("[I]t is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case."). Here, the state is compelling Ms. Wood to call herself Teacher rather than Ms. and to avoid answering or lie if asked by a student what title or pronouns she uses or even whether she is a woman. By statute, and under threat of delicensing, she must choose between risking her job by answering truthfully, answering in a manner that is inconsistent with her beliefs, simply ignoring the question, or stating that she is not permitted to answer—an action that itself sends an

expressive message that is contrary to what that teacher believes. This is no less a violation of the First Amendment than it would be to force a teacher who wears a cross either to lie or to walk away or state that she cannot answer when asked by a student whether the cross she wears expresses her Christian faith or to prohibit teachers from answering any questions about their race or national origin. No interest-balancing analysis is needed to hold this unconstitutional.

Even if interest balancing were to apply, "widespread" government policies which "chill[] potential speech before it happens" give rise to "far more serious concerns" than the specific responses to individual speech acts considered in the standard *Pickering–Garcetti* case. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995); *see also Janus*, 138 S. Ct. at 2472. In such cases, "the Government's burden is greater"; it must "show that the interests of … a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Nat'l Treasury Emps. Union*, 513 U.S. at 468; *see also Janus*, 138 S. Ct. at 2472 (characterizing this as a "heavier" burden than most *Pickering–Garcetti* cases). "The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus*, 138 S. Ct. at 2472. Moreover, government suppression of speech before it is spoken constitutes a prior restraint on speech, "the most serious and the least tolerable infringement on First Amendment

rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "Any system of prior restraint … comes to [the] Court bearing a heavy presumption against its constitutional validity." *F.W/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)).

The government cannot meet its heavy burden to justify its blanket policy of prior restraint. Ms. Wood's strong interest in being allowed to provide and use her title and pronouns easily outweighs the government's interest in silencing such expression. As explained in her declaration, it is deeply distressing for Ms. Wood to be forced to conceal who she is. Wood Decl. ¶¶ 10–11, 14, 16–21. The present regime wastes class time, singles her out from other teachers, and stigmatizes her with the authority of the state. *Id.* ¶¶ 9, 15, 21.

Subsection 3's restriction on Ms. Wood's speech rights is not only content-based but also viewpoint-based. "In general, viewpoint-based restrictions on expression require greater scrutiny than subject-matter-based restrictions." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 431 (1992) (Stevens, J., concurring); *see also id.* 388–92. In this sense, Florida's regime is *more* violative of the First Amendment than one that would bar both a Muslim teacher from wearing her headscarf and a Christian teacher from wearing her cross. Florida's regime is more akin to one that permits the cross but bans the headscarf (or vice versa). Florida now permits public employees to express in their capacities as private citizens certain views about which titles and

28

pronouns are appropriate for a particular individual, even as it silences (under threat of discipline and decertification) the expression of others.

Moreover, to the extent that Defendants argue that the law is intended to prevent students from learning about the existence of transgender people or somehow to stop the contagion of "gender ideology,"[5] that interest is both invalid and, in any event, not served by subsection 3. Consider a teacher who presents as male and sports a beard, but who may no longer use the title Mr. to identify himself; or a teacher, like Ms. Wood, who presents as female, but who may no longer use the title Ms. to identify herself.

In short, Defendants cannot explain why Florida's policy of restricting Ms. Wood's speech genuinely furthers any legitimate interest. The statutory scheme instead appears to be a crudely disguised cover for pushing transgender and nonbinary people out of the profession entirely—an illegitimate interest. *Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding that a law that "seems inexplicable by anything but animus toward the class it affects … lacks a rational relationship to legitimate state interests").

## IV.    Ms. Wood will suffer irreparable harm until an injunction is issued.

Ms. Wood's injuries are ongoing and irreparable. First, she is required, on a

---

[5] Yacob Reyes, "What's in a name: 'don't say gay' vs. 'parental rights'", Tampa Bay Times (March 31, 2022), https://www.tampabay.com/news/florida-politics/2022/03/31/whats-in-a-name-dont-say-gay-vs-parental-rights/.

daily basis, to avoid using the pronouns and title that she uses in every area of life—a restriction that constitutes ongoing discrimination on the basis of sex. It is settled in the Eleventh Circuit that courts are to "presume irreparable harm in Title VII cases" once administrative remedies have been exhausted. *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) (citing *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1520 (11th Cir. 1983)); *see also Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984). Ms. Wood is currently forced to live under threat of termination and delicensing because of a statutory scheme that restricts her expressive conduct because of her sex. That is an ongoing and irreparable injury.

Second, as noted above, Ms. Wood is also being subjected to an ongoing, content- and viewpoint- based restriction on her speech. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (citing *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc) ("The only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether.")); *Nebraska Press Ass'n*, 427 U.S. at 559.

**V.    The injury to Ms. Wood outweighs whatever damage the proposed injunction might cause Defendants, and the injunction would not be adverse to the public interest.**

Ms. Wood is being compelled by subsection 3 to conceal or misrepresent her gender on a daily basis. That injury continues to accrue. In contrast, the state has no interest in subjecting Ms. Wood to sex discrimination or compelling her to convey its message about gender. As noted above, subsection 3 cannot serve any interests related to preventing "contagion" of "gender ideology" because it is not crafted to protect anyone from learning about the existence of transgender people. The only plausible purpose of subsection 3 is to stigmatize transgender and nonbinary teachers and to drive them out of the classroom. These are not legitimate government interests. *Romer*, 517 U.S. at 632. Such interests cannot outweigh the significant harm to Ms. Wood's dignity caused by being forced to choose every day between risking termination or delicensing and being who she is.

## CONCLUSION

Ms. Wood respectfully requests that the Court grant her motion and preliminarily enjoin Defendants, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any such person, from enforcing subsection 3.

Respectfully submitted.

December 21, 2023                          */s/ Sam Boyd*
                                          Sam Boyd, Fla. Bar No. 1012141

Carli Raben, Fla. Bar No. 1036013
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131
(786) 347-2056
(786) 237-2949 (fax)
sam.boyd@splcenter.org
carli.raben@splcenter.org

Aaron S. Fleisher[†§]
SOUTHERN POVERTY LAW CENTER
1101 17th St NW Ste. 705
Washington, DC 20036
(202) 536-9719
(202) 971-9205 (fax)
aaron.fleisher@splcenter.org
[†] *Not admitted to practice law in DC*

Diego A. Soto[‡§]
Jessica L. Stone[§]
SOUTHERN POVERTY LAW CENTER
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030
(404) 521-6700
(404) 377-0708 (fax)
diego.soto@splcenter.org
jessica.stone@splcenter.org
[‡] *Admission to GA pending*

Simone Chriss, Fla. Bar No. 124062
Jodi Siegel, Fla. Bar No. 511617
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

James M. Finberg[*]

32

James Baltzer[*]
ALTSHULER BERZON LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
jfinberg@altshulerberzon.com
jbaltzer@altshulerberzon.com

*Counsel for Plaintiffs*

[*] Pro hac vice *motion forthcoming*
[§] *Admitted* pro hac vice

## CERTIFICATE OF WORD COUNT

According to Microsoft Word, the word-processing system used to prepare this Motion and Memorandum, there are 245 total words contained within the Motion, and there are 7421 words contained within the Memorandum of Law.

December 21, 2023                    */s/ Sam Boyd*
                                     Sam Boyd