## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Katie Wood *et al.*,

*Plaintiffs*

v.                                    No. 4:23-cv-00526-MW-MAF

Florida Department of Education *et al.*,

*Defendants*.

————————————————————/

## PLAINTIFF AV SCHWANDES'S
## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff AV Schwandes ("Mx. Schwandes") respectfully requests that the Court preliminarily enjoin Defendants Florida Department of Education ("FDOE"), State Board of Education ("SBOE"), Education Practices Commission ("EPC"), Commissioner of Education ("Commissioner"), Members of Defendant SBOE, and Members of Defendant EPC (collectively, "State Defendants"), their officers, agents, servants, employees, attorneys, and successors, and other persons who are in active concert or participation with any such person, from enforcing subsection 3 of Florida Statutes ("Fla. Stat.") § 1000.071 (2023) ("subsection 3").

Mx. Schwandes, a nonbinary teacher who uses they/them pronouns, was fired from their public-school teaching job because of subsection 3. On or about January

13, 2024, they received a letter, dated January 4, 2024, from Defendant FDOE stating that they are facing an investigation and possible sanctions, including revocation of their teaching license, for violating that law. Mx. Schwandes, who was assigned female at birth but identifies as nonbinary, was fired for informing students of their title Mx. because it does not, in Florida's view, correspond to their sex assigned at birth. This constitutes discrimination on the basis of sex in violation of Title VII. It also violates their First Amendment right to free speech by applying a content- and viewpoint-based prior restraint on their private speech. They are entitled to a preliminary injunction on these claims to end the ongoing injury to them caused by these discriminatory policies because they are likely to succeed on the merits of these claims, their injury is ongoing and irreparable, and their interest in ending that injury outweighs Florida's interest in continuing its discriminatory policy.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K), Plaintiff respectfully requests oral argument on this motion, which they estimate would take one hour.

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(B), counsel for the Plaintiff conferred with counsel for all the Defendants against whom relief is sought in this motion on January 16, 2024. Counsel for Defendants indicated that they oppose the relief sought. The parties are continuing to meet and confer in an effort to agree on a joint briefing

schedule for this motion.

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

Mx. Schwandes was a public-school teacher at the Florida Virtual School and is a nonbinary person who uses the title Mx. and they/them pronouns. Ex. 1, Declaration of AV Schwandes ("Schwandes Decl.") ¶¶ 3, 7-14. They challenge subsection 3, which states that they may not "provide" the title Mx. and they/them pronouns to any students. Subsection 3 unlawfully requires Mx. Schwandes to stay silent about or misrepresent a basic element of how they present themself to the world and conceive of themself—one as fundamental as their name, race, or religion. *Id.* ¶¶ 4-5. Mx. Schwandes was fired earlier this school year for the simple act of informing students they use the title Mx. On or about January 13, 2024, they received a letter informing them that they were being investigated by Defendants FDOE and EPC.

Subsection 3 violates Title VII of the Civil Rights Act of 1964 and the Free Speech Clause of the First Amendment to the U.S. Constitution. It violates Title VII because it discriminates against Mx. Schwandes with respect to the terms, conditions, or privileges of their employment because of their sex. Punishing Mx. Schwandes for using the title Mx. constitutes unlawful sex stereotyping, in violation of Title VII. Moreover, because the statute exempts some intersex individuals, people whose bodies do not conform solely to either male or female sex characteristics,

allowing them to use the title Mx. and they/them pronouns if they wish, it treats Mx. Schwandes differently from those teachers on the basis of sex, in violation of Title VII.

Subsection 3 also violates the First Amendment because it unconstitutionally restrains Mx. Schwandes' speech by requiring them to conceal or misrepresent who they are in all interactions with students. "[T]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Although governments may exercise considerable control over teachers' speech, that does not mean that "everything teachers … say in the workplace [i]s government speech subject to government control." *Id.* at 2425. To hold otherwise would mean "a school could fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." *Id.*

The Court has made clear that prohibiting such expressive activity would violate not only the Free Exercise Clause, but also the Free Speech Clause "under any" applicable standard, *id.* at 2426, notwithstanding the fact that a Muslim teacher's choice to wear a headscarf will inevitably result in students learning about that teacher's deeply held commitments. Just as Florida cannot constitutionally require

Black employees to wear makeup to lighten their skin to conceal their race, bar Latino employees from using certain names in order to conceal their national origin, or require pregnant employees to take leave to conceal their pregnancies, it cannot require Mx. Schwandes to conceal their title and pronouns.

