# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

Wood, *et al.*,

       *Plaintiffs*,

       v.

Florida Department of Education, *et al.*,

       *Defendants*.

Case No. 4:23-cv-526-MW-MAF

# STATE DEFENDANTS' CONSOLIDATED RESPONSE
# IN OPPOSITION TO PLAINTIFFS' MOTIONS
# FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................... 3

    A.   The Florida Legislature enacts comprehensive legislation on K-12 education. .................................................................. 3

    B.   Plaintiffs challenge Subsection 3. ............................................ 7

ARGUMENT .................................................................................. 8

  I.  Plaintiffs have not shown likelihood of success on the merits. ........ 8

    A.   Subsection 3 does not violate Title VII. ................................... 8

       1.   *Bostock* held only that employers cannot discriminate because of transgender "status." ............................................ 9

       2.   Subsection 3 does not discriminate based on "sex." ............. 11

       3.   Plaintiffs have not suffered an adverse employment action from the State Defendants. ................................................ 21

       4.   Subsection 3's regulation of pronouns concerns a bona fide occupational qualification. ..................................................... 24

       5.   *Bostock* does not apply to nonbinary individuals like Plaintiff Schwandes. ........................................................... 27

    B.   Subsection 3 does not violate the First Amendment. .............. 28

       1.   Plaintiffs' speech is within the scope of employment. .......... 29

       2.   Plaintiffs' speech does not concern a topic of public concern. ........................................................................ 36

       3.   The State's interests outweigh any harm to Plaintiffs. ........ 38

  II.  The equitable factors do not support preliminary relief. ............... 41

    A.   Plaintiffs cannot establish irreparable harm. ......................... 41

    B.   The public interest and balance of equities favors the State. .. 44

CONCLUSION ............................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
   557 F.3d 1177 (11th Cir. 2009) .............................................. 1

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) ....................................... passim

*Alabama v. U.S. Dep't of Com.*,
   546 F. Supp. 3d 1057 (M.D. Ala. 2021) ............................. 41

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*,
   804 F.3d 1149 (11th Cir. 2015) ................................... 36, 37

*Ambach v. Norwick*,
   441 U.S. 68 (1979) .................................................... 26, 30

*Baker v. Buckeye Cellulose Corp.*,
   856 F.2d 167 (11th Cir. 1988) ............................................ 42

*Beathard v. Lyons*,
   620 F. Supp. 3d 775 (C.D. Ill. 2022) ............................ 35, 36

*Berry v. Great Am. Dream Inc.*,
   88 F. Supp. 3d 1378 (N.D. Ga. 2015) ................................. 24

*Bethune-Cookman, Univ., Inc. v. Dr. Mary
   McLeod Bethune Nat'l Alumni Ass'n, Inc.*,
   2023 WL 3704912 (11th Cir. May 30, 2023) ...................... 41

*Bostock v. Clayton County*,
   140 S. Ct. 1731 (2020) ................................................ passim

*Buchanan v. Alexander*,
   919 F.3d 847 (5th Cir. 2019) ............................................. 33

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006) ............................................................ 22

*Burt v. Fuchs*,
   2023 WL 4103942 (N.D. Fla. June 21, 2023) ............... passim

*Chambers v. Omaha Girls Club, Inc.*,
   834 F.2d 697 (8th Cir. 1987) ....................................... 26, 27

*Davis v. Legal Servs. Ala., Inc.,*
   19 F.4th 1261 (11th Cir. 2021) ............................... 21, 23, 24

*Dick v. CRC Ins. Servs.,*
   2009 WL 10687917 (N.D. Ala. Dec. 14, 2009) ................... 22

*Doe 2 v. Shanahan,*
   917 F.3d 694 (D.C. Cir. 2019) ............................... 12

*Doe v. Dekalb Cnty. Sch. Dist.,*
   145 F.3d 1441 (11th Cir. 1998) ............................. 21

*EEOC v. Catastrophe Mgmt. Sols.,*
   852 F.3d 1018 (11th Cir. 2016) ........................... 16, 17

*Epperson v. Arkansas,*
   393 U.S. 97 (1968) .......................................... 1

*Evans-Marshall v. Bd. of Educ. of the
   Tipp City Exempted Vill. Sch. Dist.,*
   624 F.3d 332 (6th Cir. 2010) ......................... passim

*Fernandez v. Sch. Bd. of Miami-Dade Cnty.,*
   898 F.3d 1324 (11th Cir. 2018) ............................. 29

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ........................................ 28

*Garcia v. Gloor,*
   618 F.2d 264 (5th Cir. 1980) ............................... 17

*Garrett v. Okaloosa County,*
   734 F.2d 621 (11th Cir. 1984) .............................. 25

*Georgia v. President of the U.S.,*
   46 F.4th 1283 (11th Cir. 2022) ............................. 45

*Glenn v. Brumby,*
   663 F.3d 1312 (11th Cir. 2011) ............................. 20

*Grossman v. S. Shore Pub. Sch. Dist.,*
   507 F.3d 1097 (7th Cir. 2007) .............................. 31

*Hand v. Scott,*
   888 F.3d 1206 (11th Cir. 2018) ............................. 44

*Howard v. Walgreen Co.,*
   605 F.3d 1239 (11th Cir. 2010) ............................. 23

*Jenkins v. Tuscaloosa City Bd. of Educ.*,
  72 F. Supp. 3d 1238 (N.D. Ala. 2014)..................................................24

*Keener v. Convergys Corp.*,
  342 F.3d 1264 (11th Cir. 2003)...........................................................45

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 508 (2022)..................................................................... passim

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006)...........................................................44

*Kidd v. Mando Am. Corp.*,
  731 F.3d 1196 (11th Cir. 2013)................................................21, 22, 23

*Kingsville Indep. Sch. Dist. v. Cooper*,
  611 F.2d 1109 (5th Cir. 1980)..............................................................33

*L.W. ex rel. Williams v. Skrmetti*,
  73 F.4th 408 (6th Cir. 2023) ..........................................................44, 45

*Leigh v. Artis-Naples, Inc.*,
  2022 WL 18027780 (M.D. Fla. Dec. 30, 2022) ....................................42

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
  474 F.3d 477 (7th Cir. 2007)..........................................................32, 40

*McDonald's Corp. v. Robertson*,
  147 F.3d 1301 (11th Cir. 1998)...........................................................42

*Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
  336 F.3d 185 (2d Cir. 2003) ................................................................39

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021)..........................................................2, 25

*Pals Grp., Inc. v. Quiskeya Trading Corp.*,
  2017 WL 532299 (S.D. Fla. Feb. 9, 2017) ..........................................41

*Pernell v. Fla. Bd. of Governors*,
  641 F. Supp. 3d 1218 (N.D. Fla. 2022)....................................33, 38, 39

*Rotkiske v. Klemm*,
  140 S. Ct. 355 (2019)..........................................................................16

*Sampson v. Murray*,
  415 U.S. 61 (1974)..............................................................................43

iv

*Shannon v. Bellsouth Telecomms., Inc.,*
  292 F.3d 712 (11th Cir. 2002)............................................................. 23

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000)........................................................... 44

