# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

Wood, *et al.*,

        *Plaintiffs*,

      v.

Florida Department of Education, *et al.*,

        *Defendants*.

Case No. 4:23-cv-526-MW-MAF

# STATE DEFENDANTS' MEMORANDUM OF LAW
# IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................ 3

    A. The Florida Legislature enacts comprehensive
    legislation on K-12 education. ............................................. 3

    B. Plaintiffs challenge Subsection 3. .................................. 7

ARGUMENT .................................................................................. 8

I.   Plaintiffs fail to state claims under Title VII (Counts 1, 2). ............ 8

    A. Plaintiffs have not plausibly alleged sex-based discrimination. .. 8

      1. *Bostock* held only that employers cannot discriminate because
      of transgender "status." ........................................... 9

      2. Subsection 3 does not discriminate based on "sex." ................. 9

    B. Plaintiffs have not suffered an adverse employment
    action from the State Defendants. ................................. 16

    C. Subsection 3's regulation of pronouns concerns
    a bona fide occupational qualification. ....................... 19

    D. *Bostock* does not apply to nonbinary individuals
    like Plaintiff Schwandes. ............................................. 21

II.  Plaintiffs fail to state a claim under the
    First Amendment (Count 7). ........................................... 22

    A. Plaintiffs' speech is within the scope of their employment. ....... 23

    B. Plaintiffs' speech does not concern a topic of public concern ...... 26

    C. The State's interests outweigh any harm to Plaintiffs. ............. 28

III. Plaintiffs fail to state a claim under the
    Equal Protection Clause (Count 10). ............................... 30

    A. Subsection 3 is subject to rational-basis review ........................ 30

    B. Subsection 3 satisfies intermediate scrutiny .............................. 32

IV. Plaintiffs fail to state a claim under Title IX (Count 13). ............... 39

    A. Title VII preempts Plaintiffs' Title IX claims. ........................... 39

    B. Plaintiffs have not alleged any Title IX violation. ...................... 40

CONCLUSION ............................................................................. 41

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
557 F.3d 1177 (11th Cir. 2009) .............................................................. 1

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
57 F.4th 791 (11th Cir. 2022) ...................................................... passim

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.,*
804 F.3d 1149 (11th Cir. 2015) .............................................................. 27

*Ambach v. Norwick,*
441 U.S. 68 (1979) ................................................ 20, 23, 33, 34

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) .............................................................. 21

*Berry v. Great Am. Dream Inc.,*
88 F. Supp. 3d 1378 (N.D. Ga. 2015) ................................................ 19

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ...................................................... passim

*Buchanan v. Alexander,*
919 F.3d 847 (5th Cir. 2019) .............................................................. 29

*Burt v. Fuchs,*
2023 WL 4103942 (N.D. Fla. June 21, 2023) .......................... 22, 24, 25

*Califano v. Jobst,*
434 U.S. 47 (1977) .............................................................. 36

*Chambers v. Omaha Girls Club, Inc.,*
834 F.2d 697 (8th Cir. 1987) .............................................................. 20

*D.N. ex rel. Jessica N. v. DeSantis,*
2023 WL 7323078 (S.D. Fla. Nov. 6, 2023) ........................................ 40

*Davis v. Legal Servs. Ala., Inc.,*
19 F.4th 1261 (11th Cir. 2021) ...................................................... 17, 18

*Dick v. CRC Ins. Servs.*,
2009 WL 10687917 (N.D. Ala. Dec. 14, 2009) ...................................... 17

*Doe 2 v. Shanahan*,
917 F.3d 694 (D.C. Cir. 2019) .............................................................. 10

*Doe v. Dekalb Cnty. Sch. Dist.*,
145 F.3d 1441 (11th Cir. 1998)............................................................. 17

*Drisin v. Fla. Int'l Univ. Bd. of Trs.*,
2017 WL 3505299 (S.D. Fla. June 27, 2017) ........................................ 39

*EEOC v. Catastrophe Mgmt. Sols.*,
852 F.3d 1018 (11th Cir. 2016)............................................................. 14

*Eknes-Tucker v. Governor of Ala.*,
80 F.4th 1205 (11th Cir. 2023) ....................................................... 31, 38

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ................................................................................. 1

*Evans-Marshall v. Bd. of Educ. of the*
*Tipp City Exempted Vill. Sch. Dist.*,
624 F.3d 332 (6th Cir. 2010)..................................................... 23, 27, 29

*Fernandez v. Sch. Bd. of Miami-Dade Cnty.*,
898 F.3d 1324 (11th Cir. 2018) ............................................................ 22

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ............................................................................. 22

*Garcia v. Gloor*,
618 F.2d 264 (5th Cir. 1980)................................................................ 14

*Garrett v. Okaloosa County*,
734 F.2d 621 (11th Cir. 1984).............................................................. 19

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011)............................................................ 32

*Greater Birmingham Ministries v.*
*Sec'y of State for State of Ala.*,
992 F.3d 1299 (11th Cir. 2021).................................................... 37, 38

iii

*Grossman v. S. Shore Pub. Sch. Dist.*,
  507 F.3d 1097 (7th Cir. 2007).........................................24, 33

*Howard v. Walgreen Co.*,
  605 F.3d 1239 (11th Cir. 2010)................................................18

*Janus v. Am. Fed'n of State, Cnty., &
  Mun. Emps., Council 31*,
  138 S. Ct. 2448 (2018)............................................................34

*Jenkins v. Tuscaloosa City Bd. of Educ.*,
  72 F. Supp. 3d 1238 (N.D. Ala. 2014).................................18

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 508 (2022).............................................22, 25, 26

*Kidd v. Mando Am. Corp.*,
  731 F.3d 1196 (11th Cir. 2013).......................................17, 18

*Kingsville Indep. Sch. Dist. v. Cooper*,
  611 F.2d 1109 (5th Cir. 1980)...............................................29

*Lalli v. Lalli*,
  439 U.S. 259 (1978)................................................................36

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
  32 F.4th 1363 (11th Cir. 2022)............................................38

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
  474 F.3d 477 (7th Cir. 2007).............................................24, 29

*Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
  336 F.3d 185 (2d Cir. 2003)...................................................28

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021)..............................................2, 20

*Pernell v. Fla. Bd. of Governors*,
  641 F. Supp. 3d 1218 (N.D. Fla. 2022)..........................28, 29

*Rotkiske v. Klemm*,
  140 S. Ct. 355 (2019).............................................................13

*Schultz v. Bd. of Trs. of Univ. of W. Fla.*,
  2007 WL 1490714 (N.D. Fla. May 21, 2007)........................................ 39

