# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Katie Wood *et al.*,

        *Plaintiffs*,

v.                            No. 4:23-cv-00526-MW-MAF

Florida Department of Education *et al.*,

        *Defendants*.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS

State Defendants' motion to dismiss, Doc. 63-1, Plaintiffs' First Amended Complaint ("Complaint"), Doc. 56, argues that Florida may require Plaintiffs to hide their titles and pronouns at all times in their workplace. They repeatedly suggest that by merely doing what other teachers do—introducing themselves by title and pronouns—Plaintiffs are making "curricular" decisions at odds with state goals by "instructing" about gender identity, a "controversial" and "sensitive" topic. Although State Defendants disclaim any assertion that Plaintiffs are unsuited to the teaching profession, their arguments imply otherwise. Subsection 3 has already driven transgender and nonbinary teachers out of their jobs, including one plaintiff in this case, and it daily threatens to do the same to others.

The Supreme Court has repeatedly stood against this kind of exclusionary

workplace policy. In *Bostock v. Clayton County*, 590 U.S. 644 (2020), it made clear that discrimination against transgender people is no different or more defensible than any other form of sex discrimination under Title VII. And in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), it held that what Florida seeks to do here—bar teachers from expressing their identities at schools out of fear of what a student might infer from that choice—violated the First Amendment. Likewise, the Equal Protection Clause and Title IX also prohibit the state's discriminatory policy.

## BACKGROUND

Plaintiffs are two current and one former Florida public-school teachers. Doc. 56 ¶¶ 4–6. Plaintiffs Katie Wood and Jane Doe are transgender women. *Id.* ¶¶ 75, 93. They were assigned male at birth, but their gender identities are female. *Id.* ¶ 30. They live and work as women. *Id.* ¶¶ 76, 94. Plaintiff AV Schwandes is nonbinary; they were assigned female at birth, but their gender identity is neither male nor female. *Id.* ¶ 103.

After subsection 3's enactment, Plaintiffs' respective employers told them that, because of the sex they were assigned at birth, they could no longer use the titles and, in Ms. Wood's and Ms. Doe's cases, pronouns they had been using at work to identify themselves: Ms. and she/her pronouns for Ms. Wood and Ms. Doe, and Mx. for Mx. Schwandes. *Id.* ¶¶ 81–82, 90, 99, 101, 106–07. Plaintiffs' failure to comply with subsection 3 would result in sanctions from State Defendants, including

loss of their teaching certificates, which they need to be employed as public-school teachers in Florida. *Id.* ¶¶ 45, 52.

Prohibiting Plaintiffs from describing themselves by the titles and pronouns that express their respective gender identity, and threatening them with loss of employment, has caused them psychological distress and feelings of stigma. *Id.* ¶ 74. For example, for Ms. Wood, going by Teacher, a non-gendered title that no male or female teachers at her school use and that does not come naturally to her when describing herself, instead of Ms., a title that expresses her female gender identity, has caused her to feel stigma, *id.* ¶ 86, and anxiety about losing her career, *id.* ¶ 89. It also has disrupted her ability to teach and distracted her students. *Id.* ¶ 87.

For Mx. Schwandes, that threat became reality: Defendant Florida Virtual School suspended and then fired them for violating subsection 3. *Id.* ¶¶ 107, 109. Defendant Florida Department of Education is now investigating their educator certificate. *Id.* ¶ 111.

## STANDARD OF REVIEW

"At the motion to dismiss stage, this Court accepts the allegations in Plaintiff[s'] Amended Complaint as true and construes them in the light most favorable to Plaintiff[s]." *Claire v. Fla. Dep't of Mgmt. Servs.*, 504 F. Supp. 3d 1328, 1330 (N.D. Fla. 2020) (citing *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016)). "To withstand a motion to dismiss under Rule 12(b)(6), a complaint must

include 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 1330–31 (quoting *Hunt*, 814 F.3d at 1221). "A 'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 1331 (quoting *Hunt*, 814 F.3d at 1221).

## ARGUMENT

### I. Plaintiffs state Title VII claims.

Subsection 3 violates Title VII both because it fails *Bostock*'s but-for test for identifying sex discrimination and because it relies on unlawful sex stereotypes. State Defendants argue that subsection 3's requirements are a bona fide occupational qualification ("BFOQ"), but this is an affirmative defense unsuited for resolution on a motion to dismiss, and they have not met that defense's high burden. Finally, Plaintiffs have suffered adverse employment actions because they have been forced to choose between hiding their true selves at work or losing their jobs and educator certificates, and in Mx. Schwandes's case, they were fired for their choice.

### A. Plaintiffs state a Title VII claim under *Bostock*.

Ms. Wood's and Ms. Doe's Title VII claims are subject to the "straightforward rule" articulated in *Bostock* for identifying Title VII violations: "if changing the employee's sex would have yielded a different choice by the employer[,] a statutory violation has occurred." 590 U.S. at 659–60.

In *Bostock*, Aimee Stephens, who was assigned male at birth but whose gender identity was female, was fired when she announced "that she planned to 'live and work full-time as a woman' after she returned from an upcoming vacation." *Id.* at 654. Her employer explained that he fired her "because [s]he was no longer going to represent [her]self as a man. [Sh]e wanted to dress as a woman." Br. for Resp't Aimee Stephens, at *9, *Bostock*, 590 U.S. 644. Applying Title VII's straightforward rule, the Supreme Court held that Ms. Stephens's employer violated Title VII because "[i]f the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." 590 U.S. at 660.

As State Defendants concede, Doc. 63-1 at 12, subsection 3 fails Title VII's simple test: if an employee was assigned female at birth, they may use Ms. and she/her pronouns, but if they were assigned male at birth, they may not.

Subsection 3 also discriminates because of sex insofar as it discriminates based on whether an employee has sex characteristics that vary from characteristics typical to the employee's sex assigned at birth. If the employee does have such variations—if, in the statute's words, they were "born with a genetically or biochemically verifiable disorder of sex development"—then subsection 3 does not prohibit the employee from using any title or pronoun, including Mx. and they/them

pronouns. Fla. Stat. § 1000.071(1). But if the employee, like Mx. Schwandes, does not have those sex characteristics, then subsection 3 restricts the employee from using certain titles and pronouns. That is sex discrimination. "[I]t is impossible to discriminate" in this way "without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660. Subsection 3 discriminates against Mx. Schwandes "for … attributes it … tolerate[s] in" the exempted individuals. *Id.* at 658. Its discrimination against employees who have typical sex characteristics violates Title VII no less than an employer's discrimination against an employee for being transgender, *id.* at 660, or "insufficiently feminine" or "insufficiently masculine," *id.* at 659.

Since subsection 3 plainly fails *Bostock*'s but-for test, State Defendants instead argue that the test's "purpose" was only "to determine whether the word 'sex' in Title VII covered individuals who are homosexual or transgender as a *class*," Doc. 63-1 at 9–10, not to determine "whether regulating particular *conduct* constitutes discrimination based on 'sex,'" *id.* at 10.

State Defendants' reading of *Bostock* is incompatible with its text. First, *Bostock* explained that Title VII "tells us three times … that our focus should be on individuals, not groups," 590 U.S. at 658, so the purpose of the but-for test emphatically is *not* to identify covered and not-covered classes of individuals. Instead, its purpose is to determine whether "the employer intentionally relies in part on *an individual employee's* sex," whether "changing *the employee's* sex would have yielded

6

a different choice by the employer." *Id.* at 659–60 (emphasis added). Second, the Court summarized its holding at the outset by referring to conduct: "An employer who fires an individual for being homosexual or transgender fires that person for traits *or actions* it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Id.* at 651–52 (emphasis added).

Third, the facts involved conduct, not just status. Gerald Bostock "was fired for *conduct* 'unbecoming' a county employee," *id.* at 653 (emphasis added), and Ms. Stephens was fired because "she planned to 'live and work full-time as a woman,'" *id.* at 654. Fourth, the Court discussed how Title VII's rule applied to conduct too, such as tardiness, suggesting that if an employer would have tolerated a tardy male employee, then it would violate Title VII to fire a tardy female employee. *Id.* at 660. Fifth, the Court, applying precedent, reasoned that "it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it." *Id.* at 664. "[N]othing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination." *Id.* at 667. Finally, of course *Bostock* did not address the legality of specific policies that were not at issue in the case, such as sex-segregated bathrooms, but that does not somehow carve out all conduct from its reasoning and holding.

