# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Katie Wood *et al.*,

      *Plaintiffs*,

v.          No. 4:23-cv-00526-MW-MAF

Florida Department of Education *et al.*,

      *Defendants*.

_____/

## PLAINTIFFS KATIE WOOD AND AV SCHWANDES'S REPLY
## IN SUPPORT OF THEIR MOTIONS FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................. 1

ARGUMENT ..................................................................................... 2

    I. Plaintiffs are likely to succeed on the merits ............................... 2

        A. Subsection 3 violates Title VII ....................................... 2

            1. Subsection 3 fails the but-for test articulated in *Bostock* ........ 2

            2. *Bostock* bars discrimination based on individuals' conduct ... 3

            3. Subsection 3 is based on sex stereotypes in violation of Title VII ............................................................................... 8

            4. Subsection 3 is not a bona fide occupational qualification .. 12

            5. Plaintiffs have suffered adverse employment actions .......... 16

        B. Subsection 3 violates the First Amendment ................................... 20

            1. State Defendants cannot prohibit Plaintiffs from existing as transgender and nonbinary people at work ........................... 20

            2. Plaintiffs have satisfied the public concern prong of *Garcetti* ................................................................................... 25

            3. State Defendants have offered no interest to justify subsection 3 ........................................................................ 27

    II. Plaintiffs did not unreasonably delay filing their motions for preliminary injunction ............................................................................. 31

    III. Plaintiffs have shown irreparable harm under Title VII ......................... 33

    IV. The public interest and balance of equities favor Plaintiffs ................... 36

CONCLUSION .................................................................................. 37

CERTIFICATE OF WORD COUNT ....................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC Charters, Inc. v. Bronson*,
  591 F. Supp. 2d 1272 (S.D. Fla. 2008) ............................................................36

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) (en banc) ....................................................*passim*

*Alabama v. U.S. Dep't of Com.*,
  546 F. Supp. 3d 1057 (M.D. Ala. 2021) ..........................................................33

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*,
  804 F.3d 1149 (11th Cir. 2015) ......................................................................26

*Baker v. Buckeye Cellulose Corp.*,
  856 F.2d 167 (11th Cir. 1988) ...................................................................33, 34

*Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l
  Alumni Ass'n, Inc.*,
  No. 22-14257, 2023 WL 3704912 (11th Cir. May 30, 2023)
  (unpublished) .................................................................................................33

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ..................................................................................*passim*

*Braxton v. Bd. of Pub. Instruction of Duval Cnty.*,
  303 F. Supp. 958 (M.D. Fla. 1969) ................................................................22

*Burt v. Fuchs*,
  No. 1:22-cv-75, 2023 WL 4103942 (N.D. Fla. June 21, 2023) ......................22

*Chambers v. Omaha Girls Club*,
  629 F. Supp. 925 (D. Neb. 1986) ..............................................................15, 16

*Chavez v. Credit Nation Auto Sales, LLC*,
  641 F. App'x 883 (11th Cir. 2016) ..................................................................11

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez,*
    561 U.S. 661 (2010) ........................................................................6

*Cox v. Am. Cast Iron Pipe Co.,*
    784 F.2d 1546 (11th Cir. 1986) ........................................................18

*Davis v. Legal Servs. Ala., Inc.,*
    19 F.4th 1261 (11th Cir. 2021) ........................................................18

*Diaz v. Pan Am. World Airways, Inc.,*
    442 F.2d 385 (5th Cir. 1971) ......................................................13, 15

*Dick v. CRC Ins. Servs., Inc.,*
    No. 2:08-cv-00910, 2009 WL 10687917 (N.D. Ala. Dec. 14, 2009)................18

*Dothard v. Rawlinson,*
    433 U.S. 321 (1977).......................................................................12

*Dream Defs. v. DeSantis,*
    559 F. Supp. 3d 1238 (N.D. Fla. 2021) ........................................31, 33

*E.E.O.C. v. Joe's Stone Crab, Inc.,*
    220 F.3d 1263 (11th Cir. 2000) ..........................................................8

*EEOC v. Catastrophe Management Solutions,*
    852 F.3d 1018 (11th Cir. 2016) ......................................................6, 7

*EEOC v. Kamehameha Sch./Bishop Est.,*
    990 F.2d 458 (9th Cir. 1993) ...........................................................16

*Eknes-Tucker v. Governor of Ala.,*
    80 F.4th 1205 (11th Cir. 2023) ........................................................11

*Eller v. Prince George's Cnty. Pub. Schs.,*
    580 F. Supp. 3d 154 (D. Md. 2022)...................................................19

*Entrekin v. City of Panama City,*
    376 F. App'x 987 (11th Cir. 2010) ................................................19, 20

*Evans v. Ga. Reg'l Hosp.,*
    850 F.3d 1248 (11th Cir. 2017...........................................................6

*FF Cosms. FL, Inc. v. City of Miami Beach*,
866 F.3d 1290 (11th Cir. 2017) .........................................................37

*Fla. Businessmen for Free Enter. v. City of Hollywood*,
648 F.2d 956 (5th Cir. 1981) ............................................................36

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990)..........................................................................31

*Garcia v. Stillman*,
No. 22-CV-24156, 2023 WL 3478450 (S.D. Fla. May 16, 2023).....37

*Garneau v. Raytheon Co.*,
323 F. Supp. 391 (D. Mass. 1971) ....................................................37

*Garrett v. Okaloosa Cnty.*,
734 F.2d 621 (11th Cir. 1984) .........................................12, 14, 15, 16

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ................................................9, 11, 12

*Hamilton v. Alabama*,
376 U.S. 650 (1964)..........................................................................18

*Hardin v. Stynchcomb*,
691 F.2d 1364 (11th Cir. 1982) ..................................................13, 14

*Hinson v. Clinch Cnty., Ga. Bd. of Educ.*,
231 F.3d 821 (11th Cir. 2000) ..........................................................17

*Howard v. Walgreen Co.*,
605 F.3d 1239 (11th Cir. 2010) ........................................................18

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of
Am., UAW v. Johnson Controls, Inc.*,
499 U.S. 187 (1991).........................................................5, 11, 12, 14

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018)......................................................................29

*Jenkins v. Tuscaloosa City Bd. of Educ.*,
72 F. Supp. 3d 1238 (N.D. Ala. 2014)..............................................20

*Kansas Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*,
    31 F.3d 1536 (10th Cir. 1994) ............................................................36

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022)...............................................20, 22, 23, 24

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ......................................................36

*Kidd v. Mando Am. Corp.*,
    731 F.3d 1196 (11th Cir. 2013) ......................................................18

*Koe v. Noggle*,
    No. 1:23-cv-2904, 2023 WL 5339281 (N.D. Ga. Aug. 20, 2023) ....................33

*L.A. Dep't of Water & Power v. Manhart*,
    435 U.S. 702 (1978)...............................................................10

*Lane v. Franks*,
    573 U.S. 228 (2014)...............................................................26

*McCrimmon v. Daley*,
    No. 68 C 1665, 1970 WL 119 (N.D. Ill. Mar. 31, 1970)...................................37

*McDonald's Corp. v. Robertson*,
    147 F.3d 1301 (11th Cir. 1998) ................................................33, 34

*McMahon v. World Vision, Inc.*,
    No. 2:21-cv-00920, 2023 WL 4704711 (W.D. Wash. July 24,
    2023) ........................................................................5

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*,
    No. 3:02-cv-1005, 2012 WL 6827463 (M.D. Fla. Aug. 30, 2012) ....................34

*Pals Grp., Inc. v. Quiskeya Trading Corp.*,
    No. 16-23905-CIV, 2017 WL 532299 (S.D. Fla. Feb. 9, 2017).......................33

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022) ..........................................29

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ......................................................8, 10, 11

