# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Wood, *et al.*,

      *Plaintiffs*,

      v.

Florida Department of Education, *et al.*,

      *Defendants*.

Case No. 4:23-cv-526-MW-MAF

# STATE DEFENDANTS' REPLY
# IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii
INTRODUCTION ...................................................................... 1
ARGUMENT ............................................................................ 3
I.   Plaintiffs fail to state claims under Title VII ................................ 3
    A. Subsection 3 does not run afoul of *Bostock* ............................. 3
    B. Plaintiffs' stereotyping arguments are foreclosed by precedent. ............................................................ 13
    C. There is no alleged adverse employment action. ....................... 15
    D. Plaintiffs have not refuted the State Defendants' BFOQ defense. ........................................................ 18
II.   Plaintiffs' speech is not protected by the First Amendment. .......... 20
    A. Subsection 3 regulates only speech pursuant to teachers' official duties. ................................................ 20
    B. Plaintiffs' personal titles and pronouns are not matters of public concern. .......................................... 22
    C. The State's interests outweigh Plaintiffs' alleged harm. ............ 24
III. Plaintiffs fail to state a claim under the Equal Protection Clause .................................................................. 26
    A. Subsection 3 is subject to rational-basis review. ....................... 26
    B. Subsection 3 satisfies intermediate scrutiny. ........................... 28
    C. Plaintiffs cannot proceed under a disparate impact theory. ...... 33
IV. Plaintiffs fail to state a claim under Title IX. ............................... 34
    A. Title VII preempts Plaintiffs' Title IX claims .......................... 34
    B. Plaintiffs have not alleged any Title IX violation. ..................... 36
CONCLUSION ........................................................................ 37
CERTIFICATE OF WORD COUNT ................................................ 39
CERTIFICATE OF SERVICE ........................................................ 39

# TABLE OF AUTHORITIES

**Cases**

*Abdur-Rahman v. Walker*,
567 F.3d 1278 (11th Cir. 2009) ............................................................ 21

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ............................................................ 31

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) ....................................................... passim

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*,
804 F.3d 1149 (11th Cir. 2015) ............................................. 20, 21, 23

*Ambach v. Norwick*,
441 U.S. 68 (1979) ...................................................................... 21, 32

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) .............................................................. 6

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ..................................................................... passim

*Boyce v. Andrew*,
510 F.3d 1333 (11th Cir. 2007) ............................................................ 24

*Brown v. Gen. Servs. Admin.*,
425 U.S. 820 (1976) ............................................................................ 35

*Burnside v. Byars*,
363 F.2d 744 (5th Cir. 1966) ............................................................... 28

*Carswell v. Air Line Pilots Ass'n Int'l*,
540 F. Supp. 2d 107 (D.D.C. 2008) ..................................................... 18

*Christian Legal Soc'y Chapter of the Univ. of Cal.,
Hastings Coll. of the L. v. Martinez*,
561 U.S. 661 (2010) ............................................................................ 11

*Cox v. Am. Cast Iron Pipe Co.*,
784 F.2d 1546 (11th Cir. 1986) ............................................................ 15

*D.N. ex rel. Jessica N. v. DeSantis*,
2023 WL 7323078 (S.D. Fla. Nov. 6, 2023) .................................. 31, 34

*Dothard v. Rawlinson,*
    433 U.S. 321 (1977) ............................................................ 19

*Drisin v. Fla. Int'l Univ. Bd. of Trs.,*
    2017 WL 3505299 (S.D. Fla. June 27, 2017) ...................................... 35

*Duke v. Hamil,*
    997 F. Supp. 2d 1291 (N.D. Ga. 2014) ........................................ 24

*EEOC v. Catastrophe Mgmt. Sols.,*
    852 F.3d 1018 (11th Cir. 2016) ................................................... 4, 11, 14

*EEOC v. Catastrophe Mgmt. Sols.,*
    876 F.3d 1273 (11th Cir. 2017) ............................................................ 4

*Eknes-Tucker v. Governor of Ala.,*
    80 F.4th 1205 (11th Cir. 2023) ......................................................... 27

*Eller v. Prince George's Cnty. Pub. Schs.,*
    580 F. Supp. 3d 154 (D. Md. 2022) ............................................... 16, 17

*Entrekin v. City of Panama City,*
    376 F. App'x 987 (11th Cir. 2010) ..................................................... 17

*Evans-Marshall v. Bd. of Educ. of the*
*Tipp City Exempted Vill. Sch. Dist.,*
    624 F.3d 332 (6th Cir. 2010) .............................................................. 25

*FCC v. Beach Commc'ns, Inc.,*
    508 U.S. 307 (1993) ........................................................................... 33

*Fernandez v. Sch. Bd. of Miami-Dade Cnty.,*
    898 F.3d 1324 (11th Cir. 2018) ......................................................... 20

*Ferrill v. Parker Grp., Inc.,*
    168 F.3d 468 (11th Cir. 1999) ........................................................... 16

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ............................................................... 20, 25, 26

*Glenn v. Brumby,*
    663 F.3d 1312 (11th Cir. 2011) ......................................................... 27

*Graham-Kilby v. J.P. Morgan Chase, N.A.,*
    2023 WL 2908831 (N.D. Ga. Jan. 13, 2023) ...................................... 33

*Great Am. Fed. Sav. & Loan Ass'n v. Novotny,*
    442 U.S. 366 (1979) ........................................................................... 35

*Hamilton v. Alabama*,
    376 U.S. 650 (1964) .............................................................. 16

*Hamze v. Steel*,
    2014 WL 12640242 (S.D. Fla. Aug. 18, 2014) ..................................... 18

*Harper v. Blockbuster Ent. Corp.*,
    139 F.3d 1385 (11th Cir. 1998) ................................................... passim

*Henderson v. City of Birmingham*,
    826 F. App'x 736 (11th Cir. 2020) ...................................... 17

*Holland v. Gee*,
    677 F.3d 1047 (11th Cir. 2012) ......................................... 15

*Howard v. Walgreen Co.*,
    605 F.3d 1239 (11th Cir. 2010) ......................................... 16

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 508 (2022) ....................................................... 22

*Kidd v. Mando Am. Corp.*,
    731 F.3d 1196 (11th Cir. 2013) ......................................... 15

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
    432 F. Supp. 3d 823 (S.D. Ind. 2020) ............................ 21, 24

*Lakoski v. James*,
    66 F.3d 751 (5th Cir. 1995) ............................................. 35

*Maggio v. Sipple*,
    211 F.3d 1346 (11th Cir. 2000) ......................................... 23

*Martinez v. Bynum*,
    461 U.S. 321 (1983) ....................................................... 28

*Mathews v. De Castro*,
    429 U.S. 181 (1976) ....................................................... 33

