**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
KATIE WOOD, et al.,              )
                                 )
              Plaintiffs,        ) Case No: 4:23cv526
                                 )
          v.                     ) Tallahassee, Florida
                                 ) March 29, 2024
FLORIDA DEPARTMENT OF            )
EDUCATION, et al.,               )
                                 ) 8:32 AM
              Defendants.        )
_____  )
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 42)**

Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
111 North Adams Street
Tallahassee, Florida 32301
megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

For the Plaintiffs:        Southern Poverty Law Center
                           By:  SAMUEL TURNER SILK BOYD
                                Attorney at Law
                                sam.boyd@splcenter.org
                           2 Biscayne Boulevard
                           Suite 3750
                           Miami, Florida 33101

                           Southern Poverty Law Center
                           By:  DIEGO ARMANDO SOTO
                                Attorney at Law
                                diego.soto@splcenter.org
                           150 East Ponce De Leon Avenue
                           Suite 340
                           Decatur, Georgia 30030

                           Altshuler Berzon LLP
                           By:  JAMES MICHAEL FINBERG
                                Attorney at Law
                                jfinberg@altber.com
                           177 Post Street
                           Suite 300
                           San Fransico, California 94108

                           Southern Legal Counsel Inc.
                           By:  JODI LYNN SIEGEL
                                SIMONE MICHELLE CHRISS
                                Attorneys at Law
                                jodi.siegel@southernlegal.org
                                simone.chriss@southernlegal.org
                           1229 NW 12th Avenue
                           Gainesville, Florida 32601


For Florida Department of Education:

                           Consovoy McCarthy PLLC
                           By:  BRYAN K. WEIR
                                DANIEL JOSEPH SHAPIRO
                                DANIEL M. VITAGLIANO
                                Attorneys at Law
                                bryan@consovoymccarthy.com
                                daniel@consovoymccarthy.com
                                dvitagliano@consovoymccarthy.com
                           1600 Wilson Boulevard
                           Suite 700
                           Arlington, Virginia 22209

<u>APPEARANCES (cont'd.)</u>:

For Hillsborough County School Board:

                        Akerman LLP
                        By:  JASON LEE MARGOLIN
                             Attorney at Law
                             jason.margolin@akerman.com
                        401 East Jackson Street
                        Suite 1700
                        Tampa, Florida 33602


For Lee County School Board:

                        Roetzel & Andress PA
                        By:  MIKALA ANN MAKAR
                             Attorney at Law
                             mmakar@ralaw.com
                        999 Vanderbilt Beach Road
                        Suite 401
                        Naples, Florida 34108

**P R O C E E D I N G S**

1

2          (Call to Order of the Court at 8:32 AM on Friday, March 29,

3     2024.)

4               THE COURT:  Please take your seats.

5               We are here in Case No. 4:23cv526.  We are here on an

6     evidentiary hearing on a motion for preliminary injunction.  We

7     also have pending motions to dismiss.  I have counsel present.

8               I'm not sure if we switched because I don't know

9     everybody.  Is this -- are plaintiffs on this side?

10              THE COURTROOM DEPUTY:  Yes.

11              THE COURT:  Okay.  Sometimes we switch around.

12              So I've got -- is it Mr. Boyd?

13              MR. BOYD:  That's me.

14              THE COURT:  All right.

15              And if somebody else is going to speak -- and I have

16    got Mr. Weir?

17              MR. WEIR:  Yes, Your Honor.

18              THE COURT:  And for Hillsborough County?

19              MR. MARGOLIN:  Good morning, Your Honor.  Margolin for

20    Hillsborough County.

21              THE COURT:  All right.  And Makar?

22              MS. MAKAR:  Your Honor, Mikala Makar for Lee County

23    school.

24              THE COURT:  And I have got Mr. Marsey for the virtual

25    school.

1    If somebody else is going to speak, because I know we

2 have other lawyers that have joined -- for example, I have got

3 lawyers sitting with Mr. Weir -- just let me know.

4    MR. BOYD:  Your Honor, Mr. Soto will address, with

5 your permission, the Equal Protection Clause and Title IX

6 claims, to the extent that those are relevant.

7    THE COURT:  Oh, Equal -- I was getting ready to say --

8 I was thinking preliminary injunction.  I was thinking, oh, I

9 didn't think that there was an equal protection claim in the PI,

10 but I get it, for the motion to dismiss.

11    And I know this is on the docket, but just for any

12 reviewing court, so the history is clear -- and they, of course,

13 could reference the appellate docket -- once the motions were

14 filed, as y'all know, I set this for a scheduling conference.

15 The parties submitted joint proposed schedules for briefing,

16 which were ECF Nos. 30 and 48.

17    I adopted the parties' proposed schedule and joint

18 amended schedule without limitations, ECF Nos. 34 and 39.  I

19 specifically waived the word limits on the parties' responses

20 and replies, ECF No. 51, which is the minutes from the

21 scheduling conference held on February 1st, 2024.

22    Neither side asked to engage in any specific discovery

23 to prepare for the preliminary injunction hearing.  Neither side

24 indicated they intended to call live witnesses at the hearing.

25 Instead, the parties indicated they were going to rely on the

declarations. Both sides agreed this Court would decide the
pending motions, again, on the written record and evidence
submitted in the form of declarations and affidavits.

That's all to say that I want the record to be clear I
didn't jam everybody up. In fact, this is a schedule that's
much longer than the schedule I would normally set. Also, I
didn't keep anybody from calling witnesses; I didn't keep
anybody from seeking discovery that was needed to respond to the
motions. I also did not receive any motions to supplement the
record or add declarations. I also didn't artificially limit
the documents that were filed by the parties, motions and so
forth. In fact, again, I waived the word limit.

So both sides have had a -- when I say both sides,
there's multiple parties. But both sides have had a full and
fair opportunity to file what they wanted to file with this
Court and make their record.

I'll also note that folks reached out from the parties
to my courtroom deputy, and she sent them -- the parties an
email wherein she communicated with the parties that the way we
were going to conduct this hearing, since nobody intended to
call any witnesses and the evidence was already locked in and it
was closed in terms of what evidence would be considered by the
Court -- that the parties had had a full and fair opportunity to
brief the issue, so we'd start with the motions to dismiss.

