# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

Katie Wood *et al.*,

        *Plaintiffs*,

v.                       No. 4:23-cv-00526-MW-MAF

Florida Department of Education *et al.*,

        *Defendants*.

_____/

## PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 4

   I.   Ms. Wood and Ms. Doe have alleged discrimination in the "terms, conditions, or privileges" of their employment ............................................... 4

      A. The legal standard after *Muldrow* ........................................................... 5

      B. Plaintiffs have adequately alleged "some harm" ................................... 7

      C. Forced compliance with subsection 3 is a "term" of Plaintiffs' employment ............................................................................................. 8

      D. Subsection 3 alters the "conditions" of Plaintiffs' employment ......... 11

      E. Subsection 3 discriminatorily revokes a "privilege" of Plaintiffs' employment ........................................................................................... 16

      F. Ms. Wood has plausibly alleged a hostile work environment ............ 19

         1. Ms. Wood was subject to harassment .................................... 21

         2. The harassment was both severe and pervasive ..................... 23

         3. The Defendants are liable for the harassment ........................ 28

   II.  Mx. Schwandes states a Title VII claim against State Defendants .............. 29

  III.  Mx. Schwandes states a Title VII claim against Defendant Florida Virtual School .......................................................................................................... 31

  IV.  Count 1 is not a shotgun pleading ............................................................... 33

CONCLUSION ......................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aburaad v. Haines City*,
   2022 WL 861578 (M.D. Fla. Mar. 23, 2022) ....................................................14

*Ass'n of Mexican-Am. Educators v. State of California*,
   231 F.3d 572 (9th Cir. 2000) ........................................................................29, 30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................25

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020)..............................................................................4, 15, 32

*Brady v. Harris Ventures Inc.*,
   2022 WL 22288532 (N.D. Ga. Jan. 10, 2022)....................................................20

*Brooks v. City of Utica*,
   275 F. Supp. 3d 370 (N.D.N.Y. 2017)..................................................................22

*Chambers v. D.C.*,
   35 F.4th 870 (D.C. Cir. 2022)................................................................................13

*Chance v. Wakulla Cnty.*,
   2019 WL 13280167 (N.D. Fla. July 9, 2019)....................................................33

*Copeland v. Georgia Dep't of Corr.*,
   97 F.4th 766 (11th Cir. 2024) .......................................................................*passim*

*Cox v. Am. Cast Iron Pipe Co.*,
   784 F.2d 1546 (11th Cir. 1986) ...........................................................................12

*Davis v. Town of Lake Park*,
   245 F.3d 1232 (11th Cir. 2001) .............................................................................5

*Fed. Exp. Corp. v. Holowecki*,
   552 U.S. 389 (2008)................................................................................................13

*Fernandez v. Trees, Inc.*,
   961 F.3d 1148 (11th Cir. 2020) ...........................................................................28

*Ferrill v. Parker Grp., Inc.*,
    168 F.3d 468 (11th Cir. 1999) ............................................................13

*Fla. Educ. Ass'n v. Dep't of Educ.*,
    2018 WL 10560519 (N.D. Fla. Dec. 19, 2018) ...........................29, 30

*Ford Motor Co. v. N.L.R.B.*,
    441 U.S. 488 (1979).............................................................................12

*Fort Stewart Sch. v. Fed. Lab. Rels. Auth.*,
    495 U.S. 641 (1990).............................................................................11

*Freytes-Torres v. City of Sanford*,
    270 F. App'x 885 (11th Cir. 2008) ....................................................29

*Garcia v. Randolph-Brooks Fed. Credit Union*,
    2020 WL 364133 (W.D. Tex. Jan. 22, 2020) ....................................22

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993).......................................................................19, 20

*Henson v. City of Dundee*,
    682 F.2d 897 (11th Cir. 1982) ...........................................................12

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984).........................................................2, 16, 17, 18

*Holland v. Gee*,
    677 F.3d 1047 (11th Cir. 2012) .........................................................15

*Hulsey v. Pride Restaurants, LLC*,
    367 F.3d 1238 (11th Cir. 2004) ..................................................19, 33

*Johnson v. State of N.Y.*,
    49 F.3d 75 (2d Cir. 1995) ...................................................................10

*Jones v. Nippon Cargo Airlines Co.*,
    2018 WL 1077355 (N.D. Ga. Jan. 12, 2018)....................................20

*Lange v. Houston Cnty.*,
    101 F.4th 793 (11th Cir. 2024) ..........................................................32

*Lansdale v. Air Line Pilots Ass'n Int'l*,
　　430 F.2d 1341 (5th Cir. 1970) ............................................................17

*Marques v. Club Madonna, Inc.*,
　　2019 WL 13256721 (S.D. Fla. June 3, 2019) ....................................23

*Mendoza v. Borden, Inc.*,
　　195 F.3d 1238 (11th Cir. 1999) (en banc) .............................23, 24, 26

*Meritor Sav. Bank, FSB v. Vinson*,
　　477 U.S. 57 (1986) ........................................................................6, 22

*Monaghan v. Worldpay US, Inc.*,
　　955 F.3d 855 (11th Cir. 2020) ............................................................5

*Mount Lemmon Fire Dist. v. Guido*,
　　586 U.S. 1 (2018) ..............................................................................13

*Muldrow v. City of St. Louis*,
　　144 S. Ct. 967 (2024)....................................................................*passim*

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*,
　　462 U.S. 669 (1983)..............................................................................6

*Oncale v. Sundowner Offshore Servs., Inc.*,
　　523 U.S. 75 (1998).......................................................6, 11, 15, 31

*Peeler v. Premier Ambulatory Surgical Ctr., LLC*,
　　2019 WL 13290394 (N.D. Ga. Feb. 6, 2019) ....................................18

*Poague v. Huntsville Wholesale Furniture*,
　　369 F. Supp. 3d 1180 (N.D. Ala. 2019)..............................................23

*Reeves v. C.H. Robinson Worldwide, Inc.*,
　　594 F.3d 798 (11th Cir. 2010) ............................................20, 24, 33

*Richardson v. Jackson*,
　　2021 WL 9598490 (N.D. Ga. Sept. 16, 2021)....................................23

*Trans World Airlines, Inc. v. Thurston*,
　　469 U.S. 111 (1985)............................................................................17

*Webb v. Walmart Inc.*,
2024 WL 1159682 (N.D. Ala. Mar. 18, 2024) ...................................................17

*West v. Butler Cnty. Bd. of Educ.*,
2024 WL 2697987 (11th Cir. May 24, 2024)...................................................12

*White v. DaimlerChrysler Motors Co.*,
2006 WL 8431865 (N.D. Ga. June 13, 2006)...................................................14

