**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| KATIE WOOD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:23-cv-00526 |
| | ) | |
| FLORIDA DEPT. OF ED., et al., | ) | Chief Judge Mark E. Walker |
| | ) | |
| Defendants. | ) | |

**STATEMENT OF INTEREST**
**OF THE UNITED STATES OF AMERICA**

The United States respectfully submits this Statement of Interest pursuant to

28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests

of the United States in a suit pending in a court of the United States." Pending

before the Court are Defendants' motions to dismiss Plaintiffs' Second Amended

Complaint ("SAC"). ECF Nos. 101-05. The United States has a strong interest in

this case, which concerns the proper application of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e-2(a) ("Title VII"), to claims by three transgender

public school teachers that they have been discriminated against with respect to

their terms, conditions, and privileges of employment because of their sex and that

one of them endured a hostile work environment because of her sex. The Attorney

General is charged with enforcing Title VII where the employer is a state or local

1

"government, governmental agency, or political subdivision." 42 U.S.C. § 2000e-5(f)(1).

This Statement of Interest addresses the applicable Title VII standards under which this Court should consider whether the SAC sufficiently pleads facts alleging (i) discrimination with respect to Plaintiffs' terms, conditions, or privileges of employment and (ii) a hostile work environment claim against Hillsborough County School Board and the State Defendants.[1]

## STATEMENT OF THE CASE[2]

1. *Florida Statute § 1000.071*

In 2023, the State of Florida enacted Florida Statute § 1000.071 ("§ 1000.071"), entitled "Personal Titles and Pronouns." ECF No. 94 ¶¶ 20-23. Under Subsection 3, "[a]n employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." *Id*. Section 1000.071 defines "sex" based on various physical characteristics "present at birth." *Id.* ¶ 21.

After enactment of § 1000.071, the Commissioner of Education and the

---

[1] The United States expresses no view on issues before the Court not addressed here.

[2] This Statement of Interest assumes the truth of the allegations in the SAC (ECF No. 94) as required at the motion to dismiss stage. *Young Apartments*, *Inc. v. Town of Jupiter*, *FL*, 529 F.3d 1027, 1037 (11th Cir. 2008).

State Board of Education ("SBOE") issued regulations by which Defendants can discipline employees who violate Subsection 3, including by suspending or revoking their educator certificates. *Id*. ¶¶ 33-35. Defendants Hillsborough County School Board ("HCSB"), Lee County School Board ("LCSB"), and Florida Virtual School Board of Trustees ("FLVS") subsequently imposed employment policies requiring teachers to use titles and pronouns in accordance with § 1000.071. *Id*. ¶¶ 51-83, 107-08, 118, 128, and 132. The employment policies, laws, and regulations at issue are referred to collectively hereafter as Defendants' "title/pronoun" policy or policies.

### 2. *Plaintiffs*

Plaintiff Katie Wood, a transgender woman, is a public school teacher at Lennard High School ("Lennard") in Hillsborough County, Florida, where she has worked since 2021. ECF No. 94 ¶¶ 90 and 92. Ms. Wood's pronouns are "she" and "her" and her personal title is "Ms." *Id*. ¶ 91. When hired, Ms. Wood was open about being transgender and HCSB was supportive of her gender identity and expression, including allowing her to use the title Ms. and she/her pronouns. *Id*. ¶ 93.

Plaintiff Jane Doe is a transgender woman and public school teacher in Lee County, where she has worked since 2017. *Id*. ¶¶ 112-14. Ms. Doe's pronouns are "she" and "her" and her personal title is "Ms." *Id*. When Ms. Doe transitioned in

2021, LCSB was supportive and updated its records to reflect her new name and female gender. *Id.* ¶ 115-16. LCSB also allowed her to use the title Ms. and she/her pronouns. *Id.*

Plaintiff AV Schwandes was employed as a public school teacher by FLVS from July 2021, until October 2023. *Id.* ¶ 125. Mx. Schwandes is nonbinary, meaning their gender identity is neither male nor female, but they were assigned the female sex at birth. *Id.* ¶ 124. Mx. Schwandes uses the title "Mx." and the pronouns they and them. *Id.* From 2021 until June or July 2023, Mx. Schwandes used both the titles "Professor" and "Mrs." at work. *Id.* ¶ 126. Beginning around June or July 2023, Mx. Schwandes began using the title Mx. and they/them pronouns at work. *Id.*

After enactment of § 1000.071, each of the Plaintiffs were informed by their respective school officials that, in accordance with Defendants' title/pronoun policies, they could no longer use the pronouns or the titles that aligned with their gender identity. Ms. Doe now cannot provide her correct title and pronouns to students and cannot correct anyone at work who misgenders her. *Id.* ¶¶ 118-21. Defendants' policies stigmatize her, threaten her psychological well-being, and adversely affect her both in and outside the classroom. *Id.* ¶ 3.[3]

---

[3] Social science research confirms that misgendering can have injurious effects, including causing transgender individuals "to feel stigmatized" and to suffer

Ms. Wood was told that she could no longer use the title "Ms." and, instead, could only use the titles "Mr., Teacher, or Coach." *Id.* ¶ 97. These policies also forbade Ms. Wood from telling students that her correct pronouns were she/her and correcting people who misgendered her. *Id.* ¶¶ 105-08. Inadvertently or otherwise, students increasingly misgendered Ms. Wood after the enactment of the title/pronoun policies and she could not correct them. *Id.* ¶ 106. This caused her distress and humiliation. *Id.* The title/pronoun policies continued to impact Ms. Wood until this Court, based on the First Amendment, entered an injunction that prohibited enforcement of the policies against her. ECF No. 82 at 59.