The investigation of Mx. Schwandes will inflict irreparable harm upon Mx. Schwandes. They will have to expend time and effort responding to the inquiry, including potentially by retaining counsel, providing responses to inquiries, and attending hearings. If they are disciplined by the commission, that will interfere with their ability to seek future employment and injure their reputation further. The Constitution and federal law do not tolerate Florida's assault on Mx. Schwandes's dignity and expressive freedom. A preliminary injunction is needed to protect their rights.

## BACKGROUND

### I.    Subsection 3's impact on Mx. Schwandes.

Mx. Schwandes is a former Florida public-school teacher at the Florida Virtual School ("FLVS") who is nonbinary. Schwandes Decl. ¶¶ 3, 7. They use the title Mx. and they/them pronouns. *Id.* ¶¶ 3, 5.

Mx. Schwandes has been a middle and high school teacher in Maryland and Florida since 2006 and holds an active Florida Educator Certificate. *Id.* ¶ 6. They were hired as a teacher at FLVS in July 2010. *Id.* ¶ 7. They had consistently high

performance evaluations in that role. *Id.* ¶ 8.

Mx. Schwandes has been gender nonconforming since they were a child, and those feelings continued into adulthood. *Id.* ¶ 4. Those feelings culminated with their realization in 2023 that they are nonbinary. *Id.* ¶ 5. As part of that realization, they began using the title Mx. *Id.*

Instruction at FLVS is fully remote for a frequently changing student population, so Mx. Schwandes regularly was called upon to introduce themselves to new pupils. *Id.* ¶ 7. Initially, they did so using the titles professor and Mrs. *Id.* ¶ 9. Once Mx. Schwandes began using their nonbinary title Mx., they informed their principal that they would introduce themselves to students at work accordingly. *Id.* Their principal initially agreed with this decision. *Id.*

In August 2023, however, Mx. Schwandes received an email from their principal stating that they could no longer use that title. *Id.* ¶ 11. Mx. Schwandes refused to comply. *Id.* This email was followed on September 15 by a written document titled a "directive" from FLVS that they change their title in FLVS's systems that day. *Id.* ¶ 13. Mx. Schwandes did not do so. *Id.* They were suspended that same day without pay *Id.* ¶ 15. On September 26, 2023, they filed a complaint with the Florida Commission on Human Relations. *Id.* ¶ 17. On October 24, 2023, they were fired. *Id.* ¶ 21.

On or about January 13, 2024, after this lawsuit was filed, Mx. Schwandes

received a letter from Defendant FDOE informing them that the Office of Professional Practices Services had "determined an investigation is warranted into allegations that [they] failed to follow directives from [their] employer." *Id.* ¶ 23. This is an apparent reference to Mx. Schwandes's refusal to stop using the title Mx., as that is the only written "directive" Mx. Schwandes received from FLVS and hence the only one which they refused to follow. *Id.*

## II.    Content and enforcement of subsection 3 and implementing regulations.

Section 1000.071 was enacted by the Florida Legislature as part of Florida House Bill 1069 (2023). Subsection 1 states that "it shall be the policy of every public K-12 educational institution that is provided or authorized by the Constitution and laws of Florida that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Section 1000.071, however, "does not apply to individuals born with a genetically or biochemically verifiable disorder of sex development, including, but not limited to, 46, XX disorder of sex development; 46, XY disorder of sex development; sex chromosome disorder of sex development; XX or XY sex reversal; and ovotesticular disorder." *Id.* Individuals with these sex characteristics sometimes refer to themselves as intersex and sometimes refer to themselves using they/them pronouns and gender-neutral titles.