*Snider Tire, Inc. v. Chapman,*
  2021 WL 2497942 (N.D. Ala. Apr. 27, 2021) ...................................... 41

*Stollings v. Tex. Tech Univ.,*
  2021 WL 3748964 (N.D. Tex. Aug. 25, 2021)..................................... 10

*Texas v. EEOC,*
  633 F. Supp. 3d 824 (N.D. Tex. 2022) ........................................... 10, 11

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969).............................................................................. 30

*UAW v. Johnson Controls, Inc.,*
  499 U.S. 187 (1991).............................................................................. 24

*United States v. Nat'l Treasury Emps. Union,*
  513 U.S. 454 (1995).............................................................................. 38

*Van Der Meulen v. Brinker Int'l,*
  153 F. App'x 649 (11th Cir. 2005) ...................................................... 22

*Vernonia Sch. Dist. 47J v. Acton,*
  515 U.S. 646 (1995).............................................................................. 39

*Virgil v. Sch. Bd. of Columbia Cnty.,*
  862 F.2d 1517 (11th Cir. 1989)............................................................. 1

*Warren v. DeSantis,*
  90 F.4th 1115 (11th Cir. 2024) ........................................................... 40

*Weaver v. Nebo Sch. Dist.,*
  29 F. Supp. 2d 1279 (D. Utah 1998).................................................... 35

*Webb-Edwards v. Orange Cnty. Sheriff's Off.,*
  525 F.3d 1013 (11th Cir. 2008)........................................................... 21

*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016)........................................................... 41

**Statutes**

42 U.S.C. §2000e(j) .............................................................................. 15

42 U.S.C. §2000e(k) ......................................................... 15

Fla. Stat. §1000.071(1) ................................................... passim

Fla. Stat. §1000.071(2) ............................................................. 6

Fla. Stat. §1000.071(3) .......................................... 2, 6, 14, 31

Fla. Stat. §1000.071(4) ............................................................. 6

Fla. Stat. §1000.071(6) ................................................ 6, 31, 35

## Other Authorities

Chan Tov McNamarah,
  *Misgendering*, 109 Cal. L. Rev. 2227 (2021) ........................................ 16

Dylan Vade, *Expanding Gender and Expanding the Law: Toward a
  Social and Legal Conceptualization of Gender That Is More Inclusive
  of Transgender People*,
  11 Mich. J. Gender & L. 253 (2005) ....................................... 15

Fla. H.R. Comm. on Educ. & Emp., CS/CS/HB 1069 (2023)
  Staff Final Analysis (May 22, 2023) ............................................ 4, 5, 6

Jessica A. Clarke, *They, Them, and Theirs*,
  132 Harv. L. Rev. 894 (2019) ......................................................... 15, 16

*Transgender and Non-Binary People FAQ*,
  Human Rights Campaign, https://perma.cc/9G8T-J3JX ................... 14

## Regulations

Fla. Admin. Code R. 6A-10.081(2)(a)14 ..................................................... 6

# INTRODUCTION

The Supreme Court has long recognized that "public education in our Nation is committed to the control of state and local authorities." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). Questions of "educational suitability" are "core educational policy matter[s] within the exclusive province of local school boards." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1225 (11th Cir. 2009). And government "officials can take into account the emotional maturity of the intended audience in determining the appropriateness of potentially sensitive topics such as sex." *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1523 (11th Cir. 1989) (cleaned up).

The Supreme Court has also long recognized "that 'sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth.'" *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.)). Florida shares the view that "a person's sex is an immutable biological trait," Fla. Stat. §1000.071(1), and it enacted the law challenged here to regulate in class-

rooms the relatively recent phenomenon of using "preferred personal ti-
tle[s] or pronouns" that do not correspond to the sex of the person but
instead correspond to the person's asserted gender identity. *Id.*
§1000.071(1), (3).

No one disputes, of course, that the use of preferred pronouns and
titles "has produced a passionate political and social debate." *Meri-
wether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). But like any other
topic, states and localities can choose how they want to address that
topic in their public schools. Some may require teachers to use preferred
pronouns. *See, e.g.*, *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of
Trs.*, 2023 WL 4297186, at *1 (D. Wyo. June 30, 2023). Others may allow
teachers to choose how to use preferred pronouns. And others, like Flor-
ida, may prohibit teachers from using preferred pronouns.

The choice of Florida's elected leaders may arouse strong feelings
and condemnation from those that disagree with it. But a state's peda-
gogical choice to adhere to "the Supreme Court's longstanding recogni-
tion that 'sex … is an immutable characteristic,'" *Adams*, 57 F.4th at
807, does not constitute discrimination under Title VII or violate the

First Amendment. The Court should deny Plaintiffs' motions for preliminary injunction.

## BACKGROUND

### A. The Florida Legislature enacts comprehensive legislation on K-12 education.

Florida has enacted various measures over the last few years on how public schools should address sensitive subjects such as sex and sex education. In 2021, "the legislature created the Parents' Bill of Rights (PBOR) which enumerates parental rights with respect to a minor child for education, health care, and criminal justice procedures." Fla. H.R. Comm. on Educ. & Emp., CS/CS/HB 1069 (2023) Staff Final Analysis 8 (May 22, 2023), https://bit.ly/3Sx5jaj. The PBOR is meant to ensure that schools do not "infring[e] upon the fundamental right of a parent to direct the upbringing, education, health care, and mental health of his or her minor child without demonstrating a compelling state interest for such actions." *Id.* The PBOR requires, for example, that school districts adopt "[p]rocedures for a parent to object to instructional materials … based on beliefs regarding morality, sex, and religion or the belief that such materials are harmful." *Id.* at 9 (codified at Fla. Stat. §1014.05(1)(c)).

In 2022, the Legislature enacted additional legislation to "further support[] the rights of parents to direct the education of their students." *Id.* at 10. One of those directives, for example, "prohibit[s] classroom instruction by school personnel … about sexual orientation or gender identity in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." *Id.* (codified at Fla. Stat. §1001.42(8)(c)3).

Building on these prior laws, Florida passed HB1069 in May 2023. HB1069 "expands the existing prohibition on instruction relating to sexual orientation and gender identity … to include prekindergarten through grade 8" and to apply to "charter schools." *Id.* (codified at Fla. Stat. §1001.42(8)(c)3). In addition, "the bill requires that instruction on sexual orientation and gender identity in grades 9 through 12 be age-appropriate or developmentally appropriate for students." *Id.* (codified at Fla. Stat. §1001.42(8)(c)3). And it requires school districts to publish "policies for notifying parents of the appeals process regarding concerns with the school district's implementation" of "instruction on sexual orientation or gender identity." *Id.* (codified at Fla. Stat. §1001.42(8)(c)7).