*Shannon v. Bellsouth Telecomms., Inc.*,
  292 F.3d 712 (11th Cir. 2002)............................................................ 18

*Texas v. EEOC*,
  633 F. Supp. 3d 824 (N.D. Tex. 2022) ................................................... 9

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969).......................................................................... 23

*UAW v. Johnson Controls, Inc.*,
  499 U.S. 187 (1991).......................................................................... 19

*Van Der Meulen v. Brinker Int'l*,
  153 F. App'x 649 (11th Cir. 2005) ....................................................... 17

*Vernonia Sch. Dist. 47J v. Acton*,
  515 U.S. 646 (1995).......................................................................... 28

*Virgil v. Sch. Bd. of Columbia Cnty.*,
  862 F.2d 1517 (11th Cir. 1989)....................................................... 1, 35

*Warren v. DeSantis*,
  90 F.4th 1115 (11th Cir. 2024) ........................................................... 29

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*,
  2023 WL 4297186 (D. Wyo. June 30, 2023)...................................... 2, 27

**Statutes**

42 U.S.C. §2000e(j) ............................................................................ 13

42 U.S.C. §2000e(k) ........................................................................... 13

Fla. Stat. §1000.071(1) ................................................................. passim

Fla. Stat. §1000.071(2) ........................................................................ 6

Fla. Stat. §1000.071(3) ................................................... 2, 6, 12, 24

Fla. Stat. §1000.071(4) ........................................................................ 5

Fla. Stat. §1000.071(6) ................................................................. 6, 24

Fla. Stat. §1001.42(8)(c)3 ........................................................... 35

Fla. Stat. §1012.796(1)(a) .......................................................... 7

Fla. Stat. §1012.796(1)(d)(1) ..................................................... 6

**Other Authorities**

Dylan Vade, *Expanding Gender and Expanding the Law:*
  *Toward a Social and Legal Conceptualization of Gender*
  *That Is More Inclusive of Transgender People*,
  11 Mich. J. Gender & L. 253 (2005) ..................................... 11

Fla. Exec. Order No. 19-32 (Jan. 31, 2019) ........................... 34

Fla. H.R. Comm. on Educ. & Emp., CS/CS/HB 1069 (2023)
  Staff Final Analysis 8 (May 22, 2023) ......................... 3, 4, 5

Jessica A. Clarke, *They, Them, and Theirs*,
  132 Harv. L. Rev. 894 (2019) .......................................... 11, 12

*Transgender and Non-Binary People FAQ*,
  Human Rights Campaign, https://perma.cc/9G8T-J3JX ................... 11

**Regulations**

Fla. Admin. Code R. 6A-10.081(2)(a)14 .................................... 6

**INTRODUCTION**

The Supreme Court has long recognized that "public education in our Nation is committed to the control of state and local authorities." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). Questions of "educational suitability" are "core educational policy matter[s] within the exclusive province of local school boards." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1225 (11th Cir. 2009). And government "officials can take into account the emotional maturity of the intended audience in determining the appropriateness of potentially sensitive topics such as sex." *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1523 (11th Cir. 1989) (cleaned up).

The Supreme Court has also long recognized "that 'sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth.'" *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.)). Florida shares the view that "a person's sex is an immutable biological trait." Fla. Stat. §1000.071(1). And it enacted the law challenged here to regulate in

classrooms the relatively recent phenomenon of using "preferred personal title[s] or pronouns" that do not correspond to the sex of the person but instead correspond to the person's asserted gender identity. *Id.* §1000.071(1), (3).

No one disputes, of course, that the use of preferred pronouns and titles "has produced a passionate political and social debate." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). But like any other topic, states and localities can choose how they want to address that topic in their public schools. Some may require teachers to use preferred pronouns. *See, e.g.*, *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 2023 WL 4297186, at *1 (D. Wyo. June 30, 2023). Others may allow teachers to choose how to use preferred pronouns. And others, like Florida, may prohibit teachers from using preferred pronouns.

The choice of Florida's elected leaders may arouse strong feelings and condemnation from those that disagree with it. But a state's pedagogical choice to adhere to "the Supreme Court's longstanding recognition that 'sex … is an immutable characteristic,'" *Adams*, 57 F.4th at 807, does not violate the law. The Court should dismiss Plaintiffs' complaint.

# BACKGROUND

### A. The Florida Legislature enacts comprehensive legislation on K-12 education.

Florida has enacted various measures over the last few years on how public schools should address sensitive subjects such as sex and sex education. In 2021, "the legislature created the Parents' Bill of Rights (PBOR) which enumerates parental rights with respect to a minor child for education, health care, and criminal justice procedures." Fla. H.R. Comm. on Educ. & Emp., CS/CS/HB 1069 (2023) Staff Final Analysis 8 (May 22, 2023), https://bit.ly/3Sx5jaj. The PBOR is meant to ensure that schools do not "infring[e] upon the fundamental right of a parent to direct the upbringing, education, health care, and mental health of his or her minor child without demonstrating a compelling state interest for such actions." *Id.* The PBOR requires, for example, that school districts adopt "[p]rocedures for a parent to object to instructional materials … based on beliefs regarding morality, sex, and religion or the belief that such materials are harmful." *Id.* at 9 (codified at Fla. Stat. §1014.05(1)(c)).

In 2022, the Legislature enacted additional legislation to "further support[] the rights of parents to direct the education of their students."

*Id.* at 10. One of those directives, for example, "prohibit[s] classroom instruction by school personnel … about sexual orientation or gender identity in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." *Id.* (codified at Fla. Stat. §1001.42(8)(c)3).

Building on these prior laws, Florida passed HB1069 in May 2023. HB1069 "expands the existing prohibition on instruction relating to sexual orientation and gender identity … to include prekindergarten through grade 8" and to apply to "charter schools." *Id.* (codified at Fla. Stat. §1001.42(8)(c)3). In addition, "the bill requires that instruction on sexual orientation and gender identity in grades 9 through 12 be age-appropriate or developmentally appropriate for students." *Id.* (codified at Fla. Stat. §1001.42(8)(c)3). And it requires school districts to publish "policies for notifying parents of the appeals process regarding concerns with the school district's implementation" of "instruction on sexual orientation or gender identity." *Id.* (codified at Fla. Stat. §1001.42(8)(c)7).