State Defendants' only support for their reading of *Bostock* is *Texas v. EEOC*,

633 F. Supp. 3d 824, 828 (N.D. Tex. 2022), which interpreted *Bostock* as limited to status-based discrimination but was not a Title VII enforcement action. Its analysis is unpersuasive because the court ignored *Bostock*'s unequivocal but-for test and express language regarding both status and conduct. For that reason, no other reported decision has followed that reasoning in the two years since its publication. *See, e.g.*, *McMahon v. World Vision, Inc.*, No. 2:21-cv-00920, 2023 WL 4704711, at *3 (W.D. Wash. July 24, 2023) (rejecting argument under *Bostock* that employer policy "is not facially discriminatory because it targets conduct rather than protected traits").

Furthermore, State Defendants' argument is inconsistent with longstanding Title VII law. For example, *Phillips v. Martin Marietta Corp.* held that, absent proof of a BFOQ, an employer violated Title VII by refusing to hire women based on their conduct of having pre-school-age children, despite being willing to hire men with children that age and women generally. 400 U.S. 542, 543 (1971); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.* ("*UAW*"), 499 U.S. 187, 198 (1991) (holding employer policy classifying "on the basis of gender and childbearing capacity" violated Title VII); *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010) ("Our decisions have declined to distinguish between status and conduct in [the sexual orientation] context.").

Even if *Bostock* and Title VII were somehow limited to status-based discrimination, *Bostock* especially applies in this case because subsection 3 facially discriminates because of sex. It specifically defines "sex" to refer only to one's sex assigned at birth, Fla. Stat. § 1000.21(9), and then requires employers to discriminate on that basis, singling out for disparate treatment any individual employee whose "title or pronouns do not correspond to [their] sex," Fla. Stat. § 1000.071(3). It does not matter if Florida's intention behind subsection 3 was to discriminate on the basis of conduct rather than status; "intentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal of discriminating" on some other basis. *Bostock*, 590 U.S. at 661.

State Defendants' reliance on *EEOC v. Catastrophe Management Solutions*, 852 F.3d 1018 (11th Cir. 2016), is misplaced. *See* Doc. 63-1 at 16–18. There, the Eleventh Circuit rejected an as-applied Title VII race discrimination challenge to an employer's facially neutral policy providing that an employee's "[h]airstyle should reflect a business/professional image," 852 F.3d at 1022, and stated that "courts generally have upheld facially neutral policies regarding mutable characteristics" like hairstyle, *id.* at 1030. But subsection 3 is not "facially neutral"; it expressly discriminates on the basis of a characteristic that Florida law defines as "an immutable biological trait"—sex. Fla. Stat. § 1000.071(1).

Finally, State Defendants argue that "[a]pplying *Bostock*'s but-for test to the

conduct at issue here would lead to an unworkable rule and absurd results" because "[s]ubsection 3 would violate Title VII for transgender teachers who use 'he' or 'she' as their pronouns[,] but it would not violate Title VII for teachers that use 'they,' 'ze,' 'hir,' or other pronouns." Doc. 63-1 at 12–13. Even if Plaintiffs were wrong that Title VII also bars subsection 3's impact on nonbinary people like Mx. Schwandes, State Defendants do not explain why Title VII's failure to protect them should mean that Ms. Doe and Ms. Wood should be stripped of the protection that the plain text of Title VII affords them under *Bostock*.

### B.    Plaintiffs state a Title VII claim for unlawful sex stereotyping.

"[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for 'in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (citation omitted). This is true "even where the stereotypes are benign or not grounded in group animus." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1284 (11th Cir. 2000). "All persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype." *Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011); *see id.* at 1318 & nn.6–7 (citing Title VII cases as examples). For example, the Sixth Circuit in Ms. Stephens's case, before it was

affirmed by the Supreme Court in *Bostock*, held that her employer violated Title VII by firing her "based on her refusal to conform at work to stereotypical notions of how biologically male persons should dress, appear, behave, and identify." *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 594 (6th Cir. 2018), *affirmed*, *Bostock*, 590 U.S. 644.

Subsection 3's prohibition on Ms. Wood's and Ms. Doe's use of Ms. and she/her pronouns rests entirely on sex stereotypes about how individuals assigned male at birth should describe themselves and present themselves to others, and its prohibition on Mx. Schwandes's use of Mx. rests entirely on such stereotypes about individuals assigned female at birth. As State Defendants concede, subsection 3 "adher[es] to longstanding social norms and practices regarding pronouns," Doc. 63-1 at 35, and indeed there is *no* justification for subsection 3 *other* than sex stereotypes about who should use which pronouns.

State Defendants argue that *Adams by & through Kasper v. School Board of St. Johns County*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc), "foreclose[s] any argument that Florida's law engages in 'sex-stereotyping' that violates Title VII" because a policy based on "biological sex" "does not depend in any way on how [people] act or identify" and "biological sex … is not a stereotype." Doc. 63-1 at 15 (quoting *Adams*, 57 F.4th at 809). But *Adams* was not a Title VII case, and it addressed only sex-segregated bathrooms, which raise unique policy and legal issues

not presented by this case. *Cf. Bostock*, 590 U.S. at 681 (leaving for another day the question of how Title VII applies to sex-segregated bathrooms).

Nor did *Adams* carve out policies based on "biological sex" from longstanding precedent on sex stereotyping or hold that such policies necessarily "do[] not depend in any way on how [people] act or identify." *Adams*, 57 F.4th at 809. Instead, *Adams* dealt only with the sex-based bathroom policy before it, which it interpreted to "not depend in any way on how students act or identify." *Id.* "[B]iological differences" mattered to the Court because "bodily exposure is most likely to occur" in the bathroom. *Id.* at 805. Subsection 3 does not address any "bodily exposure" of "biological differences," and regardless, Title VII does not permit discrimination based on biological differences in the absence of a BFOQ. *See, e.g.*, *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 (1978) (holding discrimination based on biological difference that "women … live longer than men" violated Title VII).

To the extent that State Defendants argue that subsection 3 is not based on sex stereotypes in violation of Title VII because "it 'establishes a rule that applies equally to both sexes,'" Doc. 63-1 at 31 (discussing Plaintiffs' equal protection claims), *Bostock* clearly forecloses that argument. "Title VII liability is not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women. Instead, the law makes each instance of discriminating against an individual employee because of that individual's sex an

independent violation of Title VII." *Bostock*, 590 U.S. at 662. "[A]n employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability" *Id.*

### C. Subsection 3 is not a "bona fide occupational qualification."

While purporting to disclaim the position that "transgender or nonbinary teachers are unable as a class of teaching," Doc. 63-1 at 19–20, State Defendants nonetheless insist that Plaintiffs' claims must be dismissed because "using pronouns consistent with one's sex is a BFOQ" for teaching in Florida public schools, *id.* at 20.

State Defendants' BFOQ argument is an affirmative defense on which they bear the burden of proof. *Weeks v. S. Bell Tel. & Tel. Co.*, 408 F.2d 228, 232 (5th Cir. 1969); *Hardin v. Stynchcomb*, 691 F.2d 1364, 1370–71 (11th Cir. 1982). And, "because it is an affirmative defense that is not apparent from the face of the Complaint and requires an analysis of facts that have not been set before the Court," it is not an appropriate basis to dismiss Plaintiffs' claims. *Santos v. Fed. Nat. Mortg. Ass'n*, 889 F. Supp. 2d 1363, 1367 (S.D. Fla. 2012); *see also Bader v. United Airlines, Inc.*, 113 F. Supp. 3d 981, 986 (N.D. Ill. 2015) ("[A] BFOQ … may not ordinarily be resolved on a motion to dismiss.").

In any case, subsection 3 is not a BFOQ. Title VII creates an exception to its prohibition on discrimination "in those certain instances where … sex … is a bona

fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e). But this is an "extremely narrow" exception. *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977); *UAW*, 499 U.S. at 201. In addition, "to qualify as a BFOQ, a job qualification must relate to the 'essence' or to the 'central mission of the employer's business.'" *UAW*, 499 U.S. at 203 (citations omitted); *see Garrett v. Okaloosa Cnty.*, 734 F.2d 621, 624 (11th Cir. 1984).