*Rosenfeld v. S. Pac. Co.*,
  444 F.2d 1219 (9th Cir. 1971) ........................................................................15

*Shannon v. Bellsouth Telecomms., Inc.*,
  292 F.3d 712 (11th Cir. 2002) .......................................................................18

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) .....................................................................34

*Snider Tire, Inc. v. Chapman*,
  No. 2:20-cv-1775, 2021 WL 2497942 (N.D. Ala. Apr. 27, 2021) .................33

*Storves v. Island Water Ass'n, Inc.*,
  No. 2:10-cv-274, 2010 WL 11622686 (M.D. Fla. Nov. 3, 2010) ..................34

*Temple Univ. v. White*,
  941 F.2d 201 (3d Cir. 1991) ..........................................................................36

*United States v. National Treasury Employees Union*,
  513 U.S. 454 (1995)........................................................................................29

*Van Der Meulen v. Brinker Int'l*,
  153 F. App'x 649 (11th Cir. 2005) .................................................................18

*Vigars v. Valley Christian Ctr. of Dublin, Cal.*,
  805 F. Supp. 802 (N.D. Cal. 1992).................................................................16

*Weeks v. S. Bell Tel. & Tel. Co.*,
  408 F.2d 228 (5th Cir. 1969) .........................................................................13

*Wilson v. Sw. Airlines Co.*,
  517 F. Supp. 292 (N.D. Tex. 1981) ................................................................13

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) .....................................................................32

**Statutes**

42 U.S.C. § 2000e-2................................................................................12, 13, 16

Fla. Stat. § 1000.21 ..................................................................................3, 14, 28

Fla. Stat. § 1000.071 ................................................................................2, 7, 23

Fla. Stat. § 1001.42 ...............................................................................28

# INTRODUCTION

The core of State Defendants' justification for subsection 3 is that by merely doing what other teachers do—introducing themselves by title and pronouns—Plaintiffs are making "curricular" decisions akin to introducing students to "mature sexual themes." But Plaintiffs do not "instruct" students about gender identity simply by introducing themselves by title and pronouns, any more than a Christian teacher impermissibly teaches about Christianity by praying quietly in view of students or a Black teacher instructs about race merely by their presence. To argue otherwise is to describe transgender teachers as inherently abnormal or deviant and deserving of fewer rights to expression and equal employment than other teachers.

Every day subsection 3 is permitted to operate, Ms. Wood is forced to live with and repeat, at risk of losing her livelihood, this invidious state message. And Mx. Schwandes faces a state investigation and potential delicensing for refusing to do so. Unless subsection 3's enforcement is enjoined, Plaintiffs will continue to suffer irreparable harm. State Defendants have no interest in enforcing a state law that conflicts with federal law and the Constitution. Plaintiffs have therefore met their burden for a preliminary injunction.

**ARGUMENT**

## I.    Plaintiffs are likely to succeed on the merits.

### A.    Subsection 3 violates Title VII.

#### 1.    Subsection 3 fails the but-for test articulated in *Bostock*.

State Defendants concede that, with respect to Ms. Wood's she/her pronouns, subsection 3 fails the "straightforward rule" articulated in *Bostock v. Clayton County*, 590 U.S. 644, 659 (2020), for identifying Title VII violations. Doc. 60 at 14; *see also* Doc. 11 at 14–15 (describing *Bostock*'s test). Ms. Wood is not permitted to use Ms. and she/her pronouns because she was assigned male at birth, even though she would be allowed to do so if she had been assigned female. Doc. 56 ¶ 81; Doc. 11-1 ¶¶ 2, 9; Fla. Stat. § 1000.071(3). That concession is decisive for Ms. Wood's likelihood of success on the merits of her Title VII claim.

With respect to Mx. Schwandes, State Defendants also have no meaningful rebuttal to Plaintiffs' showing that subsection 3 discriminates against them "because of … sex" by using certain sex characteristics as the sole basis for prohibiting Mx. Schwandes, but not other employees, from using non-gendered titles and pronouns. Doc. 45 at 13–14; *Bostock*, 590 U.S. at 656 ("Title VII's 'because of' test incorporates the simple and traditional standard of but-for causation." (cleaned up)). State Defendants instead contend that "[t]he conditions referenced in the statute are not separate sexes, they are 'genetically or biochemically verifiable disorder[s] of sex

development,'" and assert that "*Bostock* presumes that there are two sexes." Doc. 60 at 28. But the question is not what labels ("disorders" or anything else) Florida's law uses, *Bostock*, 590 U.S. at 646, nor what *Bostock* "presumes" about an issue it nowhere addresses, but simply whether the employer has discriminated against an "individual" "because of" their "sex." Here, because Mx. Schwandes was assigned female at birth and because they do not have certain sex characteristics, subsection 3 discriminates against them "for actions or attributes it … tolerate[s] in" other employees. *Id.* at 658.[1] Discrimination against employees who have typical (or atypical) sex characteristics violates Title VII no less than an employer's discrimination against an employee for being transgender, *id.* at 660, or "insufficiently feminine" or "insufficiently masculine," *id.* at 659. Nor, contrary to State Defendants' suggestion, Doc. 60 at 28, did *Adams* address the relevance of intersex characteristics under Title VII or any other law. *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc).

### 2.    *Bostock* bars discrimination based on individuals' conduct.

Because subsection 3 cannot survive *Bostock*'s but-for test, State Defendants argue that it was intended only to "determine whether the word 'sex' in Title VII

---

[1] The fact that Florida's law discriminates between intersex people and others like Mx. Schwandes on the basis of sex is confirmed by the statute itself, which defines an employee's "sex" as determined by their "sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth," and similarly carves out its exemption by reference to genetic, biochemical, chromosomal, and genital characteristics. Fla. Stat. §§ 1000.21(9), 1000.071(1).

covered individuals who are … transgender as a *class*," not to "determine whether regulating particular *conduct* constitutes discrimination based on 'sex.'" Doc. 60 at 11. But *Bostock* explained that under Title VII, "our focus should be on individuals, not groups." 590 U.S. at 658. The purpose of the but-for test is to determine whether "the employer intentionally relie[d] in part on *an individual employee's* sex," *id.* at 659 (emphasis added). If "changing *the employee's* sex would have yielded a different choice by the employer," *id.* at 659–60 (emphasis added), it does not matter whether the employer purports only to be regulating "conduct." "[I]t's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it," *id.* at 664, because "nothing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination," *id.* at 667.

*Bostock* itself was about conduct as well as status. Gerald Bostock "was fired for *conduct* 'unbecoming' a county employee," *id.* at 653 (emphasis added), and Aimee Stephens was fired because "she planned to 'live and work full-time as a woman,'" *id.* at 654. And the Court summarized its holding at the outset by referring to conduct: "An employer who fires an individual for being homosexual or transgender fires that person for traits *or actions* it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Id.* at 651–52 (emphasis added).

State Defendants' cited cases do not support their position. *Stollings v. Texas Tech University* drew no distinction between status and conduct. No. 5:20-cv-250, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021) (cited at Doc. 60 at 10). Meanwhile, *Texas v. EEOC* was not a Title VII enforcement action, and although it interpreted *Bostock* as relating only to discrimination based on "status," its analysis is unpersuasive because the court ignored *Bostock*'s unequivocal but-for test and express language regarding both status and conduct. 633 F. Supp. 3d 824, 828 (N.D. Tex. 2022) (cited at Doc. 60 at 11). For that reason, no other reported decision has followed that reasoning in the two years since its publication. *See, e.g.*, *McMahon v. World Vision, Inc.*, No. 2:21-cv-00920, 2023 WL 4704711, at *3 (W.D. Wash. July 24, 2023) (rejecting argument under *Bostock* that employer policy "is not facially discriminatory because it targets conduct rather than protected traits").