*McCollum v. California*,
    2006 WL 2263912 (N.D. Cal. Aug. 8, 2006) ....................... 18

*Moore v. City of Roswell*,
    2023 WL 6370626 (N.D. Ga. July 6, 2023) ......................... 24

*Morgan v. Ford*,
    6 F.3d 750 (11th Cir. 1993) ............................................. 23

*Moss v. City of Pembroke Pines*,
782 F.3d 613 (11th Cir. 2015).............................................. 24

*Othon v. Wesleyan*,
612 F. Supp. 3d 35 (D. Conn. 2020) ............................... 35, 36

*Phillips v. Martin Marietta Corp.*,
400 U.S. 542 (1971) ................................................................ 11

*Rademakers v. Scott*,
350 F. App'x 408 (11th Cir. 2009) ....................................... 18

*Randle v. Dynamic Sec., Inc.*,
2017 WL 4572289 (N.D. Ala. Oct. 13, 2017) ...................... 17

*Rotkiske v. Klemm*,
140 S. Ct. 355 (2019) ................................................................ 8

*Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*,
552 U.S. 148 (2008) ................................................................ 36

*Texas v. EEOC*,
633 F. Supp. 3d 824 (N.D. Tex. 2022) ............................... 6, 9

*UAW v. Johnson Controls, Inc.*,
499 U.S. 187 (1991) ........................................................... 11, 18

*United States ex rel. Osheroff v. Humana Inc.*,
776 F.3d 805 (11th Cir. 2015)............................................... 19

*Virgil v. Sch. Bd. of Columbia Cnty.*,
862 F.2d 1517 (11th Cir. 1989)............................................. 31

*Wainberg v. Piedmont Univ.*,
2023 WL 3931506 (N.D. Ga. Mar. 7, 2023).................... 2, 34

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*,
2023 WL 4297186 (D. Wyo. June 30, 2023) ................. 21, 24

*Willingham v. Macon Tel. Publ'g Co.*,
507 F.2d 1084 (5th Cir. 1975)..................................... passim

*Zibtluda, LLC v. Gwinnett County ex rel.
Bd. of Comm'rs of Gwinnett Cnty.*,
411 F.3d 1278 (11th Cir. 2005)............................................. 28

**Statutes**

Fla. Stat. §1000.01(3) ................................................................ 29

Fla. Stat. §1000.03(2)(a) ....................................................... 29, 31

Fla. Stat. §1000.071(1) ..................................................... 20, 25, 29

Fla. Stat. §1000.071(2) .............................................................. 29

Fla. Stat. §1000.071(3) .............................................................. 29

Fla. Stat. §1000.071(4) .............................................................. 29

Fla. Stat. §1000.21(9) ................................................................ 30

Fla. Stat. §1003.46(2)(a) ............................................................ 30

**Other Authorities**

Ch. 2023-105, Laws of Fla. .................................................... 29, 30

Fla. Exec. Order No. 19-32 (Jan. 31, 2019) ............................... 30

Fla. H.R. Comm. on Educ. & Emp., PCS for CS/HB 1069 (2023)
   Staff Analysis (Mar. 21, 2023), https://bit.ly/3v3WvB4 .................... 29

Fla. H.R. Comm. on Educ. & Emp., recording of proceedings
   (Mar. 23, 2023, 8:00 AM), https://bit.ly/4bXHa5F ................. 19, 30, 31

Fla. H.R., recording of proceedings (Mar. 31, 2023, 11:30 AM),
   https://bit.ly/3wKV4YJ ........................................................ 31

# INTRODUCTION

Plaintiffs' primary theory is that this case is just a "straightforward" application of *Bostock v. Clayton County*, 590 U.S. 644 (2020). But *Bostock* explicitly refused to address whether the Supreme Court's "but-for" test applied to conduct, leaving Eleventh Circuit precedent on that issue untouched. And that precedent has long foreclosed Plaintiffs' claims. For nearly 50 years, the rule in this circuit has been that distinctions based on a mutable characteristic such as "length of hair" don't violate Title VII because they are "related more closely to the employer's choice of how to run his business than to equality of employment opportunity." *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084, 1091 (5th Cir. 1975) (en banc). This circuit has also specifically rejected the view that the Supreme Court's "'but-for' test"—which long predates *Bostock*—"undermines the *Willingham* Court's analysis and conclusions." *Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1389 (11th Cir. 1998). To overcome these precedents, Plaintiffs must show that *Bostock*'s explicit refusal to extend its decision to conduct implicitly overturned them. Plaintiffs cannot make that showing.

Plaintiffs' other claims likewise suffer from major defects. Their First Amendment claims cannot escape the long line of cases confirming that states and localities have broad power to regulate teachers' speech to their students. That leeway extends to Plaintiffs' equal protection claims too: "As the Supreme Court has recognized, constitutional rights, including Fourteenth Amendment rights, are different in public schools than elsewhere because of the schools' custodial and tutelary responsibility for children." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801–02 (11th Cir. 2022) (en banc) (internal quotations omitted). Nor can Plaintiffs escape that the "'vast majority of the district courts in the Eleventh Circuit … have held that Title VII preempts Title IX in the employment context' and that Title VII is the exclusive remedy for employment discrimination claims against federally funded programs." *Wainberg v. Piedmont Univ.*, 2023 WL 3931506, at *21 (N.D. Ga. Mar. 7, 2023) (collecting cases).

For these reasons and those stated in this and the State Defendants' prior briefs, the Court should grant the motion to dismiss.

## ARGUMENT

### I. Plaintiffs fail to state claims under Title VII.

### A. Subsection 3 does not run afoul of *Bostock*.

**1.** Plaintiffs' simplistic reading of *Bostock*'s but-for test cannot be squared with the opinion itself. The Court decided only one question: "whether an employer who fires someone *simply for being homosexual or transgender* has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Bostock*, 590 U.S. at 681 (emphasis added). And the Court expressly did not resolve the issues raised here. *Id.* ("Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind."). *Bostock* thus recognized that status and conduct are conceptually different, and the Courts' decision not to address conduct left existing precedent on that issue in place.