And since the defense -- defendants, rather, were the

1   last side to be heard with their reply, we'd start with the

2   surreply, if any, and a true surreply, that is, not repeating

3   what's in the papers. But if there is something that plaintiffs

4   needed to add in response to the surreply -- I'm sorry -- to the

5   reply of the defendants, we'd do the same thing in reverse for

6   the preliminary -- the motions for preliminary injunction. I

7   say that because I want to make plain nobody should be surprised

8   that's how we were going to conduct this hearing.

9         Let me also note -- and I'm not suggesting that it's

10  determinative of anything; I'm not suggesting that it's going to

11  necessarily move the needle in one direction or the other, but I

12  am aware of the Eleventh Circuit decision that was released

13  yesterday, *Copeland,* which talks about, of course, Title VII.

14        Let me find out, starting with -- I believe it's going

15  to be Mr. Soto. And before I do that, let me pause to say I'm

16  not suggesting I'm not reserving the right to ask any questions.

17  I just wanted to have everybody follow up, and to the extent

18  they want to say anything in reply to the last document filed,

19  we do that first.

20        Let me start with -- I believe it's Mr. Soto is going

21  to do the motions to dismiss, or no?

22        MR. BOYD: Your Honor, with your permission, I would

23  like to address some points about Title VII and the State

24  interest question on the motions to dismiss. They are relevant

25  to both motions, and I think Mr. Soto has a point about the

1   Equal Protection Clause with respect to the motions to dismiss.

2            THE COURT:  Okay.

3            MR. BOYD:  So first, on the government interest prong,

4   which the defendants have expanded upon in their reply brief, I

5   just wanted to make a point that holding the subsection (3)

6   advances the state interest requires accepting four propositions

7   which we think are all absurd or unsupported.

8            So, first, that a law that allows everyone in

9   Ms. Wood's school to call her Ms. Wood, except for her herself,

10  somehow advances the state interest in preventing confusion;

11  that a law that requires a teacher who identifies as and

12  presents as a woman to use male pronouns and titles, again,

13  prevents confusion; that Florida has a state interest in

14  prohibiting plaintiffs from using their titles and pronouns to

15  advance a pedagogical interest; that it is false to say that

16  their gender identity is different from their sex assigned at

17  birth when Florida law prohibits instruction on gender identity

18  in all circumstances, with one exception.  And that's my fourth

19  point.

20           So the defendants raised in their reply brief for the

21  first time a statute that's an exception to the so-called "don't

22  say gay" law that provides that health education can be taught,

23  but that statute is quite narrow.  It says that health classes

24  must, quote, *Classify males and females as provided in Section*

25  *1000.219, and teach that biological males impregnate biological*

*females by fertilizing female egg with male sperm. The female*
*then gestates the offspring, and that these reproductive roles*
*are binary, stable, and unchangeable.*

So defense's position is that this creates a
pedagogical interest in restricting all teachers' pronoun use in
all circumstances, even though their pronoun use doesn't say
anything about their biological capacity to bear children, and
when -- defendants stated in their opposition brief -- this is
ECF 60 at page 20 -- that pronouns -- that, quote: *Pronouns are*
*wholly divorced from biological sex.*

And second point as to Title VII, defendants placed a
great deal of emphasis in their briefing on the mutability point
with respect to protected characteristics and *Bostock* and how it
allegedly --

THE COURT: Hold on a second.

M-u-t-a-b-l-y -- no. I'm sorry -- l-i-t-y.

MR. BOYD: Thank you, Your Honor.

And so the point I want to make here -- and I think
we've addressed their interpretation of *Bostock* already, but the
point I wanted to make here is even if you accept defendants'
framing of the issues, plaintiff should still prevail.

So, first of all, immutability doesn't mean, as
defendants suggest, that all members of the protected class
share that characteristic. So, for example, in *Catastrophe*
*Management,* the Court said that hair -- that hair texture could

be an immutable characteristic because it's associated with African ancestry. But not all people who identify as Black or who we would consider Black have that hair texture.

And similarly, you know, our clients use particular pronouns. Ms. Wood uses she/her pronouns. Mx. Schwandes uses they/them pronouns. The fact that some other transgender people may not use just one pronoun doesn't mean that for our clients their pronoun use is immutable. So for them -- for Ms. Wood, for example, her use of she/her is an immutable characteristic of her gender identity as a woman.

And so I don't think the Eleventh Circuit has ever said that immutability is limited to -- the immutable characteristics -- excuse me -- are limited to those which all members of the class share. Other circuits, you know, have clarified that point and said -- for example, the Ninth Circuit says that an immutable characteristic is one which is so fundamental to one's identity that a person should not be required to abandon them. That's *Latta v. Otter,* 771 F.3d 456 at Note 4.

I just say that to note that, you know, I think the -- even if you accept the immutability analysis and the sort of status conduit distinction, for our clients their pronouns are probably the most central aspect of their transgender identity. They are -- Ms. Wood is a woman. To be a woman in our society is to be referred to using female titles and pronouns.

1        Thank you, Your Honor.

2        THE COURT:  Mr. Soto, and if you'll approach the

3 podium, please.

4        MR. SOTO:  Good morning, Your Honor.

5        I have three points in surreply on the equal

6 protection claims.  First, I'd like to clarify what plaintiffs'

7 equal protection theories are because I think there remains a

8 little bit of confusion in the State's reply brief about those

9 theories.

10        Second, I'd like to respond to Florida's position that

11 pronouns express sex rather than gender identity and that

12 pronouns are assigned based off of biological differences.

13        And then, finally, I'd like to clarify that plaintiffs

14 do, in fact, dispute that Florida has asserted a sufficient

15 interest, contrary to Florida's assertion in their reply brief.

16        So on the first point, just to clarify our --

17 plaintiffs' equal protection theories, our primary argument is

18 that subsection (3) is subject to intermediate scrutiny for two

19 reasons, the first being that it classifies on the basis of sex

20 assigned at birth, or what Florida calls biological sex, and

21 because it perpetuates stereotypes about men and women.

22        On that second point, I read Florida's brief to kind

23 of suggest that stereotypes might not be a means to invoke or

24 trigger intermediate scrutiny.  And to the extent that I read

25 that correctly, that's just contrary to the Supreme Court's

decision in *J.E.B. against Alabama* and the Eleventh Circuit's

decision in *Glenn against Brumby*.  The Eleventh Circuit also

confirmed that that theory is still viable and triggers

intermediate scrutiny in *Adams* at page 813 and *Eknes-Tucker* at

1229.