*Zaklama v. Mt. Sinai Med. Ctr.*,
842 F.2d 291 (11th Cir. 1988) ......................................................................3, 29

## Statutes and Rules

42 U.S.C. § 2000e-2...........................................................................*passim*

Fla. Stat. § 1000.071 .............................................................1, 9, 28, 32

Fed. R. Civ. P. 12 ........................................................................................25

## Other Authorities

Black's Law Dictionary (11th ed. 2019) .............................................................10

EEOC Compliance Manual § 613.2, 2006 WL 4672702 ...................................13, 14

EEOC Compliance Manual § 613.4, 2006 WL 4672704 .......................................13

# INTRODUCTION

This case challenges the enforcement of Florida's law prohibiting public school teachers like Plaintiffs Katie Wood, Jane Doe, and AV Schwandes from providing to their students titles or pronouns that do not "correspond" to their "sex." Fla. Stat. § 1000.071(3) ("subsection 3"). Plaintiffs have filed a Second Amended Complaint. Doc. 94. State Defendants and Defendants Hillsborough County School Board, Lee County School Board, and Florida Virtual School Board of Trustees ("Florida Virtual School") have filed motions to dismiss certain of Plaintiffs' Title VII and Title IX claims in the Second Amended Complaint. As the Defendants' arguments substantially overlap, Plaintiffs file this single consolidated opposition.

The Court previously held that "on this record," Plaintiffs had not adequately alleged that Defendants' enforcement of subsection 3 discriminates in the "terms, conditions, or privileges" of Plaintiffs' employment within the meaning of Title VII. Doc. 91 at 7-8. The Second Amended Complaint contains substantial additional allegations addressing that statutory requirement. The motions to dismiss nevertheless assert that subsection 3 and similar policies—no matter how blatantly discriminatory—can *never* relate to the "terms, conditions, or privileges" of employment. That is incorrect.

With respect to Ms. Wood and Ms. Doe, as alleged in detail in the Second Amended Complaint, the Defendants have expressly altered the "terms" of

Plaintiffs' employment by formally stating that non-compliance with subsection 3 is grounds for termination, license revocation, or other discipline. Doc. 94 ¶¶ 33-76. That is the heartland of the phrase "terms, conditions, or privileges of employment," which Defendants' motions fail to address at all.

Defendants' discriminatory policy also alters the "conditions" of Plaintiffs' employment. Courts and the EEOC have interpreted the term "conditions of employment" broadly to encompass even relatively narrow aspects of an employee's working conditions. While Defendants appear to suggest that restrictions on titles and pronouns in the workplace are not sufficiently important to qualify for Title VII protection, the Supreme Court has made clear that Title VII does not permit employers to defend facial discrimination on the ground that it affects only "not-so-significant" conditions of employment. *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024). If Defendants' view were the law, employers could require Black employees to use different titles than their White co-workers—a conclusion caselaw refutes.

Subsection 3 also discriminates regarding the "privileges" of employment. *See Hishon v. King & Spalding*, 467 U.S. 69, 74-75 (1984). Before subsection 3, Plaintiffs were allowed to use the titles and pronouns that reflected their gender identities. Other teachers at Defendants' schools, but not Plaintiffs, are still afforded that privilege, which affects a basic aspect of a teacher's job—how they are allowed and required to present themselves to their students. Defendants' *only* contrary argument

is that Title VII protects only those "privileges" used to induce acceptance of employment offers—an argument with no basis in Title VII's text or caselaw.

Plaintiffs need only show discrimination in the "terms, conditions, *or* privileges of employment"—Plaintiffs have alleged all three. On top of that, Ms. Wood has also plausibly alleged that Defendants' enforcement of subsection 3 is actionable because it subjects her to a hostile work environment. Doc. 94 ¶¶ 147-151, 171-174. Specifically, prior to this Court's injunction, Ms. Wood was required to stand in front of classes of students every day and misgender herself—a repeated, deep humiliation that plausibly meets the standard for severe or pervasive harassment. The Defendants urge that there is no "harassment" if the victim is made to say the cruel words herself, but that is unsupported by law and contrary to logic. Indeed, as alleged in the Second Amended Complaint, subsection 3 not only subjected Ms. Wood to daily humiliation in her own self-presentation but predictably led to increased misgendering from her students as well.

Finally, State Defendants are liable to Mx. Schwandes as well. Most critically, while they did not technically order Mx. Schwandes's termination, they are responsible for enforcing Defendant Florida Virtual School's compliance with subsection 3, and they have never disputed that they are Mx. Schwandes's employer for Title VII purposes. State Defendants are therefore legally responsible for Mx. Schwandes's firing. *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988).

At bottom, the Defendants' view of Title VII would nullify protections against workplace discrimination for transgender employees—especially those who, unlike Plaintiffs, are not governmental employees protected by the First Amendment. On Defendants' interpretation of the phrase "terms, conditions, or privileges of employment," not only would such employees have no right to use the titles and pronouns that correspond with their gender, but they would furthermore presumably have no right to wear clothing or use names that match their gender. That result would render *Bostock* hollow by allowing employers to drive transgender employees out of the workplace, and it is not the law.

For these reasons and those below, the Court should deny the motions to dismiss.

## ARGUMENT

### I.    Ms. Wood and Ms. Doe have alleged discrimination in the "terms, conditions, or privileges" of their employment.

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1). In the Second Amended Complaint, Ms. Wood and Ms. Doe have plausibly alleged discrimination with respect to (1) terms of employment, (2) conditions of employment, and (3) privileges of employment. In addition, Ms. Wood has plausibly alleged that she was

subjected to a hostile work environment. The Defendants' arguments to the contrary fail.[1]

### A.    The legal standard after *Muldrow*

Until recently, the Eleventh Circuit limited the types of employer conduct that violated Title VII. In the absence of a hostile work environment, a plaintiff had to show that the employer took "adverse" or "tangible" employment action against them, *see Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020), which required proving a "serious and material change in the terms, conditions, or privileges of employment," *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).

As this Court has recognized, Doc. 91 at 6, and as Defendants do not dispute, that is no longer the law. In *Muldrow*, 144 S. Ct. 967, 974, the Supreme Court held that Title VII plaintiffs must show only "some harm respecting an identifiable term or condition of employment"—they need not meet any "heightened bar." The Court expressly held that "this decision changes the legal standard used in any circuit that has previously required 'significant,' 'material,' or 'serious' injury. It lowers the bar Title VII plaintiffs must meet." *Id.* at 975 n.2.

---

[1] Defendants make no argument specific to Title IX. The legal issues are the same for both the Title VII and Title IX claims.