When Mx. Schwandes continued to use the Mx. title and they/them pronouns, FLVS suspended them for violating Defendants' title/pronoun policies; directed them to comply by using Ms., Mrs., or Miss instead of Mx.; would not allow them to use non-gendered titles like "Professor, Doctor, or Teacher"; and threatened to terminate them if they did not comply. *Id.* ¶¶ 128-29. After Mx. Schwandes still refused to comply, FLVS terminated them. *Id.* ¶ 132. In January 2024, Defendant Florida Department of Education ("FDOE") informed Mx. Schwandes by letter that the Professional Practices Services office had "'determined an investigation is warranted into allegations that [they] failed to

---

negative "affective and social psychological outcomes." Kevin A. McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3 Stigma & Health 53, 54 (2016).

follow directives from [their] employer.'" *Id.* ¶ 134. This investigation could result in the revocation of Mx. Schwandes' educator certificate, among other penalties. *Id.* ¶¶ 38-45.

### 3. Relevant Procedural History

Plaintiffs sued FDOE; SBOE and its members; the Commissioner of Education; the Education Practices Commission ("EPC") and its members (collectively referred to hereafter as "State Defendants"); LCSB; FLVS; and HCSB. They asserted claims against Defendants under Title VII, Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.* ("Title IX"), and the First and Fourteenth Amendments of the Constitution. In response to motions to dismiss, this Court held that the title/pronoun policies discriminate against Plaintiffs on the basis of sex. ECF Nos. 91 at 11-17 and 88 at 5. But the Court held that, except for Mx. Schwandes' termination, Plaintiffs had not sufficiently pled that the title/pronoun policies discriminated against them with respect to their terms, conditions, or privileges of employment, as required by Title VII. ECF No. 91 at 7. The Court gave Plaintiffs an opportunity to cure this defect in their Complaint and Plaintiffs used this opportunity to file the SAC.

In Counts 1-6 of the SAC, Plaintiffs assert sex discrimination claims under Title VII, alleging that Defendants have discriminated against them on the basis of their sex through implementation of § 1000.071(3), including Defendants'

6

title/pronoun policies. Mx. Schwandes also continues to allege that FLVS

unlawfully terminated them because of their sex, and Ms. Wood alleges HCSB and

the State Defendants subjected her to a hostile work environment because of her

sex. ECF No. 94 ¶¶ 170-74 and 204-05.[4]

## DISCUSSION

An employer violates Title VII if it "discriminate[s] against" an employee

"with respect to his compensation, terms, conditions, or privileges of employment,

because of such" employee's "sex," which includes discrimination on the basis of

gender identity. 42 U.S.C. § 2000e-2(a)(1) and *Bostock v. Clayton Cty.*, 590 U.S.

644, 662 (2020). As this Court recognized, the Supreme Court recently abrogated

the Eleventh Circuit's requirement that an employer's discriminatory action must

have a "serious and material" effect on a term, condition, or privilege of

employment to be actionable. ECF No. 91 at 6-7 (*discussing Muldrow v. City of St.

Louis*, 144 S. Ct. 967 (2024)). The Supreme Court held that the Eleventh Circuit

and other courts "rewrote Title VII" when they imposed this heightened "showing

that the statutory text does not require." *Muldrow*, 144 S. Ct. at 975. Thus,

*Muldrow* "lowers the bar" for plaintiffs in the Eleventh Circuit and other courts

and, as such, "many cases will come out differently." *Id.* at fn.2.

---

[4] Mx. Schwandes has also asserted a Title VII retaliation claim which is not
addressed here.

This Court also recognized that Plaintiffs sufficiently alleged that the title/pronoun policies caused them "some harm" for purposes of establishing that Defendants discriminated against them in violation of Title VII. *Id.* at 7 (*citing Muldrow*, 144 S. Ct. at 974). And for the same reasons that this Court articulated regarding Plaintiffs' equal protection claims and Mx. Schwandes' Title IX claim, the title/pronoun policies discriminate against Plaintiffs because of their sex under Title VII. ECF No. 91 at 11-15 and ECF No. 88 at 5.

Thus, to determine if Plaintiffs' Title VII sex discrimination claims can proceed, this Court need only decide whether Plaintiffs have sufficiently pled that the title/pronoun policies discriminate "with respect to" Plaintiffs' "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). They have. Indeed, as alleged by Plaintiffs, Defendants' title/pronoun policies are a term or condition of employment because compliance with the policies is mandatory. Plaintiffs had to comply or risk numerous adverse consequences, including termination of their employment. Plaintiffs have also sufficiently alleged that the title/pronoun policies denied them a privilege of employment and created a hostile work environment for Plaintiff Katie Wood.

I.    **Defendants' title/pronoun policies relate to Plaintiffs' "terms," "conditions," and "privileges" of employment.**

In *Muldrow*, the Supreme Court reaffirmed that the phrase "terms, conditions, or privileges of employment" is not used solely "in the narrow

contractual sense; it covers more than economic or tangible" harms. 144 S. Ct. at

974 (cleaned up). Indeed, the phrase "terms, conditions, or privileges of

employment," § 2000e-2(a)(1), "is an expansive concept" with a broad sweep,

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (citation omitted). This

language "evinces a congressional intent to strike at the entire spectrum of

disparate treatment" in employment. *Id.* at 64 (cleaned up).

    The *Muldrow* Court wiped away decades of precedent in this and other

circuits. 144 S. Ct. at fn. 2 ("[T]his decision changes the legal standard used in any

circuit that has previously required 'significant,' 'material,' or 'serious' injury.").