Subsection 3 of the statute then states that "[a]n employee or contractor of a

public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex."[1]

The exact limits of subsection 3's prohibition are not clear. For example, it is unclear whether Mx. Schwandes would violate the statute by stating "I am nonbinary" or "I don't go by 'Ms.'" These statements do not state explicitly the speaker's title or pronouns but are arguably proscribed by the statute. Moreover, subsection 3's reach is not limited to the workplace or work hours; it applies wherever, whenever, and however an employee interacts with students.

Following the enactment of subsection 3, the Commissioner and the SBOE issued regulations empowering State Defendants to discipline school employees who violate subsection 3, including by suspending or revoking their certifications to teach—generally an eligibility requirement for employment as a public-school teacher in Florida. Fla. Stat. § 1012.55(b). Specifically, they amended the Principles of Professional Conduct for the Education Profession in Florida (the "Principles"), Fla. Admin. Code r. 6A-10.081, to make violating § 1000.071, including subsection

---

[1] "Sex" under subsection 3 means "the classification of a person as either female or male based on the organization of the body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." Fla. Stat. § 1000.21(9). This definition of sex is referred to as "biological sex" by some or "sex assigned at birth" by others. Plaintiff assumes for purposes of this case that this definition of sex is consistent with the meaning of sex under the federal constitutional provisions and statutes from which their claims arise.

3, a disciplinary violation, which in turn constitutes grounds for suspension or revocation of a certificate, Fla. Stat. § 1012.795(1)(j).

State Defendants may learn about violations of subsection 3 in several ways, including from school boards, who must report such violations to the FDOE. Fla. Stat. § 1012.796(1)(d)(1). The FDOE is tasked with investigating potential violations of subsection 3. Fla. Stat. § 1012.796(1)(a). It must then advise the Commissioner of its findings, and the Commissioner is tasked with determining whether there is probable cause to find a violation. Fla. Stat. § 1012.796(3). If the Commissioner concludes there is such probable cause, the Commissioner is responsible for filing and prosecuting a complaint. Fla. Stat. § 1012.796(6). The EPC is tasked with reviewing complaints. It must either dismiss the complaint or impose penalties on the respondent, such as by denying any applications for a certificate, revoking or suspending the respondent's existing certificates, imposing an administrative fine up to $2,000 for each offense, placing the respondent on probation, restricting the authorized scope of the respondent's practice, reprimanding the respondent in writing, and barring the respondent, if their certificate has expired, from applying for a new certificate for up to ten years or permanently. Fla. Stat. § 1012.796(7). The FDOE maintains a public database of discipline orders against teachers and a separate publicly available list of teachers whose license have been revoked. Fla. Stat. § 1001.10(4)(b), (5)(a).

The Commissioner and SBOE have also empowered school boards to suspend or terminate the respondent's employment for violating subsection 3, both because certification is generally an eligibility requirement to teach in Florida public schools, Fla. Stat. § 1012.55(b), and because the violation of subsection 3 is a violation of the Principles and hence classified as misconduct, Fla. Admin. Code r. 6A-5.056(2), which is treated as just cause for termination, Fla. Stat. § 1012.33(1)(a).

The SBOE is tasked with enforcing school boards' compliance with subsection 3. Fla. Stat. §§ 1001.03(8), 1008.32. The Commissioner is tasked with investigating allegations of school boards' noncompliance, with determining probable cause, and with reporting such determinations to the SBOE. Fla. Stat. § 1008.32(2)(a). If a school board is unwilling or unable to comply, the SBOE is authorized to report that to the Legislature, to withhold funds, to declare the school board ineligible for competitive grants, and to require periodic reporting as to the compliance issues. Fla. Stat. § 1008.32(4).

## ARGUMENT

Mx. Schwandes seeks a preliminary injunction against the enforcement of subsection 3. "To obtain a preliminary injunction, a movant must show (1) a substantial likelihood that it will ultimately prevail on the merits of the underlying case; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed

injunction may cause the opposing party; and (4) that if issued, the injunction would not be adverse to the public interest." *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1299 (11th Cir. 2022).

## I.     Mx. Schwandes is substantially likely to prevail on the merits of their claims.

### A.     Mx. Schwandes has standing.

Mx. Schwandes seeks only an injunction against enforcement of a single statutory provision—subsection 3, and they have standing to do so. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1271–72 (11th Cir. 2006). Standing requires "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Granite State Outdoor Adver., Inc. v. City of Clearwater*, 351 F.3d 1112, 1116 (11th Cir. 2003).