Several other HB1069 provisions dovetail with these new laws. "[T]he bill defines, for purposes of the education code, 'sex' as the classification of a person as either female or male based on the organization of the body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." *Id.* at 8 (codified at Fla. Stat. §1000.21(9)). And the bill expresses Florida's pedagogical choice on that issue: "It shall be the policy of every public K-12 educational institution … that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1). This policy, however, "does not apply to individuals born with a genetically or biochemically verifiable disorder of sex development, including, but not limited to, 46, XX disorder of sex development; 46, XY disorder of sex development; sex chromosome disorder of sex development; XX or XY sex reversal; and ovotesticular disorder." *Id.*

HB1069 regulates usage of personal titles and pronouns in furtherance of Florida's pedagogical goals. For students, the bill prohibits any requirement that a student "provide his or her preferred personal title or

pronouns or be penalized or subjected to adverse or discriminatory treatment for not providing [them]." *Id.* §1000.071(4). For teachers, and most relevant here, the bill provides that "[a]n employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." *Id.* §1000.071(3) ("Subsection 3"). And for both teachers and students, the bill prohibits any requirement that they "refer to another person using that person's preferred personal title or pronouns if such personal title or pronouns do not correspond to that person's sex." *Id.* §1000.071(2).

HB1069's provisions regulating personal titles and pronouns are expressly limited to the school setting. The law provides, "The limitations of this section only apply to the actions of an employee or contractor acting within the scope of their employment duties with the public K-12 educational institution." *Id.* §1000.071(6). And Florida's regulations confirm that the law relates only "to the use of personal titles and pronouns *in* educational institutions." Fla. Admin. Code R. 6A-10.081(2)(a)14 (emphasis added).

**B. Plaintiffs challenge Subsection 3.**

Plaintiff Katie Wood is a biological male who "socially transitioned to being a woman in 2020." Wood Decl. ¶2. Wood has been a math teacher at Lennard High School in Hillsborough County since 2021. *Id.* ¶¶3, 5. When Subsection 3 went into effect for the 2023–2024 school year, Wood, after consultation with Lennard High's principal and the Hillsborough County School Board, began going by "Teacher Wood" and uses that title in all communications with students. *Id.* ¶¶9, 12–17.

Plaintiff A.V. Schwandes is a biological female who identifies as "nonbinary," meaning Schwandes identifies as "neither male nor female." Schwandes Decl. ¶3; *see also* Am. Compl. ¶103. Schwandes started teaching at Florida Virtual School in 2021. Schwandes Decl. ¶7. Starting "around late June or early July of 2023," Schwandes began using the title "Mx." at work. *Id.* ¶9. In August 2023, a supervisor ordered Schwandes to stop using the Mx. title at work. *Id.* ¶11. Schwandes refused to comply and was terminated on October 24, 2023. *Id.* ¶¶12–21.

Although Subsection 3 was enacted on May 17, 2023, Wood did not file a charge of employment discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) until December 8, 2023, and

Schwandes did not file an EEOC complaint against the State Defendants until December 12. Am. Compl. ¶¶92, 110. Several days later, Plaintiffs filed this lawsuit, challenging Subsection 3. Wood moved for a preliminary injunction on December 21, 2023—seven months after the legislation was enacted, and halfway through the 2023–2024 school year. Schwandes followed suit nearly six weeks later, on January 29, 2024.

## ARGUMENT

## I. Plaintiffs have not shown likelihood of success on the merits.

### A. Subsection 3 does not violate Title VII.

Plaintiffs portray their Title VII claims as a straight-forward application of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *See* Wood Mot. 14–15; Schwandes Mot. 13–14. Not so. The Court in *Bostock* held only that discriminating against a transgender person because of that person's transgender *status* violates Title VII. The Court declined to extend its decision to *conduct* that may affect transgender individuals. Here, Subsection 3 regulates only conduct and does not discriminate based on "sex."

## 1. *Bostock* held only that employers cannot discriminate because of transgender "status."

It is important first to parse what the Supreme Court held (and did not hold) in *Bostock*. The Court explained that "[t]he only statutorily protected characteristic at issue in today's cases is 'sex.'" 140 S. Ct. at 1739. And "[t]he only question before [the Court] is whether an employer who fires someone *simply for being* homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.* at 1753 (emphasis added). The Court answered in the affirmative: "For an employer to discriminate against employees *for being homosexual or transgender*, the employer must intentionally discriminate against individual men and woman in part *because of sex*." *Id.* at 1743 (emphasis added).

As momentous as the decision may have been, it's holding is narrow: "An employer who fires an individual *merely for being gay or transgender* defies" Title VII. *Id.* at 1754 (emphasis added). The decision, in other words, is expressly confined to discrimination based on "homosexuality or transgender *status*." *Id.* at 1741 (emphasis added). The Court focuses on "status" throughout its opinion. *See id.* at 1737–39, 1741–42, 1744–49, 1753–54; *see also Texas v. EEOC*, 633 F. Supp. 3d 824, 831

(N.D. Tex. 2022) ("In total, Justice Gorsuch referenced 'homosexuality or transgender status' fifteen times.").

By contrast, the Court did not extend Title VII liability to *conduct* that may be correlated to transgender status: "Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 140 S. Ct. at 1753. And nowhere did *Bostock* purport to eliminate all sex-based distinctions in employment.

The topline? "While *Bostock* held that Title VII protection based on sex classifications includes an individual's sexual orientation [and transgender status], it did not establish a new or otherwise separate protected class, but instead clarified the scope of sex classification." *Stollings v. Tex. Tech Univ.*, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021). And the Court did not rest its decision on the idea that "sex" in Title VII "captur[es] more than anatomy and reach[es] at least some norms concerning gender identity and sexual orientation." *Bostock*, 140 S. Ct. at 1739. The Court instead rested its decision "on the assumption that 'sex' … referr[ed] only to biological distinctions between male and female." *Id.*

"[T]ime and again, Justice Gorsuch's majority *presumes* there will be Title VII cases where the protected class 'sex' may not reach particular conduct." *Texas*, 633 F. Supp. 3d at 834.

### 2. Subsection 3 does not discriminate based on "sex."

**a.** Subsection 3 does not discriminate based on "sex" because it regulates conduct, not transgender status. To assert otherwise, Plaintiffs primarily point to the but-for causation test the Supreme Court conducted in *Bostock*. *See* Wood Mot. 14–15; Schwandes Mot. 13–14. That test was simple: "if changing the employee's sex would … yield[] a different choice by the employer[,] a statutory violation has occurred." *Bostock*, 140 S. Ct. at 1741. But the point of that test in *Bostock* was to determine whether the word "sex" in Title VII covered individuals who are homosexual or transgender as a *class*. In other words, the Court considered whether those individuals categorically were covered by protections against discrimination based on "sex." And the but-for test showed that they were: "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 1741. That test, however, did not determine whether regulating particular *conduct* constitutes discrimination based on "sex."

That is why the Court specifically refused to address such regulations. *See id.* at 1753; *supra* p.10.

The Court's refusal was wise, particularly for pronoun usage, because transgender individuals don't use only the pronouns associated with the opposite sex. "[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex). Quite the opposite." *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring); *see also id.* at 701 (Wilkins, J., concurring) ("[T]he American Medical Association … define[s] transgender in terms of identifying with, rather than identifying with *and living in accord with*, one's preferred gender."). Indeed, the Human Rights Campaign notes that only "*some* transgender and non-binary people" pursue "a unique and personal process that can include changing clothes, names, pronouns and behaviors to fit their gender identity," while others take "some" or "none of these steps to transition." *Transgender and Non-Binary People FAQ*, Human Rights Campaign, https://perma.cc/9G8T-J3JX (emphasis added). In other words, pronoun choice is independent of transgender status.