Several other HB1069 provisions dovetail with these new laws. "[T]he bill defines, for purposes of the education code, 'sex' as the classification of a person as either female or male based on the organization of

the body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." *Id.* at 8 (codified at Fla. Stat. §1000.21(9)). And the bill expresses Florida's pedagogical choice on that issue: "It shall be the policy of every public K-12 educational institution … that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1). This policy, however, "does not apply to individuals born with a genetically or biochemically verifiable disorder of sex development, including, but not limited to, 46, XX disorder of sex development; 46, XY disorder of sex development; sex chromosome disorder of sex development; XX or XY sex reversal; and ovotesticular disorder." *Id.*

HB1069 regulates usage of personal titles and pronouns in furtherance of Florida's pedagogical goals. For students, the bill prohibits any requirement that a student "provide his or her preferred personal title or pronouns or be penalized or subjected to adverse or discriminatory treatment for not providing [them]." *Id.* §1000.071(4). For teachers, and most

relevant here, the bill provides that "[a]n employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." *Id.* §1000.071(3) ("Subsection 3"). And for both teachers and students, the bill prohibits any requirement that they "refer to another person using that person's preferred personal title or pronouns if such personal title or pronouns do not correspond to that person's sex." *Id.* §1000.071(2).

HB1069's provisions regulating personal titles and pronouns are expressly limited to the school setting. The law provides, "The limitations of this section only apply to the actions of an employee or contractor acting within the scope of their employment duties with the public K-12 educational institution." *Id.* §1000.071(6). And Florida's regulations confirm that the law relates only "to the use of personal titles and pronouns *in* educational institutions." Fla. Admin. Code R. 6A-10.081(2)(a)14 (emphasis added).

Subsection 3 is enforced through a series of nondiscretionary requirements. School boards must report violations to the FDOE. Fla. Stat. §1012.796(1)(d)(1). Defendant FDOE, in turn, must investigate potential

violations. *Id.* §1012.796(1)(a) ("The Department of Education shall cause to be investigated expeditiously any complaint filed before it or otherwise called to its attention.").

**B. Plaintiffs challenge Subsection 3.**

Plaintiff Katie Wood is a biological male who "socially transitioned as a woman in or around 2020." Am. Compl. ¶76. Wood has been a math teacher at Lennard High School in Hillsborough County since 2021. *Id.* ¶77. When Subsection 3 went into effect for the 2023–2024 school year, Wood, after consultation with Lennard High's principal and the Hillsborough County School Board, began going by "Teacher Wood" and using that title in all communications with students. *Id.* ¶¶82, 84.

Plaintiff Doe is a biological male who "socially transitioned as a woman after Thanksgiving 2021." *Id.* ¶94. Doe has been a teacher in Lee County since 2017. *Id.* ¶95. Because of Subsection 3, Doe "may no longer provide to students" a "Ms. title and she/her pronouns." *Id.* ¶99.

Plaintiff A.V. Schwandes is a biological female who identifies as "nonbinary," meaning Schwandes identifies as "neither male nor female." *Id.* ¶103. Schwandes started teaching at Florida Virtual School in 2021. *Id.* ¶104. "Starting in June or July of 2023," Schwandes began using "Mx.

and they/them pronouns at work." *Id.* ¶105. In August 2023, a supervisor ordered Schwandes to stop using the Mx. title at work. *Id.* ¶106. Schwandes refused to comply and was terminated on October 24, 2023. *Id.* ¶¶107, 109.

Although Subsection 3 was enacted on May 17, 2023, Plaintiffs Wood and Doe did not file charges of employment discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) until December 8, 2023, and Schwandes did not file an EEOC charge against the State Defendants until December 12. *Id.* ¶¶92, 102, 110. Several days later, Plaintiffs filed this lawsuit, challenging Subsection 3. The EEOC's investigation is still open, but Plaintiffs have received right to sue letters from the Department of Justice. *Id.*

## ARGUMENT

### I. Plaintiffs fail to state claims under Title VII (Counts 1, 2).

#### A. Plaintiffs have not plausibly alleged sex-based discrimination.

In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held only that discriminating against a transgender person because of that person's transgender *status* violates Title VII. The Court declined to extend its decision to *conduct* that may affect transgender

8

individuals. Here, Subsection 3 regulates only conduct and does not discriminate based on "sex."

### 1. *Bostock* held only that employers cannot discriminate because of transgender "status."

As the State Defendants have explained at length, PI Opp. 9–11, *Bostock*'s holding is narrow: "An employer who fires an individual *merely for being gay or transgender* defies" Title VII. *Id.* at 1754 (emphasis added). The decision, in other words, is expressly confined to discrimination based on "homosexuality or transgender *status*." *Id.* at 1741 (emphasis added). The Court focuses on "status" throughout its opinion. *See id.* at 1737–39, 1741–42, 1744–49, 1753–54; *see also Texas v. EEOC*, 633 F. Supp. 3d 824, 831 (N.D. Tex. 2022) (collecting quotes). By contrast, the Court did not extend Title VII liability to regulating *conduct* in a way that may affect transgender persons: "[W]e do not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 140 S. Ct. at 1753.

### 2. Subsection 3 does not discriminate based on "sex."

**a.** Subsection 3 does not discriminate based on "sex" because it regulates conduct, not transgender status. *Bostock*'s "but-for" test is inapplicable because its purpose is to determine whether the word "sex" in Title

VII covered individuals who are homosexual or transgender as a *class*. *See* PI Opp. 11. That test, however, did not determine whether regulating particular *conduct* constitutes discrimination based on "sex." That is why the Court specifically refused to address those types of regulations. *See Bostock*, 140 S. Ct. at 1753.

The Court's refusal was wise, particularly for pronoun usage, because transgender individuals don't use only the pronouns associated with the opposite biological sex. "[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex). Quite the opposite." *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring); *see also id.* at 701 (Wilkins, J., concurring) ("[T]he American Medical Association … define[s] transgender in terms of identifying with, rather than identifying with *and living in accord with*, one's preferred gender."). Indeed, the Human Rights Campaign notes that only "*some* transgender and non-binary people" pursue "a unique and personal process that can include changing clothes, names, pronouns and behaviors to fit their gender identity," while others take

"some" or "none of these steps to transition." *Transgender and Non-Binary People FAQ*, Human Rights Campaign, https://perma.cc/9G8T-J3JX (emphasis added). Additionally, many transgender individuals use gender neutral pronouns such as they/them or ze/zir/zirs. *See* PI Opp. 13–14. In other words, pronoun choice is independent of transgender status.