State Defendants' theory is that "pronoun usage has a substantial relationship to the ability to teach in Florida in light of the State's pedagogical goals"—presumably, the goal of teaching students that it is "false" to use any pronouns that do not "correspond to" one's "sex"—and subsection 3 "ensures that public employees do not provide students with messages that contradict the State's curriculum on this topic." Doc. 63-1 at 20. But Plaintiffs' Complaint, Doc. 56, discloses no reason to believe that Plaintiffs' providing their titles and pronouns to students would in any way interfere with the "normal operation" of the schools at which they teach. *Cf. Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir. 1971) ("No one has suggested that having male stewards will so seriously affect the operation of an airline as to jeopardize or even minimize its ability to provide safe transportation from one place to another."); *Wilson v. Sw. Airlines Co.*, 517 F. Supp. 292, 302 (N.D. Tex. 1981) (holding no BFOQ where "sex-linked job functions are only 'tangential'

to the essence of the occupations and business involved"). Plaintiffs allege the opposite, that subsection 3 has interfered with the normal operation of their classrooms. *See, e.g.*, Doc. 56 ¶¶ 86–87.

Nor is there any reason from the Complaint to believe that Florida's view of appropriate titles and pronouns is part of the "curriculum" at any of Plaintiffs' schools. *See infra* § III.B. Even if it were, that narrow subject could represent at most only a miniscule fraction of what students learn at school. State Defendants therefore cannot plausibly show that rules regarding title and pronoun usage relate to the "essence" or "central mission" of schools, institutions for which the evident purpose is far broader—the education of students generally. *UAW*, 499 U.S. at 203. Nor does State Defendants' theory make any practical sense. Students do not have access to teachers' "sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth," Fla. Stat. § 1000.21(9), so there is no reason to believe they would even *know* whether any teachers were providing them with "messages that contradict State policy on the topic of sex," Doc. 63-1 at 20. Indeed, it would seem to harm Florida's purported interest, not help it, if a teacher who presents as female were to use Mr. and he/him pronouns with students.

Moreover, State Defendants cannot rely on subsection 3 itself to justify their discrimination. The settled rule is that an employer's own preferences cannot justify a BFOQ. *Diaz*, 442 F.2d at 388–89. As for the Legislature, courts have made clear

that "[t]he mere fact that a state enacts a discriminatory regulation does not create a BFOQ defense for one who follows such a regulation." *Garrett*, 734 F.2d at 624; *Rosenfeld v. S. Pac. Co.*, 444 F.2d 1219, 1225–26 (9th Cir. 1971) (holding compliance with state law does not transform a discriminatory practice into a BFOQ). On State Defendants' theory, Title VII would permit schools to discriminate freely on the basis of religion, sex, or national origin, so long as the school asserted that the discriminatory policy embodied some "curriculum" the school wished to teach. That cannot be. *Cf. Diaz*, 442 F.2d at 389 ("[I]t would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome.").

State Defendants rely on *Chambers v. Omaha Girls Club, Inc.*, 834 F.2d 697, 701 (8th Cir. 1987), but that nearly four-decade-old decision permitted a refusal to hire single pregnant teachers under unusual circumstances, including that the program's "only purpose" was to provide girls with role models. *See Chambers v. Omaha Girls Club*, 629 F. Supp. 925, 952 (D. Neb. 1986) ("[T]his decision will not be applicable in many other situations which this Court could envision."). By contrast, the Complaint here contains no evidence at all that subsection 3 is "reasonably necessary" to the "normal operation" of Florida schools. 42 U.S.C. § 2000e-2(e).

### D. Plaintiffs have alleged adverse employment actions.

State Defendants contend that their conduct towards Plaintiffs does not rise to the level of "adverse employment actions" sufficient for Title VII liability. Doc. 63-1 at 16–19. But they do not grapple with Plaintiffs' allegations and instead merely assert that "[s]ubsection 3 has no real effect on Plaintiffs' employment," that the Complaint's contrary allegations are merely "subjective views," which are "not controlling," and that a handful of wholly non-analogous cases involved "far more adverse" conduct. Doc. 63-1 at 17–18.

Title VII applies to all discrimination respecting "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). The Eleventh Circuit has interpreted that phrase to require an "adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). To assess whether an employment practice is adverse, courts "use an objective test, asking whether a reasonable person in [the plaintiff's] position would view the employment action in question as adverse." *Hinson v. Clinch Cnty.*, 231 F.3d 821, 829 (11th Cir. 2000).

It is hard to imagine that any employee—female, male or nonbinary; transgender or cisgender—would not find the "terms, conditions, or privileges" of their employment significantly changed if their employer prohibited them, but not other employees, from using the titles and pronouns that reflect their own gender identity.

More expressly than the employer conduct in the vast majority of Title VII cases, subsection 3 literally alters the "terms" and "conditions" of employment as a teacher in Florida's public schools—not informally, but by statute, and on the very real threat of termination, as Mx. Schwandes discovered. *Cf. Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986) ("Job titles … themselves are conditions of employment protected by Title VII."); *see also Holland v. Gee*, 677 F.3d 1047, 1058 (11th Cir. 2012) (holding that transfer to a position of equal pay but less prestige is an adverse employment action); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (holding that employer's policy of assigning employees call lists and scripts based on race is direct evidence of unlawful disparate treatment).

State Defendants list a series of cases in which courts found no adverse employment action and assert without reasoning that these cases involved "far more significant acts" than the "far less adverse" harms suffered by Plaintiffs. Doc. 63-1 at 17–18. But none of State Defendants' cases is remotely analogous, and certainly none have anything to say about whether Title VII is implicated by denying some employees (but not others) the right to operate according to their gender identity in the workplace. Indeed, none of the cases addressed employee identity or self-expression of any kind.[1] More helpful are cases that consider the significance of how

---

[1] None of State Defendants' cases plausibly involves employer action as significant as what subsection 3 has inflicted on Plaintiffs. *See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1203 (11th

people are addressed. For instance, in *Hamilton v. Alabama*, 376 U.S. 650 (1964), the Supreme Court reversed a contempt conviction for Mary Hamilton, a Black woman who had been held in contempt for insisting that a lawyer examining her in court address her as "Miss Hamilton" rather than "Mary." Or consider that being "repeatedly misgendered" has been held to contribute to a hostile work environment under Title VII. *Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 173 (D. Md. 2022). While hostile work environment cases involve a merely constructive change in the terms and conditions of employment, here subsection 3 accomplishes the same result *de jure* by mandating what amounts to continual sex harassment.

Although State Defendants argue that Defendant Florida Virtual School Board of Trustees—not they—terminated Mx. Schwandes, Doc. 63-1 at 18, they do not dispute that (1) Mx. Schwandes was terminated, (2) termination is an adverse employment action, and (3) they are "employer[s]" for Title VII purposes. Doc. 56 ¶¶ 109, 113, 118; *see also Freytes-Torres v. City of Sanford*, 270 F. App'x 885, 894

---

Cir. 2013) (plaintiff lost supervisory responsibilities but "neither a decrease in pay nor a loss of title"); *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1264–67 (11th Cir. 2021) (plaintiff was given a "simple paid suspension" after complaints about his behavior from subordinates and co-workers); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (plaintiff was "reassigned to a different geographic area" and maintained the same job title); *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (supervisor left a voicemail that plaintiff's "job was in jeopardy," but took no concrete action against plaintiff); *Van Der Meulen v. Brinker Int'l*, 153 F. App'x 649, 655 (11th Cir. 2005) (plaintiff "alleged one statement made threatening her future management aspirations"); *Dick v. CRC Ins. Servs., Inc.*, No. 2:08-cv-00910, 2009 WL 10687917, at *14 (N.D. Ala. Dec. 14, 2009) (supervisor "inadvertently made a comment referring to the [disabled] plaintiff's facial expressions").

(11th Cir. 2008) ("Termination is an ultimate employment action that is undeniably adverse.").