Furthermore, State Defendants' argument is inconsistent with longstanding Title VII law. For example, *Phillips v. Martin Marietta Corp.* held that absent proof of a bona fide occupational qualification ("BFOQ"), an employer's refusal to hire women based on the conduct of having pre-school-age children, despite its willingness to hire men with children that age, violated Title VII. 400 U.S. 542, 543 (1971); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.* ("*UAW*"), 499 U.S. 187, 198 (1991) (employer policy classifying "on the basis of gender and childbearing capacity" violated Title VII);

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010) ("Our decisions have declined to distinguish between status and conduct in [the sexual orientation] context."). Under Eleventh Circuit law, as well, at least one judge expressly recognized even before *Bostock* that Title VII's protections for transgender employees are not limited to "status." *See Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1260 (11th Cir. 2017), *abrogated by Bostock*, 590 U.S. 644 (W. Pryor, J., concurring) ("Glenn 'presented' and 'dressed as a woman' at work and notified the supervisor that Glenn intended to continue this behavior. … Title VII would have protected any biological male under those facts, not because of status, but *because of behavior*." (cleaned up) (emphasis added)).

Because Title VII prohibits discrimination based on conduct, State Defendants' argument that "pronoun choice is independent of transgender status," Doc. 60 at 12–14, because not all transgender people use nonbinary pronouns or because some experience gender fluidity, is irrelevant. The opposite rule would be absurd— allowing discrimination under Title VII based on every characteristic not all members of the protected class share. This would allow not only discrimination based on transgender people's titles and pronouns (and appearance or other form of gender expression), but also firing a Jewish employee for wearing a yarmulke, since not all Jewish people do, or a Black employee for adopting an African-derived name.

For the same reasons, State Defendants' reliance on *EEOC v. Catastrophe*

*Management Solutions*, 852 F.3d 1018 (11th Cir. 2016), for the proposition that Title VII reaches only "immutable characteristics," Doc. 60 at 16–18, is misplaced. That decision rejected an as-applied Title VII race discrimination challenge to an employer's facially neutral hairstyle policy on the grounds that "courts generally have upheld facially neutral policies regarding *mutable* characteristics" like hairstyle, 852 F.3d at 1032 (cleaned up), and that "Title VII protects persons in covered categories with respect to their immutable characteristics, but not their cultural practices," *id.* at 1030. But subsection 3 is not "facially neutral"; its requirements are explicitly based on sex, a characteristic the law itself defines as "an immutable biological trait." Fla. Stat. § 1000.071(1), (3). It is analogous not to a facially neutral hairstyle policy but to one that permitted only members of one race, but not another, to wear a particular hairstyle.

Finally, State Defendants argue that applying *Bostock*'s but-for test here "would lead to an unworkable rule and absurd results" because "[s]ubsection 3 would violate Title VII for transgender teachers who use 'he' or 'she' as their pronouns[,] but it would not violate Title VII for teachers that use 'they,' 'ze,' 'hir,' or other pronouns." Doc. 60 at 14–15. State Defendants are wrong that subsection 3's discriminatory prohibition on gender-neutral pronouns complies with Title VII, but regardless, they do not explain why prohibiting sex discrimination against Ms. Wood, who uses she/her pronouns, would under any circumstances be "absurd" or

"unworkable" because some other person would not be protected from discrimination.

### 3. Subsection 3 is based on sex stereotypes in violation of Title VII.

State Defendants do not contest that discrimination because of sex stereotypes violates Title VII, as indeed they cannot. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion); *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1284 (11th Cir. 2000). Instead, they rely extensively on *Adams* to argue that classifications based on "biological sex" are lawful and not based on stereotypes. Doc. 60 at 18–19. But State Defendants misapply *Adams*, which was not a Title VII case and which addressed only sex-segregated bathrooms, an issue raising unique policy and legal considerations not presented by this case.

State Defendants argue that, under *Adams*, "a policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status." Doc. 60 at 19 (quoting 57 F.4th at 809). But they ignore the critical word "lawfully." *Adams* made this statement after determining that the bathroom policy was lawful under the Equal Protection Clause because it satisfied intermediate scrutiny—it served "important governmental objectives" and the "discriminatory means employed [were] substantially related to the achievement of those objectives." 57 F.4th at 801 (quotation omitted). But there is no "intermediate scrutiny" step under Title VII. Instead, facial discrimination by employers automatically

violates the statute unless the employer can prove a BFOQ. The Eleventh Circuit has confirmed precisely this point. *Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011) (holding that "[i]f this were a Title VII case, the analysis would end" after determining that the employer acted on the basis of a sex stereotype, without the need for applying intermediate scrutiny). Similarly, *Adams* held the facially discriminatory bathroom policy was lawful under Title IX because of Title IX's express carve-out for bathrooms. 57 F.4th at 817. But Title VII has no carve-out for teacher pronouns. *See id.* at 811; *Bostock*, 590 U.S. at 669 ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.").

State Defendants quote *Adams*'s statement that the bathroom policy did not discriminate on the basis of transgender status because it "divides students into biological male and biological female groups—both of which can inherently contain transgender students—for purposes of separating the male and female bathrooms by biological sex." Doc. 60 at 19 (quoting 57 F.4th at 809). To the extent State Defendants imply that subsection 3 is lawful because it adversely affects both transgender men and transgender women (as well as nonbinary employees like Mx. Schwandes), this mode of reasoning does not apply in the Title VII context, as reflected in *Adams*'s clear distinction of *Bostock*. *See* 57 F.4th at 808–09. *Bostock* was emphatic that Title VII focuses on individuals, not groups, so the fact that an employer discriminates against members of both "groups" is not a defense. 590 U.S. at 662

("[J]ust as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.").

Nor did *Adams* carve out policies based on "biological sex" from longstanding precedent on sex stereotyping or hold that such policies necessarily "do[] not depend in any way on how [people] act or identify." 57 F.4th at 809. Instead, *Adams* dealt only with the sex-based bathroom policy before it, which it interpreted to "not depend in any way on how students act or identify." *Id.* "[B]iological differences" mattered to the Court because "bodily exposure is most likely to occur" in the bathroom. *Id.* at 805. Subsection 3 does not address any "bodily exposure" of "biological differences," and State Defendants effectively concede that subsection 3 is grounded in sex stereotypes. *See* Doc. 60 at 20 (pronoun usage is "wholly divorced from biological sex"); *id.* at 40 (subsection 3 is "based on longstanding social and cultural norms").[2] In any case, even if subsection 3 were based on "biological differences," Title VII does not permit discrimination based on biological differences between sexes in the absence of a BFOQ. *See, e.g.*, *L.A. Dep't of Water & Power v. Manhart*,

---

[2] Analogously, consider whether Title VII would permit Florida to require married but not unmarried women to use the title Mrs. as the title that "corresponds to" their marital status. Such a rule, like subsection 3, would be grounded solely in stereotypes, and applying that rule to any individual woman would be discrimination because of sex. Under Title VII, both married women and transgender women are free to use the title Ms. because "we are beyond the day when an employer could … insist[] that [employees] matched the stereotype associated with their group." *Price Waterhouse*, 490 U.S. at 251.

435 U.S. 702, 707 (1978) (holding discrimination based on biological difference that "women … live longer than men" violated Title VII); *UAW*, 499 U.S. at 192 (discrimination based on biological capacity to become pregnant violated Title VII).[3]

State Defendants also all but ignore the Eleventh Circuit's binding decision in *Glenn*, falsely asserting in a footnote that arguments based on *Glenn* are "foreclosed" by *Adams*'s statement (plucked out of context) that "'sex' is not a stereotype." Doc. 60 at 20 n.1 (quoting 57 F.4th at 813). Rather than overrule *Glenn*, *Adams* distinguished it as involving "workplace discrimination involving nonconformity with sex stereotypes"—precisely like this case. *Adams*, 57 F.4th at 813; *see also Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023) (reaffirming *Glenn*'s continued relevance in employment discrimination cases); *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 884 (11th Cir. 2016) (citing *Glenn* in a Title VII case).