That existing precedent forecloses Plaintiffs' Title VII claims. As the State Defendants have explained, *see* PI Opp. (Dkt. 60) 16–18, the Eleventh Circuit has long held that Title VII does not reach discrimination based on mutable traits—*i.e.*, conduct—even if such conduct is generally associated with a protected class. Rather, "distinctions in employment practices between men and women on the basis of something other

than immutable or protected characteristics do not inhibit employment *opportunity* in violation of [Title VII]." *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1029 (11th Cir. 2016) (quoting *Willingham*, 507 F.2d at 1092). For example, policies that allow women—but not men— to wear their hair long don't violate Title VII because "a hiring policy that distinguishes on some other ground, such as grooming codes or length of hair, is related more closely to the employer's choice of how to run his business than to equality of employment opportunity." *Willingham*, 507 F.2d at 1091. A plaintiff's failure to allege that the regulated trait is "an immutable characteristic," as a result, requires dismissal for failure to state a claim. *Catastrophe Mgmt. Sols.*, 852 F.3d at 1030; *accord EEOC v. Catastrophe Mgmt. Sols.*, 876 F.3d 1273, 1274 (11th Cir. 2017) (Jordan, J., concurring in the denial of rehearing en banc) (explaining panel affirmed dismissal "because the EEOC's complaint did not allege—as required by our Title VII disparate-treatment precedent—that dreadlocks are an immutable characteristic of black individuals").

Existing circuit precedent also establishes that the Supreme Court's but-for test does not apply to conduct or displace this circuit's

longstanding mutable/immutable distinction. Plaintiffs agree (at 48) that the but-for test "is not *Bostock*'s creation." It has been around a long time. And the Eleventh Circuit already addressed its application to conduct in *Blockbuster*, 139 F.3d 1385. There, the Eleventh Circuit applied *Willingham* to a policy prohibiting men but not women from wearing long hair. "The plaintiffs argue[d] that the application of the 'but-for' test in [Supreme Court precedent] undermines the *Willingham* Court's analysis and conclusions." *Id.* at 1389.

The Eleventh Circuit "disagree[d]" and, in fact, found the plaintiffs' contrary view to be objectively *unreasonable*. *Id.* The application of the but-for test occurs, the court explained, where the "plaintiffs could not avoid the effects of the discriminatory policies; they received lesser benefits simply because of their sex." *Id.* "Because the discriminatory policies in" the Supreme Court's cases "were aimed at a single immutable characteristic—the plaintiffs' sex—a simple 'but for' test effectively identified forbidden discrimination." *Id.* By contrast, "[t]he *Willingham* plaintiff was denied employment because he chose not to cut his hair; however, males in general were not prohibited from working for the defendant." *Id.* "Consequently, applying the 'but-for' test from" Supreme

Court precedent "to a *Willingham*-type situation does not effectively identify forbidden discrimination, i.e., discrimination that deprives members of a given sex of equal employment opportunity." *Id.* The Eleventh Circuit was clear: "The 'but-for' test is appropriate only where alleged discrimination is based on sex alone." *Id.* The Eleventh Circuit has thus recognized there is an inherent difference between discriminating against someone based on their *status* versus *conduct* typically associated with that status.

*Bostock* itself closely mirrors that distinction with its many references to discrimination based on "status," *see Texas v. EEOC*, 633 F. Supp. 3d 824, 831 (N.D. Tex. 2022), and the Court's flat refusal to extend the decision or the but-for test to conduct, *Bostock*, 590 U.S. at 681. To side with Plaintiffs, then, the Court would have to treat that explicit refusal as an implicit rejection of Eleventh Circuit precedent that started before that court's existence. *See Willingham*, 507 F.2d 1084; *accord Bonner v. City of Prichard*, 661 F.2d 1206, 1209–10 (11th Cir. 1981) (en banc).

**2.** Though it's not an open question, the Eleventh Circuit's refusal to extend the but-for test to conduct was correct as an original matter.

This case is the perfect example why a contrary rule leads to absurd results. As the State Defendants explained at length, transgender individuals don't use only the pronouns associated with the opposite biological sex. Many transgender individuals use biologically aligned pronouns; others use non-traditional pronouns; and still others use different pronouns depending on social context. *See* PI Opp. 12–14, 20; Mot. Dismiss (Dkt. 63-1) 10–12, 16. Plaintiffs do not dispute this reality. And that reality shows using the but-for test would mean that Subsection 3 violates Title VII for transgender teachers who use "he" or "she" as their pronouns but not for transgender (or nonbinary) teachers who use "they"—like Plaintiff Schwandes—or any other pronouns. Mot. Dismiss 12–13. But it cannot be that Title VII violations turn on the type of differing pronouns a teacher uses rather than the teacher's biological sex. And that irregularity shows *Bostock* applies to status and not conduct.

Congress's textual choices confirm the same. Congress knows how to expand protections beyond classes to conduct, *see* Mot. Dismiss 13, and it hasn't done so with Title VII. Extending *Bostock* to conduct would run afoul of the Supreme Court's command that "[a]textual judicial supplementation is particularly inappropriate when … Congress has shown

that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019). Plaintiffs didn't respond to that point at all.

**3.** Plaintiffs' counterarguments to all this fall short. *First*, Plaintiffs (at 6–7) focus on *Bostock*'s statements about Title VII applying to "individuals, not groups." But *Bostock* is internally consistent only if its but-for test is recognized as deciding only whether transgender and homosexual status are covered by Title VII, not whether conduct associated with such status is covered. And if conduct were subject to the "straightforward" but-for rule, as Plaintiffs argue (at 4), then why would the Court specifically refuse to address its application to conduct? After all, "sex-segregated bathrooms, locker rooms, and dress codes," *Bostock*, 590 U.S. at 681, could be said to fall under Plaintiffs' theory too. But the Eleventh Circuit has already disagreed *Bostock* went that far, at least on bathrooms, *Adams*, 57 F.4th at 809, and it otherwise has rejected applying the but-for test to conduct, *Blockbuster*, 139 F.3d at 1389; *supra* pp.4–6.

*Second*, Plaintiffs (at 7) lift out of context a statement from *Bostock* referring to "actions." But the "actions" to which the Court referred were

a homosexual individual's attraction to members of the same sex. *See, e.g.*, *Bostock*, 590 U.S. at 660 ("If the employer fires the male employee for no reason other than the fact he is *attracted to men*, the employer discriminates against him for *traits or actions* it tolerates in his female colleague." (emphasis added)); *see also Texas*, 633 F. Supp. 3d at 834. Indeed, the line Plaintiffs quote immediately follows an express statement that the Court's holding is confined to status—"[t]oday, we must decide whether an employer can fire someone simply for being homosexual or transgender," 590 U.S. at 650–51—and is closely followed by similar framings of the question presented, *id.* at 653.

*Third*, Plaintiffs argue (at 7) that "the facts [in *Bostock*] involved conduct, not just status." But again, that is not how the Court framed things: "Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status." *Id.*

*Fourth*, Plaintiffs oddly point (at 7) to language in *Bostock* explaining the irrelevance of conduct "such as tardiness" to argue that "Title VII's rule applied to conduct too." But the Court made that point to show

that only status counts, not conduct. Indeed, the Court said in that very passage that "Title VII has nothing to say" about conduct, unless it is "inextricably bound up with sex," *id.* at 660–61—precisely the Eleventh Circuit's longstanding mutable/immutable distinction, *supra* pp.3–6.