Then, in the alternative, if the Court were to

disagree with plaintiffs that intermediate scrutiny even

applies, that's when plaintiffs argue that subsection (3)

nonetheless is unconstitutional under *Arlington Heights* and

*Romer* because of its effect and purposes to discriminate against

transgender and nonbinary people.

Contrary to Florida's assertions in its reply brief,

plaintiffs never disclaimed that theory.  They never disclaimed

or abandoned their allegations in the complaint, such as at

paragraphs 29 to 33, that at least part of subsection (3)'s

purpose and effect are to discriminate against transgender and

nonbinary people.

And to the assertion in -- excuse me -- Florida's

reply brief that plaintiffs did not raise a disparate impact or

purpose claim in their client complaint, that's just not

required under case law.  Plaintiffs don't need to specify in

detail every theory as long as they allege a plausible claim.

The second point I would like to raise in the surreply

is in response to the -- to Florida's argument that like the

medication treatments in *Eknes-Tucker* for gender dysphoria,

pronouns are somehow different for males and for females because
of biological differences between males and females, but that
argument fails for four reasons.

First, that argument is the precise stereotype that
plaintiffs argue is what makes subsection (3) unlawful, this
idea that one sex assigned at birth is what determines what
titles and pronouns should -- a person should and shouldn't use.

Second, pronouns are just not like those medication
treatments for gender dysphoria in *Eknes-Tucker*.  Whereas
medication treatments have different effects depending on one's
biological traits, pronouns do not depend on or affect one's
biology.  And *Eknes-Tucker* was adamant at page 1229 that it was
dealing with medical treatments and not employment
discrimination.  And, of course, this case is about the latter.

Third, Florida provides no evidence or authority for
the idea that pronouns exclusively describe biology rather than
gender identity.

And, finally, this argument fails because it
contradicts not only plaintiffs' allegations in the complaint,
but also Florida's own motion at page 16 about how transgender
and nonbinary people use titles and pronouns to express gender
identity, not sex.  And it also contradicts Florida's assertion
at page 35 of its motion that subsection (3) enforces, quote,
"long-standing social norms and practices regarding pronouns,"
end quote, which are stereotypes, not biology.

1          And then the final point I'd like to make on the equal

2     protection claims is that contrary to Florida's assertion at

3     page 28 of its reply, plaintiffs do dispute that Florida has met

4     its burden on important governmental interests.

5          Florida's first interest is in teaching students its

6     stereotyped view about title and pronouns usage.  But that

7     doesn't work under cases like *United States against Virginia* and

8     *J.E.B.* in which the Supreme Court said that states cannot invoke

9     interest that themselves rely on sex stereotypes.

10          Florida's first interest is also circular and thus

11     invalid under *United States against Virginia*.  Florida says it

12     can prohibit the use of pronouns that do not correspond with

13     one's sex because, in a circular fashion, Florida has an

14     interest in teaching that it is false to use pronouns that do

15     not correspond with one's sex.

16          Florida cannot try to fix these problems by recasting

17     that first interest at a higher level in, quote, "advancing the

18     state's pedagogical goals generally" because that would, under

19     the fifth prong, the second prong of intermediate scrutiny,

20     allow Florida and other states to smuggle in any discriminatory

21     curriculum based on sex, race, and national origin, because all

22     of that curriculum would advance this general goal of

23     pedagogical -- of advancing the State's pedagogical goals.

24          And then, finally, the State's dual interests are just

25     not genuine because they are at war with each other as we

1  explained in our response brief.  Florida can't simultaneously

2  want to teach students a particular stereotyped view of sex and

3  pronouns while also saying that it wants to avoid these

4  controversial and contemptuous social issues in the classroom.

5          Unless Your Honor has any questions, that's all I have

6  in the surreply.

7          THE COURT:  Thank you.

8          MR. BOYD:  Thank you.

9          THE COURT:  Let me go in reverse.  I don't believe

10  they do, but let me find out.

11          Mr. Marsey, anything?

12          MR. MARSEY:  No, Your Honor.

13          THE COURT:  MS. Makar?

14          MS. MAKAR:  No, Your Honor.

15          THE COURT:  Anything from Hillsborough County?

16          MR. MARGOLIN:  No, Your Honor.

17          THE COURT:  All right.

18          Mr. Weir.

19          MR. WEIR:  Thank you, Your Honor.  I will just focus

20  on a few points.  I don't want to reopen anything that's been

21  briefed, obviously.

22          The first is a point on immutability, and I believe my

23  friends --

24          THE COURT:  And, by the way, I should have asked,

25  Mr. Weir -- and we'll do this as we are moving forward, so let

me pause here.  I customarily, when we go through that, because
you don't necessarily know what's going to be said, Are you
prepared or did you need a break?  And I'm going to do the same
thing in reverse when we do the PI.

Do you -- because you have colleagues for a reason;
and if you want to talk to somebody before you respond or look
for something, that's fine too.  So I want to make sure I'm not
cutting anybody off.

MR. WEIR:  I think I just have a few affirmative
points to make and that's it.

THE COURT:  That's fine.

MR. WEIR:  On the point about immutability versus
mutability, the Eleventh Circuit precedent is that that does not
turn on what the individual believes about the trait.  That's in
*Adams*, Your Honor.  I can read it.  It's from page 807.  The
Court said:  *The district court did not make a finding equating*
*gender identity as akin to biological sex, nor could the*
*district court have made such a finding that would have legal*
*significance.  To do so would refute the Supreme Court's*
*long-standing recognition that sex, like race and national*
*origin, is an immutable characteristic determined solely by the*
*accident of birth.*

And so immutability -- and that's not just *Adams*.
That's also in *Willingham* and *Blockbuster* and in *Catastrophe*
*Management*, that the same theme is running through all of those

1   cases.  So that's our response on that point.

2         On the question of -- on the equal protection clause

3   claim, whether rational -- as I understand Mr. Soto to be

4   arguing whether rational basis review or intermediate scrutiny

5   applies, we rely on *Eknes-Tucker* for the proposition that

6   rational basis applies.  We think the reasoning in that case

7   just last year applies here.