Regarding the requirement of "some harm," the plaintiff must show merely that they have been "treat[ed] worse" on the basis of a protected characteristic. *Id.*; *see also id.* at 977 (plaintiff must have been "left … worse off"). As Justice Kavanaugh noted, the "some-harm requirement appears to be a relatively low bar" that would include harms related to "money, time, satisfaction, schedule, convenience, commuting costs or time, prestige, status, career prospects, interest level, perks, professional relationships, networking opportunities, effects on family obligations, or the like." *Id.* at 980 (Kavanaugh, J., concurring in the judgment); *see also Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 683 (1983) (holding that even very minor changes in employer-provided health insurance—such as removing coverage for broken bones—would violate Title VII if done on a discriminatory basis).

With respect to the requirement that the discrimination must relate to "terms, conditions, or privileges" of employment, the Court emphasized that "[t]he 'terms or conditions' phrase … is not used 'in the narrow contractual sense'; it covers more than the 'economic or tangible.'" *Muldrow*, 144 S. Ct. at 974; *see also Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

**B.     Plaintiffs have adequately alleged "some harm."**

Ms. Wood and Ms. Doe are unquestionably harmed by Defendants' enforce-ment of subsection 3 against them, as alleged in detail in the Second Amended Com-plaint. *See, e.g.*, Doc. 94 ¶¶ 98, 102-09 ("Going by titles like Mr. and pronouns like he and him would harm [Ms. Wood], including emotionally, risk physical harm from others, and disrupt her classroom and ability to do her job."); *id.* ¶ 119 (same for Ms. Doe).

This Court has already acknowledged these harms. Doc. 91 at 3-4 (all plain-tiffs showed injury-in-fact on their Title VII claims); Doc. 82 at 46 (holding that "the undisputed fact that Ms. Wood must continue to alter her speech on a daily basis at work with respect to her preferred title and pronouns constitutes an imminent, irrep-arable harm").

Defendant Lee County School Board suggests that Ms. Doe does "not allege that she has actually suffered an adverse action." Doc. 105 at 6-7. But the complaint alleges harm to Ms. Doe from subsection 3's prohibition on providing her Ms. title and she/her pronouns to students. Doc. 94 ¶¶ 118-121. Lee County School Board relies on abrogated Eleventh Circuit law and simply ignores the relevant harms. Doc. 105 at 6 (arguing that impact on employee must be "tangible").

In its prior Order, this Court stated that its dismissal of Plaintiffs' Title VII claims "hinge[d] on the *type* of harm suffered, not the *severity* of that harm." Doc.

91 at 7. State Defendants repeat that statement. Doc. 103-1 at 8. Plaintiffs agree that under Title VII, they must show harm "respecting an identifiable term or condition of employment." *Muldrow*, 144 S. Ct. at 974. As alleged in more detail in the Second Amended Complaint, and as explained next, Defendants' discriminatory workplace policy—embodied in official policy documents governing employee conduct—meets that standard.

### C. Forced compliance with subsection 3 is a "term" of Plaintiffs' employment.

As alleged in detail in the Second Amended Complaint, Plaintiffs can be fired if they don't comply with subsection 3. Thus, Defendants' implementation of subsection 3 violates Title VII by literally imposing new "terms of employment" on Plaintiffs. Defendants' contention—that a facially discriminatory policy enforced by termination is nonetheless not discrimination in the "terms of employment" under Title VII—defies the statute's text and would require the incongruous result that employees who violate their employer's rules and are fired can sue, but those who comply with their employer's discriminatory policy rather than lose their jobs have no remedy. There is no support for that interpretation of Title VII.

As a teacher in the Hillsborough County School District, Ms. Wood is required to "adhere to the principles enumerated in Defendant Hillsborough County School Board's Standards of Ethical Conduct." Doc. 94 ¶ 58 (citing Hillsborough Cnty. Sch. Bd. Pol'y 3210(B)). As recently revised, those "Standards of Ethical

Conduct," Hillsborough Cnty. Sch. Bd. Pol'y 3210(A)(14), expressly require that teachers like Ms. Wood "not violate s. 1000.071, F.S., which relates to the use of personal titles and pronouns in educational institutions." Doc. 94 ¶ 59. A "Hillsborough County teacher may be discharged from employment" for "willful refusal to obey laws or policies relating to the public schools." *Id.* ¶ 63.

Similarly, Ms. Doe must "comply with the disciplinary principles" enumerated in Lee County School District's Standards of Ethical Conduct for Instructional Staff. Doc. 94 ¶ 68 (citing Lee Cnty. Sch. Bd. Pol'y 3210). Those Standards require teachers to "not violate F.S. 1000.071, which relates to the use of personal titles and pronouns in educational institutions." Doc. 94 ¶ 69 (citing Lee Cnty. Sch. Bd. Pol'y 3210(A)(14)). Violation "subjects the individual to revocation or suspension of the individual instructional staff member's certificate, or the other penalties as provided by law." Doc. 94 ¶ 68 (citing Lee Cnty. Sch. Bd. Pol'y 3210)*.* Further, any teacher who commits a "willful violation" of Lee County School Board's policies, including subsection 3, is "guilty of gross insubordination" and is "subject to dismissal or such other lesser penalty as … Lee County School Board may prescribe." Doc. 94 ¶ 73 (citing Lee Cnty. Sch. Bd. Pol'y 3120).

Likewise, State Defendants have amended the Florida Administrative Code to expressly require teachers to comply with subsection 3 on pain of dismissal, license

revocation, or other discipline. Fla. Admin. Code r. 6A-10.081(2)(a)(14); *id.* r. 6A-5.056(2); Doc. 94 ¶¶ 33, 35, 55.

In other words, Defendants do not merely request that teachers adhere to subsection 3 or promote such adherence as a matter of informal rules, guidance, instructions, or norms. Defendants have made clear that if Plaintiffs want to keep their jobs and their teaching certificates, they *must* comply with subsection 3. *See* Doc. 94 ¶ 142. That sort of employer action falls squarely within Title VII's prohibition on discrimination in the "terms" of employment. *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "terms" as "[p]rovisions that define an agreement's scope; conditions or stipulations"); *Johnson v. State of N.Y.*, 49 F.3d 75, 78-79 (2d Cir. 1995) (noting that employee's termination resulted from employer's "incorporat[ion] [of a] mandatory retirement age into the terms of employment," and holding that "an employer … is not permitted to adopt [a] facially discriminatory termination policy as a condition of employment").