Over 20 years ago, the Eleventh Circuit adopted the erroneous "serious and

material" standard for evaluating whether an employment decision was an

"adverse action" that could violate Title VII. *Davis v. Town of Lake Park, Fla.*, 245

F.3d 1232, 1239 (11th Cir. 2001). Until recently, nearly every other circuit also

applied an equally erroneous standard. *See Hamilton v. Dallas Cty.*, 79 F.4th 494,

fn. 62 (5th Cir. 2023) (surveying cases from all other circuits).

    Consequently, there is a dearth of cases that discuss the definition of the

words "terms," "conditions," and "privileges" in Title VII. The lack of direct Title

VII precedent, however, does not mean this Court is without guidance on their

meaning. The Court should apply the ordinary meaning of these words and, as

courts have often done when interpreting Title VII, look for guidance from cases

that interpret the National Labor Relations Act ("NLRA"). *Hishon v. King & Spalding*, 467 U.S. 69, 76 n.8 (1984) ("the meaning of this analogous language" in the NLRA "sheds light on the Title VII provision at issue"). The Court may also seek guidance from a portion of the U.S. Equal Employment Opportunity Commission's ("EEOC") Compliance Manual, discussed below, which predated many of the erroneous decisions *Muldrow* abrogated.[5]

## A. The title/pronoun policies are a "term" or "condition" of employment.

Because Title VII does not define "term" or "condition," the Court should interpret them based on their "ordinary meaning," and can do so by using, among other sources, dictionaries published when Congress enacted Title VII. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *see also Thompson v. Regions Sec. Servs., Inc.*, 67 F.4th 1301, 1306 (11th Cir. 2023). The "terms" of employment

---

[5] The United States has consistently argued that the phrase "terms, conditions, or privileges of employment" be given its plain meaning under the text of the statute. *See e.g.*, Brief of the United States as Amicus Curiae Supporting Petitioner, *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024) (No. 22-193) (asserting that transfers fall within the meaning of the statute); Brief for the United States as Amicus Curiae in Support of Appellant, *Bennett v. Butler Cty. Bd. of Ed.*, No. 23-10186-A (11th Cir. June 14, 2023) (same); Brief for the United States as Amicus Curiae, *Davis v. Legal Svcs. Ala., Inc.*, 144 S. Ct. 1455 (Mem) (2024) (No. 22-231); Brief for the United States as Amicus Curiae in Support of Plaintiff-Appellant at 21-23, *Abdi v. Hennepin Cty.*, No. 24-1393 (8th Cir. May 15, 2024); En Banc Brief for the United States as Amicus Curiae in Support of Plaintiffs-Appellants, *Hamilton v. Dallas Cty.*, 79 F.4th 494 (2023) (No. 21-10133); and Brief for the United States as Amicus Curiae in Support of Neither Party, *Threat v. City of Cleveland*, 6 F.4th 672 (6th Cir. 2021) (No. 20-4165).

are the "[p]ropositions, limitations, or provisions" that "determine[e] the nature and scope of the [employment] agreement." *Webster's New International Dictionary of the English Language* (2d ed. 1957) (Exhibit 1). "Condition" is a synonym for "term" and is defined as "[s]omething established or agreed upon as a requisite to the doing or taking effect of something else; a stipulation or provision." *Id.* "Conditions" also means "[a]ttendant circumstances . . . as [in] living conditions; playing conditions." *Id.*

Under these dictionary definitions, Plaintiffs have sufficiently alleged that the title/pronoun policies are a term or condition of employment. Plaintiffs had to comply with the policies as a "provision" or "condition" of their employment. *Id.*[6] Indeed, their continued employment was *conditioned* on their compliance. Under state law, teachers are subject to suspension or revocation of their educator certificates if they violate the title/pronoun policies; and they must be suspended or terminated from their jobs if their educator certificates are suspended or revoked. ECF No. 94 ¶¶ 33, 35, 51, and 52. According to the State Defendants, compliance with the title/pronoun policies is "foundational" to teaching and as important to

---

[6] Ms. Doe is the only Plaintiff who must presently comply with the title/pronoun policies because Mx. Schwandes was terminated and this Court has enjoined enforcement of the title/pronoun policies against Ms. Wood. All three Plaintiffs, however, have at some point been subject to the restrictions of the title/pronoun policies and thus have had the terms, conditions, or privileges of their employment affected by those policies.

teachers' performance as modeling "clear acceptable oral and written communication skills" and conveying "high expectations to all students." *Id.* ¶ 34 and Fla. Admin. Code r. 6A-5.065(2) and (2)(a)(2)(c), (e), and (h).

As alleged in the SAC, the school board Defendants also incorporated the title/pronoun policies into their Standards of Ethical Conduct which state that all "instructional staff members *shall* adhere to the principles" in those Standards. ECF No. 94 ¶¶ 59, 69, and 79; LCSB Standards of Ethical Conduct § 3210, https://perma.cc/7KYM-UFTZ; HCSB Standards of Ethical Conduct § 3210, https://perma.cc/7MDB-QYEQ; and FLVS Standards of Ethical Conduct § 1210, https://perma.cc/C884-BT7A (emphasis added).[7] These Standards of Ethical Conduct are purportedly so central to school functioning that teachers must receive training on them every year. ECF No. 94 ¶¶ 62, 72, and 82.