Mx. Schwandes faces an imminent injury from Defendants' newly-announced investigation. Most obviously, losing their license will harm their ability to seek future employment. Their name will be entered on statewide databases, Fla. Stat. § 1001.10(4)(b), (5)(a), notifying all potential future employers, not just schools, that they have been disciplined and/or fired for refusing to follow an employer's instructions. The investigatory process itself will also be time-consuming and potentially expensive. They may need to hire counsel, take time to respond to investigatory

demands, and travel to and attend one or more hearings. Enjoining the investigation will remedy all of these injuries.

**B.    Mx. Schwandes is likely to succeed on the merits of their claim that they are being discriminated against on the basis of sex in violation of Title VII of the Civil Rights Act of 1964.**

### 1.    Subsection 3 discriminates "because of sex."

Florida's treatment of Mx. Schwandes is precisely the kind of sex-stereotyping long condemned as unlawful sex discrimination by the Supreme Court and the Eleventh Circuit: stereotyping that penalizes individuals for "failing to act and appear according to expectations defined by gender." *Glenn v. Brumby*, 663 F.3d 1312, 1316–17 (11th Cir. 2011) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989)); *see also id.* at 1320–21 (holding that an employer fired a transgender woman for dressing as a woman and noting that, "[i]f this were a Title VII case, the analysis would end here"); *Price Waterhouse*, 490 U.S. at 251 ("An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind."). Mx. Schwandes has been penalized for using the title Mx. and hence "fail[ing] to act … according to expectations defined by" the sex Florida deems them to be. "[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group." *Brumby*,

664 F.3d at 1316–17 (quoting *Price Waterhouse*, 490 U.S. at 251) (cleaned up). But that is precisely what subsection 3 requires.

Subsection 3 also discriminates against Mx. Schwandes by treating them differently from intersex people. If Mx. Schwandes had one of the intersex conditions listed in Section 1000.071(1), they would be exempt from the entire Section and hence free to use the title Mx. and they/them pronouns (as some, but not all, intersex people prefer to do). However, because the state deems their sex to be female, they cannot. Hence, the statute discriminates on the basis of sex. *See Bostock v. Clayton Cnty.*, 140 S. Ct. at 1741 (2020) ("[A]n employer who intentionally treats a person worse because of sex—*such as by firing the person for actions or attributes it would tolerate in an individual of another sex*—discriminates against that person in violation of Title VII."). Treating people differently based on the presence, or absence, of intersex characteristics is no less discrimination on the basis of sex than treating men and women differently. *See Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 576 n. 4 (6th Cir. 2018*), aff'd sub nom. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 ("discrimination because of a person's … intersex, or sexually indeterminate status is no less actionable than discrimination because of a person's identification with two religions, an unorthodox religion, or no religion at all"); *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-CV-01595, 2023 WL 4848509 at *7 (S.D. Ohio July 28, 2023) ("the full scope of

discrimination on the basis of 'sex' must encompass discrimination on the basis of all the biological markers that comprise an individual's 'biological sex'—including inter alia their organs, their chromosomes, their hormones, and their gender identity").

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [their] … terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Even policies that apply to all genders are still discriminatory if employees are discriminated against on account of their sex at the individual level. *Bostock*, 140 S. Ct. at 1748 ("Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups; an employer who fires both lesbians and gay men equally doesn't diminish but doubles its liability."). Here, the law treats Mx. Schwandes differently from intersex individuals and so it treats them differently on the basis of sex.

### 2. Defendants are "discriminat[ing] against" Mx. Schwandes " with respect to [their] … terms, conditions, or privileges of employment."