For example, "[s]ome transgender people identify as male for part of their life, as female for another part of their life, and later again as male." Dylan Vade, *Expanding Gender and Expanding the Law: Toward a Social and Legal Conceptualization of Gender That Is More Inclusive of Transgender People*, 11 Mich. J. Gender & L. 253, 267 (2005). "Many transgender people's genders are situational." *Id.* at 268. And "[s]ome people wake up on different days with slightly different genders." *Id.* Relatedly, "[s]ome nonbinary people identify as transgender," Jessica A. Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 921 (2019), and "have any number of relationships to gender," including "gender fluidity," *id.* at 905–06. Such "[a] gender fluid person might experience their gender differently at different times." *Id.* at 906–07. "Gender fluid people may feel more male and use 'he' pronouns on some occasions and feel more female and use 'she' pronouns on others." *Id.* at 907. "[G]ender fluidity," in other words, is where "some individuals … change gender identities associated with the male and female sexes and thereby treat sex as a mutable characteristic." *Adams*, 57 F.4th at 803 n.6.

What's more, one study found that "29% of transgender respondents … stated they use 'they/them' pronouns." Clarke, *supra*, at 957.

"Some transgender people may request even more unfamiliar pronouns, such as ze … and hir … . Rather than Ms., Mrs., or Mr., some may request the honorific prefix Mx. … ." *Id.*; *see also* Chan Tov McNamarah, *Misgendering*, 109 Cal. L. Rev. 2227, 2227 (2021) (identifying additional pronouns "zie/zir/zirs, xe/xem/xirs, or sie/hir/hirs").

This differing use of pronouns means that Plaintiffs' but-for test fails on its own terms. Take just one application of that test here. An employee whose sex is female and uses the pronoun "they" violates Subsection 3 because "they" does "not correspond" to that employee's sex. Fla. Stat. §1000.071(3). Changing that employee's sex to male leads to the same outcome because the pronoun "they" still does "not correspond" to the employee's sex. *Id.* Thus, "changing the employee's sex" does not "yield[] a different choice by the employer" under Subsection 3. *Bostock*, 140 S. Ct. at 1741. The same is true for all pronouns other than "he" and "she."

Applying Plaintiffs' interpretation of *Bostock* would lead to an unworkable rule and absurd results. Subsection 3 would violate Title VII for transgender teachers who use "he" or "she" as their pronouns; but it would not violate Title VII for teachers who use "they," "ze," "hir," or other

pronouns. This includes Schwandes, who "use[s] the title Mx. … and they/them pronouns." Schwandes Decl. ¶3. Those different outcomes— which turn only on the *type* of differing pronoun a teacher uses rather than the teacher's sex—show that Subsection 3 does not discriminate based on "sex." It also confirms that *Bostock* used the but-for test to determine the *classes* of individuals that are covered by Title VII's protection against "sex" discrimination. It was not a test that was meant to be applied to rules regulating *conduct*.

Indeed, Congress knows how to expand protections beyond classes to protect conduct as well. Title VII itself expressly defines religion to cover related conduct: "The term 'religion' includes all aspects of religious observance and practice, as well as belief … ." 42 U.S.C. §2000e(j). Likewise, Congress expanded the definition of "because of sex" in the Pregnancy Discrimination Act of 1978 to include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." *Id.* §2000e(k). Title VII has no similar expansion of "sex" to reach beyond status to the associated conduct at issue here. And an "absent provision[] cannot be supplied by the courts," especially where "Congress has shown

that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019).

Circuit precedent also confirms that Title VII's focus is on status-based discrimination rather than on conduct-based regulation. "On several occasions," the Eleventh Circuit has "reaffirmed … that Title VII protects against discrimination based on immutable characteristics, i.e., those that an employee is born with or cannot change." *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1029 n.4 (11th Cir. 2016). The court has explained that "'equal opportunity,' which was the purpose of Title VII, 'may be secured only when employers are barred from discriminating against employees on the basis of immutable characteristics.'" *Id.* at 1028 (alteration omitted). "Similarly, an employer cannot have one hiring policy for men and another for women *if* the distinction is based on some fundamental right." *Id.* "But a hiring policy that distinguishes on some other ground, such as grooming or length of hair, is related more closely to the employer's choice of how to run his business than equality of employment opportunity." *Id.* at 1028–29. For that reason, "courts generally have upheld facially neutral policies regarding *mutable* characteristics … despite claims that the policy has an adverse impact on members of a

particular [protected class] or infringes on the expression of cultural pride and identification." *Id.* at 1032 (alteration omitted).

This principle exists because "distinctions in employment practices between men and women on the basis of something other than immutable or protected characteristics do not inhibit employment *opportunity* in violation of Title VII." *Id.* at 1029 (alteration omitted). For example: "discrimination on the basis of black hair texture (an immutable characteristic) is prohibited by Title VII, while adverse action on the basis of black hairstyle (a mutable choice) is not." *Id.* at 1030. The "take away," the Eleventh Circuit has explained, "is that … Title VII protects persons in covered categories with respect to their immutable characteristics, but not their cultural practices." *Id.*; *see also, e.g., Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980) (holding that an employer can prevent an employee from speaking a foreign language in the workplace even though that language may be closely bound up with the employee's national origin). To hold otherwise would create an unworkable standard where employees would have the final say on workplace standards. *See supra* pp.11–14.

The Eleventh Circuit's immutable and mutable distinction is analogous to the status and conduct distinction in *Bostock*. Applied here, Title

VII protects against discrimination based on the characteristic of "sex"—a status that, as *Bostock* explained, includes transgender persons. But Title VII does not protect pronoun preferences—conduct that *Bostock* left untouched. So Subsection 3's regulation of pronoun usage does not constitute discrimination based on "sex."

**b.** That same precedent also forecloses Plaintiffs' backup arguments that Florida's law engages in "sex-stereotyping" that violates Title VII. *See* Wood Mot. 15–16; Schwandes Mot. 12–13. And so does Eleventh Circuit precedent post-*Bostock*. In *Adams v. School Board of St. Johns County*, a school board had a sex-based "bathroom policy under which male students must use the male bathroom and female students must use the female bathroom." 57 F.4th at 797. A transgender student challenged that policy as unlawful discrimination because the student sought "access to the male bathrooms, which correspond with the gender [the student] identifies with." *Id.* at 801.