For example, "[s]ome transgender people identify as male for part of their life, as female for another part of their life, and later again as male." Dylan Vade, *Expanding Gender and Expanding the Law: Toward a Social and Legal Conceptualization of Gender That Is More Inclusive of Transgender People*, 11 Mich. J. Gender & L. 253, 267 (2005). "Many transgender people's genders are situational." *Id.* at 268. And "[s]ome people wake up on different days with slightly different genders." *Id.* Relatedly, "[s]ome nonbinary people identify as transgender," Jessica A. Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 921 (2019), and "have any number of relationships to gender," including "gender fluidity," *id.* at 905–06. Such "[a] gender fluid person might experience their gender differently at different times." *Id.* at 906–07. "Gender fluid people may feel more male and use 'he' pronouns on some occasions and feel

more female and use 'she' pronouns on others." *Id.* at 907. "[G]ender flu-idity," in other words, is where "some individuals … change gender iden-tities associated with the male and female sexes and thereby treat sex as a mutable characteristic." *Adams*, 57 F.4th at 803 n.6.

This differing usage shows why *Bostock*'s but-for test has no ap-plicability to pronouns. "[C]hanging the employee's sex" does not "yield[] a different choice by the employer" under Subsection 3. *Bostock*, 140 S. Ct. at 1741. Take just one application here. An employee whose sex is female, such as Plaintiff Schwandes, and uses the pronoun "they" violates Subsection 3 because "they" does "not correspond" to that employee's sex. Fla. Stat. §1000.071(3). Changing that employee's sex to male leads to the same outcome because the pronoun "they" still does "not correspond" to the employee's biological sex. *Id.* Thus, sex is not outcome determina-tive. *Bostock*, 140 S. Ct. at 1741. The same is true for all pronouns other than "he" and "she."

Applying *Bostock*'s but-for test to the conduct at issue here would lead to an unworkable rule and absurd results. Subsection 3 would vio-late Title VII for transgender teachers who use "he" or "she" as their pro-nouns; but it would not violate Title VII for teachers that use "they," "ze,"

"hir," or other pronouns. This includes Plaintiff Schwandes, who "use[s] the title Mx ... and they/them pronouns." Am. Compl. ¶ 103. Those different outcomes—which turn only on the *type* of differing pronoun a teacher uses rather than the teacher's biological sex—show that Subsection 3 does not discriminate based on "sex."

Indeed, Congress knows how to expand protections beyond classes to protect conduct as well. Title VII itself expressly defines religion to cover related conduct: "The term 'religion' includes all aspects of religious observance and practice, as well as belief ... ." 42 U.S.C. §2000e(j). Likewise, Congress expanded the definition of "because of sex" in the Pregnancy Discrimination Act of 1978 to include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." *Id.* §2000e(k). Title VII has no similar expansion of "sex" to reach beyond status to the associated conduct at issue here. And an "absent provision[] cannot be supplied by the courts," especially where "Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019).

Circuit precedent also confirms that Title VII's focus is on status-based discrimination rather than on conduct-based regulation. As the

State Defendants have explained at length, PI Opp. 16–17, the Eleventh Circuit has long held that Title VII protects only "against discrimination based on immutable characteristics, i.e., those that an employee is born with or cannot change." *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1029 n.4 (11th Cir. 2016); *see also, e.g.*, *Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980) (holding that an employer can prevent an employee from speaking a foreign language in the workplace even though that language may be closely bound up with the employee's national origin). On the other hand, "courts generally have upheld facially neutral policies regarding *mutable* characteristics … despite claims that the policy has an adverse impact on members of a particular [protected class] or infringes on the expression of cultural pride and identification." *Catastrophe Mgmt. Sols.*, 852 F.3d at 1032 (alteration omitted). The Eleventh Circuit has relied on this concept in the transgender context itself, expressly rejecting the "assert[ion] that transgender status and gender identity are equivalent to biological sex." *Adams*, 57 F.4th at 803 n.6.

The Eleventh Circuit's immutable and mutable distinction is the same status and conduct distinction in *Bostock*. Applied here, Title VII protects against discrimination based on the immutable characteristic of

"sex"—a status that, as *Bostock* explained, includes transgender persons. But Title VII does not protect pronoun preferences—conduct that *Bostock* left untouched. Subsection 3 thus does not constitute discrimination based on "sex."

**b.** These same precedents also foreclose any argument that Florida's law engages in "sex-stereotyping" that violates Title VII. And so does the Eleventh Circuit's holding in *Adams* that "the contention that the School Board's bathroom policy relied on impermissible stereotypes associated with [the plaintiff's] transgender status is wrong" because the sex-based "bathroom policy does not depend in any way on how students act or identify." *Id.* at 809. A biological female who identifies as a female and another biological female who identifies as a male both were required to use the same bathroom. The policy, in other words, "separate[d] bathrooms based on biological sex, which is not a stereotype." *Id.* All of these points are just as true for Subsection 3.

Finally, any sex stereotyping argument ignores the fundamentally different nature of pronoun usage on the one hand and transgender status on the other. *Bostock* found that homosexual and transgender status are inherently tied to "sex." 140 S. Ct. at 1742; *see also Adams*, 57 F.4th

at 803 n.6 (faulting dissent for "refus[ing] to engage the issue of gender fluidity" in equating certain conduct with transgender status). Transgender person's pronoun usage, by contrast, is not inextricably tied to biological sex in this manner. Although some pronouns are masculine and feminine, transgender persons' concept of pronouns is divorced from biological sex in a way that homosexual and transgender *status* cannot be. *See supra* pp.10–12; *see also* PI Opp. 20. Because *Bostock*'s reasoning is premised on the fact that transgender status cannot be understood without reference to sex, 140 S. Ct. at 1742, 1746, and because transgender persons' pronoun usage is not inextricably intertwined with sex in such manner, Subsection 3 does not violate Title VII under *Bostock*.

### B. Plaintiffs have not suffered an adverse employment action from the State Defendants.

Plaintiffs' Title VII claims against the State Defendants also fail as a matter of law because Plaintiffs have not suffered an adverse employment action. Plaintiffs Wood and Doe have not suffered any adverse employment action from any party. *See* PI Opp. 21–24. Plaintiff Schwandes has not suffered an adverse action from the State Defendants.

"[A]dverse employment actions include 'tangible employment actions,' which are those actions 'that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone.'" *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) (per curiam). A plaintiff's "subjective view of the significance and adversity of the employer's action is not controlling," *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 (11th Cir. 2013), and "not everything that makes an employee unhappy is an actionable adverse action," *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998).