State Defendants admit that Defendant "Florida Department of Education has opened an investigation into [Mx.] Schwandes for noncompliance with [s]ubsection 3." Doc. 63-1 at 18; Doc. 56 ¶ 111. That could lead to the revocation or suspension of Mx. Schwandes's teaching license. Doc. 56 ¶ 45. This will have an effect similar to, or even greater than, being terminated because it will prevent Mx. Schwandes from being employed by any Florida public school and will negatively impact their ability to seek even an out-of-state teaching job. *See Bogden-Cozmuta v. Granby Urgent Care, LLC*, No. 3:20-cv-00879-VLB, 2022 WL 4585442, at *7 (D. Conn. Sept. 29, 2022) (holding that "threatening to report Plaintiff to the state licensing board, who presumably has the ability to revoke Plaintiff's license" was adverse employment action); *Seals v. Corr. Med. Servs., Inc.*, 473 F. Supp. 2d 912, 920 (E.D. Ark. 2007) (holding that disciplinary write-ups could constitute adverse employment action under Title VII because they could lead to license revocation); *Haymon v. D.C.*, 610 F. Supp. 3d 101, 115 (D.D.C. 2022) (holding that loss of police officer license constituted adverse employment action in a due process claim because it was similar to loss of employment).

State Defendants simply ignore the potential consequences of the investigation, instead arguing that investigations are never actionable under Title VII. Doc.

63-1 at 18–19. But this depends on the facts. *See, e.g.*, *Entrekin v. City of Panama City*, 376 F. App'x 987, 995 (11th Cir. 2010) (investigation was more than a "trivial harm" because it could "dissuade a reasonable worker from making or supporting a charge of discrimination"). Like the plaintiff in *Entrekin*, Mx. Schwandes was investigated only after submitting a discrimination charge to the EEOC. Doc. 56 ¶¶ 110–11. State Defendants' cited case, *Jenkins v. Tuscaloosa City Bd. of Educ.*, 72 F. Supp. 3d 1238, 1251 (N.D. Ala. 2014), in contrast, involved an investigation that resulted only in a "letter of reprimand" with no license revocation issues.

### E. Plaintiffs state a preemption claim.

State Defendants address Count 2 only in a footnote, Doc. 63-1 at 21 n.1, restating their Title VII argument and asserting that Plaintiffs cannot bring a preemption claim because there is no "freestanding cause of action for equitable relief for Supremacy Clause violations." *Id.* (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–26 (2015)). That is why Plaintiffs pled Count 2 under the Court's inherent equitable powers and 42 U.S.C. § 1983. *See* Doc. 56 ¶¶ 121–29; *Armstrong*, 575 U.S. at 326 (federal courts of equity have inherent equitable power "to enjoin unlawful executive action" unless statutory scheme shows "intent to foreclose equitable relief"); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989) (Section 1983 may be used to enjoin state violations of federal law unless Congress "specifically foreclosed a remedy under § 1983" (citation omitted)).

Congress did not intend to foreclose equitable relief under Title VII. The statute calls upon the courts power to "enjoin the respondent from engaging in such unlawful employment practice." 42 U.S.C. § 2000e-5(g)(1). And Title VII expressly preempts state laws "which require or permit the doing of any act which would be an unlawful employment practice under this subchapter." 42 U. S. C. § 2000e-7; *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 432 n.18 (1975) ("As to the effect of Title VII on state statutes inconsistent with it, *see* 42 U.S.C. §2000e-7.").

## II.    Plaintiffs state Free Speech Clause claims.

Free speech claims by government employees are usually analyzed under *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Courts first ask whether the "employee speaks 'pursuant to … official duties,'" or as a citizen and, if so, whether they are "addressing a matter of public concern." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527–28 (2022) (quoting *Garcetti*, 547 U.S. at 421, 423). If so, courts proceed to the second step, at which they evaluate whether the "employee's speech interests are outweighed by 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 528 (quoting *Garcetti*, 547 U.S. at 417).

State Defendants' arguments on all three parts of the *Pickering–Garcetti* test assume that Plaintiffs' use of their own titles and pronouns is part of their job

responsibilities. Because that assumption is wrong, Plaintiffs have stated a First Amendment claim.

### A. State Defendants cannot prohibit Plaintiffs from expressing their gender identities through titles and pronouns.

The Supreme Court has made clear that the government may not use its power as an employer to censor teachers by denying them the right to engage in core speech activities merely because students might witness them doing so. *Kennedy* held that a coach spoke as a private citizen on a matter of public concern when he prayed on the football field after games in view of his players. *Id.* at 519, 529–31. Though he "remained on duty" at the time of his prayers and conducted them "'within the office' environment—here, on the field of play," they nonetheless were not within his duties as a government employee. *Id.* at 530. To hold otherwise, the Court explained, would allow government to suppress all manner of private speech, such as a Muslim teacher's decision to wear a headscarf. *Id.* at 531.

*Kennedy* thus rejects the but-for test advanced by State Defendants, Doc. 63-1 at 24–25, under which an employee's speech is protected only if it would have occurred even if they had not been employed by the government. *Kennedy* instead relied on the fact that the content of the speech at issue was not something the government had created or directed. What Mr. Kennedy said when he prayed, to whom he prayed, or the choice to pray at that time instead of engage in other permitted activities had nothing to do with his duties as a coach. Plaintiffs' titles and pronouns,

likewise, are not something that the state determines just as their names are not either.

Like Mr. Kennedy's, Plaintiffs' speech is in a context in which other teachers are free to engage in various private forms of speech. While the state sets school curricula, it does not prescribe every word that teachers use at every moment in the classroom. Teachers are allowed to wear a pin with a cross or an American flag, but not one with their pronouns. They may display mementos or photos of family members on their desks but not a sign saying, for example, "Ms. Wood." They may write their names, which the state does not select or censor, on their chalkboards, but not their titles and pronouns. Teachers may start a class by asking what students did over a weekend or a vacation, and they may share similar facts about themselves, but they may not share their titles or pronouns. Nor do State Defendants deny that subsection 3 applies in the hallways, lunchrooms, and other times when teachers may interact with students outside the classroom in any number of ways that do not include provision of curricular information.

Plaintiffs do not argue, as State Defendants claim, that "all classroom discussion and communication with students [is] a time where teachers can engage in whatever private speech with students they desire." Doc. 63-1 at 26. Instead, subsection 3 singles out for special prohibition only a single form of expression: Plaintiffs' titles and pronouns, in a context where other teachers are free to say their titles and

pronouns. Subsection 3 is hence more objectionable than the rule at issue in *Kennedy* and more analogous to a rule that prohibited not all prayer but only Christian prayer on the field after football games. It is hence just as impermissible as the policy at issue in *Tinker v. Des Moines Independent Community School District*, where a school "singled out for prohibition a particular symbol—black armbands worn to exhibit opposition to this Nation's involvement in Vietnam" without "purport[ing] to prohibit the wearing of all symbols of political or controversial significance." 393 U.S. 503, 510–11 (1969).

State Defendants also cite *Ambach v. Norwick*, 441 U.S. 68, 80 (1979), for the proposition that teachers are "example[s] for students" and hence can be prohibited from providing their titles and pronouns presumably because that would set a bad example. Doc. 63-1 at 22. But *Kennedy* rejected precisely this attempt to use teachers' influence on students to justify censorship of particular speech: "A rule that the only acceptable government role models for students are those who eschew any visible religious expression would undermine a long constitutional tradition in which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" 597 U.S. at 510 (citation omitted). And *Grossman v. South Shore Public School District* is even less relevant: there the district declined to renew the contract of a guidance counselor because she threw out sex-ed materials about condoms and replaced them with abstinence-only materials

without her supervisor's consent and prayed with students as part of her guidance over them—all activities directly within her job. 507 F.3d 1097, 1098 (7th Cir. 2007) (cited at Doc. 63-1 at 23–24).

Finally, State Defendants' reliance on Fla. Stat. § 1000.071(6), which limits the section's impact to teachers "acting within the scope of their employment duties with the public K-12 educational institution," is tautological: the question is not whether the Legislature sought to define Plaintiffs' use of their titles and pronouns as part of their job—it plainly did—but whether it may do so constitutionally. For the same reason, if the facts had been the same in *Kennedy* but a state statute prohibited him from praying while acting within the scope of his employment duties the result would have been no different—indeed the school attempted unsuccessfully to apply just such a rule. *See Kennedy*, 597 U.S. at 517–18.