With respect to Mx. Schwandes's claim of sex stereotyping, State Defendants wrongly contend that Title VII does not protect nonbinary people. *See* Doc. 60 at 27 ("An employer who had a policy of not hiring nonbinary persons would not

---

3 State Defendants assert in a footnote that "no stereotype is present here" because "many transgender individuals do not seek to use pronouns that align with the opposite sex." Doc. 60 at 20 n.1. But that is like saying that, because *many* women do not wear gender-neutral clothing, it is not a sex stereotype to assume that *no* women wear gender-neutral clothing. That is in fact the prototypical example of sex stereotyping. *See, e.g.*, *Price Waterhouse*, 490 U.S. at 235, 255–56 (holding that employer, who described employee as "macho," engaged in unlawful sex stereotyping, even though many women are not "macho").

discriminate against Schwandes based on 'sex'[.]"). In fact, *Bostock* emphasized that Title VII protects "any individual" discriminated against "because of … sex." 590 U.S. at 657 (quoting 42 U.S.C. § 2000e-2(a)(1)). State Defendants have no response to the undeniable and common-sense observation that subsection 3's prohibition on Mx. Schwandes using Mx. and they/them pronouns is based entirely and impermissibly on stereotypes about how people assigned male or female at birth should identify themselves to others. *See Glenn*, 663 F.3d at 1317 ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender."). There is no non-stereotype justification for Florida's refusal to permit Mx. Schwandes to use non-gendered pronouns.

### 4. Subsection 3 is not a bona fide occupational qualification.

Title VII creates an exception to its prohibition on discrimination "in those certain instances where … sex … is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e). This is an "extremely narrow" exception. *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977). And "to qualify as a BFOQ, a job qualification must relate to the 'essence' or to the 'central mission of the employer's business.'" *UAW*, 499 U.S. at 203 (citations omitted); *Garrett v. Okaloosa Cnty.*, 734 F.2d 621, 624 (11th Cir. 1984). Employers bear the burden of affirmatively proving the

existence of a BFOQ. *Weeks v. S. Bell Tel. & Tel. Co.*, 408 F.2d 228, 232 (5th Cir. 1969); *Hardin v. Stynchcomb*, 691 F.2d 1364, 1370–71 (11th Cir. 1982).

While purporting to disclaim the position that "transgender people, as a class, are incapable of teaching Florida's curriculum," State Defendants nonetheless insist that "using pronouns consistent with one's sex is a BFOQ" for teaching in Florida public schools. Doc. 60 at 25. Their theory is that subsection 3 "accomplishes [a] pedagogical goal"—specifically, the goal of teaching students that it is "false" to use any pronouns that do not "correspond to" one's "sex"—and subsection 3 "ensures that public employees do not provide students with messages that contradict State policy on the topic of sex." *Id.* at 25–26.

But State Defendants have submitted no evidence to show that subsection 3 is "reasonably necessary to the normal operation of [this] particular business or enterprise." 42 U.S.C. § 2000e-2(e). Ms. Wood is a math teacher at Lennard High School. Doc. 11-1 ¶¶ 3, 5. There is no reason to believe (and certainly no evidence) that Ms. Wood's provision of her title or pronouns to her math students would in any way interfere with the "normal operation" of the school. *Cf. Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir. 1971) ("No one has suggested that having male stewards will so seriously affect the operation of an airline as to jeopardize or even minimize its ability to provide safe transportation from one place to another."); *Wilson v. Sw. Airlines Co.*, 517 F. Supp. 292, 302 (N.D. Tex. 1981) (no BFOQ where

"sex-linked job functions are only 'tangential' to the essence of the occupations and business involved"). Ms. Wood has only ever used Ms. and she/her pronouns as a teacher at Lennard, and received positive performance evaluations, without any apparent disruption to the school's operations. Doc. 11-1 ¶¶ 5–7; *see Garrett*, 734 F.2d at 624 ("For an occupational qualification to be 'bona fide,' it must be just as valid and necessary one day as it is the next. Yet, defendants argue, in effect, that the same women who apparently are working out well as correctional officers today would not have worked out prior to 1981, with the same qualifications. We cannot accept that argument."); *Hardin*, 691 F.2d at 1372 (similar).

Nor is there any evidence before this Court that Florida's view of appropriate pronouns is part of the "K-12 curriculum" at Lennard High School or anywhere else. Even if it were, that narrow subject could represent at most only a miniscule fraction of what students learn at school. State Defendants therefore cannot plausibly claim that rules regarding personal pronoun usage relate to the "essence" or "central mission" of schools, institutions the evident purpose of which is far broader—the education of students generally. *UAW*, 499 U.S. at 203. Nor does State Defendants' theory make any practical sense. Students do not have access to teachers' "sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth," Fla. Stat. § 1000.21(9), so there is no reason to believe they would even know whether any teachers were providing them with "messages that

contradict State policy on the topic of sex," Doc. 60 at 26.

Moreover, State Defendants cannot rely on subsection 3 itself to justify their discrimination. The settled rule is that an employer's own preferences cannot justify a BFOQ. *Diaz*, 442 F.2d at 388–89. As for the Legislature, courts have made clear that "[t]he mere fact that a state enacts a discriminatory regulation does not create a BFOQ defense for one who follows such a regulation." *Garrett*, 734 F.2d at 624; *Rosenfeld v. S. Pac. Co.*, 444 F.2d 1219, 1225–26 (9th Cir. 1971) (compliance with state law does not transform a discriminatory practice into a BFOQ). State Defendants' theory would permit schools to discriminate freely on the basis of religion, sex, or national origin so long as the school asserted that the discriminatory policy effected some "curriculum" the school wished to teach. That cannot be. *Cf. Diaz*, 442 F.2d at 389 ("[I]t would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome.").

State Defendants rely on *Chambers v. Omaha Girls Club, Inc.*, "which held that a "Girls Club" did not violate Title VII by firing a single staff member who became pregnant, because adherence to the Club's "role model" policy was a BFOQ. 834 F.2d 697, 705 (8th Cir. 1987). But in that case, the employer demonstrated that, at the Girls Club in particular, "staff members are trained and expected to act as role

models for the girls, with the intent that the girls will seek to emulate their behavior," *id.* at 699, that the Club's "*only purpose* is to serve young girls between the ages of eight and eighteen and to provide these women with exposure to the greatest number of available positive options in life," and that "teenage pregnancy is contrary to this purpose and philosophy," *id.* at 701 (emphasis added). As the district court "emphasiz[ed]" in *Chambers*, "this decision is based upon the *unique* mission of the Girls Club of Omaha, the age group of the young women served, the geographic locations of the Girls Club facilities, and the comprehensive and historical methods the organization has employed in addressing the problem of teenage pregnancy. Therefore, this decision will not be applicable in many other situations which this Court could envision." *Chambers v. Omaha Girls Club*, 629 F. Supp. 925, 952 (D. Neb. 1986).[4] By contrast, the record here contains no evidence at all that subsection 3 is "reasonably necessary" to the "normal operation" of Florida schools. 42 U.S.C. § 2000e-2(e); *see also EEOC v. Kamehameha Sch./Bishop Est.*, 990 F.2d 458, 465 (9th Cir. 1993) (discussing BFOQs in the schoolteacher context).