*Fifth*, Plaintiffs say (at 7) there is longstanding agreement that an employer's label of an employment practice is not probative. True, but irrelevant. On this issue, *Bostock* was merely pointing out the unremarkable fact that an employer's benign label for a policy—such as a "'life expectancy' adjustment"—does not control the inquiry. 590 U.S. at 664–66.

*Sixth*, Plaintiffs (at 7) downplay *Bostock*'s refusal "to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 681. But Plaintiffs' entire argument is based on the premise that *Bostock* does reach that conduct. *Bostock*'s failure to reach that question—and its discussion of conduct that is "inextricably bound up" with status, *id.* at 660–61—are coherent only if there are important distinctions between status and conduct. And there are, as the Eleventh Circuit's untouched precedent makes clear. *See Catastrophe Mgmt. Sols.*, 852 F.3d at 1030; *Blockbuster*, 139 F.3d at 1389; *Willingham*, 507 F.2d at 1091.

*Seventh*, Plaintiffs (at 8) cite three cases to assert that the "State Defendants' argument is inconsistent with longstanding Title VII law." But the Eleventh Circuit has already explained that one of those cases— *UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991)—"is entirely consistent with the *Willingham* Court's holding." *Blockbuster*, 139 F.3d at 1388. *Johnson Controls* was merely an application of Plaintiffs' second case—*Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (per curiam). *See Johnson Controls*, 499 U.S. at 198 ("This Court faced a conceptually similar situation in *Phillips* … ."). And Plaintiffs' third case— *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010)—addressed inapposite claims under the First Amendment.

*Eighth*, Plaintiffs argue (at 9) that "*Bostock* especially applies in this case because subsection 3 facially discriminates because of sex." But again, if that were the case, then "sex-segregated bathrooms, locker rooms, and dress codes" would also be illegal under *Bostock*. 590 U.S. at 681. But *Bostock* expressly reserved this argument, *id.*, and *Adams* expressly rejected it, 57 F.4th at 809. Plaintiffs' assertion also cannot be

squared with Eleventh Circuit cases, for example, that involved practices of hiring women with long hair but not men. *Blockbuster*, 139 F.3d at 1386–87; *Willingham*, 507 F.2d at 1087.

*Ninth*, Plaintiffs assert (at 9) that *Catastrophe Management Solutions* is irrelevant because Subsection 3 is not "facially neutral." Yet Subsection 3 is as facially neutral as the practices and policies at issue in *Blockbuster* and *Willingham*. As explained extensively throughout, Subsection 3 discriminates not on an individual's sex as a man or a woman (status) but on an individual's pronoun use (conduct).

*Finally*, Plaintiffs argue (at 9–10) even if nonbinary individuals are not covered by Title VII, that says nothing about Plaintiffs Wood and Doe who seek to use opposite-sex pronouns. But nonbinary persons' inability to satisfy the but-for test not only shows that they are unprotected by Title VII—it also shows the problem with applying *Bostock*'s but-for test to conduct like pronoun use. *See supra* pp.6–7. On Plaintiffs' theory, Title VII liability would turn not on sex but on the pronoun that a transgender person uses. That cannot be.

\* \* \*

Defendants' reading of *Bostock* takes its express limitations seriously, interprets the opinion as a coherent whole, harmonizes it with longstanding Eleventh Circuit precedent, reflects the reality of pronoun usage among persons who identify as transgender, and respects Congress's prerogative to identify and protect certain conduct, leaving this controversial issue to the democratic process. Plaintiffs' reading of *Bostock* does not. The Court should reject it.

## B. Plaintiffs' stereotyping arguments are foreclosed by precedent.

There is no stand-alone cause of action under Title VII for sex stereotyping. Title VII outlaws discrimination based on sex. But Plaintiffs have not stated a claim that Subsection 3 discriminates based on sex. And though Plaintiffs may wish that Title VII reaches policies regulating their conduct, "such an objective may not be read into the Civil Rights Act of 1964 without further Congressional action." *Willingham*, 507 F.2d at 1092.

In any event, Plaintiffs cannot avoid *Adams*'s holding—which applies *Bostock* itself—that segregating bathrooms based on sex is not stereotyping because "biological sex … is not a stereotype." 57 F.4th at 809. Plaintiffs assert (at 12) that this holding was grounded solely in fears of

"bodily exposure." But the court's statement about "bodily exposure" was unrelated to its discussion of stereotyping. *Id.* at 805 (discussing bodily exposure in intermediate scrutiny analysis). Instead, the en banc court rejected the view that biological sex is an impermissible stereotype by citing the long line of Supreme Court cases recognizing that "sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth," and "[t]he two sexes are not fungible." *Id.* at 809 (first quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.); then quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). The court's holding that biological sex is not a stereotype is also in line with decades of precedent in the Title VII context. *See, e.g.*, *Catastrophe Mgmt. Sols.*, 852 F.3d at 1028 (explaining that *Willingham* rejected the plaintiff's argument "that he was the victim of sexual stereotyping (i.e., the view that only women should have long hair)"). Plaintiffs are simply left incanting the word stereotype.

Plaintiffs also rely (at 10–11) on one of the lower court decisions in *Bostock* that held that the employee's firing was based in stereotype. But that helps the State Defendants, not Plaintiffs. If the Court could merely have incanted the word stereotype and ended the case, why

would it labor through pages of difficult analysis regarding its but-for causation test? Indeed, under Plaintiffs' approach, a Title VII plaintiff could merely allege that a policy is based in stereotype to avoid having to satisfy *Bostock*'s but-for test.

## C. There is no alleged adverse employment action.

Even if Subsection 3 constitutes sex discrimination, Plaintiffs' claims fail for lack of adverse employment action. Plaintiffs give lip service (at 17) to the rule that the test for adverse employment action is objective. Yet they effectively pivot to a subjective view that "any employee" would consider a prohibition on preferred pronouns to be adverse action. *See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 (11th Cir. 2013) (explaining that an employee's "subjective view of the significance and adversity of the employer's action is not controlling"). For support, the best they can do is point (at 18) to a case where an employer changed an employee's *job* title—not the *personal* title the employee preferred, *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986)—and two other cases where the employer changed the employee's job duties, *Holland v. Gee*, 677 F.3d 1047, 1058 (11th Cir. 2012); *Ferrill v. Parker*

*Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). Subsection 3 does not do any of that.

To that end, "[n]ot all employer actions that negatively impact an employee qualify as 'adverse employment actions.'" *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010). A change in terms and conditions must be "*serious and material*" to constitute adverse employment action. *Id.* The mere "threat of termination" that Plaintiffs complain of (at 18) "falls well short." *Id.* (holding "message threatening that [plaintiff's] job was in jeopardy" was not adverse action).