8         And the Court said in two reasons -- even though in

9   that case biological girls were not allowed to be given drugs to

10  transition to boys and vice versa, it did discriminate on the

11  basis of sex on its face.  The Court said that that did not

12  trigger intermediate scrutiny for two reasons.  And this is

13  again under the Equal Protection Clause:  *The statute does not*

14  *establish an unequal regime for males and females.  It affects*

15  *both.*  That's a quote at page 1228.  And then the statute refers

16  to sex only because the medical procedures that it regulates are

17  themselves sex-based.  That's at 1228.  We think those two --

18  those two holdings as to why intermediate scrutiny does not

19  apply and play equally here.

20        And then on whether they have pled an intentional

21  discrimination claim under the Equal Protection Clause, pleading

22  disparate impact alone under the Equal Protection Clause is not

23  enough.  The Court has been -- the Eleventh Circuit has been

24  clear on that.  So you have to have some intentional acts

25  because the Equal Protection Clause bars only intentional

discrimination, not disparate impact, like Title VII, for example.

　　　　And the allegations in their complaint between 29 and, I believe, 33 paragraphs, which Mr. Soto just repeated, those don't -- none of those on their own constitute evidence of intentional discrimination. I think we made that point in our briefs, but I wanted to make it here.

　　　　That's all I had in response, Your Honor.

　　　　THE COURT: Thank you.

　　　　All right. Now we're going to do things in reverse with the motions for preliminary injunction, which are ECF No. 11 and 45. Here the last to be heard were the plaintiffs, so we'll start with the defense. But before, Mr. Weir, I turn to you, because I know you've got some things to say, let me find out.

　　　　Mr. Marsey, anything from Virtual School?

　　　　MR. MARSEY: No, Your Honor.

　　　　THE COURT: And I know not everybody is the subject of a PI, but I'm still going to ask everybody.

　　　　Anything from Lee County?

　　　　MS. MAKAR: No, Your Honor.

　　　　THE COURT: Anything from Hillsborough County?

　　　　MR. MARGOLIN: Yes, Your Honor, very briefly.

　　　　THE COURT: Sure. And so let me -- my cryptic remark, I think the parties know what I'm talking about. Not everybody

1   is -- has been heard on or is subject to and not every claim is

2   part of the preliminary injunction motions.  But go ahead.

3          MR. MARGOLIN:  Thank you.  And, again, for the record,

4   this is Jason Margolin on behalf of the defendant the

5   Hillsborough County School Board.

6          We do adopt the State's arguments in opposition to the

7   injunction motion, but I did want to just emphasize that

8   separately Plaintiff Wood has not directed any allegations

9   against the school board of conduct that could be enjoined.  And

10  I'd like to point the Court simply to Plaintiff Wood's

11  declaration.  This is at Doc 11-1 at paragraph 9.

12         Plaintiff Wood states that all the school board did

13  was inform all teachers of the law.  Wood says, quote:  *The*

14  *directive was that the, quote, 'law states,'* end quote.  Merely

15  informing all teachers of a new law is not conduct that triggers

16  any of the causes of action pled or that should be enjoined.

17  You see this again, Plaintiff Wood continues later in that same

18  paragraph and says, quote:  *When I asked if the school wanted me*

19  *to use 'Mister,' my principal specified that this was coming*

20  *from the state, not the school,* end quote.  And plaintiffs' own

21  declaration shows the absence of conduct by my client, the

22  Hillsborough County School Board.

23         In paragraph 10, Plaintiff Wood says that she was --

24         THE COURT:  Counsel, I do have to ask, though -- help

25  me to understand.  I understand that through that declaration

1 and through that statement they are saying, We didn't come up

2 with a policy, but if your boss tells you, It's not me, but you

3 can't do it, to -- because we are required to enforce state law,

4 which seems to me to be implicit, help me to understand why

5 that's not so.

6      MR. MARGOLIN:  The allegations are only that we told

7 Plaintiff Wood and all teachers about a new statute.

8      THE COURT:  Well, let me try it a different way.  If I

9 look to one of my law clerks who work directly for me and I say,

10 the AO doesn't permit you taking leave in excess of X, so I'll

11 see you tomorrow, I didn't draft the laws on leave, but I've

12 just told my employee that they can't take leave.

13      Help me to understand -- I mean, I'm just a simple

14 country judge, but help me to understand why that's not a

15 directive from me even though I didn't promulgate the leave

16 requirements, I'm just applying them to my employee.

17      MR. MARGOLIN:  I think the "I'll see you tomorrow"

18 emphasizes they would be required to come back.  Based on,

19 again, plaintiffs' very narrow allegations against my client,

20 they weren't commanding her that she had to do it, they were

21 merely informing her of what the law said and what the

22 consequences could be from the State, not from my client.

23      THE COURT:  So you're free to continue to work here

24 and go by Missus; the only -- we'll never do anything to you,

25 but the State might go after your license.  We are going to let

1    you continue to work here and use whatever pronoun you want as

2    long as you want so long as the State doesn't intervene.  And if

3    they don't do anything, you're fine to work here.  That's what's

4    implied in this record.

5           MR. MARGOLIN:  Your Honor, correct.  I think that's

6    what Plaintiff Wood's declaration has said.

7           THE COURT:  Okay.

8           MR. MARGOLIN:  And so, again, I think otherwise we

9    stand by the State's arguments, but I just wanted to emphasize

10   the minimal allegations against my client.

11          THE COURT:  Okay.

12          MR. MARGOLIN:  Thank you.

13          THE COURT:  And why don't we do one -- so we're not

14   jumping back around to that, before -- does the plaintiff have

15   any response?

16          MR. BOYD:  Yes, Your Honor, very briefly.

17          I would just add, for Ms. Wood's declaration, in

18   addition to paragraph 9, which my colleague cited, I would also

19   point to paragraph 12 where she declares that, I had a meeting

20   with my principal during which she restated the same policy.  So

21   I think that shows that she understood it to be district policy

22   that she had to follow state law, which is not unusual.

23          I would also note the State has -- the district has an

24   obligation to report violations of state law to the defendant

25   State Board of Education.  And so by telling her, You have to

comply with state law, she knows that district policy requires them to report violations of state law. So I think, as your question suggested, the implication was fairly clear.

THE COURT: When we say "she knows," is that something I'm supposed to infer, or is that something that's in the record?