State Defendants ignore Plaintiffs' new allegations on this issue. *See* Doc. 103-1 at 7-10. State Defendants rely on this Court's reasoning (prior to *Muldrow*) that subsection 3 "does not impact Plaintiffs' 'salary' or 'status as a teacher' and does not diminish 'the prestige or responsibility of [the] position as an educator.'" Doc. 103-1 at 7 (citing Doc. 82 at 15 and *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021)). But that is an argument about the severity of the harm,

which *Muldrow* foreclosed. No Defendant provides any authority to explain how a facially discriminatory policy that inflicts harm and is enforced on pain of termination could *not* violate Title VII's unambiguous prohibition on discrimination in the "terms … of employment." Moreover, as made clear in the Second Amended Complaint, subsection 3 *does* "impact Plaintiffs' 'salary' or 'status as a teacher'": unless Plaintiffs submit to Defendants' discriminatory policy, they are subject to termination. Doc. 94 ¶¶ 33-76.

**D.    Subsection 3 alters the "conditions" of Plaintiffs' employment.**

Separately, enforcement of subsection 3 also violates Title VII by changing the "conditions" of Plaintiffs' employment. The word "conditions" has "two common meanings." *Fort Stewart Sch. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 645 (1990). It "can mean matters 'established or agreed upon as a requisite to the doing ... of something else'; and it can also mean 'attendant circumstances,' or an 'existing state of affairs.'" *Id.* Here, Defendants have discriminated in the "conditions" of employment in both senses: by changing the "requisites" to employment (as addressed in the prior section), but also by altering the attendant circumstances of employment, i.e. Plaintiffs' "working conditions" (as addressed in this section).

Courts have interpreted the term "conditions of employment" protected by Title VII to encompass a broad range of working conditions. *Oncale*, 523 U.S. at 78 (Title VII "not only covers 'terms' and 'conditions' in the narrow contractual sense,

but … strike[s] at the entire spectrum of disparate treatment of men and women in employment."); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986) ("Job titles … are conditions of employment protected by Title VII."); *Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir. 1982) ("'[T]erms, conditions, or privileges of employment' include the state of psychological well being at the workplace"); *see also Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 501 (1979) (holding that "food prices and services" at a factory were "conditions of employment" triggering employer's labor law duty to bargain). Here, there is little doubt that regulating the ways that teachers identify themselves to their own students on a daily basis—and in a manner that degrades teachers' fundamental dignity in their own eyes and the eyes of their students—is an alteration to the "conditions" of Plaintiffs' employment within the meaning of Title VII. Doc. 94 ¶ 141.

State Defendants try to smuggle an improper "significance" test back into the analysis by repeatedly asserting that "merely" being required to comply with subsection 3 is not "actionable adverse employment action" because "[s]ubsection 3 does not affect Plaintiffs' salary, status, prestige, or responsibilities as teachers." Doc. 103-1 at 7, 9. But that is not the correct legal standard. *West v. Butler Cnty. Bd. of Educ.*, 2024 WL 2697987, at *2 (11th Cir. May 24, 2024) (requiring "a reduction in pay, prestige, or responsibility" is no longer the standard post-*Muldrow*).

Contrary to Defendants' view, an employer who enforces a discriminatory policy violates Title VII even if the policy covers only one narrow aspect of an employee's working conditions. Access to snacks may not be a significant part of a job, but there is no doubt that if an employer hangs a "Whites Only" sign over a box of donuts, it violates Title VII. *Chambers v. D.C.*, 35 F.4th 870, 878 (D.C. Cir. 2022). Similarly, the EEOC's Compliance Manual explains that if an employer permits male but not female employees to smoke at their desks, that discrimination affects a "term, condition, or privilege" of the female employees' employment. [2] EEOC Compliance Manual § 613.4(b)(3), 2006 WL 4672704; *see also Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 471 n.5, 472, 476 (11th Cir. 1999) (assigning call center scripts by race affects the terms and conditions of employment under 42 U.S.C. § 1981).

The EEOC Compliance Manual also contains examples demonstrating that policies concerning courtesy titles, like subsection 3, alter the conditions of employment. It violates Title VII for an employer to require Black employees to address White employees as Mr. or Mrs., while permitting White employees to use Black employees' first names. EEOC Compliance Manual § 613.2(b)(1), 2006 WL

---

[2] *See* https://www.eeoc.gov/laws/guidance/cm-613-terms-conditions-and-privileges-employment. The EEOC's Compliance Manual "reflect[s] 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008); *see also, e.g.*, *Mount Lemmon Fire Dist. v. Guido*, 586 U.S. 1, 8 (2018) (relying on the Manual).

4672702. It likewise violates Title VII for an employer to refer to its male employees as "men" and its female employees as "girls." *Id.* § 613.2(b)(3), 2006 WL 4672702.

Subsection 3 unmistakably changes (and causes harm respecting) Plaintiffs' working conditions. As alleged in the Second Amended Complaint, subsection 3 "regulated and regulate[s] how Plaintiff[s] may do their work, namely how Plaintiff[s] may refer to themselves in the workplace, which also affected and affects how colleagues, students, and others refer to Plaintiff[s]." Doc. 94 ¶ 141. How a person presents themselves—and is allowed by their employer to present themselves—is an integral (if sometimes unnoticed) part of any job. It is perhaps nowhere more important than at a school, where a teacher's job depends on effectively presenting themselves as an adult worthy of respect and deference. *Cf. Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 770 (11th Cir. 2024) (misgendering of prison guard was particularly harmful "given his position and need to command respect from inmates").

State Defendants further argue that "actions that merely affect *how* an employee performs job responsibilities, even actions that make employment more 'difficult,' are not actionable." Doc. 103-1 at 9. But again, that is simply not the law. State Defendants cite two inapposite district court cases, both of which rely on the abrogated "serious and material" standard. *White v. DaimlerChrysler Motors Co.*, 2006 WL 8431865, at *16 (N.D. Ga. June 13, 2006); *Aburaad v. Haines City*, 2022

WL 861578, at *3 (M.D. Fla. Mar. 23, 2022). Moreover, the result in *Muldrow* itself demonstrates that changing "how an employee performs job responsibilities," Doc. 103-1 at 9, such as through a transfer, *is* actionable under Title VII. 144 S. Ct. at 977.

Taking a different tack, Lee County School Board argues that Title VII "'does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" Doc. 105 at 5 (quoting *Oncale*, 523 U.S. at 81). But the Court in *Oncale* was referring to the boundaries of a typical hostile work environment claim, not a claim based on an official employer *policy*. Regardless, to the extent Lee County School Board suggests that enforcement of subsection 3 inflicts only "innocuous" harms on Plaintiffs, it is wrong. *See, e.g.*, Doc. 94 ¶ 102. In addition, forcing Plaintiffs to communicate, through their titles and pronouns, the humiliating message that their gender identity is "false" plausibly impairs their status and prestige as teachers worthy of their students' respect—harms that were sufficient to state a Title VII claim in this Circuit even prior to *Muldrow*. *Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012).[3]

---

[3] Lee County School Board incorrectly argues that enforcement of subsection 3 is not an "adverse employment action" because "the challenged policies apply equally to both sexes." Doc. 105 at 4-5. The fact that subsection 3 discriminates against both men and women "doubles rather than eliminates Title VII liability," *Bostock v. Clayton Cnty.*, 590 U.S. 644, 662 (2020), but that is unrelated to whether the discrimination pertains to terms, conditions, or privileges of employment.