The mandatory nature of the title/pronoun policies and the consequences for non-compliance make clear that the policies are a term or condition of Plaintiffs' employment. Indeed, Mx. Schwandes' termination leaves no room for doubt that teachers who violate the policies will face significant discipline. *Id.* ¶ 132. If courts have not previously recognized personal use of titles and pronouns as related to the

---

[7] The Court may consider the Standards of Ethical Conduct because courts may consider documents referenced in the complaint when ruling on a motion to dismiss if the documents are central to a plaintiff's claims and their authenticity is undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

terms or conditions of employment (ECF No. 91 at 7), that may well be because title and pronoun usage has not typically been a subject of employment policies or regulated in the workplace. But these Defendants have opted to regulate employees' use of titles and pronouns in the workplace. Their choice to do so, and to condition Plaintiffs' employment on compliance with the title/pronoun policies, makes those policies a term or condition of employment. Thus, under the ordinary meaning of the words "term" and "condition," Defendants' title/pronoun policies are or were a term or condition of all three Plaintiffs' employment.

Additionally, a section of the EEOC's Compliance Manual, which predates many cases *Muldrow* abrogated, describes examples of "terms" and "conditions" of employment that comport with the ordinary meaning of those words. EEOC Compliance Manual Section 613 *Terms, Conditions, and Privileges of Employment* (1982), https://perma.cc/9LWG-8PMS. One example of an unlawful practice in the Compliance Manual is a facially discriminatory policy permitting male employees to smoke at their desks but requiring female employees to smoke in a lounge. *Id.* at 613.4(b), Example 3. Defendants' facially discriminatory title/pronoun policy affected Plaintiffs' terms and conditions of employment at least as much as this smoking policy.[8]

---

[8] The EEOC Compliance Manual, while not binding authority or a substantive rule, represents "a body of experience and informed judgment to which courts and

For all these reasons, under the ordinary meaning of the words "terms" and "conditions," the SAC contains facts sufficient to state a claim that the title/pronoun policies discriminated "with respect to" Plaintiffs' "terms" and "conditions . . . of employment," 42 U.S.C. § 2000e-2(a)(1), because they are terms and conditions of employment.

## B.    NLRA cases interpreting the words "terms" and "conditions" further support Plaintiffs' claims.

NLRA case law further affirms the sufficiency of Plaintiffs' allegations. The Supreme Court has explained that "certain sections of Title VII were expressly patterned after" the NLRA.  *Hishon*, 467 U.S. at fn.8.  Accordingly, cases interpreting the words "terms and conditions of employment" under the NLRA "shed light" on what those words mean in Title VII. *Id.* at fn.8; *see also Darnell v. City of Jasper, Ala.*, 730 F.2d 653, fn.3 (11th Cir. 1984) (cases interpreting provisions of NLRA "given great weight" when interpreting similar provisions in Title VII). The NLRA makes it an unfair labor practice to encourage or discourage union membership through "discrimination in regard to . . . any *term or condition of employment*" and it requires unions and employers to collectively bargain with respect to "wages, hours, and other *terms and conditions of employment*." 29 U.S.C. §§ 158(a)(3) and (d) (emphasis added). For decades, courts have read this

---

litigants may properly resort for guidance."  *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (cleaned up).

language in the NLRA expansively. *See e.g.*, *N.L.R.B. v. Buddy Schoellkopf Prods., Inc.*, 410 F.2d 82, 88-89 (5th Cir. 1969) ("privilege of purchasing goods from the company" constituted a term or condition); *Conolon Corp. v. N.L.R.B.*, 431 F.2d 324, 329 (9th Cir. 1970) (disciplinary reprimand constituted term or condition); and *Mid-South Bottling Co.*, 287 N.L.R.B. 1333, 1342-43 (1988), *enforced*, 876 F.2d 458 (5th Cir. 1989) (refusing to allow an employee to borrow a dolly for personal use impacted terms and conditions of employment).

Particularly relevant here, courts have repeatedly held in NLRA cases that employment policies which regulate workplace behavior constitute terms or conditions of employment. For example, in *N.L.R.B. v. Dynatron/Bondo Corp.*, the Eleventh Circuit affirmed the NLRB's finding that a new policy barring smoking on the employer's premises constituted a change to employees' terms and conditions of employment. 176 F.3d 1310, 1314-15 (11th Cir. 1999).[9] Policies which dictate when employees may take breaks during the workday are terms and conditions of employment. *Parsons Elec., LLC v. N.L.R.B.*, 812 F.3d 716, 720-21 (8th Cir. 2016) and *El Paso Elec. Co. v. N.L.R.B.*, 681 F.3d 651, 659 (5th Cir. 2012). Courts have also held that policies which dictate how an employee must perform their work, such as safety rules, alter the terms and conditions of

---

[9] This smoking policy in *Dynatron* is similar to the smoking policy described in the section of the EEOC Compliance Manual discussed above.

employment. *N.L.R.B. v. Gulf Power Co.*, 384 F.2d 822, 825 (5th Cir. 1967) (workplace safety rules were a term or condition of employment) and *N.L.R.B. v. Miller Brewing Co.*, 408 F.2d 12, 14 (9th Cir. 1969) (imposition of new plant rules impacted terms and conditions of employment).

When violation of a new policy could lead to an employee's termination, that is even more reason to find that it alters the terms or conditions of employment. For example, in *N.L.R.B. v. Roll and Hold Warehouse and Distribution Corp.,* the court held that a new attendance policy altered employees' terms and conditions of employment, in part, because violation of the policy could result in termination. 162 F.3d 513, 517-18 (7th Cir. 1998). Similarly, in *Ciba-Geigy Pharmaceuticals Division v. N.L.R.B.* the employer instituted a policy designed to decrease the unnecessary use of medical leave and the court held that it altered the terms and conditions of employment, in part, because the employer had terminated employees who violated the policy. 722 F.2d 1120, 1126-27 (3d Cir. 1983).