Mx. Schwandes is being and will be "discriminate[d] against … with respect to [their] … terms, conditions, or privileges of employment" by Defendants' investigation and its potential consequences. 42 U.S.C. § 2000e-2(a)(1). The Eleventh Circuit has interpreted that phrase to require an "adverse employment action," which

need not be an ultimate employment decision, so long as it "alter[s] the employee's compensation, terms, conditions, or privileges of employment, deprive[s] [them] of employment opportunities, or adversely affect[s] [their] status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citation omitted).[2]

"Termination is an ultimate employment action that is undeniably adverse." *Freytes-Torres v. City of Sanford*, 270 F. App'x 885, 894 (11th Cir. 2008). Defendant's investigation, if successful, could lead to the revocation or suspension of Mx. Schwandes's teaching license. Fla. Stat. § 1012.796(7). This will have an effect similar to, or even greater then, being terminated because it will prevent Mx. Schwandes from being employed by *any* Florida public school. *See Bogden-Cozmuta v. Granby Urgent Care, LLC*, No. 3:20-CV-00879-VLB, 2022 WL 4585442 at *7 (D. Conn. Sept. 29, 2022) ("It is difficult to see how threatening to report Plaintiff to the state licensing board, who presumably has the ability to revoke Plaintiff's license and thus impede his ability to work in his profession, could not be an adverse employment action."); *Seals v. Corr. Med. Servs., Inc.*, 473 F. Supp. 2d 912, 920 (E.D. Ark. 2007) (disciplinary write-ups could constitute adverse employment action under Title VII because they could lead to license revocation); *Haymon v. D.C.*, 610 F. Supp. 3d

---

[2] The Supreme Court is currently reviewing the degree of harm needed to meet this test. *Muldrow v. City of St. Louis*, 143 S. Ct. 2686 (2023). At oral argument, several Justices seemed to suggest that being classified by sex or race could alone impose a dignitary harm sufficient to meet the statutory test. Oral Argument at 10:45, 1:03:35, 1:06:55, 1:10:46, 1:25:00, *Muldrow v. City of St. Louis*, No. 22-193, https://www.oyez.org/cases/2023/22-193.

101, 115 (D.D.C. 2022) (loss of license to serve as a police officer constituted adverse employment action in context of a due process claim because it was similar to loss of employment). It may also affect their ability to teach in other states. Schwandes Decl. ¶ 24.

### 3. Defendants are subject to liability under Title VII.

Title VII provides that it is "an unlawful employment practice for *an employer*—(1) to fail or refuse to hire or to discharge *any individual*, or otherwise to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex[.]" 42 U.S.C. § 2000e-2(a) (emphasis added).

The FDOE, SBOE, and EPC are Mx. Schwandes's "employer[s]" within the meaning of Title VII. *See* 42 U.S.C. § 2000e(a)–(b). "It is clear from the language of [Title VII] that Congress intended that the rights and obligations it created under Title VII would extend beyond the immediate employer-employee relationship." *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988); *see also id.* (quoting *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C. Cir. 1973) ("To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment

that Congress has prohibited.")). At least one court has held that the FDOE is a proper defendant in a Title VII case brought by teachers directly employed by district school boards because "[the FDOE] was up to its elbows in the allegedly unlawful practice" through its control over school board funding and over the implementation of the discriminatory policy. *Fla. Educ. Ass'n v. Dep't of Educ.*, No. 4:17-CV-414, 2018 WL 10560519 at *3 (N.D. Fla. Dec. 19, 2018); *accord Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 582 (9th Cir. 2000) ("[I]n addition to controlling local districts' budgets and textbooks and regulating the duties of public school employees, the state dictates whom the districts may and may not hire. That degree of control over districts' hiring decisions subjects Defendants to the coverage of Title VII in this case.").

Here, the SBOE and FDOE are similarly "up to [their] elbows in the allegedly unlawful practice." *Fla. Educ. Ass'n*, 2018 WL 10560519 at *3. The SBOE amended the Principles to make violating subsection 3 a "disciplinary violation," Fla. Admin. Code r. 6A-10.081(2)(a)(14), and the Practices to establish that "ensuring that the learning environment is consistent with § 1000.071" is a criterion for being an effective educator, Fla. Admin. Code r. 6A-5.065(2)(a)(2)(h). The FDOE is investigating Mx. Schwandes pursuant to rules established by the SBOE. If it finds cause to discipline them, it will submit that to the EPC, which may suspend or revoke the educator certificate "of any instructional personnel or school administrator" for

disciplinary violations. Fla. Stat. § 1012.795(1)(j). Similar to the California teacher credential at issue in *Association of Mexican-American Educators*, 231 F.3d at 582, Florida's educator certificate is required for public school teachers in the state, but it is not mandatory for private school teachers. *See* Fla. Stat. § 1012.32. Thus, the State Defendants "dictate[] whom the districts may and may not hire," which subjects them to the coverage of Title VII. *Ass'n of Mexican-Am. Educators*, 231 F.3d at 582.