Relying on *Bostock*, the en banc court held that the "bathroom policy does not discriminate against transgender students." *Id.* at 800. The court observed that "[w]hile *Bostock* held that 'discrimination based on homosexuality or transgender status necessarily entails discrimination

based on sex,' that statement is not in question in this [case]." *Id.* at 809 (internal citation omitted). Rather, the question was whether "a policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status." *Id.* It can: "while the bathroom policy at issue classifies students on the basis of biological sex, it does not facially discriminate on the basis of transgender status." *Id.* That was true because the policy "divides students into biological male and biological female groups—both of which can inherently contain transgender students—for purposes of separating the male and female bathrooms by biological sex." *Id.*

As for stereotyping, the en banc court also held that "the contention that the School Board's bathroom policy relied on impermissible stereotypes associated with [the plaintiff's] transgender status is wrong" because "[t]he bathroom policy does not depend in any way on how students act or identify." *Id.* A biological female who identifies as a female and another biological female who identifies as a male both were required to use the same bathroom. The policy, in other words, "separate[d] bathrooms based on biological sex, which is not a stereotype." *Id.* All of these points are just as true for pronouns usage as required by Subsection 3.

Finally, Plaintiffs' reliance on *Bostock* ignores the fundamental difference between transgender pronoun usage and transgender status. *Bostock* found that "transgender status [is] inextricably bound up with sex." 140 S. Ct. at 1742. But transgender pronoun usage is not. Although some pronouns are masculine and feminine, transgender persons' concept of pronouns is wholly divorced from biological sex in a way that transgender *status* cannot be. As explained, transgender persons' pronouns can match their sex, match the opposite sex, go back and forth between the two, or match no sex at all. *See supra* pp.12–14. By contrast, *Bostock* bases its reasoning on the fact that transgender status cannot be understood without reference to sex. *See Bostock*, 140 S. Ct. at 1742, 1746. Under *Bostock*'s reasoning then, transgender persons' pronoun usage is not inextricably intertwined with sex in the same manner that transgender status is.[1] Accordingly, Subsection 3 does not violate Title VII, as interpreted by *Bostock*.

---

[1] For these same reasons, any argument based on *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), is foreclosed. The *Adams* en banc court was clear that "'sex' is not a stereotype." 57 F.4th at 813. And no stereotype is present here anyway—as explained, many transgender individuals do not seek to use pronouns that align with the opposite sex. *Supra* pp.12–14.

### 3. Plaintiffs have not suffered an adverse employment action from the State Defendants.

Plaintiffs also cannot establish likelihood of success on the merits because there has been no adverse employment action from the State Defendants. "[A]dverse employment actions include 'tangible employment actions,' which are those actions 'that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone.'" *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) (per curiam). Such a change in employment conditions must be "*serious and material*" to qualify as adverse employment action. *Webb-Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1031 (11th Cir. 2008).

A plaintiff's "subjective view of the significance and adversity of the employer's action is not controlling"; the action must be "materially adverse as viewed by a reasonable person in the circumstances." *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 (11th Cir. 2013). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998).

"[P]etty slights or minor annoyances" are not "*material* adversity." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Wood concedes (at 17) that no court has addressed whether regulating pronoun usage rises to the level of adverse action. The governing standard, however, provides the answer. Wood claims an adverse employment action because complying with Subsection 3 is stigmatizing, creates emotional harms, causes great "anxiety," and distracts from work. Wood Decl. ¶¶10, 14–15, 17–19. But such "subjective view[s]" are "not controlling." *Kidd*, 731 F.3d at 1204. While Wood "may [be] emotionally distraught," Subsection 3 "ha[s] no real effect on [Wood's] employment." *Van Der Meulen v. Brinker Int'l*, 153 F. App'x 649, 656 (11th Cir. 2005) (per curiam); *see also, e.g.*, *Dick v. CRC Ins. Servs.*, 2009 WL 10687917, at *14 (N.D. Ala. Dec. 14, 2009) (holding plaintiff's "emotional distress" was "insufficient to transform a *de minimis* action into one that is an actionable materially adverse action").

Holding that Wood's emotional distress constitutes an adverse employment action would contravene Eleventh Circuit precedent holding that far more significant acts did not rise to that level. For example, in

*Davis*, the court held that placing an employee on "a simple paid suspension is not an adverse employment action." 19 F.4th at 1267. In *Kidd*, the court held that "a loss of supervisory responsibilities" did not constitute adverse employment action. 731 F.3d at 1203. And in *Shannon v. Bellsouth Telecommunications, Inc.*, the court held that "reassign[ment] to a different geographic area" without more did not constitute an adverse employment action. 292 F.3d 712, 716 (11th Cir. 2002). The court, moreover, has observed that even "unwarranted reprimands, a negative work evaluation, threat of job loss through dissolution of the plaintiffs' division, threat of suspension without pay, removal of job duties, and exclusion from meetings d[oes] not constitute adverse employment action, either singly or when considered in the aggregate." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010). Wood's alleged emotional distress is far less adverse than actions consistently rejected by the Eleventh Circuit.

Schwandes, though terminated by Defendant Florida Virtual School, has suffered no adverse employment action from the State Defendants. To be sure, the Florida Department of Education has opened an investigation into Schwandes for noncompliance with Subsection 3.

While Schwandes points to a smattering of out-of-circuit case law (at 15–16), "[t]he Eleventh Circuit has held that the initiation of an internal investigation of this type against an employee does not constitute an adverse employment action." *Jenkins v. Tuscaloosa City Bd. of Educ.*, 72 F. Supp. 3d 1238, 1261 (N.D. Ala. 2014) (collecting cases); *see also Davis*, 19 F.4th at 1266–67.

### 4. Subsection 3's regulation of pronouns concerns a bona fide occupational qualification.

Even if Subsection 3 constitutes discrimination based on "sex"—a point the State Defendants strongly dispute—it is still a valid regulation of employment because the law's requirement is "a bona fide occupational qualification reasonably necessary to the normal operation of [this] particular business or enterprise." *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 200 (1991) (citing 42 U.S.C. §2000e–2(e)(1)). To qualify for the BFOQ exception, "[t]he Defendant must show that: (1) the sex-based qualification sufficiently relates to the ability to perform a duty of the job, and (2) the particular duty goes to the essence of the Defendant's business." *Berry v. Great Am. Dream Inc.*, 88 F. Supp. 3d 1378, 1380 (N.D. Ga. 2015) (cleaned up).

To be clear at the outset: the State does not contend that transgender people, as a class, are incapable of teaching Florida's curriculum. Far from it. So this is not a case where an employer is claiming a particular protected class (such as women) is categorically antithetical "to the normal operation of [its] particular business or enterprise." *Garrett v. Okaloosa County*, 734 F.2d 621, 624 (11th Cir. 1984). Florida only asserts that—if regulating the usage of pronouns constitutes "sex" discrimination—using pronouns consistent with one's sex is a BFOQ.

Subsection 3 satisfies both elements of a BFOQ. *First*, it is difficult to dispute that the "use of gender-specific titles and pronouns has produced a passionate political and social debate." *Meriwether*, 992 F.3d at 508 (collecting examples across the spectrum on this issue). Some have even framed it as "concern[ing] a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes." *Id.* As with all such "sensitive" issues, *id.*, states and localities can decide how they want the issues taught in their schools (if at all). Florida has decided its K-12 curriculum's place in that debate: "that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's

sex." Fla. Stat. §1000.071(1). Florida passed Subsection 3 to accomplish that pedagogical goal.