Plaintiffs Wood and Doe claim an adverse employment action in being required to comply with Subsection 3 because doing so is "stigmatizing," creates emotional harms, causes "great anxiety," and "distracts" from work. Am. Compl. ¶¶83, 86, 89, 100, 117. But such "subjective view[s]" are "not controlling." *Kidd*, 731 F.3d at 1204. While Plaintiffs "may [be] emotionally distraught," Subsection 3 "ha[s] no real effect on [Plaintiffs'] employment." *Van Der Meulen v. Brinker Int'l*, 153 F. App'x 649, 656 (11th Cir. 2005) (per curiam); *see also, e.g.*, *Dick v. CRC Ins. Servs.*, 2009 WL 10687917, at *14 (N.D. Ala. Dec. 14, 2009). Any doubt is

dispelled by Eleventh Circuit precedent holding that far more significant actions did not constitute adverse employment action. *See, e.g.*, *Davis*, 19 F.4th at 1267 ("paid suspension"); *Kidd*, 731 F.3d at 1203 ("loss of supervisory responsibilities"); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) ("reassign[ment] to a different geographic area"). Indeed, the court has observed that even "unwarranted reprimands, a negative work evaluation, threat of job loss through dissolution of the plaintiffs' division, threat of suspension without pay, removal of job duties, and exclusion from meetings d[oes] not constitute adverse employment action, either singly or when considered in the aggregate." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010). Plaintiffs' allegations fall far short.

Plaintiff Schwandes, though terminated by Defendant Florida Virtual School, has suffered no adverse employment action from the State Defendants. To be sure, the Florida Department of Education has opened an investigation into Schwandes for noncompliance with Subsection 3. But "[t]he Eleventh Circuit has held that the initiation of an internal investigation of this type against an employee does not constitute an adverse employment action." *Jenkins v. Tuscaloosa City Bd. of Educ.*, 72 F.

Supp. 3d 1238, 1261 (N.D. Ala. 2014) (collecting cases); *see also Davis*, 19 F.4th at 1266–67.

## C. Subsection 3's regulation of pronouns concerns a bona fide occupational qualification.

Even if Subsection 3 constitutes discrimination based on "sex"—a point the State Defendants strongly dispute—it is still a valid regulation of employment because the law's requirement is "a bona fide occupational qualification reasonably necessary to the normal operation of [this] particular business or enterprise." *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 200 (1991) (citing 42 U.S.C. §2000e–2(e)(1)). To qualify for the BFOQ exception, "[t]he Defendant must show that: (1) the sex-based qualification sufficiently relates to the ability to perform a duty of the job, and (2) the particular duty goes to the essence of the Defendant's business." *Berry v. Great Am. Dream Inc.*, 88 F. Supp. 3d 1378, 1380 (N.D. Ga. 2015) (cleaned up).

To be clear, this is not a case where an employer is claiming a particular protected class (such as women) is categorically antithetical "to the normal operation of [its] particular business or enterprise." *Garrett v. Okaloosa County*, 734 F.2d 621, 624 (11th Cir. 1984). Florida is not asserting that transgender or nonbinary teachers are unable as a class of

teaching. Rather Florida contends only that—if regulating the usage of pronouns constitutes "sex" discrimination—using pronouns consistent with one's sex is a BFOQ.

Subsection 3 satisfies both elements of a BFOQ. *First*, it is difficult to dispute that the "use of gender-specific titles and pronouns has produced a passionate political and social debate." *Meriwether*, 992 F.3d at 508 (collecting examples across the spectrum on this issue). Florida has decided its K-12 curriculum's place in that debate is "that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." Fla. Stat. §1000.071(1). This pronoun usage has a substantial relationship to the ability to teach in Florida in light of the State's pedagogical goals. *Second*, Subsection 3 "goes to the essence of" teaching in Florida because it ensures that public employees do not provide students with messages that contradict the State's curriculum on this topic. *See Ambach v. Norwick*, 441 U.S. 68, 78–79 (1979) (teachers "exert[] a subtle but important influence over [students'] perceptions and values"); *Chambers v. Omaha Girls Club, Inc.*, 834 F.2d 697 (8th Cir. 1987) (a "role model rule" prohibiting

single employees of a girls club from becoming pregnant was a BFOQ);
*see also* PI Opp. 24–27.[1]

### D. *Bostock* does not apply to nonbinary individuals like Plaintiff Schwandes.

*Bostock* also does not apply to nonbinary people like Schwandes because, on its face, it applies only to transgender persons. *See, e.g.*, 140 S. Ct. at 1737. Nonbinary persons do not satisfy *Bostock*'s but-for test for determining which classes Title VII protects. The "but-for test directs us to change one thing at a time and see if the outcome changes," and "[s]o long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* at 1739. Schwandes's sex is female. Am. Compl. ¶103. An employer who had a policy of not hiring nonbinary persons would not discriminate against Schwandes based on "sex" because "changing the employee's sex would [not] have yielded a different choice by the employer." *Bostock*, 140 S. Ct. at 1741. The employer

---

[1] Plaintiffs' Title VII preemption claim (Count 2) fails for the reasons stated above—Subsection 3 does not violate Title VII. Moreover, Plaintiffs have identified no cause of action to obtain injunctive relief on this claim. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–26 (2015) (no freestanding cause of action for equitable relief for Supremacy Clause violations).

would take the same action even if Schwandes's sex were male. Nonbinary people thus, as a class, are not covered by *Bostock*.

## II. Plaintiffs fail to state a claim under the First Amendment (Count 7).

Plaintiffs' First Amendment claims are assessed under the two-step framework from *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). *See Burt v. Fuchs*, 2023 WL 4103942, at *5 (N.D. Fla. June 21, 2023). At step one, courts ask "whether the employee spoke as a public employee pursuant to his official duties or as a private citizen on matters of public concern." *Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d 1324, 1329 (11th Cir. 2018). "If a public employee speaks pursuant to his or her official duties, … the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is— for constitutional purposes at least—the government's own speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 508, 527 (2022) (cleaned up). If the public employee spoke as a private citizen on a matter of public concern, courts proceed to step two and "the question becomes 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Fernandez*, 898 F.3d at 1329.

**A. Plaintiffs' speech is within the scope of their employment.**

Plaintiffs' desired speech falls squarely within the scope of their official duties. *See* PI Opp. 29–36. Teachers are hired to speak to students; it's their job. "When a teacher teaches, the school system does not regulate that speech as much as it *hires* that speech. Expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary." *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010) (cleaned up). "And if it is the [government] that hires that speech, it can surely 'regulate the content of what is or is not expressed,' … on its behalf." *Id.* (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995)). Moreover, the Supreme Court "has repeatedly emphasized … the comprehensive authority of the States and of school officials … to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). Teachers through their conduct "function as an example for students, which exists independently of particular classroom subjects." *Ambach*, 441 U.S. at 80. Public school authorities accordingly have a right "to control the policies" of its teachers and "forbid" certain

"conduct." *Grossman v. S. Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1100 (7th Cir. 2007).