State Defendants' attempt to distinguish *Kennedy* relies on portraying Plaintiffs' means of introducing themselves, which they use in every other area of their lives, as "instruct[ion]." Doc. 63-1 at 35. But Plaintiffs do not "instruct[]" students on gender identity by using their titles and pronouns, just as a cisgender teacher does not so instruct by using their titles and pronouns, a Muslim teacher does not instruct students on religion by wearing a headscarf, and a Black teacher does not instruct on race by wearing a natural hairstyle. *Cf. Braxton v. Bd. of Pub. Instruction of Duval Cnty.*, 303 F. Supp. 958, 959 (M.D. Fla. 1969) (holding that wearer of a goatee

"enjoy[ed] the protection of first amendment rights" because the goatee was "worn as 'an appropriate expression of his heritage, culture, and racial pride as a black man'"). Similarly, State Defendants' citation to *Burt v. Fuchs*, No. 1:22-cv-00075, 2023 WL 4103942, at *5 (N.D. Fla. June 21, 2023), is unhelpful because it assumes the conclusion they cite it to prove: that Plaintiffs' use of their own titles and pronouns is akin to "editorializing" on their views to students.

**B.    Plaintiffs have satisfied the public concern prong of *Garcetti*.**

State Defendants' public concern argument merely recycles their argument that Plaintiffs speak as government employees. They cite *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 624 F.3d 332, 342 (6th Cir. 2010), for the proposition that "'speech that occurs within the compulsory classroom setting' 'does not constitute speech on a matter of public concern' when it is 'curricular in nature.'" Doc. 63-1 at 37. But Plaintiffs do not dispute that if their speech is curricular, then it is not private and hence unprotected by the Free Speech Clause. Similarly, in *Willey v. Sweetwater County School District. No. 1 Board of Trustees*, the court held that a teacher's refusal to use students' pronouns was unprotected because the teacher spoke pursuant to her official duties, not because the teacher's views on gender were not views on a matter of public concern. No. 23-cv-069, 2023 WL 4297186, at *23 (D. Wyo. June 30, 2023).

State Defendants also suggest that Plaintiffs' speech is unprotected because

its purpose is not to raise social issues. Doc. 63-1 at 26–27. But they rely on a line of cases, going back to *Garcetti*, that apply the public concern prong to distinguish times when government employees criticize the government "from the perspective of a citizen" from those where they seek to advance a "purely private" dispute with their employer. *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1167 (11th Cir. 2015) (holding plaintiff's memorandum complaining about poor management practices was not a matter of public concern). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Lane v. Franks*, 573 U.S. 228, 241 (2014). For purposes of the *Pickering–Garcetti* test, gender identity is a "social matter" of concern to the community, much as Mr. Kennedy's religion was. To hold otherwise would allow government employers to regulate all manner of private speech on core First Amendment topics merely because it was not intended to address public controversies. Indeed, State Defendants' argument on this point does not seem to dispute this because it ends with yet another restatement of the undisputed "curricular speech" argument. Doc. 63-1 at 26–27.

### C.    Florida has offered no interest to justify this law.

State Defendants' interest-balancing argument again simply assumes that Plaintiffs' speech is part of their job duties. *See, e.g.*, Doc. 63-1 at 28–29. They make no separate argument that if Plaintiffs speak as private citizens on matters of public

concern, then Florida's interest in regulating that speech outweighs Plaintiffs'. Indeed, the only thing they say about the purpose of subsection 3 for First Amendment purposes is that it is "part of comprehensive legislation aimed to promote the State's pedagogical goals and parental rights." *Id.* at 29. But they do not attempt to explain how subsection 3 functions as "part of comprehensive legislation" that has, among other purposes, the goal of "vindicat[ing] parental rights." *Id.* Such unsupported assertions of interest are far from enough to meet State Defendants' heavy burden to justify their blanket policy of prior restraint. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) ("Any system of prior restraint … comes to [the] Court bearing a heavy presumption against its constitutional validity."). In any event, because State Defendants' arguments are, at minimum, factually disputed they are not appropriate for resolution on a motion to dismiss.

Plaintiffs' strong interest in being allowed to provide and use their titles and pronouns easily outweighs the government's interest in silencing such expressive speech. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (prior restraint on speech is "the most serious and the least tolerable infringement on First Amendment rights").

Moreover, subsection 3's restriction on Plaintiffs' speech rights is not only content-based, but also viewpoint-based. "In general, viewpoint-based restrictions on expression require greater scrutiny than subject-matter-based restrictions." *R.A.V.*

*v. City of St. Paul*, 505 U.S. 377, 431 (1992) (Stevens, J., concurring); *see also id.* at 388–92; *Hill v. Colorado*, 530 U.S. 703, 723 (2000) ("Regulation of the subject matter of messages … [is] not as obnoxious as viewpoint-based regulation ….").

Finally, the interest-balancing step is almost automatically resolved in Plaintiffs' favor to the extent that Florida is attempting to compel them to speak its message. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018) ("[I]t is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case."). Here, Florida is compelling Plaintiffs to "promote its pedagogical goals," Doc. 63-1 at 29, by avoiding using their titles and pronouns and either avoiding answering or lying if asked about their gender.

Even if interest balancing were to apply, "widespread" government policies that "chill[] potential speech before it happens" give rise to "far more serious concerns" than the specific responses to individual speech acts considered in the standard *Pickering–Garcetti* case. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995); *see also Janus*, 138 S. Ct. at 2472.

## III. Plaintiffs state Equal Protection Clause claims.

"The Equal Protection Clause is 'essentially a direction that all persons similarly situated should be treated alike.'" *Adams*, 57 F.4th at 800 (quoting *City of*

*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "[I]t is well settled that when it comes to sex-based classifications, a policy will pass constitutional muster only if it satisfies intermediate scrutiny," *id.* at 801 (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)), under which "the government must show 'that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives,'" *id.* (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

Subsection 3 is one such sex-based classification that is subject to intermediate scrutiny. First, it classifies based on sex, and is therefore subject to intermediate scrutiny because it applies to Plaintiffs but not to other employees to whom they are similarly situated in all material respects besides "biological sex." It also is based on gender stereotypes about what titles and pronouns are not used by people assigned male at birth and those assigned female at birth, another form of sex discrimination. Second, it fails intermediate scrutiny because Florida's purported objectives are not important, and subsection 3's sex classification is not substantially related to those objectives.

Even if subsection 3 were not subject to or survived intermediate scrutiny, it is unconstitutional because it intentionally discriminates against transgender and nonbinary people and because it fails rational-basis review. Whatever scrutiny applies, whether subsection 3 survives that scrutiny is not appropriate on a motion to

dismiss. *See, e.g.*, *Operation Par, Inc. v. Hernando Cnty.*, No. 8:11-cv-2679, 2012 WL 13106401, at *2 (M.D. Fla. Feb. 6, 2012) (deferring application of rational-basis review, "which is best addressed on a complete record, not the bare pleadings"); *Hassan v. City of N.Y.*, 804 F.3d 277 (2015), *as amended* (3d Cir. 2016) ("[T]he burden of producing evidence to overcome heightened scrutiny's presumption of unconstitutionality is that of the City and must be met *after* its Motion to Dismiss." (citation omitted)).

### A. Subsection 3 is subject to intermediate scrutiny.

Sex-based classifications are subject to intermediate scrutiny. *Adams*, 57 F.4th at 801. In *Adams*, the en banc Eleventh Circuit held that a policy that "requires 'biological boys' and 'biological girls'—in reference to their sex determined at birth— to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms … is a sex-based classification." *Id.* "[B]ecause th[at] policy … classifies on the basis of biological sex, it is subject to intermediate scrutiny." *Id.* at 803. Similarly, subsection 3 classifies on the basis of "biological sex" and is therefore subject to intermediate scrutiny. It prohibits employees like Ms. Wood and Ms. Doe, who were assigned male at birth, from providing to students titles and pronouns that "do not correspond to … her sex," but it does not similarly prohibit other employees who were instead assigned female at birth. Fla. Stat. § 1000.071(3).

Subsection 3 is also subject to intermediate scrutiny because it discriminates

against Plaintiffs on the basis of their gender nonconformity. Under the Equal Protection Clause, "governmental acts based upon gender stereotypes—which presume that men and women's appearance and behavior will be determined by their sex—must be subjected to heightened scrutiny because they embody 'the very stereotype the law condemns.'" *Glenn*, 663 F.3d at 1320 (quoting *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994)). "Ever since the Supreme Court began to apply heightened scrutiny to sex-based classifications, its consistent purpose has been to eliminate discrimination on the basis of gender stereotypes." *Id.* at 1319. "All persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype." *Id.* at 1318.