### 5. Plaintiffs have suffered adverse employment actions.

State Defendants contend that their conduct towards Plaintiffs does not rise to

---

[4] *See also Vigars v. Valley Christian Ctr. of Dublin, Cal.*, 805 F. Supp. 802, 809 (N.D. Cal. 1992) (denying summary judgment on BFOQ defense because of "serious disagreement about how central [the employee's] moral life was to her job as librarian, whether or not she was truly expected to act as a role model in the *Chambers* sense, and what impact her pregnancy truly had on her ability to perform either of those functions").

the level of "adverse employment action" sufficient for Title VII liability, asserting without evidence that "[s]ubsection 3 has no real effect on Wood's employment." Doc. 60 at 21–24.

But the test is not a "real effect," whatever that means, but whether "a reasonable person in [the plaintiff's] position would view the employment action in question as adverse," *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000)—a question on which Ms. Wood's declaration, despite State Defendants' dismissal of it as presenting only her "subjective views," Doc. 60 at 22, is illuminating even if not decisive. Indeed, it is hard to imagine that any employee—female or male or nonbinary; transgender or cisgender—would not find the "terms, conditions, or privileges" of their employment significantly changed if their employer prohibited them, but not other employees, from using the personal pronouns and titles that reflect their own gender identity. State Defendants do not even attempt to respond to Plaintiffs' observation that, under State Defendants' position, employers could freely discriminate on the basis of race, sex, religion, or national origin in regulating their employees' self-expression—for example, by permitting employees to wear Christian cross necklaces but not Muslim headscarves. Doc. 11 at 17.

More expressly than employer conduct in the vast majority of Title VII cases, subsection 3 literally alters the "terms" and "conditions" of employment as a teacher in Florida's public schools—not informally, but by statute, and on the very real

threat of termination, as Mx. Schwandes discovered. *Cf. Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986) ("Job titles … themselves are conditions of employment protected by Title VII.").

State Defendants list a series of cases in which courts found no adverse employment action and assert without reasoning that these cases involved "far more significant acts" than the "far less adverse" harms suffered by Ms. Wood. Doc. 60 at 22–23. But none of State Defendants' cases are remotely analogous, and certainly none have anything to say about whether Title VII is implicated by denying some employees (but not others) the right to operate according to their gender identity in the workplace. Indeed, none of the cases addressed employee self-expression of any kind.[5] More helpful are cases that consider the significance of how people are addressed. For instance, in *Hamilton v. Alabama*, 376 U.S. 650 (1964), the Supreme Court reversed a contempt conviction for Mary Hamilton, a Black woman who had

---

[5] Although this Court need not compare apples to oranges, none of State Defendants' cases plausibly involves employer action more significant than what subsection 3 has inflicted on Ms. Wood. *See Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1203 (11th Cir. 2013) (plaintiff lost supervisory responsibilities but "neither a decrease in pay nor a loss of title"); *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1264–67 (11th Cir. 2021) (plaintiff was given a "simple paid suspension" after complaints about his behavior from subordinates and co-workers); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (plaintiff was "reassigned to a different geographic area" and maintained the same job title); *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (supervisor left a voicemail that plaintiff's "job was in jeopardy," but took no concrete action against plaintiff); *Van Der Meulen v. Brinker Int'l*, 153 F. App'x 649, 655 (11th Cir. 2005) (plaintiff "alleged one statement made threatening her future management aspirations"); *Dick v. CRC Ins. Servs., Inc.*, No. 2:08-cv-00910, 2009 WL 10687917, at *14 (N.D. Ala. Dec. 14, 2009) (supervisor "inadvertently made a comment referring to the [disabled] plaintiff's facial expressions").

been held in contempt for insisting that a lawyer examining her in court address her as "Miss Hamilton" rather than "Mary." Or consider that being "repeatedly mis-gendered" has been held to contribute to a hostile work environment under Title VII. *Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 173 (D. Md. 2022). While hostile work environment cases involve a merely constructive change in the terms and conditions of employment, here subsection 3 accomplishes the same result *de jure* by mandating what amounts to continual sex harassment. *See* Doc. 11-1 ¶ 19 (Ms. Wood hears and uses her title "hundreds of times a day").

State Defendants also admit that they "ha[ve] opened an investigation into [Mx.] Schwandes for noncompliance with [s]ubsection 3," Doc. 60 at 23, and they do not dispute the crucial point that this investigation may lead to the revocation of Mx. Schwandes's teaching license—ending their career as a teacher in Florida's public schools and potentially elsewhere. *See* Doc. 45 at 15–16.[6] State Defendants simply ignore the significance of the investigation, citing a district court case for the claim that discriminatory investigations are never actionable under Title VII. But this depends on the facts. *See, e.g.*, *Entrekin v. City of Panama City*, 376 F. App'x 987, 995 (11th Cir. 2010) (investigation was more than a "trivial harm" because it

---

[6] As to Mx. Schwandes's termination as well, although State Defendants suggest that Mx. Schwandes was terminated by Defendant Florida Virtual School, they do not dispute that (1) Mx. Schwandes was terminated, (2) termination is an adverse employment action, and (3) State Defendants are "employer[s]" for Title VII purposes. *See* Doc. 45 at 15, 16–18 (citing cases).

could "dissuade a reasonable worker from making or supporting a charge of discrimination"). Like the plaintiff in *Entrekin*, Mx. Schwandes was investigated only after submitting a discrimination charge to the EEOC. Doc. 56 ¶¶ 110–11. State Defendants' cited case, *Jenkins v. Tuscaloosa City Bd. of Educ.*, 72 F. Supp. 3d 1238, 1251 (N.D. Ala. 2014), in contrast, involved an investigation that resulted only in a "letter of reprimand" with no license revocation issues.

### B. Subsection 3 violates the First Amendment.

#### 1. State Defendants cannot prohibit Plaintiffs from existing as transgender and nonbinary people at work.

Subsection 3 singles out for special censorship only a single kind of speech by teachers in schools: use of their own titles and pronouns. Under this rule, Ms. Wood can wear a cross necklace or an American flag pin but not a pin indicating she uses she/her pronouns. A cisgender woman teacher, though, could wear that same pin without issue. Ms. Wood may greet students in the hallway or in the lunchroom but not introduce herself by Ms. She can place a sign on her desk with her name, but not her title or pronouns. Subsection 3 thus goes far beyond the classroom and affects speech that Florida does not purport to control for anyone other than transgender and nonbinary teachers.

In their opening brief, Plaintiffs analogized subsection 3 to the situation in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), where a school attempted to ban prayer by a coach on a football field after games, Doc. 11 at 22–26;

Doc. 45 at 19–23, but this actually understates how offensive subsection 3 is to the First Amendment: it is more closely analogous to a law or school rule that forbade Kennedy from praying because he was a Christian but permitted teachers of other faiths to pray, or a rule that forbade Muslim teachers from wearing a headscarf but permitted Jewish ones to wear yarmulkes. It is hence just as impermissible as the policy at issue in *Tinker v. Des Moines Independent Community School District*, where a school "singled out for prohibition" "a particular symbol—black armbands worn to exhibit opposition to this Nation's involvement in Vietnam" without "purport[ing] to prohibit the wearing of all symbols of political or controversial significance." 393 U.S. 503, 510–11 (1969).

Rather than engage with the broad scope of subsection 3, State Defendants simply ignore its effect outside the classroom and rely on portraying Plaintiffs' means of introducing themselves in the classroom, using the titles and pronouns that they use in every other area of their lives, as "instruct[ion]," Doc. 60 at 34, "editorializing," *id.* at 32, or still more inexplicably and offensively, akin to a teacher "'introduc[ing] mature sexual themes to fifteen year olds,'" *id.* at 31 (citing *Evans-Marshall v. Bd. of Educ. Of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 342 (6th Cir. 2010)). But Plaintiffs do not "instruct[]" students on gender identity by using their titles and pronouns, just as a cisgender teacher does not so instruct by using their titles and pronouns, a Muslim teacher does not instruct students on religion by

wearing a headscarf, and a Black teacher does not instruct on race by wearing a natural hairstyle. *Cf. Braxton v. Bd. of Pub. Instruction of Duval Cnty.*, 303 F. Supp. 958, 959 (M.D. Fla. 1969) (holding that wearer of a goatee "enjoy[ed] the protection of first amendment rights" because the goatee was "worn as 'an appropriate expression of his heritage, culture, and racial pride as a black man'"). Similarly, State Defendants' citation to this Court's decision in *Burt v. Fuchs*, No. 1:22-cv-75, 2023 WL 4103942, at *5 (N.D. Fla. June 21, 2023), does not help it because it assumes the conclusion it is trying to prove: that Plaintiffs' use of their own titles and pronouns is akin to "editorializing" on their views to students in their teaching.