Plaintiffs have no answer to the precedent showing that their alleged emotional harms are not adverse employment action. *See* Mot. Dismiss 17–18. Plaintiffs attempt (at 18) to distinguish those cases as not "address[ing] employee identity or self-expression." Yet they cite no case that says regulating such a topic is adverse employment action. *Hamilton v. Alabama* is an unexplained summary reversal of a contempt conviction that has nothing to do with Title VII. 376 U.S. 650 (1964). And Plaintiffs misstate *Eller v. Prince George's County Public Schools* as a case about mere "misgender[ing]." 580 F. Supp. 3d 154 (D. Md. 2022). For five years, the transgender plaintiff in *Eller* was called "a wide range of derogatory

terms"; was threatened with "physical violence," including "rape" and arson; and was in fact "subjected to multiple physical assaults." *Id.* at 173–74. Subsection 3 does not "mandat[e]" anything of the sort. In any event, *Eller* addressed a hostile work environment claim and Plaintiffs' claims are based on disparate treatment. Those "are very different claims with different elements." *Randle v. Dynamic Sec., Inc.*, 2017 WL 4572289, at *5 (N.D. Ala. Oct. 13, 2017). *Eller* is inapplicable.

Plaintiffs next claim (at 20) that FDOE's investigation of Schwandes's noncompliance with Subsection 3 "could lead to the revocation or suspension of … Schwandes's teaching license" or have "potential consequences." But nothing has happened to Schwandes yet. And in the only investigation case that Plaintiffs cite the employee suffered *actual* consequences: the investigations that "ultimately led to [the plaintiff's] placement on administrative leave and termination" were adverse action, while the investigation of a complaint that "ultimately was not sustained" was not. *Entrekin v. City of Panama City*, 376 F. App'x 987, 995 (11th Cir. 2010) (per curiam). Precedent establishes that FDOE's mere opening of an investigation is not adverse action standing alone. *See, e.g.*, *Henderson v. City of Birmingham*, 826 F. App'x 736, 741 (11th Cir. 2020)

(per curiam); *Rademakers v. Scott*, 350 F. App'x 408, 412–13 (11th Cir. 2009) (per curiam).

### D. Plaintiffs have not refuted the State Defendants' BFOQ defense.

If Subsection 3 constitutes sex discrimination, then it imposes a bona fide occupational qualification. Contrary to Plaintiffs' view, courts may rule on affirmative defenses raised in a motion to dismiss based on the complaint and judicially noticeable materials. *See, e.g.*, *Hamze v. Steel*, 2014 WL 12640242, at *3 (S.D. Fla. Aug. 18, 2014). A BFOQ defense is no exception. *See, e.g.*, *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 114–20 (D.D.C. 2008); *McCollum v. California*, 2006 WL 2263912, at *6–7 (N.D. Cal. Aug. 8, 2006), *aff'd sub nom.*, *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870 (9th Cir. 2011).

Using pronouns consistent with one's sex relates both "to ability to perform the duties of the job" as a Florida public school teacher and "to the 'central mission'" of Florida public schools. *Johnson Controls*, 499 U.S. at 203–04. A teacher's use of biologically incongruous pronouns would squarely contradict Florida education policy and "thus directly undermine her capacity to provide the" education "that is the essence of

a" Florida teacher's "responsibility." *Dothard v. Rawlinson*, 433 U.S. 321, 336 (1977).

Plaintiffs argue (at 14–15) that the complaint does not show that preferred pronouns have "interfered with the normal operation of [Florida] classrooms." But bill sponsors emphasized, for example, "the confusion that's going on" among students from the scores of pronouns being used in schools. Fla. H.R. Comm. on Educ. & Emp., recording of proceedings, at 1:26:34–1:27:42 (Mar. 23, 2023, 8:00 AM), https://bit.ly/4bXHa5F ("Committee Hearing"); *see also infra* pp.29–30. Courts can rely on such information at the motion-to-dismiss pleading stage. *See, e.g.*, *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811–12 (11th Cir. 2015).

Nor do the State Defendants "rely on subsection 3 itself" to justify a BFOQ, as Plaintiffs claim (at 15). Separate from Subsection 3, the State has set education policy throughout Florida and regulated when and how gender identity is taught. Mot. Dismiss 3–7. It also made it state "policy … that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond

to such person's sex." Fla. Stat. §1000.071(1). Subsection 3 merely dove-

tails with those policy choices made independently of Subsection 3.[1]

## II. Plaintiffs' speech is not protected by the First Amendment.

### A. Subsection 3 regulates only speech pursuant to teachers' official duties.

Plaintiffs misapply the threshold inquiry under *Garcetti v. Ce-*

*ballos*—"whether the employee spoke as a public employee pursuant to

his official duties." *Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d

1324, 1329 (11th Cir. 2018) (citing 547 U.S. 410, 418 (2006)). At *Garcetti*

step one, courts conduct a "'functional review' of an employee's speech in

relation to her duties or responsibilities." *Alves v. Bd. of Regents of the*

*Univ. Sys. of Ga.*, 804 F.3d 1149, 1164 (11th Cir. 2015).

Plaintiffs concede (at 26) that the Legislature "plainly" "sought to

define Plaintiffs' use of their titles and pronouns as part of their job."

That should be the end of the matter because speech "undertaken in the

course of performing one's job" is "undertaken 'pursuant to employment

responsibilities.'" *Id.* Just as a teacher's refusal to use students' preferred

---

[1] The parties appear to agree that Plaintiffs' preemption claim rises and falls with whether Subsection 3 violates Title VII as applied to Plaintiffs. *Compare* Mot. Dismiss 21 n.1, *with* Pls.' Opp. (Dkt. 67) 21–22.

pronouns in "interactions with students" was speech "pursuant to her official duties as a teacher" and thus unprotected, so too is Plaintiffs' desire to use their own preferred personal titles and pronouns in interactions with students. *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 2023 WL 4297186, at \*23 (D. Wyo. June 30, 2023); *see also Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 839 (S.D. Ind. 2020) (holding a teacher's refusal to use transgender students' preferred pronouns was unprotected because "the way in which he addresses students is part of his official duties as a teacher").