MR. BOYD: It's alleged in the complaint, which is based on statute.

THE COURT: Well, her knowledge is alleged in the complaint, but -- I'm not suggesting it's determinative of anything, but is -- does she echo that in her declaration or is the complaint sworn?

MR. BOYD: No, she doesn't echo that specific point in her declaration, but that the statute -- it's -- it's -- the statute is public record. That's a requirement.

THE COURT: I understand.

Thank you.

MR. BOYD: Thank you, Your Honor.

THE COURT: Mr. Weir?

MR. WEIR: Thank you, Your Honor. The only thing I think that was not -- that we need a surreply to is just the equities, because that wasn't raised in our reply in the motion to dismiss, so I'll focus on those. They don't usually get a lot of air time, but I think it's important here.

First off, irreparable harm. There's two arguments we

1   make why there's no irreparable harm here.  The first is the

2   plaintiffs' delay in filing their motions for preliminary

3   injunction.  They make, I think, three or four arguments that we

4   don't think have merit.

5           The first is they suggest that unsophisticated parties

6   get a pass on filing a motion for preliminary injunction, a

7   longer time to file it than the rule that it needs to be filed

8   within two or three months.  We've not seen any law on that

9   holding them to a different standard.

10          The second, which is related, is that the time runs

11  from --

12          THE COURT:  Counsel, Let me ask you this -- and I'm

13  not saying it's here, but you'd agree with me, wouldn't you,

14  that there's case law that says that timeline's not fixed,

15  because sometimes it depends on -- for example, if you're trying

16  to negotiate a resolution of the claim -- there can be other

17  reasons that courts have considered -- that have said it may be

18  shorter, it may be longer, depending on the specific facts;

19  correct?

20          MR. WEIR:  That's correct.  I do agree with that.

21          THE COURT:  And I'm not saying that exists here.  I'm

22  just suggesting that it's not like there's this magic bright

23  line.  It can go one way or the other, depending on the facts of

24  the case; correct?

25          MR. WEIR:  I think that's right.  And plaintiffs'

1  pointed to -- I believe it's your decision from *Dream Defenders*,

2  Your Honor, where you said three months was okay to get up to

3  speed, but that was three months from the law's enactment, not

4  seven months, at least for Plaintiff Wood here, that took to

5  file that motion.

6         And it's not clear to me that, really, the lawyers who

7  needed that much time in Southern Poverty Law Center, which

8  represents these plaintiffs, laid out their legal theory at

9  proceedings on, I believe, March 23rd last year before the

10  Legislature.  The same theories are pressing here, and so I

11  don't think they needed the three months, even if it was

12  three months.

13         And then for plaintiff -- for Schwandes, I think

14  there's -- there's a suggestion in the briefing that it was --

15  it's absurd to say that that motion was filed too late, but --

16  because the investigation into the violation just happened, just

17  started.  But investigations, which I think my friend just said,

18  are automatic under the code.  And so that's been a part of the

19  law since the beginning, since the law was enacted.

20         And I think the fact -- I think that position also

21  undermines the idea that other plaintiffs' harm in that case is

22  irreparable, because there could have been a motion for

23  preliminary injunction long ago and there wasn't one filed on

24  behalf of Plaintiff Schwandes.

25         But I think more importantly under irreparable harm is

the question of damages under Title VII as we've -- as we've --

THE COURT:  And that was going to be my question to you, because I know you say there's no presumption.  But assuming I disagree with you and we have -- because I believe the commentary suggests even the treatises of the Eleventh Circuit is a bit of an outlier.  And then the question becomes what does it mean and is there limits that, for example, Judge Corrigan applied to that.

But assuming there's a presumption of the irreparable harm in a Title VII case -- and I know you disagree -- if there is, as I understood, implicit in your argument, Judge, there's -- if you look at the case, damages are available, this is the same type of damages that would be awarded in Title VII cases in federal courts all across the country every day, and there's nothing unique here.  So even if there is a presumption, we've overcome it based on the fact that damages could be awarded.  Is that --

MR. WEIR:  You just made my argument for me.

THE COURT:  Okay.  Well, and like I said, I thought it was implied in y'all's papers, but -- you focused on there being no presumption, but I just wanted to make sure that I understood your alternative argument.

MR. WEIR:  I want to just clarify.  We agree that the Eleventh Circuit has said there is a presumption in the *Baker* case, but it's limited to the facts of that case which were if

1  there's ongoing retaliatory conduct, that itself is adverse
2  employment.
3          THE COURT:  And I didn't mean to speak in shorthand.
4  But surely we can agree, Counsel, that there can be a legitimate
5  argument about -- and I adore Judge Corrigan -- but whether or
6  not that is a real or not a real distinction, correct?
7          MR. WEIR:  We can have a debate about it, of course.
8          THE COURT:  Right.  I mean, there's -- there's -- I
9  mean, it's not -- I want to make plain, it's not Judge Walker.
10 If you just go pull almost any employment treatise, they flag --
11 the Eleventh Circuit has this weird twist that most circuits
12 haven't adopted, and my only point is I think reasonable minds
13 could differ about whether or not you can cabin that decision
14 the way Judge Corrigan did.  I'm not saying I disagree with him.
15 I'm just saying it seems to me it's not as obvious that that's
16 the case.
17         MR. WEIR:  Just like with a lot of other cases that
18 we've cited when it comes to Title VII, you know, the
19 *Catastrophe Management* line of cases --
20     (Reporter requested clarification.)
21         MR. WEIR:  *Catastrophe Management* line of cases --
22 that's Eleventh Circuit precedence -- obviously binds this
23 Court.
24         We do think it has -- it is a rebuttable presumption.
25 The cases that we cite in our brief say it can't be rebutted by

1   showing damages are available.  And we can put it in the record,

2   but the plaintiffs have served Rule 26 disclosures and they are

3   asking for compensatory damages in those disclosures.  And we

4   think that those damages are available.

5           THE COURT:  And I'm going to ask plaintiff this, but

6   it seems to me that you don't necessarily have to call a witness

7   or introduce a declaration to rebut the presumption, that the

8   case itself and the claims that are made can -- the Court can

9   look to that to determine whether or not the presumption has

10  been rebutted.  Do you agree?  I'm going to ask the plaintiff.