### E. Subsection 3 discriminatorily revokes a "privilege" of Plaintiffs' employment.

Defendants have further violated Title VII by discriminating against Plaintiffs in the "privileges" of employment. 42 U.S.C. §2000e-2(a)(1). The Supreme Court has explained that Title VII protects not only benefits that are express terms of employment, but also other "privileges" that an employer is under no obligation to provide. *Hishon*, 467 U.S. at 75. "A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." *Id.* Title VII thus protects benefits that are "incidents of employment" or that "form an aspect of the relationship between the employer and employees." *Id.* at 75-76 (quotation omitted).

In *Hishon*, for example, the Court held that a female law firm associate who was denied partnership had stated a Title VII claim where she alleged that associates at the firm "could regularly expect to be considered for partnership," unlike outside attorneys, and therefore "the benefit of partnership consideration was … linked directly with an associate's status as an employee." *Id.* at 76. Moreover, the employer had "used the prospect of ultimate partnership to induce young lawyers to join the firm," but then had discriminated against her when considering her for partner. *Id.*

Here, Defendants permit most employees the privilege of using their preferred title and pronouns, but prohibit Plaintiffs, because of their sex, from exercising that

privilege. As the Second Amended Complaint alleges, "although no principle of Title VII requires Florida to allow teachers to use formal titles with students or to provide their pronouns, once Florida has allowed some teachers to do so, it may not discriminate on the basis of sex in whom it provides that benefit to." Doc. 94 ¶ 143.

Indeed, a person accepting a job at nearly any school would "regularly expect" their employer to permit them to go by "Ms. Rodriguez" or "Mr. Jones" or another title of their choice—that is the standard way that teachers refer to themselves. *Hishon*, 467 U.S. at 76. The use of such a title is "linked directly with a [teacher's] status" and is "part and parcel" of what it means to be a schoolteacher. *Id.* at 75-76; *see also Lansdale v. Air Line Pilots Ass'n Int'l*, 430 F.2d 1341, 1342 (5th Cir. 1970) (finding discrimination in privileges of employment where male but not female flight attendants were allowed to be married); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 120-21 (1985) ("[I]f TWA does grant some disqualified captains the 'privilege' of 'bumping' less senior flight engineers, it may not deny this opportunity to others because of their age."); *Webb v. Walmart Inc.*, 2024 WL 1159682, at *2-3 (N.D. Ala. Mar. 18, 2024) (under Title VII, if Walmart chooses to provide uniforms to its truck drivers, it may not provide uniforms that fit only male truck drivers). Just as Defendants could not withhold this privilege regarding titles on the basis of race or other protected characteristics, they cannot do so on the basis of sex.

State Defendants' only contrary argument is that "'to succeed under *Hishon*,' a plaintiff 'must show that the promise of receiving [the alleged benefit] was a primary factor inducing Plaintiff to work for Defendant,'" and Plaintiffs did not allege that "the ability to use preferred titles and pronouns induced them to work as Florida public school teachers." Doc. 103-1 at 9-10 (quoting *Peeler v. Premier Ambulatory Surgical Ctr., LLC*, 2019 WL 13290394, at *18 (N.D. Ga. Feb. 6, 2019)); *see also* Doc. 105 at 4 (Lee County School Board's similar argument). But Defendants' legal premise is wrong—neither *Hishon* nor any other appellate authority hold that privileges of employment are protected by Title VII only if the benefit was used as an inducement to hire the employee. Defendants' proposed rule is divorced from the statutory text and would immunize the discriminatory provision of any benefits granted for the first time after the plaintiff's employment began—which makes no sense. Moreover, both cases on which State Defendants rely apply the "serious and material" standard, and their chief case *Peeler* is squarely contradicted by *Muldrow*. *Compare Peeler*, 2019 WL 13290394, at *6, 18 (holding that denying plaintiff a company car did not deprive her of a "privilege of employment") *with Muldrow*, 144 S. Ct. at 977 (identifying loss of access to "take-home car" as harm respecting "terms, conditions, or privileges of employment").

In any case, Ms. Wood and Ms. Doe both allege that prior to subsection 3, they *were* permitted to use the titles and pronouns of their choice. Doc. 94 ¶¶ 93-95,

115-117. When Ms. Wood was hired, the school assured her it was supportive of her female gender identity and expression, including using Ms. and she/her pronouns. *Id.* ¶ 93. As teachers, Ms. Wood and Ms. Doe understood that they would use titles rather than first names to refer to themselves. *Id.* ¶¶ 99, 120. It is difficult to imagine that *any* person, absent economic necessity, would accept a job where they, but not other employees, would be forced to misgender themselves.

### F. Ms. Wood has plausibly alleged a hostile work environment.

If the Court determines that, as argued above, Ms. Wood has adequately pleaded discrimination in the terms, conditions, or privileges of her employment, then Ms. Wood's Title VII claims against State Defendants and Defendant Hillsborough County School District can proceed. The Court need not address at this stage the additional question whether she has also alleged a Title VII violation on a hostile work environment theory—which is simply another way she may be able to prove discrimination in the "terms, conditions, or privileges" of her employment. *See Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245-46 (11th Cir. 2004). If the Court reaches the question, however, Ms. Wood has plausibly alleged that Defendants' enforcement of subsection 3 created a hostile work environment.

Even in the absence of an official employer policy of discrimination, an employee's work environment can be sufficiently "hostile or abusive" to effectively alter the "terms, conditions, or privileges of employment." *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21-22 (1993). A plaintiff need not "suffer injury" or "concrete psychological harm," so long as she proves that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Id.* at 22. Workplace conduct "cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010).

A plaintiff demonstrates a hostile work environment by proving that

> (1) [s]he belongs to a protected group; (2) [s]he was sub-ject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment; and (5) [her] employer was responsible for the hostile work environment.

*Copeland*, 97 F.4th at 774 (quotations omitted).

District courts have held that "as a matter of pleading, … a plaintiff need not allege each and every element of the prima facie case," so long as the complaint "plausibly suggest[s] she was subjected to a hostile work environment." *E.g.*, *Jones v. Nippon Cargo Airlines Co.*, 2018 WL 1077355, at *9-10 (N.D. Ga. Jan. 12, 2018); *Brady v. Harris Ventures Inc.*, 2022 WL 22288532, at *5 (N.D. Ga. Jan. 10, 2022).