This NLRA case law makes clear that Defendants' title/pronoun policies are a term or condition of employment. Like the attendance policies at issue in *Roll and Hold Warehouse* and *Ciba-Geigy Pharmaceuticals*, they are policies that teachers must follow to keep their jobs. And like the smoking policy in *Dynatron*, the company store shopping policy in *Buddy Schoellkopf Prods.*, the workplace

safety rules in *Gulf Power*, and the ability to borrow a dolly for personal use in *Mid-South Bottling* (all cases within the Eleventh Circuit or the Fifth Circuit before the existence of the Eleventh Circuit), Defendants' title/pronoun policies meaningfully affect employment conditions. They required Plaintiffs to adjust how they referred to themselves and interacted with others on a daily basis, including those that misgendered them. ECF No. 94 ¶¶ 96-108, 118-21, and 127-30. For all these reasons, Defendants' title/pronoun policies would be considered "terms and conditions of employment" under the NLRA and this Court should hold that they are "terms" or "conditions . . . of employment," 42 U.S.C. § 2000e-2(a)(1), under Title VII, too.

### C.    Defendants' title/pronoun policies denied Plaintiffs a privilege of employment.

Although the court need not reach the question if it decides that Plaintiffs have sufficiently alleged that the title/pronoun policies constituted or altered their terms or conditions of employment, Defendants' policies also denied Plaintiffs a "privilege" of employment. 42 U.S.C. § 2000e-2(a)(1). The ordinary meaning of "privilege" at the time Title VII was enacted was a "right or immunity granted as a peculiar benefit, advantage, or favor." *Webster's New International Dictionary of the English Language* (2d ed. 1957) (Exhibit 1). Before Defendants enacted the title/pronoun policies, Plaintiffs enjoyed the right or benefit to use titles and pronouns corresponding to their gender identities at work. This right or benefit fits

within the ordinary meaning of "privilege" and thus Defendants could not take it away from employees on a discriminatory basis. *Hishon*, 467 U.S. at 75 (a "privilege of employment . . . may not be doled out in a discriminatory fashion").

The privilege of using titles and pronouns that match one's gender identity is similar to the privilege at issue in *Garcia v. Spun Steak Co.*, 998 F.2d 1480 (9th Cir. 1993). In *Spun Steak*, the court held that conversing with people at work is a privilege of employment which an employer may not dole out in a discriminatory fashion. *Id.* at 1487. If conversing with people at work is a privilege of employment, it follows that telling people at work your correct title and pronouns is as well. If, for example, Defendants had enacted a policy permitting white teachers to use titles like Mr. or Ms. but requiring non-white teachers to go by their first names, such a policy would clearly deny the non-white teachers a privilege of employment. The same is true for Plaintiffs under the title/pronoun policies. For these reasons, the SAC alleges facts sufficient to state a claim that Defendants' title/pronoun policies denied Plaintiffs a privilege of employment.[10]

---

[10] The State argues that a privilege of employment can only be something that induced the plaintiff to work for the defendant. ECF No. 103-1 at 10. The Court should reject this argument because it is based on unreported cases decided under the erroneous standard that *Muldrow* abrogated.

II.     **Plaintiff Katie Wood plausibly alleges that State Defendants and HCSB subjected her to a hostile work environment**.

To state a hostile work environment claim a plaintiff must allege they: (1) belong to a protected group; (2) suffered unwelcome harassment; (3) based on a protected characteristic; (4) that was severe or pervasive enough to create a "hostile or abusive environment" altering the terms and conditions of their employment; and (5) that their employer was responsible for that environment. *Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 774 (11th Cir. 2024). Ms. Wood's allegations satisfy these five elements. Indeed, many courts have held that allegations like Ms. Wood's support hostile work environment claims.[11] Most recently, in *Copeland*, the Eleventh Circuit held that a reasonable person could find that repeated misgendering, through intentionally calling a transgender man

---

[11] *See, e.g.*, *Eller v. Prince George's Cty. Pub. Sch.*, 580 F. Supp. 3d 154, 173 (D. Md. 2022) (misgendering of transgender teacher supported hostile work environment claim); *Grimes v. Cty. of Cook*, 19-cv-6091, 2022 WL 1641887, at *9 (N.D. Ill. May 24, 2022) (evidence of co-workers misgendering plaintiff supported hostile work environment claim); *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) (repeated misgendering of transgender plaintiff supported hostile work environment claim); *Doe v. Arizona*, No. 18-cv-384, 2019 WL 2929953, at *3 (D. Ariz. July 8, 2019) (summary judgment denied based on evidence that employees misgendered transgender plaintiff by referring to him with "she" pronouns and derogatory words for women); *Drew v. U.S. Dep't of Veterans Affairs*, No. CV H-16-3523, 2023 WL 186881, at *3 (S.D. Tex. Jan. 12, 2023) (evidence of co-workers referring to transgender male plaintiff as a woman contributed to hostile work environment).

"she/her," and "ma'am," contributed to the abusive or hostile work environment that the plaintiff experienced. *Copeland*, 97 F.4th at 780.

State Defendants and HCSB argue that Ms. Wood has not sufficiently alleged (A) that she suffered severe or pervasive harassment or (B) that there is a basis for employer liability. For the reasons discussed below, these arguments lack merit.

### A. The harassment Ms. Wood suffered was severe or pervasive enough to alter the terms and conditions of her employment.