### C. Mx. Schwandes is likely to succeed on their claim that subsection 3 violates the First Amendment.

The Supreme Court has made clear that the government may not use its power as an employer to censor teachers by denying them the right to engage in core speech activities merely because students might witness them doing so. *Kennedy*, 142 S. Ct. at 2407. Just as the government may not "fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria," *id.* at 2425, Defendants may not prohibit teachers from using in the workplace the titles and pronouns they use in every other aspect of their lives.

Free speech claims by government employees are usually analyzed under the *Pickering–Garcetti* test. *Kennedy*, 142 S. Ct. at 2423 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) and *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Under the first step, courts ask whether the "employee speaks 'pursuant to … official duties,'" or whether the "employee 'speaks as a citizen addressing a matter of public

concern.'" *Kennedy*, 142 S. Ct. at 2423 (quoting *Garcetti*, 547 U.S. at 421, 423). If the public employee's speech implicates a matter of public concern, courts proceed to the second step, at which they evaluate whether the "employee's speech interests are outweighed by 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Garcetti*, 547 U.S. at 417).

### 1. Mx. Schwandes spoke as a private citizen on a matter of public concern.

*Kennedy* held that a public-school football coach spoke as a private citizen on a matter of public concern when he prayed on the fifty-yard line of the football field after games in view of his players. *Id.* at 2416–20. The Court explained that though Mr. Kennedy "remained on duty" at the time of his prayers and conducted them "'within the office' environment—here, on the field of play," they nonetheless were not within his duties as a government employee. *Id.* at 2425. In other words, although Mr. Kennedy was engaging in expressive conduct that he knew his students (among other members of the public) could not help but witness, and although he did so while undisputedly on the job (interacting with students in his place of work), he nonetheless spoke as a private citizen. "He was not seeking to convey a government-created message" as he would by "instructing players, discussing strategy, encouraging better on-field performance, or engag[ing] in any other speech the District paid him to produce as a coach." *Id.* at 2424. "Simply put," the Court explained, "Mr.

Kennedy's prayers did not 'owe their existence' to Mr. Kennedy's responsibilities as a public employee." *Id.* (quoting *Garcetti*, 547 U.S. at 421) (cleaned up).

Here, too, the fact that Mx. Schwandes wishes to use their title at school does not transform their speech into government speech merely because students will witness or hear it. In a certain sense, the fact that Mx. Schwandes is in a position to introduce themselves to students "owe[s its] existence" to their job as a teacher. But in that sense Mr. Kennedy's prayers too "owe[d] their existence" to his job because had he not been employed by the school as a football coach, he would not have been on the field at football games, and no one would have seen him pray. *Kennedy* thus rejects a but-for test under which an employee's speech is protected only if it would have occurred even if they had not been employed by the government.

*Kennedy* instead relied on the fact that the *content* of the speech at issue was not something the government had created or directed. What Mr. Kennedy said when he prayed, to whom he prayed, or the choice to pray at that time instead of engage in other permitted activities, had nothing to do with his duties as a coach. Mx. Schwandes's use of their title is no different. Like Mr. Kennedy's prayers, Mx. Schwandes's title is not something that the state determines and reflects no state message. Nor may Florida transform it into a state message by legislating about it. As *Kennedy* made explicit, a government may not use ad hoc or "'excessively broad job descriptions' to subvert the Constitution's protections." *Id.* (quoting *Garcetti*,

547 U.S. at 424).

Moreover, like Mr. Kennedy, Mx. Schwandes's speech is in a context in which other teachers are free to engage in various private forms of speech. Just as some teachers might wish to share their titles when introducing themselves to students, other teachers are free to share in a private capacity other information about themselves, like the names of their partners, the names of their pets, their favorite sports teams, and the holidays they celebrate. Teachers are not automatons, programmed to speak solely about the contents of their curricula. They interact with their students as human beings with personalities, identities, families, and interests. For the purposes of the Free Speech Clause, singling out Mx. Schwandes's title for a restriction on private speech is as impermissible as it was for the school district in *Kennedy* to "single out private religious speech for special disfavor." *Id.* at 2416.