*Second*, Subsection 3 "goes to the essence of" teaching in Florida because it ensures that public employees do not provide students with messages that contradict State policy on the topic of sex. Even beyond direct curricular instruction, a "teacher serves as a role model for his students, exerting a subtle but important influence over their perceptions and values." *Ambach v. Norwick*, 441 U.S. 68, 78–79 (1979).

The Eighth Circuit's decision in *Chambers v. Omaha Girls Club, Inc.*, is closely analogous. 834 F.2d 697 (8th Cir. 1987). There, the employer was a club "designed to assist young girls between the ages of eight and eighteen to maximize their life opportunities" and included "programs directed at pregnancy prevention." *Id.* at 698. "The Club's approach to fulfilling its mission emphasize[d] the development of close contacts and the building of relationships between the girls and the Club's staff members." *Id.* To this end, the club "formulated its 'role model rule' banning single parent pregnancies among its staff members," who were "trained and expected to act as role models for the girls, with the intent that the girls will seek to emulate their behavior." *Id.* at 699. The plaintiff

became pregnant and was fired pursuant to the "role model rule." *Id.* The court explained that "the role model rule is reasonably necessary to the Club's operations" and, therefore, "qualifies as a bona fide occupational qualification." *Id.* at 705. Were it otherwise, the club's goals would be undermined. Similar interests are at stake in Florida classrooms.

### 5. *Bostock* does not apply to nonbinary individuals like Plaintiff Schwandes.

*Bostock* also does not apply to nonbinary people like Schwandes because, on its face, it applies only to transgender persons. *See, e.g.*, 140 S. Ct. at 1737. Nonbinary persons do not satisfy *Bostock*'s but-for test for determining which classes Title VII protects. The "but-for test directs us to change one thing at a time and see if the outcome changes," and "[s]o long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* at 1739. Schwandes's sex is female. Am. Compl. ¶103. An employer who had a policy of not hiring nonbinary persons would not discriminate against Schwandes based on "sex" because "changing the employee's sex would [not] have yielded a different choice by the employer." *Bostock*, 140 S. Ct. at 1741. The employer would take the same action even if Schwandes's sex were male. Nonbinary people thus, as a class, are not covered by *Bostock*.

Schwandes's heavy reliance (at 13) on Subsection 3's carveout for individuals with certain conditions misses the mark for the same reasons. The conditions referenced in the statute are not separate sexes, they are "genetically or biochemically verifiable disorder[s] of sex development." Fla. Stat. §1000.071(1). And *Bostock* presumes that there are two sexes— indeed, its entire reasoning rests on that fact. *See, e.g.*, 140 S. Ct. at 1741 ("This statute works to protect individuals of both sexes from discrimination, and does so equally."). Moreover, in *Adams*, the en banc majority also rejected the dissents' arguments that the existence of individuals with conditions like those referenced in §1000.071(1) are neither male nor female. *See* 57 F.4th at 803 n.6; *see also id.* at 822–23 (Wilson, J., dissenting). The court instead emphasized the Supreme Court's longstanding view that "the two sexes are not fungible." *Id.* at 803 n.6, 809 (majority op.) (collecting cases).

### B. Subsection 3 does not violate the First Amendment.

Plaintiffs' First Amendment claims are assessed under the two-step framework from *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). *See Burt v. Fuchs*, 2023 WL 4103942, at *5 (N.D. Fla. June 21, 2023). At step one, courts ask "whether the employee spoke as a public employee pursuant

to his official duties or as a private citizen on matters of public concern." *Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d 1324, 1329 (11th Cir. 2018). "If a public employee speaks pursuant to his or her official duties, … the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 508, 527 (2022) (cleaned up). If the public employee spoke as a private citizen on a matter of public concern, courts proceed to step two and "the question becomes 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Fernandez*, 898 F.3d at 1329.

### 1. Plaintiffs' speech is within the scope of employment.

Plaintiffs' First Amendment claims fail at step one because the speech is pursuant to official duties. This Court has recognized that speech is not protected if "the speech at issue *itself* owes its existence to the employee's professional responsibilities." *Burt*, 2023 WL 4103942, at *8. This inquiry entails "'a functional review of an employee's speech in

relation to her duties or responsibilities' to determine whether she spoke in her official capacity." *Id.*

Plaintiffs' desired speech falls squarely within the scope of their official duties. Teachers are hired to speak to students; it's their job. "When a teacher teaches, the school system does not regulate that speech as much as it *hires* that speech. Expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary." *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010) (cleaned up). "And if it is the [government] that hires that speech, it can surely 'regulate the content of what is or is not expressed,' … on its behalf." *Id.* (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995)).

Moreover, the Supreme Court "has repeatedly emphasized … the comprehensive authority of the States and of school officials … to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). Teachers through their conduct "function as an example for students, which exists independently of particular classroom subjects." *Ambach*, 441 U.S. at 80. Public school authorities accordingly have a right "to control the policies" of its teachers

and "forbid" certain "conduct." *Grossman v. S. Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1100 (7th Cir. 2007).

Subsection 3 falls squarely within *Garcetti* because it expressly limits itself to teachers' official speech and duties. It prohibits "[a]n *employee* … of a public K-12 educational institution" from "provid[ing] to a *student* his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." Fla. Stat. §1000.071(3) (emphasis added). On its face, its proscription "*only* appl[ies] to the actions of an employee or contractor acting *within the scope of their employment duties* with the *public K-12 educational institution.*" *Id.* §1000.071(6) (emphasis added). Plaintiffs' regulated speech thus "owes its existence to [Plaintiffs'] professional responsibilities." *Burt*, 2023 WL 4103942, at *8. So the government can regulate that speech without offending the First Amendment.

"How at any rate would a contrary approach work?" *Evans-Marshall*, 624 F.3d at 341. "Could a teacher introduce mature sexual themes to fifteen year olds when discussing a work of literature after a principal has told her not to?" *Id.* at 342. Of course not. Finding that the First

Amendment reaches teachers in this setting "not only would demand permanent judicial intervention in the conduct of governmental operations, but it would also transform run-of-the-mine curricular disputes into constitutional stalemates." *Id.* (cleaned up). "The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007).

This Court's recent decision in *Burt v. Fuchs* is directly on point. There, a professor included his opinions on the university's COVID policies in logistical emails sent to his students. The Court conducted "[a] functional review" and determined that the professor "spoke pursuant to his official duties." 2023 WL 4103942, at *8. The professor sent the emails "to establish the format of his English courses, which he is employed to teach, and sent them only to those students he was responsible for teaching." *Id.* Even though the content of the emails may have been political, the professor's "editorializing does not change the conclusion that his emails owe their existence to his professional responsibility to teach English courses." *Id.* (cleaned up). "[H]e sent them in the course of performing … his ordinary role as a course instructor, and they cannot reasonably be

divorced from that responsibility." *Id.* at *9 (cleaned up). That was true even though university professors may receive greater First Amendment protections than K-12 teachers. *See Pernell v. Fla. Bd. of Governors*, 641 F. Supp. 3d 1218, 1240–41 (N.D. Fla. 2022). Subsection 3 falls squarely in the same place because it regulates *only* speech between teachers and students.[2]