Subsection 3 falls squarely within *Garcetti* because it expressly limits itself to official speech. It prohibits "[a]n *employee* … of a public K-12 educational institution" from "provid[ing] to a *student* his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." Fla. Stat. §1000.071(3) (emphasis added). On its face, Subsection 3's proscription "*only* appl[ies] to the actions of an employee or contractor acting *within the scope of their employment duties* with the *public K-12 educational institution.*" *Id.* §1000.071(6) (emphasis added). So it is impossible for the law to regulate anything but speech "within the scope of … employment." Plaintiffs' regulated speech thus "owes its existence to [Plaintiffs'] professional responsibilities." *Burt*, 2023 WL 4103942, at *8. The government can regulate that speech without offending the First Amendment. *See Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) ("The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials."); *see also* PI Opp. 31–33.

The Court's holding in *Kennedy v. Bremerton* confirms that Subsection 3 regulates only speech within the scope of employment. There, the Court explained once again that "speech the government 'itself ha[d] commissioned or created' and speech the employee was expected to deliver while carrying out his job" is unprotected "government speech." 597 U.S. at 529. That is Plaintiffs' speech here. Interactions with students are "ordinarily within the scope of [Plaintiffs'] duties" as a teacher; the speech is "pursuant to government policy"; and the speech "convey[s] a government-created message." *Id.* A teacher's discussions with students at school is "speech the [government] pa[ys] [Plaintiffs] to produce as" a teacher. *Id.*; *see also Burt*, 2023 WL 4103942, at *8–9 (holding that university professor's logistical emails to students opining on COVID policy were within the scope of this duties).

None of the factors that the *Kennedy* Court relied on to find that the plaintiff there was not acting within his duties are present here. The plaintiff's prayers occurred at a time that "the District ha[d] acknowledged that its coaching staff was free to engage in all manner of private speech." 597 U.S. at 530. And the Court specifically noted that "[h]e was

*not* instructing players." *Id.* at 529 (emphasis added). Plaintiffs, by contrast, attempt to transform all classroom discussion and communication with students into a time where teachers can engage in whatever private speech with students they desire.

*Kennedy* also involved a private prayer that the Court went to great lengths to show occurred at a time when employees were free to attend to personal matters. *Id.* at 530–31. By contrast, a teacher actively communicating with a student is not "free to attend briefly to personal matters" or say whatever he wants to the student. *Id.* at 530. And it is not an "excessively broad job description[]," *id.* at 529, to recognize that teachers' direct interactions with students are within their official duties. While public school teachers are not "automatons," they are "government employees paid in part to speak on the government's behalf and convey its intended messages." *Id.* at 527. That reality means they are not entitled to "deliver any message to anyone anytime they wish." *Id.*

## B. Plaintiffs' speech does not concern a topic of public concern.

On this factor, "the relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue, it is whether the *purpose* of the employee's speech was to raise issues of public concern." *Alves v.*

26

*Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1167 (11th Cir. 2015) (cleaned up). Plaintiffs have not alleged that Subsection 3 prohibits teachers from speaking about transgender issues generally—or even that it prohibits Plaintiffs from publicly protesting Subsection 3 as a matter of policy (it expressly does not). Instead, the provision regulates speech that the teachers use in interactions with students. And "'speech that occurs within the compulsory classroom setting' 'does not constitute speech on a matter of public concern' when it is 'curricular in nature.'" *Evans-Marshall*, 624 F.3d at 342; *see also* PI Opp. 36–37.

This case is the inverse of *Willey v. Sweetwater*, which held that a policy *requiring* teachers to refer to students by their preferred pronouns did "not give rise to matters of public concern," and thus did not offend the First Amendment. 2023 WL 4297186, at *23. So too here. Plaintiffs' allegations make clear the intensely personal nature of this provision. *See* Am. Compl. ¶¶75–110. And there should be no doubt that Subsection 3 expressly allows Plaintiffs to address those concerns publicly, while off duty. While on duty, however, the purpose of Plaintiffs' speech is not "to raise issues of public concern." *Alves*, 804 F.3d at 1167.

**C. The State's interests outweigh any harm to Plaintiffs.**

Even if Plaintiffs seek to speak as private citizens on a matter of public concern, the State's interests outweigh any harm. *See* PI Opp. 38–40. The Supreme Court has recognized that First Amendment rights "are different in public schools than elsewhere" because of "the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). A "position as a teacher in a public school … by its very nature requires a degree of public trust not found in many other positions of public employment." *Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 336 F.3d 185, 198 (2d Cir. 2003). Moreover, "[s]chools operate in loco parentis to students and are permit[t]ed a degree of supervision and control that could not be exercised over free adults. This is because, in a public school environment, the State is responsible for maintaining discipline, health, and safety." *Adams*, 57 F.4th at 802 (cleaned up). Because teachers are essential state agents in operationalizing this duty, courts have long held that K-12 teachers can be subject to restrictions that would violate the First Amendment rights of private citizens and even university professors. *See, e.g.*, *Pernell v. Fla. Bd. of Governors*, 641 F. Supp. 3d 1218, 1240 (N.D. Fla. 2022) (collecting cases

discussing the differences in First Amendment analysis for K-12 public schools and universities).[2] And for public employees generally, "the First Amendment does not protect a government employee's speech that impedes his job duties." *Warren v. DeSantis*, 90 F.4th 1115, 1133 (11th Cir. 2024).

Subsection 3 is part of comprehensive legislation aimed to promote the State's pedagogical goals and vindicate parental rights. It is an integral part of Plaintiffs' job duties to further the State's pedagogical agenda in interactions with students. If the First Amendment guaranteed teachers the right to ignore pedagogical-based directives while inside the schoolhouse, K-12 education would become unworkable. *See Evans-Marshall*, 624 F.3d at 341–42; *Mayer*, 474 F.3d at 479–80.

---

[2] Defendants recognize this Court has said *Kingsville Independent School District v. Cooper*, 611 F.2d 1109 (5th Cir. 1980), can be read as protecting in-classroom speech at the high-school level. *See Pernell*, 641 F. Supp. 3d at 1242–43. But "*Garcetti* has since altered the analysis with respect to regulating public-employee speech more generally." *Id.* (citing *Wollschlaeger v. Governor*, 848 F.3d 1293, 1311 n.6 (11th Cir. 2017) (en banc)); *see also Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (applying *Cooper* only to the academic freedom context in a university classroom).