In *Glenn*, the plaintiff, a transgender woman, was fired after informing her supervisor, Mr. Brumby, that she would "begin coming to work as a woman and was also changing her legal name." *Id.* at 1314. In particular, Mr. Brumby "deemed her appearance inappropriate '[b]ecause [Glenn] was a man dressed as a woman and made up as a woman." *Id.*; *see also id.* at 1320–21. The Eleventh Circuit held that that explanation by Mr. Brumby "provide[d] ample direct evidence to support the district court's conclusion that Brumby acted on the basis of Glenn's gender nonconformity." *Id.* at 1321. Thus, it was not solely Ms. Glenn's transgender status, but also her failure to conform to gender stereotypes that resulted in a violation of the Equal Protection Clause. *Id.*

As in *Glenn*, this case concerns gender stereotyping in a public workplace. Florida statute enshrines a sex stereotype that "it is false to ascribe to a person a pronoun that does not correspond to such person's sex," Fla. Stat. § 1000.071(1), and requires Plaintiffs, who use titles and pronouns that "do[] not correspond to" their sex assigned at birth, to conform to that stereotype through subsection 3. Discrimination against Plaintiffs on the basis of their failure to conform to the sex stereotypes enshrined in Florida law is subject to intermediate scrutiny under the Equal Protection Clause.[2]

State Defendants argue that "[s]ubsection 3 'does not discriminate based on sex,'" and therefore it is subject to rational-basis review, because "Wood and Doe cannot claim to be similarly situated to biological females because they are not biologically female." Doc. 63-1 at 30. But by this logic, no group harmed by a sex-based classification would ever have a similarly situated comparator. The "similarly situated" requirement does not ask what group Plaintiffs are *in* but rather what *other* group—to which Plaintiffs are similarly situated in all material respects except the characteristic upon which they allege discrimination—is treated more favorably. "Courts must 'isolate the factor allegedly subject to impermissible discrimination.'"

---

[2] State Defendants argue that any argument based on *Glenn* is "foreclosed" by *Adams*'s statement that "'sex' is not a stereotype." Doc. 63-1 at 32 n.3 (quoting *Adams*, 57 F.4th at 813). But *Adams* did not silently overrule *Glenn*; instead, in *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023), the Eleventh Circuit reaffirmed *Glenn*'s continued relevance in employment discrimination cases.

*Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022) (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)); *see also Lewis v. City of Union City*, 918 F.3d 1213, 1221 (11th Cir. 2019) (en banc) (asking "whether Lewis adequately showed that the City treated 'similarly situated' employees *outside her class* more favorably than her" (emphasis added)). Isolating "biological sex," Ms. Wood and Ms. Doe are similarly situated to employees who were assigned female at birth and who are subject to subsection 3 but, unlike Ms. Wood and Ms. Doe, are not prohibited by subsection 3 from using Ms. and she/her pronouns.

*Adams* is not to the contrary. In that case, the en banc Eleventh Circuit suggested, without deciding, that "biological sex" was a material difference between the transgender plaintiff Adams and the cisgender students to which, he argued, he was similarly situated. *Adams*, 57 F.4th at 803 n.6. But that was because Adams, unlike Plaintiffs in this case, challenged the policy in his case as unconstitutional sex discrimination because of its discrimination based on gender identity, not because of its discrimination based on "biological sex." *See, e.g.*, En Banc Br. of Appellee Drew Adams at *22, *Adams*, 2021 WL 5630397 ("Defendant's policy of separating boys and girls in restrooms—which is not at issue—does not restrict any non-transgender boy or non-transgender girl's use of the restrooms. Instead, Andrew challenges Defendant's decision to treat him differently from other boys because he is transgender."). Ms. Wood and Ms. Doe argue that subsection 3 unconstitutionally

classifies based on "biological sex," and hence unlike in *Adams*, "biological sex" cannot be a material difference between them and their comparators that sinks their claim.

State Defendants next argue that rational-basis review applies because "it 'establishes a rule that applies equally to both sexes: it restricts' the use of pronouns that are in 'discordance between biological sex and sense of gender identity for all teachers." Doc. 63-1 at 31 (quoting *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228 (11th Cir. 2023) (cleaned up). In other words, teachers must "adher[e] to longstanding social norms and practices regarding pronouns" that are based on sex stereotypes. Doc. 63-1 at 35.

This argument incorrectly frames subsection 3 at too high a level of generality. Many policies that create different rules for men and woman can be made to seem sex-neutral in this manner. For example, the bathroom policy in *Adams* could have been recast as "establish[ing] a rule that applies equally to both sexes: it restricts the use of [bathrooms] that are in discordance between biological sex and sense of gender identity for all [students]." Doc. 63-1 at 31. But *Adams* instead easily identified the policy as a sex-based classification subject to intermediate scrutiny. *See Adams*, 57 F.4th at 801. Subsection 3 does not apply the same rule to both females and males: it prohibits those assigned female at birth from providing to students titles and pronouns that men usually use, like Mr., he, and him, and it prohibits those assigned

male at birth from providing to students titles and pronouns that women usually use, like Mrs., Ms., she, and her. Because subsection 3 distinguishes which titles and pronouns a person can use on the basis of sex, it is subject to intermediate scrutiny, not rational basis review.

State Defendants misread *Adams* to have merely "assum[ed], for purposes of the case," that intermediate scrutiny applied to the bathroom policy, Doc. 63-1 at 32 (citing *Adams*, 57 F.4th at 803 & n.6), but the entire en banc Eleventh Circuit agreed that the bathroom policy was a sex-based classification subject to intermediate scrutiny, *see Adams*, 57 F.4th at 801 (majority); *id.* at 824 (Jordan, J., dissenting); *id.* at 832 (Pryor, J., dissenting). The footnote that State Defendants misread merely concluded that the Court did not need to decide whether Adams satisfied the separate, "similarly situated" requirement because it elsewhere concluded that the bathroom policy satisfied intermediate scrutiny.

State Defendants also argue that rational-basis review applies to Mx. Schwandes's claims because they "cannot claim to be treated any differently than any man or woman because both men and women violate [s]ubsection 3 for using they/them pronouns." Doc. 63-1 at 30. But as explained in Section I.A above, subsection 3 does treat Mx. Schwandes differently from materially similar employees who are nonetheless exempted from subsection 3's prohibition on Mx. and they/them pronouns.

## B. Subsection 3 fails intermediate scrutiny.

State Defendants have not proved that subsection 3's sex classification "serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Adams*, 57 F.4th at 801 (quoting *Hogan*, 458 U.S. at 724 (1982)). "The burden of justification" that a sex classification survives intermediate scrutiny "is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

### 1. State Defendants have not proved that subsection 3 serves important governmental objectives.

"Successful defense of legislation that differentiates on the basis of gender … requires an 'exceedingly persuasive justification.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *Virginia*, 518 U.S. at 531). "For a governmental objective to be important, it cannot 'rely on overbroad generalizations about the different … preferences of males and females.'" *Adams*, 57 F.4th at 801 (quoting *Virginia*, 518 U.S. 533). It "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533. "Moreover, the classification must substantially serve an important governmental interest today, for 'in interpreting the [e]qual [p]rotection [guarantee], [we have] recognized that new insights and societal understandings can reveal unjustified inequality … that once passed unnoticed and unchallenged.'" *Morales-Santana*, 582 U.S. at 59 (quoting *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015)).

State Defendants assert two government interests supporting subsection 3:First, "[s]ubsection 3 advances the State's pedagogical goal[]" "that students should be taught that biological sex is immutable," Doc. 63-1 at 33 (citing Fla. Stat. § 1000.071(1)), and that its "pedagogical message would be undermined by teachers using pronouns that do not conform to their biological sex," *id.* at 33–34. Second, "Florida has an interest in avoiding potential confusion arising from contentious social issues," like gender identity, "and focusing the curriculum instead on core subjects," like reading, writing, and arithmetic. *Id.* at 34. In other words, Florida supposedly has an "important government interest" in teaching children sex stereotypes that erase the existence of transgender and nonbinary identities.