State Defendants' other efforts to distinguish *Kennedy* are equally unpersuasive, not least because they simply ignore the Muslim teacher hypothetical entirely. First, they argue that Kennedy's speech was not made in the classroom but instead when he and other teachers were "free to engage in all manner of private speech." Doc. 60 at 34 (citing *Kennedy*, 597 U.S. at 530). In contrast, they argue, Plaintiffs are not free to engage in private speech in the classroom. But the Muslim teacher who wears a headscarf to work is engaging in speech—expressing her Muslim faith just as Ms. Wood wishes to express that she is a woman—in the classroom. State Defendants do not and cannot explain why the expressive activity of a Muslim teacher who wears a headscarf in the classroom is protected by the First Amendment's Free Speech Clause, but the expressive activity at issue here somehow is not.

Even limiting the analysis to *Kennedy* shows how wrong State Defendants'
argument that they are permitted to regulate all "direct interactions" or "active[]
communic[ations]" between teachers and students, Doc. 60 at 34, is: *Kennedy* held
that a coach spoke as a private citizen on a matter of public concern when he prayed
on the football field after games in view of his players. 597 U.S. at 519, 529–31.
Though he "remained on duty" at the time of his prayers and conducted them
"'within the office' environment—here, on the field of play"—they nonetheless
were not within his duties as a government employee. *Id.* at 530.

State Defendants' reliance on Fla. Stat. § 1000.071(6), which limits the sec-
tion's impact to teachers "acting within the scope of their employment duties with
the public K-12 educational institution," is tautological: The question is not whether
the legislature sought to define Plaintiffs' use of their titles and pronouns as part of
their job—it plainly did—but whether it may do so constitutionally. For the same
reason, if the facts had been the same in *Kennedy* except that a state statute prohibited
employees like him from "praying while acting within the scope of their employment
duties," the result would have been no different—indeed the school attempted un-
successfully to apply just such a rule. 597 U.S. at 517–18.

Finally, State Defendants cite *Ambach v. Norwick* for the proposition that
"[t]eachers through their conduct 'function as an example for students, which exists
independently of particular classroom subjects.'" Doc. 60 at 30 (citing 441 U.S. 68,

80 (1979)). But *Kennedy* rejected precisely this argument on free speech grounds. There, the school district argued that allowing Kennedy to pray would coerce students. 597 U.S. at 510. The Court explained: "A rule that the only acceptable government role models for students are those who eschew any visible religious expression would undermine a long constitutional tradition in which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Id.* (citation omitted). Similarly, State Defendants argue that Florida may decide that transgender and nonbinary teachers are, solely by virtue of any basic expression of their gender, not appropriate role models. Such a rule cannot be reconciled with our constitutional tradition of tolerance. And *Grossman v. South Shore Public School District* is even less relevant: there the district declined to renew the contract of a guidance counselor because she threw out sex-ed materials about condoms and replaced them with abstinence-only materials without her supervisor's consent and prayed with students as part of her guidance of them—all activities directly within her job. 507 F.3d 1097, 1098 (7th Cir. 2007) (cited at Doc. 60 at 30–31).

In setting out their theory that Florida must have the power to regulate Plaintiffs' self-identification at work they ask, rhetorically "[h]ow … would a contrary approach work?" Doc. 60 at 31 (quoting *Evans-Marhsall*, 624 F.3d at 341). The answer is, quite easily: Plaintiffs could return to doing what they did without any

complaint before subsection 3 was enacted. Nothing about Plaintiffs' First Amendment claims, if accepted, would interfere with the right of Florida to set a curriculum. Instead, they simply ask for the same rights all other teachers continue to enjoy.

### 2. Plaintiffs have satisfied the public concern prong of *Garcetti*.

State Defendants fault Plaintiffs for not making a sufficiently long argument on the public concern prong of *Garcetti*, Doc. 60 at 36, but State Defendants offer little to no argument that, if Plaintiffs speak as private citizens, then their speech is still unprotected. Instead, they repeat their argument that Plaintiffs speak as government employees. *See* Doc. 60 at 36–37 (citing *Evans-Marshall*, 624 F.3d at 342, for the proposition that "'speech that occurs within the compulsory classroom setting' 'does not constitute speech on a matter of public concern' when it is 'curricular in nature.'")[7]. But Plaintiffs dispute that their speech is curricular, not whether curricular speech is a matter of public concern.

State Defendants also suggest that Plaintiffs' speech is unprotected because its purpose is not to raise social issues. Doc. 60 at 36–37. But they rely on a line of cases, going back to *Garcetti*, that apply the public concern prong to distinguish

---

[7] State Defendants' brief implies that this language states the Sixth Circuit's view. In fact, it is a quotation of the Fourth Circuit, which is important because that circuit "has not applied *Garcetti* to teachers' in-class speech" but has instead reached similar results by applying pre-*Garcetti* precedent that does not divide the analysis into the "private speech" and "public concern" prongs. *Id.* (citing *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007)).

times when government employees criticize the government "from the perspective of a citizen" from those where they seek to advance a "purely private" dispute with their employer. *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1167 (11th Cir. 2015) (holding plaintiff's memorandum complaining about poor management practices was not a matter of public concern). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quotation omitted). For purposes of the *Pickering–Garcetti* test, gender identity is a "social matter" of concern to the community, much as Kennedy's religion was. To hold otherwise would allow government employers to regulate all manner of private speech on core First Amendment topics merely because it was not intended to address public controversies. Indeed, State Defendants' argument on this point does not seem to dispute this because it ends with yet another restatement of the undisputed "curricular speech" argument. Doc. 60 at 36–37.

Finally, State Defendants cite *Willey v. Sweetwater County School District. No. 1 Board of Trustees*, Doc. 60 at 37, which held that a teacher's refusal to use students' pronouns was unprotected because the teacher spoke pursuant to her official duties, No. 23-cv-069, 2023 WL 4297186, at *23 (D. Wyo. June 30, 2023). But in that case the basis of the court's holding was that that speech was part of the teachers' official duties. Moreover, *Willey* is consistent with Plaintiffs' request to

use their titles and pronouns in school. How a teacher expresses themselves at times when they are free to engage in private speech is very different from whether they are free to ignore how students want to be addressed. For the same reason, though Kennedy was free to pray on the field, he was not free to interfere with students' religious observance, and a Muslim teacher who is free to wear a headscarf in the classroom would not be free to prohibit a Jewish student from wearing a yarmulke or refuse to address one who did.

### 3. State Defendants have offered no interest to justify subsection 3.

State Defendants' interest-balancing argument begins by again repeating their argument that Florida has an interest in regulating curricular speech—a point no one disputes. They make no separate argument that if Plaintiffs speak as private citizens on matters of public concern, then Florida's interest in regulating that speech outweighs Plaintiffs'.