Plaintiffs suggest (at 24) that their job duties are only to provide "curricular information." But the Eleventh Circuit has "consistently discredited" such "narrow, rigid descriptions of official duties." *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1284 (11th Cir. 2009). Plaintiffs' view "would disregard the actual activities engaged in" by teachers. *Alves*, 804 F.3d at 1164. Teachers are hired to interact with students. They "function as an example for students, which exists independently of particular classroom subjects." *Ambach v. Norwick*, 441 U.S. 68, 80 (1979); *see Kluge*, 432 F. Supp. 3d at 839 (noting that, even if not curricular, "addressing students is necessary to communicate with them and teach

21

them the material— … how teachers relate to students *is* part of their jobs"). While the State "does not prescribe every word that teachers use at every moment in the classroom," Pls.' Opp. 24, teachers may not "deliver any message to anyone anytime they wish," *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 508, 527 (2022).

Plaintiffs' reliance on *Kennedy* misses the mark, as the State Defendants have explained. *See* Mot. Dismiss 25–26. Unlike Mr. Kennedy after football games, teachers are *not* "free to attend briefly to personal matters" or "free to engage in all manner of private speech" when interacting with students. 597 U.S. at 530. Nor did *Kennedy* turn on the fact that the government had not "created or directed" the prayers, as Plaintiffs claim (at 23). Rather, the Court relied on the fact that Mr. Kennedy "was not engaged in speech ordinarily within the scope of his duties as a coach" and concluded that his "prayers did not owe their existence to [his] responsibilities as a public employee." *Id.* at 529–30 (cleaned up). Plaintiffs' desired speech does.

## B. Plaintiffs' personal titles and pronouns are not matters of public concern.

Plaintiffs' only argument under the public-concern inquiry (at 28) is that "gender identity is a 'social matter' of concern to the community."

But "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." *Maggio v. Sipple*, 211 F.3d 1346, 1352 (11th Cir. 2000). The "relevant inquiry" is "whether the *purpose* of [the employee's] speech was to raise issues of public concern." *Alves*, 804 F.3d at 1167.

The State Defendants do not dispute that gender identity generally may be of public concern. *See* Mot. Dismiss 2, 34. But Plaintiffs' preferred titles and pronouns are "matters of only personal interest." *Alves*, 804 F.3d at 1162. Plaintiffs seek to use their preferred titles and pronouns to "express their gender identity" and to avoid "psychological distress and feelings of stigma." Am. Compl. (Dkt. 56) ¶¶72, 74; *see id.* ¶¶75–111. Because the purpose of Plaintiffs' desired speech is "to further [their] own private interest[s]," the speech is not of public concern. *Alves*, 804 F.3d at 1162; *see Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (per curiam) (speech "driven by" teacher's "self-interest in improving conditions of her employment" was not of public concern). While Plaintiffs' desired speech "may touch up against matters of public concern, it is not directed to such concerns." *Alves*, 804 F.3d at 1167; *see Boyce v. Andrew*, 510 F.3d 1333,

1344–45 (11th Cir. 2007) (per curiam) (holding speech "ostensibly inter-mingled with" but "not intended to address matters of public concern" was unprotected); *see also Kluge*, 432 F. Supp. 3d at 839 (holding teacher's speech was not of public concern because "referring to a particular student by a particular name does not contribute to the broader public debate on transgender issues"); *Willey*, 2023 WL 4297186, at *23 (similar). Plaintiffs' speech therefore is unprotected.

## C. The State's interests outweigh Plaintiffs' alleged harm.

Even if Plaintiffs seek to speak as private citizens on matters of public concern, the balance of interests at *Garcetti* step two favors the State. Interest balancing is a question of law. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015). It can be resolved at this stage. *See, e.g.*, *Duke v. Hamil*, 997 F. Supp. 2d 1291, 1303 (N.D. Ga. 2014); *Moore v. City of Roswell*, 2023 WL 6370626, at *8 (N.D. Ga. July 6, 2023).

On this point, Plaintiffs oddly say (at 28–29) that the State Defendants "make no separate argument that if Plaintiffs speak as private citizens on matters of public concern, then Florida's interests in regulating that speech outweighs Plaintiffs'." The State Defendants plainly did

make that argument. *See* Mot. Dismiss 28–29. And they repeat their position here: Florida has a strong interest in advancing its educational "policy" that "sex is an immutable biological trait." Fla. Stat. §1000.071(1); *see* Mot. Dismiss 1, 28–29. Teachers' providing to students biologically incongruous pronouns would "express views that contravene governmental policies" and frustrate "consistency and clarity" in Florida's pedagogical message. *Garcetti*, 547 U.S. at 419, 422. Like any employer, public schools "need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public" education. *Id.* at 418.

Plaintiffs cite no contrary support for their alleged interest in providing preferred personal titles and pronouns to their students. Plaintiffs also mischaracterize Subsection 3 (at 30) as "compel[ling] them to speak [Florida's] message." But Subsection 3 compels no speech; it restricts speech. Insofar as "Florida is compelling Plaintiffs to 'promote its pedagogical goals'" (at 30), it has every right to do so, *see, e.g.*, *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010). As the Supreme Court has recognized, public schools may "ensure" that teachers' "communications are accurate …

and promote the employer's mission." *Garcetti*, 547 U.S. at 422–23. The interests weigh decisively in favor of the State.

## III. Plaintiffs fail to state a claim under the Equal Protection Clause.

### A. Subsection 3 is subject to rational-basis review.

There are two potential ways to trigger intermediate scrutiny in this context: (1) show a policy discriminates based on "biological sex"; or (2) show a policy discriminates based on transgender status. *But see Adams*, 57 F.4th at 803 n.5 (expressing "grave 'doubt' that transgender persons constitute a quasi-suspect class"). The State Defendants agree with Plaintiffs (at 35–36) that the discussion in *Adams* footnote 6 addressed the plaintiff's argument that the bathroom policy discriminated based on transgender status. *See* Mot. Dismiss 30–32 (addressing *Adams* in the "First" and "Third" paragraphs). The Plaintiffs have now made clear they are *not* pursuing a claim of intentional discrimination against transgender teachers. *See* Pls.' Opp. 35 ("But that was because Adams, *unlike Plaintiffs in this case*, challenged the policy" as "discrimination based on gender identity, not because of its discrimination based on 'biological sex.'" (emphasis added)); *see also* Am. Compl. ¶197 (asserting an intentional discrimination claim based only on "sex").

That leaves Plaintiffs' argument that Subsection 3 discriminates based on biological sex. But while Subsection 3 "discusses sex insofar as it generally addresses [pronouns] for discordance between biological sex and gender identity," it "does not *discriminate* based on sex for two reasons." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228 (11th Cir. 2023) (emphasis added). First, Subsection 3 establishes not "an unequal regime for males and females" but "a rule that applies equally to both sexes." *Id.* It regulates the pronoun usage of "*all*" teachers; it "does not prefer one sex to the detriment of the other." *Id.* Second, Subsection 3 "refers to sex only because" pronouns "are themselves sex-based." *Id.* Pronouns "are different for males and for females because of biological differences between males and females." *Id.*

Nor does Subsection 3 discriminate based on "gender nonconformity" or "gender stereotypes." *Contra* Pls.' Opp. 32–34 (discussing *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011)). Subsection 3 "does not depend in any way on how [teachers] act or identify." *Adams*, 57 F.4th at 809. It regulates pronouns "based on biological sex, which is not a stereotype." *Id.* And *Glenn* does not "read[] 'gender identity' into the definition of 'sex.'" *Id.* at 813. As explained, regulating pronoun usage does

not concern any "gender stereotype" because pronoun choice is independent of transgender status. *See* Mot. Dismiss 10–12, 15–16, 32 n.3.