11          MR. WEIR:  I agree.  It's in the complaint itself.

12          The three cases the plaintiffs cite, I just want to

13  address those briefly.  *Siegel versus Lepore*, that's a case

14  about recounting ballots in 2000.  That's the one they cite for

15  the strength of this presumption.  That cite to footnote that

16  they put in their brief is actually to the dissent in that brief

17  case, so I'm not sure that should carry any weight.

18          The *Storves versus Island Waters* case --

19      (Reporter requested clarification.)

20          MR. WEIR:  I'm sorry.  S-t-o-r-v-e-s *versus Island*

21  *Waters*.  The Court there actually found that harm could be

22  irreparable by damages.

23          And the last case from *Owner-Operator versus Landstar*

24  was not a Title VII case, and there was reparable damages there.

25  So that's damages.

1          Scope of injunction is something I want to bring up.

2    The plaintiffs have asked for an injunction.  If Your Honor were

3    to grant an injunction, that would be statewide against all

4    employers on behalf of all plaintiffs.  The Eleventh Circuit has

5    been clear that an injunction should run to the parties, no

6    broader than necessary.  To counter that proposition, the

7    plaintiffs cite a couple of First Amendment cases.  There's two

8    of them.  Both cases are ones where the regulation was -- the

9    claim was -- the First Amendment claim -- excuse me -- was that

10   the law was overbroad, and the only way to grant relief would be

11   to grant a -- a statewide --

12          THE COURT:  I didn't know I was going to have to ask

13   this, but I'll be asking the plaintiff.  They'll need to

14   address -- I -- based on the way the complaints were drafted and

15   the arguments that have been made, this seemed to me to be an

16   as-applied challenge for the two plaintiffs, but if they want to

17   try to convince me otherwise, they can.

18          MR. WEIR:  Right.  I agree with that.  I just also

19   wanted to point out that the Eleventh Circuit case that they

20   cite, *City of Miami Beach*, points out that an overbroad striking

21   down a challenge is, quote, "strong medicine," doing a statewide

22   injunction.

23          And then on the Title VII cases they point out

24   supporting a statewide injunction, those are both out of

25   circuit, of course.  They're from the 1970s, but they weren't

1    preliminary injunctions, they were cases where at summary

2    judgment, once judgment had been entered against the State and

3    after a trial, the courts in those cases entered a judgment that

4    the State could not enforce that law.  And it's obviously not

5    the posture we're in right now.

6            And the last point I wanted to bring up is in our

7    reply brief in our motion to dismiss, this *Catastrophe*

8    *Management* line of cases, we talk about *Catastrophe Management*

9    PI case -- excuse me -- briefing, which synthesized what we sort

10   of call, the three of us, the *Troika* cases, which is *Willingham*

11   and *Blockbuster*.  And the *Blockbuster* case itself rejects that

12   the but-for test applies to conduct.

13           I just wanted to highlight that.  It's in our reply

14   brief but it's not in our --

15       (Reporter requested clarification.)

16           MR. WEIR:  It's in our reply brief in the motion to

17   dismiss, but it's not in our PI opposition, just the *Catastrophe*

18   *Management* cases.

19           Thank you.

20           THE COURT:  Thank you.

21           And, Mr. Boyd, you may not need more time, but we've

22   all been talking at a pretty fast clip.  So as not to torture

23   the court reporter, we're going to go ahead and take a break

24   now, so you can confer with your colleagues and prepare whatever

25   response you have to Mr. Weir's arguments and then we'll come

1  back.

2        How long would you like?

3        MR. BOYD:  I think five minutes should be sufficient,

4  Your Honor.

5        THE COURT:  All right.  Well, I'm going to give the

6  court reporter at least ten.  So we'll come back in ten minutes

7  at 9:20.

8        Thank you.

9        MR. BOYD:  Thank you, Your Honor.

10     (Recess taken at 9:09 AM.)

11     (Resumed at 9:29 AM.)

12        THE COURT:  Please take your seats.

13        Counsel -- and, Counsel, let me go ahead and get you

14  to address from the get-go, which I'm sure you are going to talk

15  about anyway -- talk about the case law on the delay as it

16  relates to filing the complaint and seeking a preliminary

17  injunction relative to the passage of the law.  The law at

18  issue, did it take effect in July of -- 1st of 2023?

19        MR. BOYD:  I believe that's right, Your Honor.

20        THE COURT:  As I understand it, the complaint was

21  filed on 12-13, and Ms. Wood's preliminary injunction was filed

22  on 12-21-2023, and the second PI motion was filed on 1-30-2024.

23  Is that correct?

24        MR. BOYD:  I believe that's right, Your Honor.

25        THE COURT:  And so the eight-day delay between the

1    complaint and Ms. Wood's PI is not particularly consequential,

2    but I do want you to help me to understand, under the law what's

3    the explanation that you are relying on that a law is passed and

4    then you effectively serve as a teacher for almost an entire

5    semester before you seek relief?

6         MR. BOYD:  Your Honor, I don't know that there's any

7    law clearly addressing the question.  Certainly, she was not

8    aware -- Ms. Wood was not aware of the law until --

9         THE COURT:  Doesn't the law -- doesn't the case law

10   make clear it's -- you're presumed to be aware of the law, and

11   it doesn't matter when you, in fact, become aware of the law for

12   purposes of claiming irreparable damage for a PI?

13        MR. BOYD:  I think that's, perhaps, generally correct.

14   I would say I'm not sure that that's been applied in the context

15   of an individual civil rights claim like this one.  I mean,

16   certainly the cases cited by the defendants are all

17   sophisticated parties.  A lot of them are trademark cases where

18   there are particular concerns about delay.

19        THE COURT:  Has any court -- and, look, I'm right or

20   wrong or known for doing things sometimes for the first time.

21   But has any court -- any decision you can point me to the court

22   said the lack of sophistication is a basis for the delay?

23        MR. BOYD:  I'm not aware of that, Your Honor.

24        THE COURT:  Does it matter when I was going through

25   Ms. Wood's -- I'm sorry -- is it Mrs. or Ms.?

1          MR. BOYD:  Ms.

2          THE COURT:  Ms. Wood, is there -- going through her

3    affidavit, there's this progression where I'm -- we have a

4    meeting.  We're told -- we get a memo.  We then have a meeting.