Here, State Defendants do not dispute that Ms. Wood (1) belongs to a pro-tected group, and that (3) her harassment is based on her sex. And contrary to State Defendants' arguments, Ms. Wood has been subject to severe or pervasive harass-ment for which State Defendants are liable.

### 1. Ms. Wood was subject to harassment.

The core of Ms. Wood's hostile work environment claim is her allegation that prior to the injunction in this case, she was effectively forced to misgender herself every single day at work—to stand in front of class after class of students and use the title Teacher Wood, which no other female teacher uses and which hence communicates to students that she is not a woman. Doc. 94 ¶ 149. This constant drip of humiliating, demeaning speech—speech that the Defendants' policy forces Ms. Wood to speak out of her own mouth every day—is harassment Title VII prohibits.

Forcing Ms. Wood to repeat the state's message that her gender identity is false has further, odious consequences for her work environment. When misgendering of Ms. Wood, both accidental and intentional, predictably increased after subsection 3 was implemented, Ms. Wood was forbidden from responding with her correct pronouns and title—compounding the injury through her forced silence. Doc. 94 ¶¶ 105-08. The essential hostility of her work environment, however, derives not from the conduct of Ms. Wood's students, but from the message that Defendants' policy forces Ms. Wood to communicate herself.

State Defendants do not contend that misgendering is not harassment, but instead rely solely on their assertion that "[b]y its very nature, harassment is done by another person." Doc. 103-1 at 13; *id.* at 14-15 (similar).

But the harassment here *is* attributable to "another person"—the Defendants. In that respect, it is no different than if the Defendants required the school principal or a co-worker to go into all of Ms. Wood's classes and misgender her every day. Subsection 3's scheme accomplishes the same harassment by another means: requiring Ms. Wood to spread that abusive message herself, and forbidding her from contradicting it. *Cf. Brooks v. City of Utica*, 275 F. Supp. 3d 370, 381 (N.D.N.Y. 2017) (forcing employee to wear baseball cap and hairnet to conceal religious hairstyle contributed to hostile work environment); *Garcia v. Randolph-Brooks Fed. Credit Union*, 2020 WL 364133, at *8 (W.D. Tex. Jan. 22, 2020) (allowing hostile work environment claim where plaintiff was "forced to wear women's clothing [and] told to wear makeup and her hair down"). On State Defendants' view of the law, it would not be "harassment" to institute a policy requiring particular employees to refer to themselves using racial slurs—an absurd conclusion. To the extent State Defendants' argument is that Ms. Wood's use of Teacher Wood is somehow voluntary, that is both factually wrong and also asks the wrong question. *Meritor*, 477 U.S. at 68 (the "correct inquiry is whether respondent by her conduct indicated that the alleged [harassment] [was] unwelcome, not whether her actual participation … was voluntary").

If State Defendants wish to use a word other than "harassment" to describe the conduct Ms. Wood is subjected to—call it "compelled humiliation"—it makes

no difference. The word "harassment" is not in the statute. The point is that Defendants "requir[e] [her] to work in a discriminatorily hostile or abusive environment." *Copeland*, 97 F.4th at 774.

## 2.   The harassment was both severe and pervasive.

District courts regularly conclude that "[t]he determination of whether [the defendant's] conduct rises to the level of severe or pervasive is … more appropriately made at the summary judgment stage when discovery has been completed." *Richardson v. Jackson*, 2021 WL 9598490, at *9 (N.D. Ga. Sept. 16, 2021); *see also*, *e.g.*, *Poague v. Huntsville Wholesale Furniture*, 369 F. Supp. 3d 1180, 1194 (N.D. Ala. 2019); *Marques v. Club Madonna, Inc.*, 2019 WL 13256721, at *3 (S.D. Fla. June 3, 2019). Here, too, the factual determination regarding the severity of Ms. Wood's experience as a result of subsection 3's implementation should be made on a factual record at a later stage. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) (noting "fact intensive" nature of severe or pervasive inquiry). In any event, Ms. Wood has plausibly alleged that her harassment was both severe and pervasive.

The "severe-or-pervasive element has two subrequirements: one subjective and the other objective." *Copeland*, 97 F.4th at 775. State Defendants do not dispute that Ms. Wood "subjectively perceive[s] the hostile work environment to be abusive." *Id.*; Doc. 103-1 at 16. As for the objective component, courts consider four

factors in assessing harassment: "(1) its frequency, (2) its severity, (3) whether it is 'physically threatening or humiliating,' and (4) whether it 'unreasonably interferes with ... job performance.'" *Copeland*, 97 F.4th at 775 (quoting *Mendoza*, 195 F.3d at 1246). Crucially, these factors "are neither elements nor requirements," *Copeland*, 97 F.4th at 775, but instead call for a "totality of the circumstances" analysis, *Mendoza*, 195 F.3d at 1246. Thus, for example, "harassment may violate Title VII without interfering with an employee's performance," and "frequent but less severe harassment" can also be sufficient. *Copeland*, 97 F.4th at 776; *see Reeves,* 594 F.3d at 808 ("Either severity *or* pervasiveness is sufficient to establish a violation of Title VII.").

State Defendants do not dispute that Ms. Wood has alleged "frequent" harassment. Doc. 103-1 at 17. Prior to the injunction, the harassment affected her every single day, as she "hears and uses her title countless times every day." *See* Doc. 94 ¶¶ 99-100, 173. As courts have held, "[u]ndoubtedly, conduct that occurs daily (even over a shorter span of time) is frequent." *Copeland*, 97 F.4th at 776.

In addition to this daily humiliation, Ms. Wood has also alleged that the number and frequency of students misgendering her increased during the period of subsection 3's enforcement. Doc. 94 ¶ 106. During the relatively short period prior to the injunction, approximately 10 students misgendered her in a manner and context she understood was intentional, and an estimated 30-40 additional students

misgendered her in a manner she understood to be unintentional. *Id.* ¶ 106.[4] Ms. Wood "attributes this increase … to her inability, under subsection 3, to inform students that she goes by Ms. and she/her pronouns." *Id.*[5]

As to the second factor, severity, requiring a transgender woman to misgender herself to her students on a daily basis is properly understood as severe. Forbidding her from expressing her gender identity, and forcing her instead to carry the state's offensive and discriminatory message—that her own, hard-won gender identity is "false"—plausibly causes her to be seriously "stigmatized, distressed, and humiliated," as she alleges. Doc. 94 ¶¶ 91, 102.