> *1. Ms. Wood has alleged that both the implementation of the title/pronoun policies and the misgendering she suffered as a result were harassment.*

Ms. Wood alleges State Defendants and HCSB harassed her through their implementation of the title/pronoun policies. ECF No. 94 ¶¶ 33-48, 51-57, 59-66, 97, 147, 151, 170, and 177. Courts have held that employers who harass employees through the implementation of policies may be liable for creating a hostile work environment. For example, in *Maldonado v. City of Altus*, the court ruled that the defendant could be held liable for creating a hostile work environment by implementing a policy that required employees to only speak English. 433 F.3d 1294, 1308 (10th Cir. 2006) *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Similarly, in *Adams v. City of New York*, the court held that a policy requiring employees to wait for someone to relieve them from their post before using the restroom could contribute to a hostile

work environment for female employees who were disproportionately affected by the policy and suffered extreme discomfort and humiliation as a result. 837 F. Supp. 2d 108, 126 (E.D.N.Y. 2011). Like the defendants in *Maldonado* and *Adams*, State Defendants and HCSB may be held liable for creating a hostile work environment for Ms. Wood by implementing the title/pronoun policies. These facially discriminatory policies prohibited Ms. Wood from using the title and pronouns consistent with her gender identity or correcting students who misgendered her. ECF No. 94 ¶¶ 102 and 107-08.

Ms. Wood also alleges that, after implementation of the title/pronoun policies, she experienced misgendering from students with increasing frequency. ECF No. 94 ¶ 106. As discussed above, the Eleventh Circuit and other federal courts have recognized that repeated or pervasive misgendering may create an abusive or hostile work environment for transgender employees. *See* footnote 11 *supra* and *Copeland*, 97 F.4th at 780.

> 2. *The SAC contains sufficient facts to state a claim that a reasonable person could find that Ms. Wood suffered severe or pervasive harassment which created a hostile or abusive work environment.*

The severe-or-pervasive element of a hostile work environment claim requires a plaintiff to show that they both subjectively perceived an environment to be hostile or abusive and that it would have been hostile or abusive to a reasonable person. *Copeland*, 97 F.4th at 775. This standard does not require evidence that the

21

harassment "seriously affected a plaintiff's psychological well-being." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). It is a "highly contextual" standard which requires consideration of the "totality of the circumstances." *Copeland*, 97 F.4th at 775-76.

To determine whether harassment of an employee meets the objective reasonable-person requirement, courts consider: (1) whether it "unreasonably interferes with . . . job performance"; (2) whether it is "physically threatening or humiliating"; (3) its frequency; and (4) its severity. *Copeland*, 97 F.4th at 775 (cleaned up). All of these factors are not required and none of them are dispositive. *Id*. at 775-76.

A reasonable jury can find that harassment unreasonably interfered with a plaintiff's job performance based on evidence of at least one such occasion. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002). The Eleventh Circuit has also repeatedly held that a plaintiff can win a hostile work environment claim with "weaker" evidence of interference with job performance. *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1155 (11th Cir. 2020)*; Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1287 (11th Cir. 2018). That is because harassment need not be so extreme that it produces tangible effects on job performance to be actionable. *Miller*, 277 F.3d at 1277; *Copeland*, 97 F.4th at 776.

Ms. Wood plausibly alleges that Defendants' implementation of their title/pronoun policies subjected her to frequent harassment which interfered with her job performance. As one might expect, as a teacher, Ms. Wood hears and uses her title "countless times every day." *Id.* ¶ 99. Before implementation of the title/pronoun policies, Ms. Wood used the "Ms." title and corrected students who used the wrong pronouns. *Id.* ¶ 94-95. After implementation of the title/pronoun policies, her everyday practice of using and everyday experience of hearing others use her title transformed into a continuous experience of harassment. Every day, she had to use and hear the stigmatizing title "Teacher" and was forbidden from correcting the dozens of students who used the title "Mr." or he/him pronouns, including at least ten students who did so intentionally. *Id.* ¶¶ 100-08. To successfully perform her job, Ms. Wood must establish and maintain respect from her students, and she struggled to do that while students could repeatedly, and without correction, use language that she reasonably found to be humiliating. *Id*. ¶ 99, 106. The title/pronoun policy and the harassment it engendered further impacted Ms. Wood's job performance because the daily risk that she could lose her job and educator certificate for violating the policy further distracted her and caused her great anxiety. *Id*. ¶ 104.[12]

---

[12] The State argues that the title "Teacher" is "innocuous" and cannot support Ms. Wood's claim. ECF No. 103-1 at 18. This argument ignores important context,

Ms. Wood also plausibly alleges that the harassment she experienced was severe. The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998) (cleaned up). The Eleventh Circuit has held that harassment is more severe when, among other things: (1) supervisors participate in it; (2) it continues despite the plaintiff's objections to it; and (3) it is directed at the plaintiff, rather than when it merely occurs in the plaintiff's presence. *Copeland*, 97 F.4th at 777; *Miller*, 277 F.3d at 1277. Determining whether harassment is severe also requires "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Copeland*, 97 F.4th at 778 (*quoting Oncale*, 523 U.S. at 80).