Nor is the fact that Mx. Schwandes wishes to speak in a virtual classroom to students dispositive. In *Kennedy*, the Court rejected the argument that Mr. Kennedy's prayers were part of his official duties simply because they were witnessed by students. The government, when it speaks, may sometimes take positions on controversial topics. But *Kennedy* makes clear that it may not use that power to define its employees' duties so broadly as to suppress protected speech activity undertaken by public school employees in their private capacities. *Id.* at 2424. Moreover, subsection 3 goes further than the restriction at issue in *Kennedy*. It restricts teachers'

speech in all interactions with students, at all times—in the classroom, outside the classroom, and outside the schoolhouse altogether.

Even before *Kennedy*, at least one court had concluded that a teacher speaks as a private citizen when answering student questions about the teacher's sexual orientation. *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1281 (D. Utah 1998) (holding it was a First Amendment violation to punish teacher for coming out to students). Since *Kennedy*, another court has already ruled that a coach was speaking in his private capacity on a matter of public concern when he replaced a poster created by his university's athletic department including the phrase "Black Lives Matter" with one of his own design reading "All Lives Matter to Our Lord and Savior Jesus Christ." *Beathard v. Lyons*, 620 F. Supp. 3d 775, 781–82 (C.D. Ill. 2022).

Mx. Schwandes also spoke on a matter of public concern for purposes of the *Pickering–Garcetti* test. Florida's state-wide policy "that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex" should alone make clear that Mx. Schwandes's gender expression is apparently a matter of public concern in Florida. Fla. Stat. § 1000.071(1). And although the parties in *Kennedy* did not dispute that Mr. Kennedy's speech was on a matter of public concern, the Court did not question that fact. Preventing Mx. Schwandes from using their title and pronouns is no more permissible on public concern grounds than banning Mr. Kennedy from praying or a

Muslim teacher from wearing a headscarf.

### 2. The balance of interests favors Mx. Schwandes.

The second step of the *Pickering–Garcetti* test, interest balancing, is almost automatically resolved in Mx. Schwandes's favor to the extent that the government is attempting to compel them to speak the government's message. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018) ("[I]t is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case."). Here, the state is compelling Mx. Schwandes to call themself something other than Mx. and to avoid answering or lie if asked by a student what title or pronouns they use. By statute, and under threat of delicensing, they must choose between risking their job by answering truthfully, answering in a manner that is inconsistent with their beliefs, simply ignoring the question, or stating that they are not permitted to answer—an action that itself sends an expressive message that is contrary to what they believe. This is no less a violation of the First Amendment than it would be to force a teacher who wears a cross either to lie or to walk away or state that she cannot answer when asked by a student whether the cross she wears expresses her Christian faith or to prohibit teachers from answering any questions about their race or national origin. No interest-balancing analysis is needed to hold this unconstitutional.

Even if interest balancing were to apply, "widespread" government policies which "chill[] potential speech before it happens" give rise to "far more serious concerns" than the specific responses to individual speech acts considered in the standard *Pickering–Garcetti* case. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995); *see also Janus*, 138 S. Ct. at 2472. In such cases, "the Government's burden is greater":  it must "show that the interests of … a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Nat'l Treasury Emps. Union*, 513 U.S. at 468; *see also Janus*, 138 S. Ct. at 2472 (characterizing this as a "heavier" burden than most *Pickering–Garcetti* cases). "The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus*, 138 S. Ct. at 2472. Moreover, government suppression of speech before it is spoken constitutes a prior restraint on speech, "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "Any system of prior restraint … comes to [the] Court bearing a heavy presumption against its constitutional validity." *F.W/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)).