Plaintiffs rely almost entirely on *Kennedy v. Bremerton School District*. *See* Wood Mot. 21–26; Schwandes Mot. 18–22. But *Kennedy* confirms that Subsection 3 regulates only speech within the scope of employment. There, the Court explained once again that "speech the government 'itself ha[d] commissioned or created' and speech the employee was expected to deliver while carrying out his job" is unprotected "government speech." 597 U.S. at 529. That is Plaintiffs' speech here. Interactions with students are "ordinarily within the scope of [Plaintiffs'] duties" as a teacher; the speech is "pursuant to government policy"; and the

---

[2] Defendants recognize this Court has said *Kingsville Independent School District v. Cooper*, 611 F.2d 1109 (5th Cir. 1980), can be read as protecting in-classroom speech at the high-school level. *See Pernell*, 641 F. Supp. 3d at 1242–43. But "*Garcetti* has since altered the analysis with respect to regulating public-employee speech more generally." *Id.* (citing *Wollschlaeger v. Governor*, 848 F.3d 1293, 1311 n.6 (11th Cir. 2017) (en banc)); *see also Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (applying *Cooper* only to the academic freedom context in a university classroom).

speech "convey[s] a government-created message." *Id.* A teacher's discussions with students at school is "speech the [government] pa[ys] [Plaintiffs] to produce as" a teacher. *Id.* "Simply put:" Plaintiffs' use of personal titles and pronouns in student interactions owes its existence to their "responsibilities as a public employee." *Id.*

None of the factors that Plaintiffs rely on from *Kennedy* are present here. There, the plaintiff's prayers occurred at a time that "the District ha[d] acknowledged that its coaching staff was free to engage in all manner of private speech." *Id.* at 530. And the Court specifically noted that "[h]e was *not* instructing players." *Id.* at 529 (emphasis added). Plaintiffs, by contrast, attempt to transform all classroom discussion and communication with students into a time where teachers can engage in whatever private speech with students they desire.

*Kennedy* also involved a private prayer that the Court went to great lengths to show occurred at a time when employees were free to attend to personal matters. *Id.* at 530–31. By contrast, a teacher actively communicating with a student is not "free to attend briefly to personal matters" or say whatever he wants. *Id.* at 530. And it is not an "excessively broad job description[]," *id.* at 529, to deem teachers' direct interactions

with students while at work to be within their official duties. While public school teachers are not "automatons," Wood Mot. 24; Schwandes Mot. 21, they are "government employees paid in part to speak on the government's behalf and convey its intended messages," *Kennedy*, 597 U.S. at 527. That reality means they are not entitled to "deliver any message to anyone anytime they wish." *Id.*

Plaintiffs' only two other cases are not on point. *See* Wood Mot. 25; Schwandes Mot. 22. *Weaver v. Nebo School District* predates *Garcetti* and (likely for that reason) fails to even consider whether the teacher's speech was within the scope of employment. 29 F. Supp. 2d 1279, 1283–84 (D. Utah 1998). The court considered only whether the "restrictions go beyond the classroom and unconstitutionally infringe on [the teacher's] right to speak in public." *Id.* at 1283. Section 3 does not. *See* Fla. Stat. §1000.071(6); *supra* pp.6, 31. And *Beathard v. Lyons* arose in the university setting, which raises inherently different concerns from K-12 cases. 620 F. Supp. 3d 775, 782 (C.D. Ill. 2022). The case also didn't involve a teacher or professor; it involved a college football coach who "was employed to coach football"—not "to decorate his door or to use it to promote a particular viewpoint." *Id.* at 782. Further distinguishing that case,

"[t]here was no school policy prohibiting Plaintiff decorating his door in whichever fashion he might choose," and he "was not required, as a term of his employment, to either refrain from decorating his door or to decorate it in a certain way." *Id.* That case is far afield from this one.

## 2. Plaintiffs' speech does not concern a topic of public concern.

Plaintiffs offer just 10 lines each on why the regulated speech concerns a matter of public concern, again portraying the issue as fait accompli. *See* Wood Mot. 25–26; Schwandes Mot. 22–23. Here again, Plaintiffs are mistaken. "[T]he relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue, it is whether the *purpose* of the employee's speech was to raise issues of public concern." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1167 (11th Cir. 2015) (cleaned up). Although broader social issues surrounding pronoun usage are certainly of public interest, that is not what this case is about. Plaintiffs have not asserted that Subsection 3 prohibits teachers from speaking about transgender issues generally—or even that it prohibits Plaintiffs from publicly protesting Subsection 3 as a matter of policy (it expressly does not). Instead, the provision regulates speech that the teachers use in interactions with students. And "'speech that occurs

within the compulsory classroom setting' 'does not constitute speech on a matter of public concern' when it is 'curricular in nature.'" *Evans-Marshall*, 624 F.3d at 342.

This case is the inverse of *Willey v. Sweetwater*, which involved a policy *requiring* teachers to refer to students by their preferred pronouns. 2023 WL 4297186, at *1. A teacher challenged the rule on First Amendment grounds. But the "[p]olicy only implicate[d] Mrs. Willey's interactions with students inside her classroom, and the communications she has pursuant to those duties with parents." *Id.* at *23. The court therefore had "little trouble concluding that Mrs. Willey was being asked—indeed compelled—to speak pursuant to her official duties as a teacher, and not as a citizen on a matter of public concern." *Id.* As such, the "content, form, and context" of such measures "do not give rise to matters of public concern." *Id.*

So too here. Plaintiffs have made clear the intensely personal nature of this provision. And there should be no doubt that Subsection 3 expressly allows Plaintiffs to address those concerns publicly, while off duty. While on duty, however, the purpose of Plaintiffs' speech is not "to raise issues of public concern." *Alves*, 804 F.3d at 1167.

### 3. The State's interests outweigh any harm to Plaintiffs.

Even if Plaintiffs seek to speak as private citizens on a matter of public concern, the State's interests outweigh the countervailing interest. Plaintiffs declare that this balancing test is "almost automatically resolved" against the State. Wood Mot. 26; Schwandes Mot. 23. But that's not how *Garcetti* works. At step two, courts must "engage in 'a delicate balancing of the competing interests surrounding the speech and its consequences.'" *Kennedy*, 597 U.S. at 508–09. Courts consider "whether an employee's speech interests are outweighed by 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 528.[3]

---

[3] Citing *United States v. National Treasury Employees Union* (*NTEU*), 513 U.S. 454 (1995), Plaintiffs argue that Defendants face a higher burden at step two because Subsection 3 is a "widespread" policy. Wood Mot. 27; Schwandes Mot. 24. But *NTEU*'s holding was not moored to the presence of a government-wide regulation. Instead, the Court applied a higher burden "[b]ecause the vast majority of the speech at issue" did "not involve the subject matter of Government employment" and took "place outside the workplace." 513 U.S. at 470. Those conditions are not present here—quite the opposite. The State Defendants recognize that this Court suggested in *Pernell* that it may read *NTEU* differently. *See* 641 F. Supp. 3d at 1271–72. But *Pernell* was a university case and so implicated different considerations than the K-12 context, *see id.* at 1240–41, and required a completely different test, *see id.* at 1268 (emphasizing "Court is *not* applying *Garcetti*").