## III. Plaintiffs fail to state a claim under the Equal Protection Clause (Count 10).

### A. Subsection 3 is subject to rational-basis review.

Subsection 3 is not subject to intermediate scrutiny, *contra* Am. Compl. ¶198, for three reasons. First, the statute does not discriminate based on sex because Plaintiffs are not similarly situated to members of the opposite biological sex. "The promise of equal protection is limited to 'keep[ing] governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Adams*, 57 F.4th at 803 n.6. Because biological sex is the "sole characteristic on which" the State's pedagogical interests are based, "biological sex is the relevant respect with respect to which persons must be similarly situated." *Id.* (cleaned up). Wood and Doe cannot claim to be similarly situated to biological females because they are not biologically female. And Plaintiff Schwandes cannot claim to be treated any differently than any man or woman because both men and women violate Subsection 3 for using they/them pronouns. *See supra* pp.21–22. "Thus, in prohibiting [Plaintiffs] from using [their preferred pronouns]," the State is not "'treat[ing] differently persons who are in all relevant respects alike' for purposes of the Equal Protection Clause." *Adams*, 57 F.4th at 803 n.6.

Second, Subsection 3 "does not discriminate based on sex" because it "does not establish an unequal regime for males and females." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228 (11th Cir. 2023). "[H]eightened scrutiny applies to 'official action that closes a door or denies opportunity to women (or to men).'" *Id.* Subsection 3 "does not distinguish between men and women in such a way." *Id.* Rather, it "establishes a rule that applies equally to both sexes: it restricts" the use of pronouns that are in "discordance between biological sex and sense of gender identity for *all* [teachers]." *Id.*

Third, Subsection 3 does not discriminate based on transgender or nonbinary status. *Adams* squarely controls here. Subsection 3 "facially classifies based on biological sex—not transgender status or gender identity." 57 F.4th at 808. "Transgender status and gender identity are wholly absent from [Subsection 3's] classification. And both sides of the classification—biological males and biological females—include transgender [teachers]." *Id.* "Because the … policy divides [teachers] into two groups, both of which include transgender [teachers], there is a lack of identity between the policy and transgender status, as the [pronoun]

options are equivalent to those provided to all [teachers] of the same biological sex." *Id.* (cleaned up).[3]

## B. Subsection 3 satisfies intermediate scrutiny.

Plaintiffs fail to state an Equal Protection Clause claim even if Subsection 3 is subject to intermediate scrutiny. *See Adams*, 57 F.4th at 803 & n.6 (noting that "there [we]re serious questions" whether a similar policy triggered intermediate scrutiny and assuming, for purposes of the case, that it did). The starting point for this Equal Protection Clause challenge is "the role that schools have in setting policies for students." *Id.* at 801–02. "[C]onstitutional rights, including 'Fourteenth Amendment rights, are different in public schools than elsewhere' because of 'the schools' custodial and tutelary responsibility for children.'" *Id.* at 802. Moreover, because schools operate *in loco parentis* and States are "responsible for maintaining discipline, health, and safety" "in a public

---

[3] For these same reasons, any argument based on *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), is foreclosed. The en banc Eleventh Circuit has been clear that "'sex' is not a stereotype." *Adams*, 57 F.4th at 813. And individuals of both sexes are equally forbidden from using the pronouns of the opposite sex. Moreover, no stereotype is present here—as explained, it is Plaintiffs who are engaged in stereotyping by arguing that all transgender individuals seek to use pronouns that do not align with biological sex. *Supra* pp.10–12, 15–16.

school environment," "the Supreme Court has afforded deference to their decisions even when examining certain constitutional issues." *Id.*

With that in mind, "[t]o satisfy intermediate scrutiny, the [pronoun] policy must (1) advance an important governmental objective and (2) be substantially related to that objective." *Id.* at 803. Subsection 3 clears these hurdles as it advances several important governmental objectives.

The State Defendants assert two interests at this stage. *First*, Subsection 3 advances the State's pedagogical goals. States have long been responsible for setting the curriculum of their classrooms. *See supra* pp.1, 23, 28–29. Moreover, because teachers "function as an example for students," *Ambach*, 441 U.S. at 80, the government has the right "to control the policies" related to teacher conduct and to "forbid" certain "conduct," *Grossman*, 507 F.3d at 1100. Relevant here, Florida has determined that students should be taught that biological sex is immutable. Fla. Stat. §1000.071(1). That interest is legitimate, especially in light of "the Supreme Court's longstanding recognition that 'sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth.'" *Adams*, 57 F.4th at 807 (quoting *Frontiero*, 411 U.S. at 686). And the State has reasonably concluded that its pedagogical

message would be undermined by teachers using pronouns that do not conform to their biological sex. *See Ambach*, 441 U.S. at 78–79.

*Second*, Florida has an interest in avoiding potential confusion arising from contentious social issues and focusing the curriculum instead on core subjects. Gender identity is a "controversial" and "sensitive political topic[]" that is "undoubtedly [a] matter[] of profound 'value and concern to the public.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018). And Subsection 3 is part of Florida's comprehensive effort to "return to the basics of reading, writing and arithmetic" as the core of K-12 education. Fla. Exec. Order No. 19-32 (Jan. 31, 2019).

Subsection 3 is substantially related to advancing these interests. As in *Adams*, requiring teachers to use sex-aligned pronouns is a "mirror," 57 F.4th at 805, of the State's interest in implementing its pedagogical view that "a person's sex is an immutable biological trait," Fla. Stat. §1000.071(1). A biological man using feminine pronouns in interactions with students undermines that goal. *See Ambach*, 441 U.S. at 79 ("through both the presentation of course materials and the example he

sets, a teacher has an opportunity to influence the attitudes of students").

Moreover, state law provides that "[c]lassroom instruction by school personnel or third parties on … gender identity may not occur in prekindergarten through grade 8 … ." Fla. Stat. §1001.42(8)(c)3. And "[i]f such instruction is provided in grades 9 through 12, the instruction must be age-appropriate or developmentally appropriate for students in accordance with state standards." *Id.* By adhering to longstanding social norms and practices regarding pronouns, Subsection 3's regulation helps avoid unnecessarily introducing the topic of gender identity into classroom instruction. The regulation also ensures the topic is limited only to the "age-appropriate" instruction that state law authorizes for high-school students. *See Virgil*, 862 F.2d at 1523.

Subsection 3 is narrowly tailored to achieve the state's pedagogical goals and to avoid unnecessary classroom confusion that distracts from teaching the core subjects. In any event, "the Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex." *Adams*, 57 F.4th at 801. Instead, the regulation must only be "substantially related to an important governmental objective[;] there must

be enough of a fit between the policy and its asserted justification." *Id.* (cleaned up). Nor does the Equal Protection Clause require the State to show that Subsection 3's application to each specific teacher furthers its state interests. *See Califano v. Jobst*, 434 U.S. 47, 55 (1977) ("broad legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples"); *Lalli v. Lalli*, 439 U.S. 259, 272–73 (1978) (inquiry turns on the law's "relation to the state interests it is intended to promote," not its "fairness"). Particularly given the deference school authorities are due, there is at least "enough of a fit between the policy and its asserted justification[s]." *Adams*, 57 F.4th at 801 (cleaned up).