Yet there is no other evidence of this supposed "important government interest." Section 1000.071 does not require teaching students anything about this supposedly important interest. Indeed, as State Defendants themselves point out, Florida law actually prohibits "instruction" on "gender identity" in most contexts. Doc. 63-1 at 35 (citing Fla. Stat. § 1001.42(8)(c)(3)). Defendant State Board of Education has itself previously argued to a different federal court that "it would violate [§ 1001.42(8)(c)(3)] to instruct students that … gender identity is immutable based on biological traits." Br. of State Defs., *Cousins v. Grady*, No. 6:22-cv-1312, 2022 WL 19348689 (M.D. Fla. Dec. 16, 2022), ECF 112 at 3–4; *see also id.* at 1 (claim that law bars "any acknowledgment whatsoever of the existence of LGBTQ+

people" is "fearmongering at best"); *id.* at 3 (statute does not prohibit "literary references to a … transgender person"); *cf. id.* ("photos of same-sex spouses on their desks … are not classroom instruction on sexual orientation").

The only remaining state interest in subsection 3 is bare animus towards transgender and nonbinary people. That animus is apparent in section 1000.071's text. Subsection 1 establishes a policy, implemented through subsection 3, that brands their expression of their gender identity through titles and pronouns as "false." Although State Defendants assert that Florida is not trying to remove all transgender and nonbinary teachers from the classroom, *see* Doc. 63-1 at 19–20, that is subsection 3's obvious and practical effect. But states do not have any interest, much less an exceedingly persuasive one, in discriminating for discrimination's sake in "rely[ing] on overbroad generalizations about the different … preferences of males and females," *Adams*, 57 F.4th at 801 (quoting *Virginia*, 518 U.S. 533), or in setting curriculum based on animus, *cf. Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 972 (D. Ariz. 2017) (holding curriculum restriction motivated by animus against Mexican–Americans violated the Fourteenth Amendment).

Citing *Adams*, State Defendants argue that their discriminatory policy should be given deference because Plaintiffs' workplace is a school. Doc. 63-1 at 32–33 (citing *Adams*, 57 F.4th at 801–02). Yet *Adams* rejected the view that "schools have a carte blanche" to discriminate. 57 F.4th at 802.

### 2. State Defendants have not shown that subsection 3 is substantially related to the achievement of Florida's objectives.

State Defendants also fail to show that subsection 3 is properly tailored to Florida's asserted interests. Although the fit between means and ends need not be "perfect," there still "must be 'enough of a fit'" that the policy is "substantially related" to the asserted justification." *Id.* at 801. State Defendants argue that "[a] biological man using feminine pronouns in interactions with students undermines [their] goal … in implementing its pedagogical view that 'a person's sex is an immutable biological trait.'" Doc. 63-1 at 34.

Far from supporting Florida's alleged interests, subsection 3 actually undermines them. It forces teachers who in all other ways present as one gender to out themselves as transgender through their use of titles and pronouns. For example, Ms. Wood presents as a woman, but subsection 3 forces her to use either Mr. and he/him pronouns, which she cannot and will not use, *see* Doc. 56 ¶ 83, or Teacher, "a non-gendered title that no male or female teachers at her school use," *id.* ¶ 86, and that "has disrupted Ms. Wood's ability to teach and distracted her students," *id.* ¶ 87. Instead of "avoiding potential confusion … and focusing the curriculum instead on core subjects," Doc. 63-1 at 34, subsection 3 unavoidably injects gender identity into conversations with students, distracts from the teacher's instruction of "core curriculum," and creates confusion for students.

State Defendants quote *Califano v. Jobst*, 434 U.S. 47 (1977), for the

proposition that a "broad legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." Doc. 63-1 at 36. But that was said about a classification subject to rational basis review, not intermediate scrutiny. *See Califano*, 434 U.S. at 56. Furthermore, Plaintiffs are not "atypical examples." State Defendants themselves say that one of subsection 3's purposes is to "avoid[] potential confusion arising from contentious social issues," such as "[g]ender identity," Doc. 63-1 at 34. But Florida has deemed controversial only gender identities that differ from one's sex assigned at birth, so it is no wonder that subsection 3 has real-world effects only for transgender and nonbinary teachers, such as Plaintiffs.

Moreover, Florida's dual interests are at war with each other under subsection 3's regime. While the first calls on teachers to teach students by example that one's gender identity cannot be different from one's sex because "biological sex is immutable," Doc. 63-1 at 33, the second stresses that gender identity has no role in the classroom because it is too "controversial" and "sensitive," *id.* at 34. And both of State Defendants asserted interests depend on the false claim that Plaintiffs' use of their titles and pronouns is itself part of a school's "curriculum." *See* Section II.A.

For these reasons, subsection 3 fails intermediate scrutiny and is unconstitutional.

### C. Subsection 3 is motivated at least in part to discriminate against transgender and nonbinary teachers.

"[A] disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by 'purposeful discrimination.'" *Adams*, 57 F.4th at 810 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979)). If "the statutory classification is indeed neutral in the sense that it is not gender-based," then the "question is whether the adverse effect reflects invidious gender-based discrimination." *Feeney*, 442 U.S. at 274. Subsection 3 is sex-based, but even if it were somehow sex-neutral, its "adverse effect[s]" clearly "reflect[] invidious gender-based discrimination."

The discriminatory purpose need only be "*a* motivating factor," not the "dominant" or "primary" concern. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) (emphasis added). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Courts look to, for example, "[t]he impact of the official action," *id.*, its "historical background … particularly if it reveals a series of official actions taken for invidious purposes," *id.* at 267, and "[t]he legislative or administrative history," *id.* at 268.

Subsection 3's restriction in reality only adversely affects transgender and nonbinary teachers. Cisgender teachers are still free to use the titles and pronouns they use in all other aspects of their lives. This disparate impact was not merely

foreseeable, it was at least in part the intended result of these measures. *See supra* Section III.B.2.

"[P]urposeful discrimination" is written into the text of section 1000.071. It labels transgender and nonbinary people's use of titles and pronouns "false" "'because of,' not merely 'in spite of,' its adverse effects upon" them. *Adams*, 57 F.4th at 810 (quoting *Feeney*, 442 U.S. at 279). State Defendants now rely on that statutory animus to defend subsection 3. *See supra* Section III.B.1. Plaintiffs' allegations of animus external to the text of the statute itself, *see* Doc. 56 ¶¶ 29–33, evidence a "series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 266–67. Subsection 3 therefore is unconstitutional.

State Defendants argue that the bill that created subsection 3 cannot be motivated by purposeful discrimination because it "was supported by extensive legislative reports about parental rights and age-appropriate education," Doc. 63-1 at 37, citing one legislative analysis, *see id.* at 3 (citing Fla. H.R. Comm. on Educ. & Emp., CS/CS/HB 1069 (2023) Staff Final Analysis 8 (May 22, 2023), https://bit.ly/3Sx5jaj). First, even if the legislative analysis provides alternative motivations for the passage of subsection 3, that does not mean that purposeful discrimination was not a motivating factor. Second, the cited legislative analysis supports no non-discriminatory motivations. Beyond reciting the statute's text, it barely mentions subsection 3 at all. It does not discuss any justification specific to subsection

3, explain any factors motivating subsection 3 in particular, cite any evidence justifying subsection 3, or cite any other legislative reports containing such justification.

### D. Subsection 3 would fail rational basis review too.

Rational basis review requires "a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). That "inquiry is 'not a toothless one,'" and there are limits to the latitude afforded states." *Deen v. Egleston*, 597 F.3d 1223, 1230 (11th Cir. 2010) (citation omitted). It "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633. A law that "seems inexplicable by anything but animus toward the class it affects … lacks a rational relationship to legitimate state interests." *Id.* at 632. Indeed, "[i]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Id.* at 634.

Section 1000.071's animus towards transgender and nonbinary people is apparent on its face. *See supra* Section III.B.1. State Defendants' defense of subsection 3 depends on their having a legitimate governmental interest in teaching children that it is "false" when transgender and nonbinary people—"a politically unpopular group" that is particularly "burdened by the law"—use titles and pronouns that express their gender identity. *See* Doc. 63-1 at 33–34. There is no rational basis to conclude that allowing transgender and nonbinary teachers to use titles and pronouns

that express their gender identity "would threaten legitimate interests of [Florida] in a way that" allowing cisgender teachers to use the pronouns that express their gender identities "would not." *Cleburne*, 473 U.S. at 448.

Plaintiffs have properly stated an Equal Protection Clause claim regardless of the level of scrutiny applied.

## IV.   Plaintiffs state Title IX claims.

"Title IX was passed as part of the Education Amendments of 1972 and 'patterned after' the Civil Rights Act of 1964." *Adams*, 57 F.4th at 811 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694–96 (1979)). "The statute mandates that, subject to certain exceptions: 'No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Id.* (quoting 20 U.S.C. § 1681(a)) (cleaned up). Courts "must accord it a sweep as broad as its language." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)).