Indeed, the only thing State Defendants say about the purpose of subsection 3 for First Amendment purposes is that it is "part of comprehensive legislation aimed to promote the State's pedagogical goals and parental rights," and is a "policy choice … based on longstanding social and cultural norms." Doc. 60 at 40. But simply asserting such an interest is not the same as explaining what it is, let alone why it outweighs Plaintiffs' interests. State Defendants note elsewhere that section 1000.071(1), provides that it is "the policy" of Florida schools that "it is false to

ascribe to a person a pronoun that does not correspond to such person's sex," Doc. 60 at 5, but State Defendants point to no efforts other than subsection 3 to advance this goal.[8]

It cannot be that Florida's interest is to instruct students on this "policy" though because, as State Defendants themselves note, Florida law actually explicitly prohibits "instruction relating to sexual orientation and gender identity" in prekindergarten through grade eight and limits it in high school. Doc. 60 at 11 (citing Fla. Stat. § 1001.42(8)(c)(3)). As Defendant State Board of Education has previously represented to another federal court: "it would violate [§ 1001.42(8)(c)(3)] to instruct students that … gender identity is immutable based on biological traits." Br. of State Defs., *Cousins v. Grady*, No. 6:22-cv-1312, 2022 WL 19348689 (M.D. Fla. Dec. 16, 2022), ECF 112 at 3–4; *see also id.* at 1 (claim that law bars "any acknowledgment whatsoever of the existence of LGBTQ+ people" is "fearmongering at best"); *id.* at 3 (statute does not prohibit "literary references to a … transgender person"); *cf. id.* ("photos of same-sex spouses on their desks … are not classroom instruction on sexual orientation").

Moreover, to the extent Plaintiffs are speaking in their personal capacity on a matter of public concern (the only circumstance in which interest balancing is

---

[8] State Defendants also cite similar language in Fla. Stat. § 1000.21(9), but that statute merely provides definitions for the chapter.

relevant) compelling them to relay Florida's message is not a permissible interest.[9]

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018) ("[I]t is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case."). Indeed, State Defendants seem to concede subsection 3 is intended to compel Plaintiffs to "further the State's pedagogical agenda"—that is to speak Florida's message—"in interactions with students." Doc. 60 at 40.

State Defendants at least attempt to distinguish in a footnote, Doc. 60 at 38 n.3, *United States v. National Treasury Employees Union* (*NTEU*), 513 U.S. 454 (1995), which this Court has explained "suggests that Defendants face a heavier burden to justify a 'statutory restriction on expression,'" than it would "with respect to an isolated disciplinary action," *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1272 (N.D. Fla. 2022). State Defendants dispute this characterization of *NTEU*, on the ground that "'the vast majority of the speech at issue' did 'not involve the subject matter of Government employment.'" Doc. 60 at 38 n.3. But the first of these two factors is also present here—Plaintiffs' speech is about their

---

[9] In their motions, Plaintiffs said the interest balancing step is "almost automatically" resolved in their favor "*to the extent that* the government is attempting to compel [them] to speak the government's message." Doc. 11 at 26 (emphasis added); Doc. 45 at 23 (same). State Defendants quote the first phrase out of context to imply that Plaintiffs claimed it applied to the entire interest balancing step. Doc. 60 at 38.

gender, not their employment. And Plaintiffs have also explained that their speech was in a context when teachers are free to speak a variety of messages, as employees are permitted outside the workplace. Moreover, *NTEU*'s holding regarding the heightened scrutiny on broad statutory restrictions is nowhere limited in the text of the decision in the manner State Defendants suggest.

Instead of addressing Plaintiffs' argument or making a clear case for the need for subsection 3, State Defendants cite a variety of truisms about public education with no apparent application to this case. State Defendants note that "[a] 'position as a teacher in a public school … by its very nature requires a degree of public trust not found in many other positions of public employment." Doc. 60 at 39 (quoting *Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 336 F.3d 185, 198 (2nd Cir. 2003)). But unless State Defendants mean to suggest that teachers who use pronouns other than those favored by Florida are inherently untrustworthy—an odious concept—it is unclear why this matters.

On the other side of the balance—Plaintiffs' interests—State Defendants do not question or dispute any of Ms. Wood's or Mx. Schwandes's asserted interests other than asserting they do not have an interest because their speech is curricular. *Compare* Doc. 11 at 28 and Doc. 45 at 23–25 *with* Doc. 60 at 38–40.

State Defendants themselves sought to emphasize the need for "a delicate balancing of the competing interests" in First Amendment cases involving public

employee speech. Doc. 60 at 38 (quoting *Kennedy*, 597 U.S. at 508–09)). But they have not come close to meeting the "heavy presumption against its constitutional validity" borne by any law imposing prior restraint on speech. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)). It is true that subsection 3 reflects a policy choice, just as every legislative provision does. But State Defendants' incantatory invocations of "policy choice" do not allow Florida to avoid the constitutional limitations imposed by the First Amendment.

## II. Plaintiffs did not unreasonably delay filing their motions for preliminary injunction.

State Defendants argue that Plaintiffs delayed too long before filing their suit and preliminary injunction motions, but their argument ignores the real-world difficulties for individual teachers without legal training of learning about what the law requires and seeking and obtaining counsel. In any event, as this Court has explained, "delay is but one factor in the irreparable harm analysis." *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1285 (N.D. Fla. 2021) (citations omitted).

Moreover, in Mx. Schwandes's case the delay argument is absurd. They filed their motion for a preliminary injunction on January 30, two weeks after learning that they were being investigated for potential loss of licensure. Doc. 45-1 ¶ 23. Up until that point, State Defendants presumably would have argued that Mx. Schwandes could not show irreparable harm because the initiation of a future investigation

31

was speculative, they were not currently employed by a school, and hence were not imminently impacted by whether or not subsection 3 could be enforced.

As for Ms. Wood, her declaration states that she only learned that subsection 3 might impact her at the start of the 2023 school year, which began in mid-August 2023,[10] and was not definitively told she could not use her title and pronouns upon pain of losing her license until several weeks later. *See* Doc. 11-1 ¶¶ 9–13. She filed her motion for preliminary injunction on December 21, 2023, Doc. 11, about three months later, not the seven months of State Defendants' calculations.[11] And even had she learned of subsection 3 and how her school would enforce it before it went into effect and filed sooner, she risked State Defendants arguing that the facts about its enforcement were too uncertain to establish standing. Ms. Wood is a public school teacher without the means or knowledge to easily identify counsel to represent her. By contrast, in *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (cited at Doc. 60 at 41), the plaintiff was a pornography business raising trademark issues. All of State Defendants' cited cases include similar corporate or

---

[10] School Board of Hillsborough County, 2023-2024 Student Calendar, https://www.hillsboroughschools.org/Page/9367.

[11] Out of professional courtesy, Plaintiffs agreed to State Defendants' request to delay the preliminary injunction briefing schedule on State Defendants' agreement that this would not be considered relevant to whether they were entitled to injunctive relief. State Defendants have abided by that agreement, but Plaintiffs note it here for the avoidance of any confusion.

government plaintiffs and longer or equal delays.[12] In contrast, in civil rights cases like this one as this Court has found, reasons such as "the time it took [plaintiffs] to consider their options, prepare their lawsuit, and prepare their motion" can be justifications for delay. *Dream Defs.*, 559 F. Supp. 3d at 1285 (three-month delay); *see also Koe v. Noggle*, No. 1:23-cv-2904, 2023 WL 5339281, at *26 (N.D. Ga. Aug. 20, 2023) (three-month delay after law went into effect was reasonable and not plaintiffs "sitt[ing] on their rights").

## III. Plaintiffs have shown irreparable harm under Title VII.

State Defendants concede that, delay aside, First Amendment violations establish irreparable harm. Doc. 60 at 44. They dispute only whether Plaintiffs have suffered irreparable harm under Title VII.