**B. Subsection 3 satisfies intermediate scrutiny.**

**1.** Even if intermediate scrutiny applies, Subsection 3 is "substantially related to an important governmental objective." *Adams*, 57 F.4th at 801. Florida's interests are "advanc[ing] the State's pedagogical goals" and "avoiding potential confusion arising from contentious social issues and focusing the curriculum instead on core subjects." Mot. Dismiss 33–34. These interests undoubtedly are important. *See, e.g.*, *Martinez v. Bynum*, 461 U.S. 321, 329 (1983) ("The provision of primary and secondary education … is one of the most important functions of local government."); *accord Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966). Plaintiffs do not dispute this.

Plaintiffs instead argue (at 39, 44–45) there is no indication of these interests. Not so. The State's interests are shown in the statutory scheme and legislative history. *See, e.g.*, *Zibtluda, LLC v. Gwinnett County ex rel. Bd. of Comm'rs of Gwinnett Cnty.*, 411 F.3d 1278, 1288 (11th Cir. 2005) (discerning interests from statute's text, preamble, and legislative history). HB1069 amended the Florida Early Learning-20

Education Code to define the term "sex" and to regulate classroom instruction on gender identity and usage of biologically incongruous pronouns, among other things. *See* Ch. 2023-105, at 1–2, Laws of Fla. (preamble). The Code's purpose is to provide "courses, classes, and educational institutions and services adequate" for students "to obtain a high quality education." Fla. Stat. §1000.01(3). Under the Code, "[t]he Legislature shall establish education policy, [and] enact education laws." *Id.* §1000.03(2)(a). Section 1000.071 provides that it "shall be the policy" of Florida public schools "that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." *Id.* §1000.071(1). Subsection 3 is one of several provisions implementing that policy. *See id.* §1000.071(2)-(4).

The legislative history confirms the State's interests. What began as HB1223, Section 1000.071 was added to HB1069 before the Education and Employment Committee. *See* Fla. H.R. Comm. on Educ. & Emp., PCS for CS/HB 1069 (2023) Staff Analysis (Mar. 21, 2023), https://bit.ly/3v3WvB4. As to Subsection 3, bill sponsors explained to the Committee that there are "as many as 78 pronouns that are being used in the general public, also in the school system." Committee Hearing,

*supra*, at 1:26:34–1:28:00. They gave as examples pronouns xe, xem, ze, and hir to "highlight some of the confusion that is occurring with children today." *Id*. They concluded:

> The purpose of this bill around pronouns is to get our teachers back to focusing on the reason that they became teachers in the first place, get them back to focusing on why we send our children to school in the first place. And that's to learn math, English, history—the core subjects.

*Id*.; *see also id*. at 2:27:10–2:28:06 (supporting legislator emphasizing need to improve student literacy and writing). That purpose is consistent with Florida's efforts to "return to the basics of reading, writing and arithmetic" as the core of K-12 education. Fla. Exec. Order No. 19-32 (Jan. 31, 2019).[2]

---

[2] In an effort to paint the State as inconsistent, Plaintiffs point (at 39–40) to a brief the State filed in a different case in 2022, in which the State explained that §1001.42(8)(c)(3) generally prohibits instruction on "sexual orientation" and "gender identity." But that statute was amended by the same legislation that created the provision challenged here, adding an exception to the general prohibition. *See* Ch. 2023-105, §3, at 3, Laws of Fla. (amending §1001.42(8)(c)3 to restrict classroom instruction on sexual orientation or gender identity "except when required by ss. 1003.42(2)(n)3. and 1003.46"). Consistent with Subsection 3, the statute now requires that, during "health education, when such instruction and course material contains instruction in human sexuality, a school shall … [c]lassify males and females as provided in s. 1000.21(9)," Fla. Stat. §1003.46(2)(a), *i.e.*, "based on the organization of the body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth," *id*. §1000.21(9).

Plaintiffs contend (at 40) the State's interest is "bare animus towards transgender and nonbinary people" because the law "establishes a policy" that deems it "false" to use biologically incongruous pronouns. But Plaintiffs (at 35) have abandoned any claim that Subsection 3 violates the Equal Protection Clause because it is "discrimination based on gender identity." *See supra* pp.26. Yet even setting that aside, it is the Legislature's obligation to "establish education policy." Fla. Stat. §1000.03(2)(a). The challenged policy simply embraces "the Supreme Court's longstanding recognition that 'sex … is an immutable characteristic.'" *Adams*, 57 F.4th at 807. This measure is "a core educational policy matter within the exclusive province of local school boards." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1225 (11th Cir. 2009); *accord Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1523 (11th Cir. 1989). And if it is relevant, legislators expressly disclaimed any discriminatory animus. *See* Committee Hearing, *supra*, at 2:32:15–2:32:30; *see also* Fla. H.R., recording of proceedings, at 50:40–51:00 (Mar. 31, 2023, 11:30 AM), https://bit.ly/3wKV4YJ. Plaintiffs have not shown animus. *See, e.g.*, *D.N. ex rel. Jessica N. v. DeSantis*, 2023 WL 7323078, at *7–8 (S.D. Fla. Nov. 6, 2023).

**2.** Subsection 3 is also substantially related to the State's interests. The policy need only have "'a close and substantial bearing on' the governmental objective"—there does not have to be "a perfect fit between means and ends." *Adams*, 57 F.4th at 801, 805. As the State Defendants explained, teachers using preferred pronouns would undermine Florida's pedagogical view that sex is immutable and unnecessarily inject issues of gender identity into classrooms. Mot. Dismiss 34–35.