5    Then they come into my room and talk to me about, you know,

6    Erase it.  You shouldn't have that on your blackboard.

7          So I know there is some facts before me that talk

8    about sort of there's this series of actions that take place,

9    and then, of course, there's -- I don't think I invented it from

10   whole cloth -- the idea that you don't have to file your

11   complaint instantaneously for -- to claim irreparable harm.

12         What else are you -- so lack of sophistication, the

13   facts where you've explained that you truly realize what's

14   happening and how the law is going to be applied, and you need

15   time to gear up for a complicated case.  What else are you

16   relying on?

17         MR. BOYD:  One other point is that the implementing

18   regulations for the statute weren't issued until August of 2023,

19   and those implementing regulations provide the enforcement

20   mechanism.  So I think had we filed a PI prior to those

21   regulations going into effect, there would be questions about,

22   you know, how is the law going to be enforced.

23         THE COURT:  I get it.  I spend a lot of time with the

24   State of Florida doing "Who's on first?" routines with respect

25   to when laws are -- when claims are ripe, and it's like

*Goldilocks and the Three Bears*:  When is the porridge just right to file your complaint?  So I understand there is a bit of a delay.

But does that explain a four-month or five-month delay between the law passing, the regulations being implemented?  So even if you use that as the trigger, it's -- it would be four months; correct?

MR. BOYD:  It would be from sometime in August.  We would have September, October, November, and then the filing in December.  So I'm not quite sure if it's four months, but -- I don't have the exact date of the regulations in front of me, so I can't quite --

THE COURT:  Surely, with one of the --

MR. BOYD:  More than three months.

THE COURT:  -- 12 lawyers here, somebody can tell me quickly.  When did the regulations -- I put -- I had August of 2023.  I didn't have a date.

MR. SOTO:  August 22nd, Your Honor.

THE COURT:  All right.  So it's one day that -- the PI was one day shy of four months.  My math is still pretty good.

But go ahead.

MR. BOYD:  Yes, I'll take four months, Your Honor.

I'd also just say, you know, it's not just the time. As you've said, complaints don't get drafted instantly.  It's also the time for Ms. Wood to locate counsel.  You know, it's

1    one thing for us as advocates to have a concern about a law.  We

2    don't -- you know, people don't necessarily know about us.  They

3    don't know who is challenging a law.  It takes some time for

4    those concerns -- you know, for us to go out in the community

5    and say, Is this something that's affecting people?  And then --

6           THE COURT:  You can get -- if a Coca-Cola truck runs a

7    red light and kills your wife and three children, you probably

8    can get -- and probably, sadly, be approached at the hospital,

9    but you are not going to have a problem getting a lawyer.

10   Bringing a civil rights case is a harder climb.

11          MR. BOYD:  Exactly, Your Honor, especially a civil

12   rights case where we're a nonprofit organization, at least

13   Southern Poverty Law Center is and some of the legal counsel is.

14          THE COURT:  Has any case recognized that as a basis

15   for a longer delay?

16          MR. BOYD:  Not that I'm aware of, Your Honor.

17          THE COURT:  Okay.

18          MR. BOYD:  With respect to Mx. Schwandes, also, I

19   think the case for delay there is much weaker.  She filed --

20   excuse me.  They filed their preliminary injunction two weeks

21   after learning of the investigation, and certainly, you know, we

22   didn't file a preliminary injunction prior to that because we

23   felt that at that point the irreparable harm argument would be

24   weak because they had been fired and were not currently being

25   employed.

However, once the investigation began, we do think we have -- we've cited case law for suspension of licensing to be an irreparable harm, because that's a public record. Maybe the Court could order that license restored. I'm not sure about that. There might be a separation of powers type of concern about that. But, in any event, the public stigma of that process, you know, can't be erased by money damages.

With respect to -- and I'm shifting from the timing, unless you have any other questions.

THE COURT: You answered my question. Unless you have something else to add, I just wanted to --

MR. BOYD: Yeah, Your Honor, we will -- yeah. If we find anything else, we'll submit it by memorandum.

So as to the irreparable harm question --

THE COURT: Well, wait, wait. I just want to make -- if you need to add something, you can add it today, but the --

MR. BOYD: Understood.

THE COURT: I'm taking this case under advisement. Everything is closed. That's why I started with y'all agreed, both sides, on whether you were going to have discovery. You had every opportunity to file declarations, and you had no word limits on anything.

And so the -- if something new had come up -- so, like, if, you know, there was some change in the law or something, then certainly we would allow additional briefing,

1    but absent something along those lines, I'm taking this under

2    advisement at the conclusion of this hearing.

3            MR. BOYD:  Understood, Your Honor.  I spoke too

4    quickly.

5            THE COURT:  So the record will reflect I didn't yell

6    at you.  I'm just saying that's the state of the record.

7            MR. BOYD:  Understood, certainly.

8            And, frankly, there isn't a lot of law on this

9    question that we were able to find, at least in the

10   Eleventh Circuit.

11           So on the irreparable harm question, I think the only

12   other point I wanted to add is that there's just an ongoing

13   dignitary harm to Ms. Wood of every day having to go into class

14   and refer to herself using "Teacher," to be misgendered by her

15   students, out of ignorance in some cases, and sort of to go

16   through that process on a day-to-day basis.

17           And I would just say the *Copeland* case, which

18   Your Honor referenced at the start, that's an Eleventh Circuit

19   case about a transgender prison guard.  I mean, that is a --

20   that's a damages case.  It's not a preliminary injunction.  But

21   I think there's a lot of language in there making very clear the

22   dignitary harms of being misgendered.

23           With respect to the First Amendment claim, I did want

24   to clarify that, you know, we are arguing that this law violates

25   the Constitution on its face because it lacks a plain,

1   legitimate scope.  There is really no one we can see this law

2   being applied to enforce -- with maybe one small exception, on

3   whom it could be applied constitutionally.  So the law is not

4   going to be enforced against a cisgender teacher because they

5   are going to want to use the pronouns that match their sex

6   assigned at birth by default, so the law is not going to come

7   into effect.  For transgender teachers, we've argued the law is

8   unconstitutional as applied to them.