There can be no dispute that misgendering, in principle, can contribute to severe harassment. *Copeland*, 97 F.4th at 779. Here, numerous legal factors support a

---

[4] State Defendants misunderstand the complaint, which alleges these dozens of incidents of misgendering occurred during the period of subsection 3's enforcement, not the entire period of Ms. Wood's employment. Doc. 94 ¶ 106; *compare* Doc. 103-1 at 20. For clarity, these incidents involve students referring to Ms. Wood as "Mr. Wood" or with he/him pronouns, not "Teacher Wood."

[5] State Defendants dispute whether Ms. Wood has alleged frequent harassment specifically with respect to misgendering by students, but as explained, that misgendering is not the core of Ms. Wood's claim. *See supra* at 21. Regardless, their arguments ignore the Eleventh Circuit's standards for frequency. *See Copeland*, 97 F.4th at 776 (noting that there is no "magic number" for frequency, but that courts have held that more than 10 incidents over 2 months was "frequent"). State Defendants also appear to complain that Ms. Wood has not identified the particular students who misgendered her, Doc. 103-1 at 20-21, which would be highly inappropriate but also ignores that a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" so long as it plausibly states a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

finding of severity. For starters, Ms. Wood's harassment is not mere misgendering by co-workers—it is an official policy enforced by her supervisors, including the school principal and her employer. *See* Doc. 94 ¶ 97. Harassment is "more severe when it involves the participation of supervisors rather than solely peers or subordinates" *Copeland*, 97 F.4th at 777. For that same reason, unlike in most other hostile work environment cases, Ms. Wood had *no* avenue for complaint or objection—there was nowhere to turn. *Cf. id.* ("[H]arassment is more severe when it occurs 'despite the employee's objections'"). It also bears emphasis that the conduct required by subsection 3 was uniquely degrading in both silencing the victim in the exercise of her own free speech and then requiring her to be the vehicle of her own harassment in the exercise of her daily job duties.

State Defendants argue that the use of the title Teacher cannot be severe, Doc. 103-1 at 17-18. That argument fails to address the critical "social context in which particular behavior occurs and is experienced by its target." *Mendoza*, 195 F.3d at 1258. No other male or female teachers at the school use the title Teacher—a fact which, alone, strongly supports the plausibility of Ms. Wood's allegation that using that title is stigmatizing. Doc. 94 ¶ 102.

As to the third factor, after happily and successfully being known as Ms. Wood for years, having to identify herself as Teacher Wood and being prohibited from using she/her pronouns is undoubtedly "humiliating." *Copeland*, 97 F.4th at

779. It singles her out and simultaneously suggests uncertainty as to her sex or gender as well as the school's disapproval of her identity. Having to repeatedly identify oneself publicly in front of a classroom underlines the harm. *Cf. id.* (finding humiliation where "Copeland's coworkers harassed him over the prison radio system, so 'the whole institution could hear.'").

State Defendants' argument that Teacher Wood is at most a "mere offensive utterance," Doc. 103-1 at 18-19, misses the mark—misgendering is more than merely "offensive" when the victim is forced to endorse it day after day. Similarly, State Defendants' assertion that the humiliation is "diminish[ed]" because the misgendering is "only in the presence of students," *id.*, both betrays a cramped understanding of what teachers care about and is not even true since Ms. Wood must misgender herself to students even if co-workers and school administrators are present too.

Fourth and finally, the Second Amended Complaint plausibly alleges that "[g]oing by Teacher disrupted Ms. Wood's ability to teach and distracted her students." Doc. 94 ¶ 103-04. It is certainly plausible that Ms. Wood's forced identity change from Ms. Wood to Teacher Wood, with the accompanying increase in misgendering from students that predictably results, would make it more difficult for Ms. Wood to do her job because it distracts the students in her classroom. The more detailed allegations State Defendants demand are not required at this stage, and

indeed no showing on this factor is ever necessarily required. *See Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1155 (11th Cir. 2020) ("[A] lack of evidence of impact on job performance is not fatal.").

### 3. The Defendants are liable for the harassment.

State Defendants argue that Ms. Wood "cannot satisfy the fifth element of a hostile work environment claim based on students not using Wood's preferred title or pronouns" because she "does not allege that State Defendants had actual knowledge of students not using Wood's preferred pronouns in the workplace." Doc. 103-1 at 25-26. But State Defendants do not dispute, as they cannot, that they are liable for the harassment based on Ms. Wood's own compelled statements and misgendering. *Id.* With respect to the misgendering by students, that is not the core of Ms. Wood's claim, but regardless, State Defendants cannot escape liability by passing the blame to Ms. Wood for not reporting the misgendering. That misgendering is expressly protected by subsection 2 of the Florida law, *see* Fla. Stat. § 1000.071(2), and Ms. Wood had no basis under Florida law or school policy to complain about it. Moreover, that misgendering is the intended (and completely predictable) outcome of State Defendants' own policy.

For all these reasons, Ms. Doe has plausibly alleged a hostile work environment under Title VII.

## II.    Mx. Schwandes states a Title VII claim against State Defendants.

State Defendants address Mx. Schwandes's Title VII claims in only a footnote. Doc. 103-1 at 10. Yet Mx. Schwandes has adequately alleged that State Defendants have discriminated against them in the "terms, conditions, or privileges of employment."

Most significantly, Mx. Schwandes was fired for refusing to comply with subsection 3, and State Defendants are liable under Title VII for that discrimination. "Termination is an ultimate employment action that is undeniably adverse." *Freytes-Torres v. City of Sanford*, 270 F. App'x 885, 894 (11th Cir. 2008); 42 U.S.C. § 2000e-2(a). While Florida Virtual School terminated Mx. Schwandes, State Defendants are equally liable for that termination.

State Defendants have never denied that they are Plaintiffs' (including Mx. Schwandes's) "employer" for Title VII purposes, nor could they. *See Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988); *Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572, 582 (9th Cir. 2000); *Fla. Educ. Ass'n v. Dep't of Educ.*, 2018 WL 10560519, at *3 (N.D. Fla. Dec. 19, 2018). An "entity that is not the direct employer of a Title VII plaintiff nevertheless may be liable if it 'interferes with an individual's employment opportunities with another employer.'" *Ass'n of Mexican-Am. Educators*, 231 F.3d at 580.