That high level officials at HCSB and the State harassed Ms. Wood by implementing the title/pronoun policies, and by failing to revoke the policies after she complained about them, increased the severity of the harassment. It was HCSB

---

which is critical in discrimination cases. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) ("context, inflection, tone of voice," and other factors are relevant when determining whether calling someone "boy" is racist). Ms. Wood was the only teacher in her school who used the title Teacher, and she was forced to use it because of her sex. ECF No. 94 ¶¶ 100-02. With this context in mind, Ms. Wood has pled sufficient facts to support her claim that use of the title Teacher was stigmatizing and humiliating.

and the principal at Lennard, Ms. Woods' employer and supervisor, who informed her that official policy prohibited her use of the "Ms." title and she/her pronouns. ECF No. 94 ¶ 97. But for this direction from her employer and supervisor, she would not have needed to use the stigmatizing title "Teacher," which no other teachers in the school used. *Id.* ¶¶ 100 and 102. Of course, State Defendants also participated in this harassment because they required HCSB to implement the title/pronoun policies. *Id.* ¶¶ 33-50. Even after Ms. Wood filed a charge of discrimination with the EEOC regarding the title/pronoun policies, the State Defendants and HCSB continued to impose the policies on her until this Court enjoined them. *Id.* ¶¶ 100 and 110. Furthermore, contrary to State Defendants' argument, ECF No. 103-1 at 23, Ms. Wood suffered misgendering directly, not secondhand, because she hears her title "countless times every day." ECF No. 94 ¶ 99. She specifically alleged that when students called her "Mr. Wood," she could not correct them. *Id.* ¶ 108.[13]

---

[13] The State Defendants argue that Ms. Wood could have told students who called her "Mr. Wood" to call her "Teacher Wood" instead. ECF No. 103-1 at 22. This argument ignores the stigma of being the only teacher required to use that title and also conflicts with the facts alleged in the SAC (ECF No. 94 ¶ 108), which the Court must presume are true. It is also unclear whether use of the title "Teacher" complies with state law. Sections 1000.071(2) and (3) do not permit teachers to use or require their students to call them by titles that "do not correspond to [their] sex"; and the title "Teacher" does not correspond to Ms. Wood's sex. Indeed, this statute may be why FLVS would not allow Mx. Schwandes to use the titles "Professor" or "Teacher." ECF No. 94 ¶¶ 128-29.

The title/pronoun policies required Ms. Wood to constantly use and be exposed to language which denied and demeaned a core aspect of her identity – her gender. It was akin to an employer imposing a policy that requires all employees to use anglicized names, such as requiring an employee named Muhammad to go by "Mike," because the employer thinks names like Muhammad are "too ethnic" and reveal the employee's national origin or religion. *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) (employer racially harassed employee named Mamdouh by calling him "Manny"). A reasonable person could, and likely would, find this harassment to be severely humiliating. Thus, for all these reasons, the SAC contains sufficient facts to support Ms. Wood's claim that she suffered severe or pervasive harassment.

**B. The State and HCSB can be held responsible for Ms. Wood's hostile work environment.**

    *1. As alleged in the SAC, State Defendants may be held liable for Ms. Wood's hostile work environment where they exercised influence over HCSB.*

Although they do not directly employ Ms. Wood, the State Defendants, along with HCSB, may be held liable for Ms. Wood's hostile work environment because their actions have cultivated that environment. The Eleventh Circuit has held that an employer who does not employ an individual may be held liable for discriminating against that individual if it influences or interferes with the individual's relationship with their employer. *Zaklama v. Mt. Sinai Med. Ctr.*, 842

F.2d 291, 294 (11th Cir. 1988) (citing *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C. Cir. 1973)).

This Court has specifically held that a "state agency can be held liable when it has a sufficient role in administering a discriminatory program . . . even when the recipients are directly employed not by the state agency but by a political subdivision." *Fla. Educ. Ass'n v. Dep't of Educ.*, 17-CV-414, 2017 WL 11509774, at *1 (N.D. Fla. Nov. 20, 2017). Relying on *Zaklama*, this Court has observed that FDOE "may be far more culpable" for enforcing a discriminatory policy that violates Title VII than even an employee's direct employer school board. *Fla. Educ. Ass'n v. Dep't of Educ.*, 17-CV-414, 2018 WL 10560519, at *3 (N.D. Fla. Dec. 19, 2018) (disparate impact challenge to scholarship program which had an adverse impact based on race and age). Using this same reasoning, courts have ruled that defendants can be held liable when their actions contribute to a hostile work environment for an individual they do not employ. *Martinez v. Pavex Corp.*, 422 F. Supp. 2d 1284, 1291 at n.7 (M.D. Fla. 2006) (relying on *Zaklama* to hold that defendant could be liable for hostile work environment suffered by non-employee plaintiff); *Velez v. Roche*, 335 F. Supp. 2d 1022, 1030 (N.D. Cal. 2004) (relying on multiple cases from around the country to hold that the defendant could be liable for causing the non-employee plaintiff to suffer a hostile work environment).

Plaintiffs plausibly allege that State Defendants are sufficiently involved in implementing the title/pronoun policies to be held responsible for the hostile work environment that those policies created. The Commissioner of Education and the SBOE amended the Principles of Professional Conduct for the Education Profession in Florida to make violations of the title/pronoun policies grounds for suspension or revocation of an educator certificate. ECF No. 94 ¶¶ 33 and 35; Fla. Admin. Code r. 6A-10.081; and Fla. Stat. § 1012.795(1)(j). FDOE investigates potential violations of the title/pronoun policies and advises the Commissioner of its findings. ECF No. 94 ¶ 38; Fla. Stat. § 1012.796(1)(a) and (b). The Commissioner determines whether there is probable cause to find a violation and if they conclude there is, they are responsible for filing and prosecuting a complaint. ECF No. 94. ¶ 40. The EPC reviews complaints and either dismisses them or imposes penalties on the respondent. *Id*. ¶¶ 44-45; and Fla. Stat. § 1012.796(7). Finally, if school boards are unwilling or unable to comply with the title/pronoun policies, the SBOE is empowered to withhold state funds, require reporting, and declare the school boards ineligible for competitive grants. ECF No. 94 ¶ 48; and Fla. Stat. § 1008.32. Each State Defendant is thus sufficiently involved in implementing the title/pronoun policies to be liable for the hostile work environment that they created for Ms. Wood. Indeed, if the State Defendants had never imposed the title/pronoun policies on HCSB, it is likely that Ms. Wood could