The government cannot meet its heavy burden to justify its blanket policy of prior restraint. Mx. Schwandes's strong interest in not losing their license for using

their title easily outweighs the government's interest in silencing such expression.

Subsection 3's restriction on Mx. Schwandes's speech rights is not only content-based but also viewpoint-based. "In general, viewpoint-based restrictions on expression require greater scrutiny than subject-matter-based restrictions." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 431 (1992) (Stevens, J., concurring); *see also id.* 388–92. In this sense, Florida's regime is *more* violative of the First Amendment than one that would bar both a Muslim teacher from wearing her headscarf and a Christian teacher from wearing her cross. Florida's regime is more akin to one that permits the cross but bans the headscarf (or vice versa). Florida now permits public employees to express in their capacities as private citizens certain views about which titles and pronouns are appropriate for a particular individual, even as it silences (under threat of discipline and decertification) the expression of others.

In short, Defendants cannot explain why Florida's policy of restricting Mx. Schwandes's speech genuinely furthers any legitimate interest. The statutory scheme instead appears to be a crudely disguised cover for pushing transgender and nonbinary people out of the profession entirely—an illegitimate interest. *Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding that a law that "seems inexplicable by anything but animus toward the class it affects … lacks a rational relationship to legitimate state interests").

## II.   Mx. Schwandes will suffer irreparable harm if an injunction is not issued.

If an injunction is not issued, Mx. Schwandes will be investigated and presumably found to have violated Subsection 3. That will lead to discipline, which seems likely to include revocation of their teaching certificate, as they do not intend to comply with the law. Loss of their teaching certificate will prevent Mx. Schwandes from continuing to seek employment as a teacher. It will also result in a permanent public record of their discipline, which is likely to impact their ability to obtain employment even outside of the teaching profession, even if their license is ultimately reinstated at the conclusion of this case. Moreover, responding to the investigation will entail significant time and expense on Mx. Schwandes's part.

## III.   The injury to Mx. Schwandes outweighs whatever damage the proposed injunction might cause Defendants, and the injunction would not be adverse to the public interest.

Mx. Schwandes faces loss of their livelihood and employment prospects. In contrast, the state has no legitimate interest in subjecting Mx. Schwandes to sex discrimination or compelling them to convey its message about gender. The only plausible purpose of subsection 3 is to stigmatize transgender and nonbinary teachers and to drive them out of the classroom. These are not legitimate government interests. *Romer*, 517 U.S. at 632. Such interests cannot outweigh the significant harm to Mx. Schwandes.

## CONCLUSION

Mx. Schwandes respectfully requests that the Court grant their motion and preliminarily enjoin Defendants, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any such person, from enforcing subsection 3.

Respectfully submitted.


January 29, 2024

*/s/ Sam Boyd*
Sam Boyd, Fla. Bar No. 1012141
Carli Raben, Fla. Bar No. 1036013
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131
(786) 347-2056
(786) 237-2949 (fax)
sam.boyd@splcenter.org
carli.raben@splcenter.org

Aaron S. Fleisher*†
SOUTHERN POVERTY LAW CENTER
1101 17th St NW Ste. 705
Washington, DC 20036
(202) 536-9719
(202) 971-9205 (fax)
aaron.fleisher@splcenter.org
† Not admitted to practice law in DC

Diego A. Soto*‡
Jessica L. Stone*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030
(404) 521-6700

(404) 377-0708 (fax)
diego.soto@splcenter.org
jessica.stone@splcenter.org
‡ Admission to GA pending

Simone Chriss, Fla. Bar No. 124062
Jodi Siegel, Fla. Bar No. 511617
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

James M. Finberg*
James Baltzer*
ALTSHULER BERZON LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
jfinberg@altshulerberzon.com
jbaltzer@altshulerberzon.com

*Counsel for Plaintiffs*

* *Admitted* pro hac vice

## CERTIFICATE OF WORD COUNT

According to Microsoft Word, the word-processing system used to prepare this Motion and Memorandum, there are 272 total words contained within the Motion, and there are 5213 words contained within the Memorandum of Law.

January 29, 2024                    */s/ Sam Boyd*
                                    Sam Boyd