The State's interests outweigh any harm. The Supreme Court has recognized that First Amendment rights "are different in public schools than elsewhere" because of "the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). A "position as a teacher in a public school … by its very nature requires a degree of public trust not found in many other positions of public employment." *Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 336 F.3d 185, 198 (2d Cir. 2003). Moreover, "[s]chools operate in loco parentis to students and are permit[t]ed a degree of supervision and control that could not be exercised over free adults. This is because, in a public school environment, the State is responsible for maintaining discipline, health, and safety." *Adams*, 57 F.4th at 802 (cleaned up). Because K-12 teachers are essential state agents in operationalizing this duty, courts have long held that they can be subject to restrictions that would violate the First Amendment rights of private citizens and even university professors. *See, e.g.*, *Pernell*, 641 F. Supp. 3d at 1240 (collecting cases discussing the differences in First Amendment analysis for K-12 public schools and universities). And for public employees generally, "the First

Amendment does not protect a government employee's speech that impedes his job duties." *Warren v. DeSantis*, 90 F.4th 1115, 1133 (11th Cir. 2024).

Subsection 3 is part of comprehensive legislation aimed to promote the State's pedagogical goals and vindicate parental rights. It is an integral part of Plaintiffs' job duties to further the State's pedagogical agenda in interactions with students. If the First Amendment guaranteed teachers the right to ignore pedagogical-based directives while inside the schoolhouse, K-12 education would become unworkable. *See Evans-Marshall*, 624 F.3d at 341–42; *Mayer*, 474 F.3d at 479–80.

\*\*\*

"The First Amendment does not ban [a state's] policy choice … ." *Evans-Marshall*, 624 F.3d at 341. Pedagogical "choices of the schools should be presumptively their own—the fact that such choices arouse deep feelings argues strongly for democratic means of reaching them," *id.*, rather than leaving them to ad hoc litigation under the First Amendment. Florida has made its policy choice, one that is based on longstanding social and cultural norms, and the First Amendment does not bar it from ensuring that choice is implemented in the classroom.

## II. The equitable factors do not support preliminary relief.

### A. Plaintiffs cannot establish irreparable harm.

At the outset, Plaintiffs' delay in filing their motions forecloses a finding of irreparable harm. Delay "of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (collecting cases); *see, e.g.*, *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1073 (M.D. Ala. 2021) ("[B]y sitting on his or her rights for even a few months, a plaintiff has squandered any corresponding entitlement to injunctive relief." (collecting cases)). Subsection 3 was passed on May 17, 2023. Wood delayed seven months in bringing this motion. Schwandes was even more tardy—delaying eight months. Plaintiffs' delays are equivalent to or longer than delays that have precluded preliminary injunctive relief. *See Wreal*, 840 F.3d at 1248 (five months); *Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, 2023 WL 3704912, at *3 (11th Cir. May 30, 2023) (per curiam) (six months); *Snider Tire, Inc. v. Chapman*, 2021 WL 2497942, at *5 (N.D. Ala. Apr. 27, 2021) (four months); *see also, e.g.*, *Pals Grp., Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) ("[C]ourts

typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." (collecting cases)).

Even putting aside Plaintiffs' unexplained delay, they fail to demonstrate irreparable harm. On the Title VII claim, Wood asserts "that courts are to 'presume irreparable harm in Title VII cases' once administrative remedies have been exhausted." Wood Mot. 30 (quoting *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988)). But the Eleventh Circuit has since limited *Baker*: "Although the Court made the general statement, [about] 'a presumption of irreparable harm' … the opinion nonetheless evinces an intent to limit the holding to the facts of the case." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1314 (11th Cir. 1998) (quoting *Baker*, 856 F.2d at 169); *see Leigh v. Artis-Naples, Inc.*, 2022 WL 18027780, at *17 (M.D. Fla. Dec. 30, 2022) ("[T]o the extent the holding in *Baker* is only 'on the facts of that case, the presumption of irreparable harm outlined by the court in *Baker* is inapplicable here." (cleaned up)).

Schwandes has even less of a colorable argument of irreparable harm against the State. Schwandes relies (at 26) on a series of vague

events that have not yet happened. Any harms from the State's investigation are redressable by an order reinstating Schwandes's teaching certificate and expunging Schwandes's record of the discipline. *See Sampson v. Murray*, 415 U.S. 61, 89–92 (1974).

Moreover, Schwandes's alleged harms—including allegations of monetary harm from responding to the investigation—are unsubstantiated. Schwandes's declaration (¶24) states in full on this issue: "If my teaching certificate was revoked, I would be concerned about my ability to get a future job. I am also concerned that if my Florida license is revoked it will damage my ability to be certified as a teacher in any other state." These vague assertions do not satisfy Schwandes's burden to establish irreparable harm. *See id.* at 91–92 ("Assuming for the purpose of discussion that respondent had made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate … .").

The State Defendants concede, however, that if the Court finds a First Amendment violation in this context—and does not credit the argument that Plaintiffs unduly delayed their motions—then circuit precedent requires a finding of irreparable harm. *See Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc) (per curiam). *But see KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

## B. The public interest and balance of equities favors the State.

The other stay factors favor the State. The State would be harmed by an injunction because "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018); *see also L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 421 (6th Cir. 2023) (noting that an injunction causes a State "irreparable harm from its inability to enforce the will of its legislature"). An injunction would also create unnecessary confusion in the middle of the school year.

On the equities, an injunction would prevent the State from effectuating its educational goals for the children at Plaintiffs' schools. To be sure, Plaintiffs also claim harms from Subsection 3's enforcement. But Subsection 3 applies only while Plaintiffs are on duty; Plaintiffs are free

to use their preferred personal titles and pronouns off duty. At any rate, these competing alleged harms "lie[] at the crux of the case." *Skrmetti*, 73 F.4th at 421. "Both sides have the same fear, just in opposite directions … ." *Id.* But "not every choice" between those harms "is for judges to make." *Id.* "In this instance, elected representatives made these precise cost-benefit decisions," and that choice "weigh[s] heavily in favor of the State at this juncture." *Id.* at 421–22. In all events, any injunction must be limited to the parties before the Court. *See Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) (injunctions must be "limited in scope to the extent necessary to protect the interests of the parties" (collecting cases)); *accord Georgia v. President of the U.S.*, 46 F.4th 1283, 1303–04 (11th Cir. 2022) (collecting cases).

## CONCLUSION

The Court should deny Plaintiffs' motions for preliminary injunction.

Dated: February 8, 2024                        Respectfully submitted,

*/s/ Bryan Weir*

Bryan Weir*
Daniel Shapiro
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: 703.243.9423
bryan@consovoymccarthy.com
daniel@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Counsel for the State Defendants*

*Admitted pro hac vice

**CERTIFICATE OF WORD COUNT**

Consistent with Local Rule 7.1(F) and this Court's Order Amending Briefing Schedule entered February 1, 2024, Dkt. No. 49, this response contains 9,122 words.

*/s/ Bryan Weir*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of February, 2024, a true and correct copy of this response was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Bryan Weir*