Plaintiffs' attempts to discount the State's interests by alleging a purposeful discriminatory motive, Am. Compl. ¶¶30–33, fail at the pleading stage. The burden is on Plaintiffs to allege that the State's otherwise neutral policy is motivated by "purposeful discrimination" because "a disparate impact alone does not violate the Constitution." *Adams*, 57 F.4th at 810. Plaintiffs' only allegations of purposeful discrimination are that HB1069 is supported only by "vague language"; one of its sponsors "did not consult *Bostock*"; Florida has enacted other laws

that impact transgender and nonbinary people; Governor DeSantis signed a law about women and girls' athletics on "the first day of Pride Month"; and various other State legislators made comments about *other* bills. Compl. ¶¶29–33. These allegations fail as a matter of law.

First, the bill was supported by extensive legislative reports about parental rights and age-appropriate education, as well as long-recognized State interests in what is taught in classrooms. *See supra* pp.1, 3–6, 23, 28–29. Second, Plaintiffs' reliance on scattered statements about *other* legislation is foreclosed by precedent. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1324 (11th Cir. 2021) (expressing "skepticism that the discriminatory intent could be ascertained from the statements of one legislator speaking about another bill"). Indeed, Plaintiffs have not "point[ed] to evidence—not a single comment made by any sitting [Florida] legislator in reference to HB1[069]—to support their argument that [Subsection 3] was intended to discriminate." *Id.* at 1325. Third, to the extent that legislator statements *on other bills* are relevant at all, *but see id.* at 1324–26, "[a]pplying the presumption of good faith—as a court must—[a] statement by a single legislator is not fairly read to demonstrate discriminatory intent by

the state legislature," *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022).

At most, Plaintiffs' allegations demonstrate an awareness of the consequences for transgender individuals arising from Subsection 3. But "discriminatory purpose implies more than intent as volition or intent as awareness of consequences." *Adams*, 57 F.4th at 810 (cleaned up).[4] Plaintiffs' cursory allegations of purposeful discrimination fail as a matter of law and do not undermine the State's legitimate interests.

\* \* \*

In sum, this case implicates "a strong disagreement between the parties over what is best for [the school] children" of Florida. *Eknes-Tucker*, 80 F.4th at 1231. "Absent a constitutional mandate to the contrary, these types of issues are quintessentially the sort that our system of government reserves to legislative, not judicial, action." *Id.*

---

[4] The allegation that one legislator's failure to consider *Bostock* is not a plausible allegation of discriminatory purpose. *See League of Women Voters*, 32 F.4th at 1373; *Greater Birmingham Ministries*, 992 F.3d at 1324–25. In any event, one sponsor's failure to consider a case says nothing about the entire Legislature's intent. *See Greater Birmingham Ministries*, 992 F.3d at 1324–25 (noting "a sponsor is only one vote"). And regardless, Subsection 3 is consistent with *Bostock*.

**IV. Plaintiffs fail to state a claim under Title IX (Count 13).**

**A. Title VII preempts Plaintiffs' Title IX claims.**

Plaintiffs' Title IX claims are duplicative of their Title VII claims. "Title IX was passed as part of the Education Amendments of 1972 and 'patterned after' the Civil Rights Act of 1964." *Adams*, 57 F.4th at 811. As a result, "district courts within the Eleventh Circuit and federal circuit courts of appeals have held that Title VII preempts Title IX and provides the exclusive remedy for employment discrimination claims against federally funded education programs." *Schultz v. Bd. of Trs. of Univ. of W. Fla.*, 2007 WL 1490714, at *2 (N.D. Fla. May 21, 2007). "[T]he 'precisely drawn, detailed enforcement structure' and 'comprehensive remedial scheme' that is Title VII preempts the more general remedy under Title IX" in these circumstances. *Id.* at *3. "Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII." *Drisin v. Fla. Int'l Univ. Bd. of Trs.*, 2017 WL 3505299, at *5 (S.D. Fla. June 27, 2017) (collecting cases). Plaintiffs' Title IX claims are preempted by Title VII and so should be dismissed.

**B. Plaintiffs have not alleged any Title IX violation.**

Even if Plaintiffs' Title IX claims are not preempted, *Adams* squarely forecloses them. There, the Eleventh Circuit rejected the argument that "the meaning of 'sex' in Title IX includes 'gender identity' for purposes of its application to transgender students." 57 F.4th at 813. Title IX's protections thus do not extend to transgender persons. *See, e.g.*, *D.N. ex rel. Jessica N. v. DeSantis*, 2023 WL 7323078, at *13 (S.D. Fla. Nov. 6, 2023) ("Bound by Eleventh Circuit precedent, we similarly hold that Title IX prohibits discrimination on the basis of biological sex—*not* gender identity."). And even if Title IX covers transgender persons, Subsection 3 does not discriminate on the basis of sex for the same reasons as under Title VII. *See supra* pp.8–16, 21–22; PI Opp. 11–20. Moreover, the Eleventh Circuit has cautioned against reliance on *Bostock* in the Title IX context because of Title IX's different statutory and regulatory context, the absurd results of interpreting sex to include transgender status under Title IX, and Title IX, unlike Title VII, was enacted under the Spending Clause. *Adams*, 57 F.4th at 811–17. For these reasons, Plaintiffs' Title IX claims fail as a matter of law.

## CONCLUSION

This Court should grant the motion and dismiss Plaintiffs' complaint.


Dated: February 12, 2024        Respectfully submitted,


        */s/ Bryan Weir*
        Bryan Weir*
        Daniel Shapiro
        Daniel M. Vitagliano*
        CONSOVOY MCCARTHY PLLC
        1600 Wilson Boulevard, Suite 700
        Arlington, VA 22209
        Telephone: 703.243.9423
        bryan@consovoymccarthy.com
        daniel@consovoymccarthy.com
        dvitagliano@consovoymccarthy.com
        *Counsel for the State Defendants*

        *Admitted pro hac vice

**CERTIFICATE OF WORD COUNT**

Consistent with Local Rule 7.1(F) and this Court's Order Amending Briefing Schedule entered February 1, 2024, Dkt. No. 49, this memorandum contains 8,116 words.

*/s/ Bryan Weir*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of February, 2024, a true and correct copy of this memorandum was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Bryan Weir*