Title IX claims are analyzed under the framework for Title VII claims. *See, e.g.*, *Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 686 (11th Cir. 2019); *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911 n.7 (11th Cir. 2013); Doc. 62 at 5; Doc. 63-1 at 40. Like Title VII, Title IX uses the "ancient and simple 'but for' common law causation test" to determine whether a "person" was

"subjected to discrimination" "on the basis of sex." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). Subsection 3 fails that but-for test just as straightforwardly under Ms. Wood's and Ms. Doe's Title IX claims as it does under their Title VII claims. *See supra* Section I.A.

*Adams* supports this simple analysis. Just as the bathroom policy there "plainly" decided whether a student may use a certain bathroom on the basis of that student's sex, 57 F.4th at 814, subsection 3 "plainly" decides whether a teacher may use a certain title or pronoun on the basis of Florida's view of that teacher's sex, so it "plainly" discriminates on the basis of sex. *Id.* But unlike in *Adams*, in which "Title IX's implementing regulations explicitly allow schools to 'provide separate toilet facilities on the basis of biological sex," *id.* at 815 (quoting 34 C.F.R. § 106.33) (cleaned up), Title IX does not provide schools a carve-out safe harbor for titles and pronouns, and State Defendants cite no such carve-out.

Subsection 3 also violates Title IX because of its sex stereotyping for the same reasons that it violates Title VII, so Plaintiffs incorporate by reference those arguments. *See supra* Section I.B.

State Defendants argue that "*Adams* squarely forecloses" Plaintiffs' Title IX claims because it "rejected the argument that 'the meaning of 'sex' in Title IX includes 'gender identity' for purposes of its application to transgender students.'" Doc. 63-1 at 40 (quoting 57 F.4th at 813). But just as the Court in *Bostock*

"proceed[ed] on the assumption that 'sex' [under Title VII] signified what the employers suggest[ed], referring only to biological distinctions between male and female," Plaintiffs assume for purposes of this case that "sex" under Title IX means "biological sex" or "sex assigned at birth." *See, e.g.*, Doc. 56 ¶ 21; *see also Adams*, 57 F.4th at 812.

State Defendants note in a single sentence that "the Eleventh Circuit has cautioned against reliance on *Bostock* in the Title IX context because of Title IX's different statutory and regulatory context, the absurd results of interpreting sex to include transgender status under Title IX, and Title IX, unlike Title VII, was enacted under the Spending Clause." Doc. 63-1 at 40 (citing *Adams*, 57 F.4th at 811–17). But, first, Plaintiffs' Title IX claims "rel[y] on *Bostock*" only to the extent that it illustrates how to apply the "'simple' and 'traditional' standard of but-for causation." *Bostock*, 590 U.S. at 656. That test is not *Bostock*'s creation; it is the "default" and "background" "rule against which Congress is normally presumed to have legislated when creating its own new causes of action." *Comcast Corp.*, 140 S. Ct. at 1014 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)). Second, "Title IX, []like Title VII," does *not* "include[] express statutory and regulatory carve-outs for differentiating between the sexes when it comes to" titles and pronouns. *Adams*, 57 F.4th at 811. Third, Plaintiffs' Title IX claims do *not* depend on "interpreting sex to include transgender status under Title IX." Doc. 63-1 at 40.

Fourth, the Eleventh Circuit did not refer to *Bostock* in its Spending Clause analysis in *Adams*, which concerned whether "the meaning of 'sex' [under Title IX] unambiguously meant something other than biological sex." 57 F.4th at 816. But again, Plaintiffs assume for purposes of this case that "sex" under Title IX *does* mean "biological sex." *See, e.g.*, Doc. 56 ¶ 21. Title IX's straightforward application to subsection 3 and its lack of any carve-out for titles and pronouns illustrate that Title IX gave State Defendants "adequate notice that they could be liable for the conduct at issue." *Adams*, 57 F.4th at 815 (quoting *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999)).

State Defendants' remaining argument is that "'[t]he 'precisely drawn, detailed enforcement structure' and 'comprehensive remedial scheme' that is Title VII preempts the more general remedy under Title IX in these circumstances." Doc. 63-1 at 39 (quoting *Schultz v. Bd. of Trs. of Univ. of W. Fla.*, No. 3:06-cv-442, 2007 WL 1490714, at *3 (N.D. Fla. May 21, 2007)). Although most district courts within the Eleventh Circuit agree with State Defendants, Plaintiffs respectfully submit that Judge Winsor in this Court and Judge Calvert in the Northern District of Georgia have the better argument. *See Bird v. Univ. of Fla. Bd. of Trs.*, No. 1:18-cv-221, 2019 WL 13087801, at *4 (N.D. Fla. Aug. 23, 2019); *Crowther v. Bd. of Regents of Univ. Sys. of Ga.*, 661 F. Supp. 3d 1342, *amended*, 2023 WL 4915078 (N.D. Ga. May 12, 2023), *appeal docketed*, No. 23-12475 (11th Cir. Aug. 1, 2023). In

summary, the cases that hold that Title VII preempts Title IX rely on an inapposite case, *see, e.g.*, *Bird*, 2019 WL 13087801, at *5–6 (distinguishing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979)), and there are numerous reasons that cut against finding preemption, *see id.* at *6 (citing *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545 (3d Cir. 2017)); *Crowther*, 661 F. Supp. 3d at 1353 (reasoning that Title VII does not expressly preempt Title IX but instead allows for broader state laws; Congress has not acted to stop Title IX enforcement in employment; and the statutes complement each other).

If the Court does not find Plaintiffs' argument persuasive, it could defer decision on this question until the Eleventh Circuit decides this issue in two consolidated cases before it. *See, e.g.*, Br. Def.-Appellant at 1, *Crowther*, No. 23-12475 (11th Cir. Oct. 12, 2023) ("Whether Title VII precludes claims for sex discrimination in employment under Title IX."), *consolidated with Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 23-11037 (11th Cir.).

## CONCLUSION

Plaintiffs respectfully request that the Court deny State Defendants' motions to dismiss.

Respectfully submitted.

February 26, 2024

*/s/ Carli Raben*
Sam Boyd, Fla. Bar No. 1012141
Carli Raben, Fla. Bar No. 1036013

Southern Poverty Law Center
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131
(786) 347-2056
(786) 237-2949 (fax)
sam.boyd@splcenter.org
carli.raben@splcenter.org

Aaron S. Fleisher[*†]
Southern Poverty Law Center
1101 17th St NW Ste. 705
Washington, DC 20036
(202) 536-9719
(202) 971-9205 (fax)
aaron.fleisher@splcenter.org
[†] *Not admitted to practice law in DC*

Diego A. Soto[*‡]
Jessica L. Stone[*]
Southern Poverty Law Center
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030
(404) 521-6700
(404) 377-0708 (fax)
diego.soto@splcenter.org
jessica.stone@splcenter.org
[‡] *Admission to GA pending*

Simone Chriss, Fla. Bar No. 124062
Jodi Siegel, Fla. Bar No. 511617
Southern Legal Counsel, Inc.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

James M. Finberg[*]
James Baltzer[*]

ALTSHULER BERZON LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
jfinberg@altshulerberzon.com
jbaltzer@altshulerberzon.com

*Counsel for Plaintiffs*

\* *Admitted* pro hac vice

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.1(F), the undersigned certifies that this filing, consistent with Local Rule 7.1(F) and this Court's order of February 1, 2024, Doc. 49, memorandum contains 12,137 words, inclusive of footnotes, according to the word-processing system used to prepare it. Like State Defendants, Doc. 63-1 at 49, Plaintiffs understood the Court's orders on February 1, 2024, Doc. 49, and February 5, 2024, Doc. 51, to waive the word limit for all briefs set forth in the February 1 order. If that understanding was incorrect, they respectfully request a modification of the word limit.

February 26, 2024                    /s/ *Carli Raben*
                                     Carli Raben, Fla. Bar No. 1036013
                                     SOUTHERN POVERTY LAW CENTER
                                     2 S. Biscayne Blvd. Ste. 3750
                                     Miami, FL 33131
                                     (786) 347-2056
                                     (786) 237-2949 (fax)

carli.raben@splcenter.org