State Defendants acknowledge that the Eleventh Circuit has held that "courts are to presume irreparable harm in Title VII cases," *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988), but claim that the Eleventh Circuit has limited *Baker* to its facts, Doc. 60 at 42, citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1314 (11th Cir. 1998). But that gets *McDonald's* precisely backwards. In

---

[12] *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1074 (M.D. Ala. 2021) (state of Alabama challenging federal regulations after 27 months); *Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, No. 22-14257, 2023 WL 3704912, at *2 (11th Cir. May 30, 2023) (unpublished) (university raising trademark claims after six months); *Snider Tire, Inc. v. Chapman*, No. 2:20-cv-1775, 2021 WL 2497942, at *5 (N.D. Ala. Apr. 27, 2021) (tire company seeking to enforce noncompete clause after three month delay); *Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV, 2017 WL 532299, at *5–6 (S.D. Fla. Feb. 9, 2017) (food company delayed fifteen months before seeking to enforce noncompete).

*Baker*, the Court held that, because irreparable harm was presumed in Title VII cases, the district court should have held an evidentiary hearing before denying an injunction. *Baker*, 856 F.2d at 169. In *McDonald's*, the plaintiff challenged the district court's denial of an evidentiary hearing, but the court rejected this argument, explaining that *Baker*'s holding about when to hold a hearing was, to use the language State Defendants quote, the point on which *Baker* intended to "limit the holding to the facts of the case." 147 F.3d at 1314. Accordingly, other cases have continued to cite *Baker* for the proposition that irreparable harm is presumed in Title VII cases. *See Siegel v. LePore*, 234 F.3d 1163, 1191 n.4 (11th Cir. 2000); *Storves v. Island Water Ass'n, Inc.*, No. 2:10-cv-274, 2010 WL 11622686, at *4 (M.D. Fla. Nov. 3, 2010); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, No. 3:02-cv-1005, 2012 WL 6827463, at *4 (M.D. Fla. Aug. 30, 2012).

State Defendants also cite *Leigh v. Artis-Naples, Inc.* in support of its interpretation of *Baker*. Doc. 60 at 42 (citing No. 2:22-cv-606, 2022 WL 18027780, at *17 (M.D. Fla. Dec. 30, 2022)). And while that case does read *McDonald's* to limit *Baker* more broadly than Plaintiffs believe the *McDonald's* court intended, it does not help State Defendants. It argues, citing a Fifth Circuit case arising from the same line of cases, that *Baker* distinguishes between past actions compensable by money damages, which it holds do not automatically require an injunction, and cases like this one involving "'actively coercing employees to abandon their convictions' by

requiring them to 'violate their religious convictions or lose all pay and benefits indefinitely'" where irreparable harm should be presumed. *Leigh*, 2022 WL 18027780, at *18 (quoting *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *9 (5th Cir. Feb. 17, 2022)).

State Defendants' effort to rebut the presumption of harm is no more persuasive. They offer no argument whatsoever to rebut Ms. Wood's substantive argument that, setting aside any presumptions of harm, she is being irreparably harmed by being daily subjected to sex discrimination. *Compare* Doc. 11 at 29–30 and Doc. 45 at 26 *with* Doc. 60 at 42–43. State Defendants do argue that Mx. Schwandes is not harmed because Mx. Schwandes relies on "a series of vague events that have not yet happened." Doc. 60 at 42–43. But it is hardly speculative to assert that State Defendants will take disciplinary action against Mx. Schwandes, who State Defendants are already investigating for what Mx. Schwandes concedes were actions violating subsection 3 and its implementing regulations. Nor have State Defendants offered any evidence otherwise.

State Defendants also argue that any harm caused by Mx. Schwandes being disciplined can be remedied by "an order reinstating Schwandes's teaching certificate and expunging Schwandes's record of the discipline." Doc. 60 at 43. But even assuming there are no procedural obstacles or prudential objections to a federal court ordering a state actor take this action, that presumes that Mx. Schwandes will have

no need of their license between the present and the eventual resolution of this case.[13] It also entirely ignores the reputational harm from being publicly delicensed, a fact that will continue to be public knowledge even if any official records are expunged. Finally, while loss of income from delicensing might ordinarily be compensable, that is not the case with respect to any State Defendants who are immune from suit under the Eleventh Amendment. *See ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1310 (S.D. Fla. 2008) ("In cases where the defendant is immune from a claim for damages such as claims against the state barred by Eleventh Amendment immunity, irreparable harm is presumed."); *Kansas Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) (same); *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991) (same).

## IV. The public interest and balance of equities favor Plaintiffs.

If Plaintiffs are likely to succeed on the merits of their arguments that subsection 3 violates federal law or the Constitution, then State Defendants also likely lack any legitimate interest in continuing to enforce it. Florida has no interest in enforcing a discriminatory and unconstitutional law. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272–73 (11th Cir. 2006) ("The public has no interest in enforcing an unconstitutional ordinance"); *see Fla. Businessmen for Free Enter. v. City*

---

[13] State Defendants cite this claim to *Sampson v. Murray*, Doc. 60 at 43 (citing 415 U.S. 61, 89–92 (1974)), but that case does not concern professional licensing, but only the unremarkable proposition that injuries compensable with money are not irreparable.

*of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981) ("Given appellants' substantial likelihood of success on the merits, … [t]he public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional."). An injunction will simply return Plaintiffs and Florida schools to the situation they were in until this school year while this lawsuit unfolds, a situation that Florida has been able to tolerate up until now.

State Defendants also suggest that any injunction should only be issued with respect to Plaintiffs and they should be allowed to continue to enforce subsection 3 against others. Doc. 60 at 45. But the Eleventh Circuit regularly affirms orders enjoining statewide statutes that conflict with the First Amendment. *See, e.g.*, *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1304 (11th Cir. 2017); *see also Garcia v. Stillman*, No. 22-CV-24156, 2023 WL 3478450, at *3 (S.D. Fla. May 16, 2023) ("it is routine, appropriate, and necessary for a district court to preliminarily enjoin Florida from enforcing a law that likely violates the First Amendment"). And though state laws explicitly conflicting with Title VII are rarer, district courts have enjoined them on a statewide basis too. *Garneau v. Raytheon Co.*, 323 F. Supp. 391, 394–95 (D. Mass. 1971); *McCrimmon v. Daley*, No. 68 C 1665, 1970 WL 119, at *1 (N.D. Ill. Mar. 31, 1970).

## CONCLUSION

Plaintiffs Katie Wood and AV Schwandes respectfully request that the Court

grant their motions for preliminary injunction.

Respectfully submitted,

Date: March 4, 2024

/s/ *James M. Finberg*
Sam Boyd, Fla. Bar No. 1012141
Carli Raben, Fla. Bar No. 1036013
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131
(786) 347-2056
(786) 237-2949 (fax)
sam.boyd@splcenter.org
carli.raben@splcenter.org

Aaron S. Fleisher[*†]
SOUTHERN POVERTY LAW CENTER
1101 17th St NW Ste. 705
Washington, DC 20036
(202) 536-9719
(202) 971-9205 (fax)
aaron.fleisher@splcenter.org
[†] *Not admitted to practice law in DC*

Diego A. Soto[*‡]
Jessica L. Stone[*]
SOUTHERN POVERTY LAW CENTER
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030
(404) 521-6700
(404) 377-0708 (fax)
diego.soto@splcenter.org
jessica.stone@splcenter.org
[‡] *Admission to GA pending*

Simone Chriss, Fla. Bar No. 124062
Jodi Siegel, Fla. Bar No. 511617
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Ave.

Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

James M. Finberg[*]
James Baltzer[*]
ALTSHULER BERZON LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
jfinberg@altshulerberzon.com
jbaltzer@altshulerberzon.com

*Counsel for Plaintiffs*

[*] *Admitted* pro hac vice

## CERTIFICATE OF WORD COUNT

I certify that this document contains 9,784 words, inclusive of headings, footnotes, and quotations, according to the word-processing system used to prepare it.

Date: March 4, 2024                    /s/ *James M. Finberg*
                                       James M. Finberg