Plaintiffs argue (at 41) that Subsection 3 does just the opposite because it "forces teachers who in all other ways present as one gender to out themselves as transgender through their use of titles and pronouns." But Florida law does not prohibit transgender persons from teaching students. *See id.* at 19–20. Teachers may present as whatever *gender* they want. The State simply seeks to avoid confusion about the immutable, biological nature of *sex*. Teachers providing to students biologically incongruous pronouns undermines the State's policy regarding *sex. See Ambach*, 441 U.S. at 79 (noting "the example [a teacher] sets" can "influence the attitudes of students"). And as legislators determined, the scores of different pronouns being used today have confused students. *Supra* pp.29–30. Given the deference schools receive, the

State has shown "enough of a fit between the policy and its asserted justification[s]." *Adams*, 57 F.4th at 801 (cleaned up).[3]

### C. Plaintiffs cannot proceed under a disparate impact theory.

Plaintiffs' attempt (at 43–44) to recast their equal protection claim under a theory that it disproportionately impacts transgender teachers. That attempt fails for multiple reasons. Most obviously, the complaint does not allege a disparate-impact theory, *see* Am. Compl. ¶¶195–203, and a "Plaintiff cannot amend her complaint through arguments in her brief in response to a motion to dismiss," *Graham-Kilby v. J.P. Morgan Chase, N.A.*, 2023 WL 2908831, at *7 (N.D. Ga. Jan. 13, 2023). But even if they could, the claim fails on its face. Disparate impact claims are not viable under the Fourteenth Amendment. *Adams*, 57 F.4th at 810 ("disparate impact alone does not violate the Constitution"). A plaintiff must always show that a "policy is motivated by 'purposeful discrimination.'" *Id.* And Plaintiffs have alleged only intentional discrimination based on

---

[3] Subsection 3 satisfies rational-basis review for these same reasons because, under that review, legislation carries a "strong presumption of constitutionality." *Mathews v. De Castro*, 429 U.S. 181, 185 (1976). And "those attacking the rationality of the legislative classification have the burden 'to negate every conceivable basis which might support it,'" *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

"sex." Am. Compl. ¶197. They have also made clear, again, that their theory is only that Subsection 3 violates equal protection because it intentionally discriminates based on "sex," not transgender status. *See supra* p.26.

Even setting all this aside, any theory that Subsection 3 is intentionally discriminatory based on transgender status fails. Plaintiffs have not met their burden to show that Subsection 3 was "motivated by 'purposeful discrimination.'" *Adams*, 57 F.4th at 810; *see, e.g.*, *D.N.*, 2023 WL 7323078, at *9 (rejecting disparate impact claim where plaintiff "failed to (plausibly) allege any such 'purposeful discrimination'"). Indeed, Plaintiffs offer no response whatsoever to the State Defendants' arguments demonstrating that Plaintiffs' allegations of purposeful discrimination are clearly insufficient under Eleventh Circuit precedent. *See* Mot. Dismiss 36–38.

## IV. Plaintiffs fail to state a claim under Title IX.

### A. Title VII preempts Plaintiffs' Title IX claims.

**1.** Plaintiffs concede (at 49) that "most district courts within the Eleventh Circuit agree with State Defendants" that Title VII preempts their Title IX claims. *See, e.g.*, *Wainberg*, 2023 WL 3931506, at *21 (collecting 13 district court decisions). Those courts are correct.

The Supreme Court has made clear that Title VII establishes "an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 829 (1976) (preempting claims under 42 U.S.C. §1981). If employment discrimination claims could be asserted through other statutes, plaintiffs "could avoid" Title VII's "detailed and specific provisions" and "administrative process, which plays such a crucial role in the scheme established by Congress." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 375–76 (1979) (preempting claims under 42 U.S.C. §1985(3)); *see also Drisin v. Fla. Int'l Univ. Bd. of Trs.*, 2017 WL 3505299, at *3–7 (S.D. Fla. June 27, 2017) (discussing "abundant authority and compelling policy reasons" for Title VII preemption).

The cases taking the minority view that Plaintiffs urge (at 49–50) are misguided. Those cases follow a "beguilingly simple syllogism" that the Supreme Court's Title IX decisions finding liability "all add up to an implied private right of action for damages under Title IX for employment discrimination." *Lakoski v. James*, 66 F.3d 751, 754 (5th Cir. 1995). They do not. *See generally Othon v. Wesleyan*, 612 F. Supp. 3d 35, 37–49 (D. Conn. 2020). "The Supreme Court has never addressed, in

*dicta* or otherwise, how Title IX's implied private remedy will apply to employment claims or the relationship between Title VII and Title IX." *Id.* at 46. But the Court has repeatedly hesitated to recognize new implied private rights of action or expand those previously recognized. *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*, 552 U.S. 148, 164–66 (2008). This Court should decline to do so here.

**2.** Plaintiffs request (at 50) that, if their preemption arguments are unpersuasive, the Court "defer decision on this question until the Eleventh Circuit decides this issue in two consolidated cases before it." But Plaintiffs opposed staying discovery because they would be "harmed" if the Court were to "delay[] relief and resolution" of their claims. Dkt. 58, at 11. And in declining to stay discovery, the Court, aware of the preemption issue before the Eleventh Circuit, *see id.* at 8, "assured" the parties that it "will not unduly delay a ruling on the … motions to dismiss," Dkt. 59, at 2. Deferring decision pending the Eleventh Circuit's resolution of this issue would do just that.

## B. Plaintiffs have not alleged any Title IX violation.

Even if Plaintiffs' Title IX claims are not preempted, they fail on the merits. Plaintiffs argue (at 46–47) that "the framework for Title VII

claims," including the "'but for' … causation test," applies to their Title IX claims. It does not.

*Adams* squarely rejected application of *Bostock*'s but-for test in the Title IX context. 57 F.4th at 814 n.7. That test, the Eleventh Circuit explained, "would swallow" Title IX's express sex-specific "carve-outs and render them meaningless" because "any lawful policy separating on the basis of 'sex' … inherently involves distinguishing between the sexes from the outset." *Id.* It makes no difference that "Title IX does not provide schools a carve-out safe harbor for titles and pronouns," as Plaintiffs argue (at 47). *Adams* rejected the argument that "'sex' in Title IX includes 'gender identity' for purposes of its application to transgender" persons. *Id.* at 813. Title IX does not provide "dual protection … based on *both* sex and gender identity when gender identity does not match sex." *Id.* at 814. And even if Title IX covered transgender persons, Subsection 3 does not discriminate based on sex for the same reasons as under Title VII. Mot. Dismiss 8–16, 21–22; *supra* pp.3–15.

## CONCLUSION

This Court should grant the motion and dismiss Plaintiffs' complaint.

Dated: March 11, 2024

Respectfully submitted,

*/s/ Bryan Weir*

Bryan Weir*
Daniel Shapiro
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: 703.243.9423
bryan@consovoymccarthy.com
daniel@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Counsel for the State Defendants*

*Admitted pro hac vice

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 7.1(F) and this Court's Order Amending Briefing Schedule entered February 1, 2024, Dkt. 49, this reply contains 7,543 words.

*/s/ Bryan Weir*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2024, a true and correct copy of this memorandum was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Bryan Weir*