9           The only possible category we can think of this law

10  could constitutionally be applied to is someone who is

11  genuinely -- you know, a gender queer person or a nonbinary

12  person who is genuinely ambivalent between the pronoun that

13  matches their sex assigned at birth and a gender-neutral pronoun

14  or the other pronoun.  So I think that certainly meets the

15  threshold for which courts have said a law can be enjoined

16  statewide under the First Amendment, and I think this is very

17  similar to the *Hamburger Mary's* case.

18          THE COURT:  You would agree that the analysis would be

19  different, though, for purpose of Title VII; correct?

20          MR. BOYD:  Yes, Your Honor, it's certainly a much

21  harder case for us to make.  I think -- you know, when a law is

22  directly conflicting with state law, I think there might be a

23  case for enjoining it as to all parties, but -- excuse me --

24  when a state law conflicts with federal law.  But certainly I

25  don't have a -- you know, a clear case as to that, particularly

1  on the preliminary injunction posture, and we are primarily, on

2  the statewide injunction portion, relying on the First Amendment

3  claim.

4       So as I was saying, on the *Hamburger Mary's* issue, I

5  think that's a very similar case to that.  That's a plaintiff

6  who was planning to engage in conduct that was clearly

7  prohibited by the statute.  Now, they framed their claim more as

8  an overbreadth claim, but I think the issues are very similar.

9  The Eleventh Circuit affirmed and the Supreme Court declined to

10 stay a statewide injunction on that issue.

11      And I think that -- you know, we certainly have

12 arguments about the statute being overbroad.  We have focused on

13 the core application, which is to our clients' use of their

14 pronouns in the classroom, but there are certainly questions

15 about the scope of this application the defendants have never

16 addressed or clarified.  For example, you know, does it apply to

17 incidental speech in the hallway?  Does it apply if two teachers

18 are talking and a student overhears them?  Does it prohibit

19 Ms. Wood from saying to her students, I am a woman?  That's

20 unclear.  She currently, you know, is afraid to say that, but,

21 you know, she -- when she says, I'm a woman, in one sense that's

22 not providing her pronouns, but in another sense, it's clearly

23 signaling what they are, right?  And I think she would rightly

24 fear discipline if she did that.

25      So to the extent that, you know, the Court were to

conclude that the core aspect of the statute is not problematic,

I think there would definitely still be questions about that

overbreadth.

And, yes, that is -- that's all the points I had on

the First Amendment.

Thank you.

THE COURT:  Thank you.

MR. WEIR:  Thank you, Your Honor.

I just want to address something that was new, nothing

additional, when it comes to the timing.

The statute itself, subsection (3), is self-executing.

It prohibits the day it was passed.  Subsection (5) of the same

statute, 1000.071, says that the State Board of Education may

adopt rules.  The rule that the State adopted only goes to

suspension of the -- of a teacher's license.  It doesn't go to

the actual prohibition itself.  I just wanted to highlight that.

THE COURT:  Anything in response to -- I'm not saying

you should or --

MR. BOYD:  I had one other small point I just wanted

to address.

THE COURT:  Certainly.

I want to make plain I'm going to let y'all -- and we

can keep going around.  If there is another lawyer that wants to

add something, you certainly can.  I'm not going to artificially

cut folks off.  I just was trying to create a framework so folks

1  could respond to each other.

2        But go ahead.

3        MR. BOYD:  This is not in response, I will confess.

4        THE COURT:  That's fair.

5        MR. BOYD:  I haven't had a chance yet to mention the

6  State's settlement of the *Equality Florida* case, which I'm sure

7  Your Honor is aware of.  I have a copy of that if you'd like me

8  to supplement the record with it.  It does include a number of,

9  you know, I think statements from the -- from the record in the

10  "don't say gay" cases that we think are relevant.  Some of them

11  are similar to ones we've put in our briefing, but to the extent

12  that they would be relevant to the State's interest, we're happy

13  to submit it now if that would be helpful.

14        THE COURT:  Mr. Weir?  He just -- he wants to

15  supplement the record with the settlement.

16        MR. WEIR:  I have no opposition -- I have no

17  opposition to that.

18        THE COURT:  I understand.

19        MR. WEIR:  The settlement just tracks the briefing,

20  the language in the briefing itself.

21        THE COURT:  Fair enough.  If you'll file a notice of

22  filing by the close of business today -- can you do that today,

23  or do you need --

24        MR. BOYD:  Yes, Your Honor.

25        THE COURT:  All right.

1          Anything additional from the plaintiffs?

2          MR. BOYD:  One moment, Your Honor.

3          THE COURT:  Y'all can huddle and defense counsel can

4   huddle as well.  I'm going to give everybody an opportunity to

5   be heard.

6      (Pause in proceedings.)

7          MR. BOYD:  No, Your Honor.

8          THE COURT:  All right.

9          Anything additional from the defense?

10         MR. WEIR:  No, Your Honor.

11         THE COURT:  All right.

12         This has been a shorter hearing than typical.  I want

13  to make plain the fact that it's been shorter than typical

14  doesn't in any mean -- in any way suggest that it's not an

15  important case.  It certainly is an important case.  And for

16  those of you that are disappointed that it wasn't longer or a

17  more vigorous hearing, I've had at least one lawyer describe my

18  PI hearings as roughly akin to giving birth.

19         But -- I know we didn't do that today, but I've read

20  your papers; I'm familiar with your arguments, and so I believe

21  I have the answers to the questions I had.  So thank you for

22  your presentation.

23         I start a trial on Monday that is going to run two

24  weeks, and we are going to have to run long trial days, from

25  8:00 a.m. to 7:00 p.m.  And then I immediately start another

1  products liability trial, so I've a month straight when I'll be

2  in court.  That doesn't mean I'm going to wait a month to issue

3  this order.  I'll do my best to get out an order as quickly as

4  possible.  I was just letting you know it may be taking me a

5  little bit longer, again, since I'm going to be in court for a

6  solid month starting on Monday.  So I'll do my best to get it

7  out as soon as possible.

8          Thank you.  I hope everyone has a safe trip home.

9          Court is in recess.

10     (Proceedings concluded at 9:45 AM on Friday, March 29,

11  2024.)

12                    * * * * * * * *

13          I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
14  Any redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy is noted within the
15  transcript.

16

17  /s/ Megan A. Hague                    March 29, 2024

18  Megan A. Hague, RPR, FCRR, CSR
    Official U.S. Court Reporter
19

20

21

22

23

24

25