Here, as alleged, State Defendants "oversee the performance of School Board Defendants' enforcement of subsection 3 and enforce School Board Defendants' compliance with subsection 3." Doc. 94 ¶¶ 46-50. State Defendants ensure the enforcement of subsection 3 (including the termination of employees who violate the law) by reporting noncompliant school boards to the Legislature, withholding funds, and other similar actions. *Id.* ¶¶ 47-48. State Defendants also promulgate the regulations providing for dismissal for employees who violate subsection 3. *Id.* ¶¶ 33, 35, 55. In effect, State Defendants help "dictate[] whom the district may and may not hire"—or must fire. *Ass'n of Mexican-Am. Educators*, 231 F.3d at 582.[6] Because State Defendants are "up to [their] elbows in the allegedly unlawful practice"—Mx. Schwandes's termination for violating state law—they "ought not escape liability just because another entity is technically the plaintiff's employer." *Fla. Educ. Ass'n*, 2018 WL 10560519, at *3.[7]

---

[6] Of course, State Defendants' role in enforcing subsection 3 in no way lessens School Board Defendants' independent role in enforcing the law, as this Court concluded in finding that Plaintiffs' injuries were traceable both to State Defendants and to School Board Defendants. Doc. 82 at 10-11.

[7] This Court previously noted that "for purposes of the motion for preliminary injunction," Mx. Schwandes did "not made any arguments that the employment actions of FLVS can be imputed onto State Defendants." Doc. 82 at 21 n.12. That was because the only injunctive relief Mx. Schwandes sought on that motion related to State Defendants' later investigation of Mx. Schwandes.

In addition, State Defendants' decision to launch a disciplinary investigation into Mx. Schwandes for refusing to comply with subsection 3 causes Mx. Schwandes harm respecting the terms, conditions, or privileges of their employment. While launching an investigation is in some sense, as this Court previously noted, Doc. 82 at 20, an "intermediate step[]," an employer's discriminatory, harmful process is not rendered immune from challenge by the possibility that the process's culmination may do even more harm. Doc. 82 at 21 (Court's recognition that "being subjected to an investigation of this type may easily be described as harmful"); *Oncale*, 523 U.S. at 78 (Title VII "evinces a congressional intent to strike at the entire spectrum of disparate treatment … in employment"). Furthermore, the investigation relates to Mx. Schwandes's employment: the very topic of the investigation is Mx. Schwandes's conduct as an employee prior to their termination, Doc. 94 ¶ 134, and the purpose of the investigation is to determine whether Mx. Schwandes may again be hired as an educator in the very school system overseen by State Defendants.

### III.    Mx. Schwandes states a Title VII claim against Defendant Florida Virtual School.

The Court made clear that Plaintiffs "need not address arguments that the Court already addressed in the previous round of motions to dismiss." Doc. 108 at

2. With one exception, all of the arguments in Florida Virtual School's new motion to dismiss fall into that category.[8]

The one exception is Florida Virtual School's argument that its enforcement of subsection 3 did not "create[] a discriminatory term or condition of employment" because "for a term or condition to be sexually discriminatory under Title VII, it must … be severe or pervasive enough to create a hostile work environment." Doc. 101 at 10-12. That is incorrect: not all claims based on discrimination in "terms, conditions, or privileges" of employment are hostile work environment claims. *See, e.g.*, *Muldrow*, 144 S. Ct. at 974 (Title VII requires showing only "some 'disadvantageous' change in an employment term or condition"). Florida Virtual School's arguments are inapplicable because Mx. Schwandes does not bring a hostile work environment claim. Florida Virtual School is liable to Mx. Schwandes under Title VII

---

[8] Specifically, Florida Virtual School argues that *Bostock*, 590 U.S. 644, does not protect nonbinary individuals and that Mx. Schwandes's termination did not violate *Bostock*'s "but-for" test. Doc. 101 at 5-7. The Court has rejected this argument. Doc. 88 at 5 ("To know which pronouns section 1000.071(3) demands Mx. Schwandes use, one must know Mx. Schwandes's sex. This is discrimination on the basis of sex."). Florida Virtual School relatedly argues that "Title VII does not protect mutable expressions like non-gender/non-binary status" or the use of gender-neutral pronouns. Doc. 101 at 8-9. This is an even more cursory version of State Defendants' "status vs. conduct" arguments this Court already rejected as "unavailing" or, "[a]t best … underdeveloped." Doc. 91 at 5 n.3; *see also* Doc. 67 at 5-10, Doc. 69 at 3-8; *Lange v. Houston Cnty.*, 101 F.4th 793 (11th Cir. 2024).

for a simpler reason: it fired Mx. Schwandes for refusing to comply with subsection 3's discriminatory mandate. *See* 42 U.S.C. §2000e-2(a); Doc. 94 ¶¶ 78-82, 190-205.

## IV. Count 1 is not a shotgun pleading.

This Court likewise made clear that Plaintiffs need not respond to State Defendants' argument that Ms. Wood was not permitted to plead a hostile work environment claim. Doc. 108 at 1-2. State Defendants' related argument—that Count 1 represents "shotgun pleading" by placing Ms. Wood's hostile work environment allegations in the same Count as her other allegations pertaining to Title VII discrimination—fails. These allegations need not be pleaded separately, and regardless, the Defendants are on adequate notice of Ms. Wood's claims. *Hulsey*, 367 F.3d at 1245-47; *Reeves*, 594 F.3d at 808 n.2; *Chance v. Wakulla Cnty.*, 2019 WL 13280167, at *1 (N.D. Fla. July 9, 2019) (Walker, C.J.).

## CONCLUSION

For the foregoing reasons, the motions to dismiss should be denied.

Date: June 25, 2024

/s/ *Carli Raben*
Sam Boyd, Fla. Bar No. 1012141
Carli Raben, Fla. Bar No. 1036013
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131
(786) 347-2056
(786) 237-2949 (fax)
sam.boyd@splcenter.org
carli.raben@splcenter.org

Aaron S. Fleisher[*†]
SOUTHERN POVERTY LAW CENTER
1101 17th St NW Ste. 705
Washington, DC 20036
(202) 536-9719
(202) 971-9205 (fax)
aaron.fleisher@splcenter.org
[†] *Not admitted to practice law in DC*

Diego A. Soto[*]
Jessica L. Stone[*]
SOUTHERN POVERTY LAW CENTER
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030
(404) 521-6700
(404) 377-0708 (fax)
diego.soto@splcenter.org
jessica.stone@splcenter.org

Simone Chriss, Fla. Bar No. 124062
Jodi Siegel, Fla. Bar No. 511617
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

James M. Finberg[*]
James Baltzer[*]
Jonathan Rosenthal[*]
ALTSHULER BERZON LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
jfinberg@altshulerberzon.com
jbaltzer@altshulerberzon.com
jrosenthal@altshulerberzon.com

*Counsel for Plaintiffs*

\* *Admitted* pro hac vice

**CERTIFICATE OF WORD COUNT**

I certify that this document contains 7,972 words, inclusive of headings, foot-notes, and quotations, according to the word-processing system used to prepare it.

Date: June 25, 2024          /s/ *Carli Raben*
                             Carli Raben