have continued to go by the title Ms., used she/her pronouns, and corrected

misgendering. ECF No. 94 ¶¶ 94-95. In that sense, the State Defendants "may be

far more culpable" for the hostile work environment than HCSB. *Fla. Educ. Ass'n*,

2018 WL 10560519, at *3.

> 2. *HCSB and State Defendants may be held responsible for Ms.*
> *Wood's harassment where top agency officials perpetrated the*
> *harassment or failed to take corrective action.*

HCSB and State Defendants can be held responsible for Ms. Wood's

harassment based on her allegations that top officials of those agencies perpetrated

the harassment by implementing the title/pronoun policies. When an organization's

top officials create a hostile work environment, the organization is liable for that

environment and it cannot avail itself of defenses normally available to

organizations when lower-level employees create a hostile work environment. In

such a situation, the organization is liable for the top officials' actions because

those officials constitute the "alter egos" or "proxies" for the organization.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998); *Dees v. Johnson*

*Controls World Servs., Inc.*, 168 F.3d 417, 421-22 (11th Cir. 1999); and *Ackel v.*

*Nat'l Commc'ns, Inc.*, 339 F.3d 376, 384 (5th Cir. 2003). For instance, in *Massey*

*v. Dorning*, the court held that Sheriff Dorning was "responsible for his own

comments," which partially formed the basis of the plaintiff's sexual harassment

claim, because he was "himself the employer" or "at least the alter ego of the" Sheriff's Office. 611 F. Supp. 3d 1301, 1316 (N.D. Ala. 2020).

The members of the school board at HCSB, who are alter egos or proxies of HCSB, harassed Ms. Wood by implementing the title/pronoun policy that prohibited her use of the Ms. title and she/her pronouns and forced her to remain silent in the face of countless instances of misgendering. The school board members incorporated this policy into HCSB's Standards of Ethical Conduct; required Ms. Wood's co-workers to report her to the "authorities" if she violated the policy; and required her and her co-workers to sit through a training where they covered this humiliating policy. ECF No. 94 ¶¶ 58-62. Thus, just like the Sheriff in *Massey*, the school board members at HCSB harassed Ms. Wood and, accordingly, HCSB may be held liable. Similarly, the individuals who run the State Defendants, who are the proxies or alter egos of the State Defendants, implemented the title/pronoun policies which contributed to Ms. Wood's hostile work environment and, as such, the State Defendants may also be held liable.

State Defendants argue they can only be held liable if they knew or should have known of the harassment against Ms. Wood and failed to take prompt corrective action. ECF No. 103-1 at 25. This argument fails because it incorrectly applies a negligence standard instead of the standard for alter ego liability, discussed above. But even under the State's proffered standard, Ms. Wood alleges

sufficient facts by which the State and HCSB could be held liable. According to the SAC, State Defendants and HCSB learned of the harassment against Ms. Wood at least when she filed her charge of discrimination with the EEOC. ECF No. 94 ¶ 110. After they learned of the harassment, neither the State Defendants nor HCSB changed the title/pronoun policies. Instead, they permitted the harassment to continue until this Court enjoined those policies. *Id.* ¶ 100. Because neither the State Defendants nor HCSB took corrective action when Ms. Wood complained about the harassment, they can be held liable for the harassment even under a negligence standard. Therefore, for all these reasons, Ms. Wood has alleged sufficient facts to support her hostile work environment claims against the State Defendants and HCSB.

## <u>CONCLUSION</u>

For the reasons discussed above, Plaintiffs have alleged sufficient facts to state Title VII claims against Defendants.

Date: June 27, 2024                     Respectfully submitted,


                                        KRISTEN CLARKE
                                        Assistant Attorney General
                                        Civil Rights Division

                                        KAREN D. WOODARD (MD Bar,
                                        no number issued)
                                        Chief
                                        Employment Litigation Section
                                        Civil Rights Division

                                        MEREDITH L. BURRELL (MD Bar,
                                        no number issued)
                                        Principal Deputy Chief
                                        Employment Litigation Section
                                        Civil Rights Division

                                        LORI B. KISCH (MD Bar, no
                                        number issued)
                                        Special Litigation Counsel
                                        Employment Litigation Section
                                        Civil Rights Division

                                        s/ Allan K. Townsend
                                        ALLAN K. TOWNSEND (ME Bar
                                        No. 9347)
                                        Senior Trial Attorney
                                        CARL CHARLES (NY Bar. No.
                                        5427026)
                                        Trial Attorney
                                        Civil Rights Division
                                        Employment Litigation Section
                                        U.S. Department of Justice
                                        4 Constitution Square
                                        150 M Street, NE
                                        Washington, DC 20530
                                        Telephone: (202) 353-5343
                                        Email: Allan.Townsend2@usdoj.gov

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that this document contains 7,387 words, inclusive of headings, footnotes, and quotations, according to the word-processing system used to prepare it.

Date:  June 27, 2024                                  <u>/s/  Allan K. Townsend</u>