[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11239

_____

KATIE WOOD,

                                                    Plaintiff-Appellee,

AV SCHWANDES, et al.,

                                                    Plaintiffs,

*versus*

FLORIDA DEPARTMENT OF EDUCATION,
FLORIDA STATE BOARD OF EDUCATION,
COMMISSIONER OF EDUCATION,
EDUCATION PRACTICES COMMISSION,
MONESIA BROWN,

In their official capacities as members of defendant education

 practices, et al.,

                                        Defendants-Appellants,


HILLSBOROUGH COUNTY SCHOOL BOARD, et al.,

                                                Defendants.


                    _____

            Appeal from the United States District Court
                for the Northern District of Florida
                D.C. Docket No. 4:23-cv-00526-MW-MAF

                    _____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

NEWSOM, Circuit Judge:

        Katie Wood is a transgender woman who teaches at a public high school in Florida.  Two years ago, the state enacted Fla. Stat. § 1000.071(3), which, as applied to Wood, prohibits her from using the honorific "Ms." and the gendered pronouns "she," "her," and "hers" in exchanges with students during class time.  Wood sued to enjoin the enforcement of § 1000.071(3) against her.  The district court granted Wood a preliminary injunction, finding it substantially likely that the law violates her First Amendment right to free speech.

We disagree. Because we hold that Wood hasn't shown a substantial likelihood that § 1000.071(3) infringes her free-speech rights, we vacate the preliminary injunction and remand the case to the district court for proceedings consistent with this opinion.

## I

Katie Wood teaches algebra at a public high school in Florida. Wood was born a biological male but now identifies as a woman. After transitioning in 2020, Wood began using the honorific "Ms." and the gendered pronouns "she," "her," and "hers." Importantly for present purposes, she wrote "Ms. Wood" and "she/her" on her classroom whiteboard and syllabi, she identified herself as "Ms. Wood" in her communications with students, and she wore a pin that said "she/her." Then, in 2023, Florida enacted Fla. Stat. § 1000.071, which states, in pertinent part, that "[a]n employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." Fla. Stat. § 1000.071(3).

Wood sued, challenging § 1000.071(3)'s constitutionality. In particular, she sought to enjoin enforcement of the statute on the ground that it violated her First Amendment right to free speech. The district court granted her request for a preliminary injunction. In so doing, the court held that Wood had shown a substantial likelihood of success on the merits of her First Amendment challenge. As relevant here, the court grounded its holding on the premise that when Wood used the identifiers "Ms.," "she," "her," and "hers"

in interactions with students, she spoke not as a government employee but rather as a private citizen. *See Wood v. Fla. Dep't of Educ.*, 729 F. Supp. 3d 1255, 1279 (N.D. Fla. 2024). That was so, the court reasoned, because her preferred honorific and pronouns "owe[ their] existence not to her professional responsibilities as a math teacher, but instead to her identity as a woman—an identity that remains true to Ms. Wood both inside and outside the classroom." *Id.* Having concluded that Wood spoke as a citizen, the court went on to hold that her speech touched on a "matter of public concern" and that her interest in expressing herself outweighed the state's interest in promoting workplace efficiency. *Id.* at 1279–84.

      This appeal ensued.

## II

      "We review the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions de novo and any findings of fact for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020).[1] "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in

---

[1] Because our dissenting colleague emphasizes so strenuously the deference owed under the abuse-of-discretion standard, *see* Dissenting Op. at 2–6, 13, we think it worth underscoring that the subsidiary question on which this case turns—whether when Wood used her preferred honorifics and identifiers in classroom interactions with students she spoke as a private citizen or a government employee—is a legal issue subject to de novo review. *See Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007) (holding that the question whether a public employee "was speaking as a citizen on a matter of public concern" is a "question[] of law").

an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Id.* (citation and quotation marks omitted). "A district court may grant a preliminary injunction only if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Id.* at 1270–71 (footnote omitted). "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citation omitted).

### III

### A

We begin—and find that we can end—with the question whether Wood has shown a likelihood of success on the merits of her First Amendment challenge. As relevant here, the First Amendment (as incorporated through the Fourteenth) prohibits state legislatures from "mak[ing any] law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment's protections extend to public-school teachers and students, "neither of whom shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (citation and quotation marks omitted).

But a teacher's right to speak is not without limits. One reason is that "[i]n addition to being [a] private citizen[]," a teacher is "also [a] government employee[] paid in part to speak on the government's behalf and convey its intended messages." *Id.*

To resolve the private-citizen/government-employee tension, we employ a two-step framework grounded in the Supreme Court's decisions in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). At step one, the employee must show that in expressing herself she is (or was) speaking both (a) as a citizen—rather than in her capacity as a government employee—(b) about a matter of public—rather than private—concern. *See Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1160 (11th Cir. 2015). If the employee survives step one, she must then demonstrate, at step two, that her interest in speaking outweighs the state's interests in promoting the efficient delivery of public services. *See Pickering*, 391 U.S. at 568.

Wood's case, we conclude, founders on the first prong of step one: She cannot show, with respect to the expression at issue here, that she was speaking as a private citizen rather than a government employee.

Let us explain.

## B

### 1

Needless to say, before we can decide whether Wood spoke as a private citizen or a government employee, we must first

identify exactly what speech her suit covers. Wood's challenge is limited in two important respects. First, the statute at issue prohibits Wood only from "provid[ing] to a student" her preferred title and pronouns while she is "acting within the scope of [her] employment duties." Fla. Stat. § 1000.071(3), (6). And second, Wood's suit, by her own admission, challenges only the statute's application to her speech "in the classroom." *Wood*, 729 F. Supp. 3d at 1289.

Accordingly, we deal here with only a narrow swath of expression: Wood disputes the state's authority to prevent her from using her preferred honorific and pronouns—by verbally stating them, writing them on her whiteboard and syllabi, and wearing a "she/her" pin—when she (1) is interacting with students (2) in the classroom and (3) within the scope of her employment duties. So, for instance, we needn't—and don't—consider whether Wood has a First Amendment right to use gendered identifiers or don a "she/her" pin when conversing with colleagues in the faculty lounge, or, for that matter, even whether she has a right to do those things in her classroom after the students have departed for the day.[2]

_____

[2] Our dissenting colleague repeatedly—but erroneously—suggests otherwise. *See, e.g.*, Dissenting Op. at 11–12 ("[N]ot every word uttered by a teacher in the classroom is the speech of the government."); *id*. at 17 ("We should be wary of holding that everything that happens in a classroom constitutes government speech outside the ambit of the First Amendment.").

**2**

Having identified the speech at issue, we turn to the question whether Wood spoke as a private citizen or, instead, as a government employee. In *Garcetti*, the Supreme Court observed that "[t]he proper inquiry is a practical one." 547 U.S. at 424. Importantly, though, the Court emphasized that the "controlling factor" is whether the employee made her statements "pursuant to [her] official duties." *Garcetti*, 547 U.S. at 421; *accord, e.g.*, *Alves*, 804 F.3d at 1161.

Given the statute's relatively limited sweep and, even more so, the narrowness of Wood's challenge, this is, we think, a straightforward case. When a public-school teacher addresses her students within the four walls of a classroom—whether orally or in writing—she is unquestionably acting "pursuant to [her] official duties." Interacting with students during class time, quite literally, *is* a teacher's "official dut[y]." *Cf.* Fla. Stat. § 1012.01(2)(a) ("Classroom teachers are staff members assigned the professional activity of instructing students in courses in classroom situations . . . .").

To be sure, we haven't yet had occasion to delineate the scope of a public-school teacher's official duties for First Amendment purposes, but our sister circuits have. In *Mayer v. Monroe County Community School Corp.*, for instance, the Seventh Circuit held that the First Amendment "does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." 474 F.3d 477, 480 (7th

Cir. 2007). The court so held—there, regarding a teacher's statement opposing U.S. intervention in Iraq—"in part because [a] school system does not 'regulate' teachers' speech as much as it *hires* that speech." *Id.* at 479. The Seventh Circuit later reaffirmed its decision in *Mayer*, holding that "in-classroom instruction necessarily constitutes statements pursuant to the teacher's official duties" and, therefore, that "a teacher's in-classroom speech is not the speech of a 'citizen' for First Amendment purposes." *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) (alteration accepted) (quotation marks and citation omitted).

Reiterating *Mayer*'s conclusion that "the school system does not 'regulate' teachers' speech as much as it *hires* that speech," 474 F.3d at 479, the Sixth Circuit held in *Evans-Marshall v. Board of Education* that "if it is the school board that hires [a teacher's] speech," then the board "can surely regulate the content of what is or is not expressed, what is expressed in other words on its behalf." 624 F.3d 332, 340 (6th Cir. 2010) (citation and quotation marks omitted). "Only the school board," the court continued, "has ultimate responsibility for what goes on in the classroom, legitimately giving it a say over what teachers may (or may not) teach in the classroom." *Id.* So too, in *Johnson v. Poway Unified School District*, the Ninth Circuit, citing both *Mayer* and *Evans-Marshall*, held that "as a practical matter, we think it beyond possibility for fairminded dispute that the 'scope and content of [a math teacher's] job responsibilities' did not include speaking to his class"—there, by displaying banners indicating his views about God's role in American

history—"in his classroom during class hours."  658 F.3d 954, 965, 967 (9th Cir. 2011) (emphasis omitted).

Our own precedent, while more general, is consistent and sounds a similar theme.  In *Alves*, for example, we observed that when a public employee speaks "in the course of performing [her] job," she does so "'pursuant to [her] employment responsibilities'" within the meaning of the Supreme Court's decision in *Garcetti*. 804 F.3d at 1164 (quoting *Garcetti*, 547 U.S. at 422–24).  Applying that principle, we held that when five university employees filed a written grievance alleging mismanagement by their supervisor, they spoke pursuant to their official duties.  Although the grievance didn't "bear the hallmarks of daily activity," we reasoned, it was "drafted and submitted by [the employees] in the course of carrying out their daily activities."  *Id*. at 1165.

So too here.  When a public-school teacher speaks "in the course of performing [her] job"—*i.e.*, "speaking to [her] class in [her] classroom during class hours," *Johnson*, 658 F.3d at 967—she does so pursuant to her official duties and therefore speaks as a government employee, not a citizen.  The speech at issue here—in which Wood verbally provided her preferred honorific and pronouns, wrote them on her whiteboard and syllabi, and wore a "she/her" pin—fits that description precisely.

Seeking to avoid this conclusion, our dissenting colleague conflates a teacher's "official duties," *Garcetti*, 547 U.S. at 421, with "curricular" instruction—and contends, in particular, that while the state can validly regulate a teacher's in-class curricular speech,

it may not regulate her noncurricular speech. *See* Dissenting Op. at 13–15. To be sure, as the dissent correctly notes, the relevant caselaw—both our own and our sister circuits'—expressly permits government regulation of a teacher's curricular speech. *See id.* at 13–14. But the inverse—that the First Amendment *forbids* regulation of a teacher's in-class *noncurricular* speech—doesn't follow. And so far as we can tell, there's no binding (or even persuasive) precedent to suggest that it does. Indeed, the Ninth Circuit's decision in *Johnson*, to take just one example, seems to suggest precisely the opposite. As already explained, the court there held that a calculus teacher's in-class display of banners referring to God's role in history—which seemingly bore no connection to his math curriculum—constituted government speech, reasoning that "teachers do not cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction." 658 F.3d at 967–68.[3]

Nor do we find persuasive the argument—advanced by the district court, Wood, and our dissenting colleague—that the Supreme Court's recent decision in *Kennedy v. Bremerton School District*,

---

[3] The lone authority the dissent manages to muster for the proposition that the First Amendment forbids government regulation of a teacher's in-class noncurricular speech is Judge Luttig's solo concurring opinion in *Boring v. Buncombe County Board of Education*, in which he asserted, without citation, that in the "context of teacher in-class noncurricular speech, the teacher assuredly enjoys some First Amendment protection." 136 F.3d 364, 373 (4th Cir. 1998) (en banc) (Luttig, J., concurring). Judge Luttig was an exceptional jurist, but not even he could get away with asking adverbs to stand in for authority.

597 U.S. 507 (2022), counsels a contrary conclusion.  Indeed, *Kennedy* is so thoroughly distinguishable as to undermine both the district court's order and Wood's position on appeal.  To be sure, the Supreme Court held there that Joseph Kennedy, a high-school football coach, had spoken as a private citizen rather than a government employee when he prayed on the field after games.  *See id*. at 529–31.  And to be sure, the Court so ruled despite the fact that the school district had claimed that it fired Kennedy for "engaging in public and demonstrative religious conduct *while still on duty*."  *Id*. at 519 (emphasis added) (citation and quotation marks omitted).  Crucial to the Court's reasoning, though, was its determination that, despite the school district's say-so, Kennedy, in fact, was *not* "on duty" when he was praying.

Several considerations that the Supreme Court emphasized in *Kennedy* bear directly on this case—but point decisively in the opposite direction.  *First*, the Court observed there that when Kennedy "uttered the three prayers that resulted in his suspension, he was not engaged in speech 'ordinarily within the scope' of his duties as a coach."  *Id*. at 529 (citation omitted).  Here, by contrast, when Wood addressed her students in the classroom—whether orally or in writing—she was doing *precisely* what a teacher "ordinarily" does.

*Second*, the Supreme Court highlighted that when he prayed, Kennedy "was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach."  *Id*. at 529–30.  Here,

USCA11 Case: 24-11239    Document: 61-1    Date Filed: 07/02/2025    Page: 13 of 38

by contrast—again—when Wood addressed her students in the classroom, she was doing *precisely* what the state paid her to do as a teacher.

*Finally*, the Court said that the "timing and circumstances" of Kennedy's prayers confirmed that he offered them as a private citizen, rather than a government employee.  *Id*. at 530.  In particular, the Court emphasized that Kennedy said his prayers after the games had concluded, when (1) "coaches were free to attend briefly to personal matters—everything from checking sports scores on their phones to greeting friends and family in the stands," (2) other "school employees were free to speak with a friend, call for a reservation at a restaurant, check email, or attend to other personal matters," and (3) students were "otherwise occupied" and "engaged in other activities like singing the school fight song."  *Id*. at 513, 514, 530.  Bottom line:  When Kennedy was praying, his official duties as a football coach had ceased—he was off the clock, so to speak.  Here, by contrast—yet again—when Wood addressed her students in the classroom, she was very much on the clock, discharging the very obligation the state had hired her to discharge.  During that time, neither she nor her students were remotely at liberty to do whatever they wanted.

*  *  *

We reiterate that our decision is a narrow one.  We hold only that when Wood identified herself to students in the classroom using the honorific "Ms." and the pronouns "she," "her," and "hers," she did so in her capacity as a government employee, and not as a

14                    Opinion of the Court                    24-11239

private citizen. Accordingly, Wood's First Amendment claim fails the first prong of step one of the *Pickering-Garcetti* analysis. We needn't reach step one's second, "matter of public concern" prong, nor need we address step two's balancing test. And because Wood can't show a likelihood of success on her First Amendment claim, we needn't address any of the remaining preliminary-injunction factors. *See Johnson & Johnson*, 299 F.3d at 1247.

## IV

For the foregoing reasons, we hold that the district court misapplied the law, and thus abused its discretion, in preliminarily enjoining Fla. Stat. § 1000.071(3)'s enforcement against Wood. We therefore vacate the district court's order and remand the case for proceedings consistent with this opinion.

**VACATED** and **REMANDED**.

24-11239                    JORDAN, J., Dissenting                    1

JORDAN, Circuit Judge, Dissenting:

Justice Robert Jackson wrote during World War II that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). That venerable principle has stood the test of time. *See, e.g., 303 Creative LLC v. Elenis*, 600 U.S. 570, 585 (2023) (citing *Barnette* for the proposition that "the government may not interfere with an uninhibited marketplace of ideas") (internal quotation marks and citation omitted); *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys."); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("It is . . . a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say.") (internal quotation marks and citation omitted);

Florida, however, has recently come to believe that the First Amendment does not prevent it from dictating what can and cannot be said. Not surprisingly, its attempts at speech orthodoxy have so far not succeeded. *See, e.g., Honeyfund.com v. Gov. of Fla.*, 94 F.4th 1272, 1278–83 (11th Cir. 2024) (striking down, on First Amendment grounds, a Florida law which banned mandatory workplace trainings endorsing certain viewpoints).

In July of 2023, Florida enacted a statute declaring that it is "false to associate to a person a pronoun that does not correspond to such person's sex." Fla. Stat. § 1000.071(1). To enforce its view of what speech is correct and permissible, Florida prohibited public school teachers, employees, and contractors from providing to a student "his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to that person's sex." § 1000.071(3). A teacher who violates this prohibition faces "revocation or suspension" of his or her "educator's certificate" or "other penalties provided by law." Fla. Admin. Code § 6A-10.081(2) & 2(a)(14).

In my view, the district court did not abuse its discretion in concluding that Katie Wood, a high school math teacher, has shown a substantial likelihood of success on her claim that § 1000.071(3) violates her First Amendment rights by prohibiting her from using her preferred personal title and pronouns in the classroom. Specifically, Ms. Wood has substantially demonstrated that her use of her preferred personal title and pronouns constitutes private speech on a matter of public concern rather than government speech. With the utmost respect for my good friends in the majority, I dissent.

**I**

We review the district court's grant of a preliminary injunction for abuse of discretion. *See, e.g., Benisek v. Lamone*, 585 U.S. 155, 158 (2018); *Reeves v. Comm'r, Ala. Dep't of Corr.*, 23 F.4th 1308, 1320 (11th Cir. 2022). The abuse of discretion standard, as the Supreme

Court has recently reminded us, is "deferential." *United States v. Tsarnaev*, 595 U.S. 302, 323 (2022). *See McLane Co., Inc. v. EEOC*, 581 U.S. 72, 83 (2017) ("[A]buse-of-discretion review is employed . . . where a decisionmaker has 'a wide range of choice as to what he decides[ ]' . . . [and] where the trial judge's decision is given 'an unusual amount of insulation from appellate revision' for functional reasons.") (citations omitted).

The Supreme Court usually reviews a district court's ruling on the "substantial likelihood of success" prong of the preliminary injunction standard for abuse of discretion. And so do we. *See, e.g., Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (concluding that the district court's determination as to likelihood of success "was not an abuse of discretion"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 934 (1975) (finding no abuse of discretion in the district court's grant of a preliminary injunction, and explaining that "[t]his is the extent of our appellate inquiry, and we therefore 'intimate no view as to the ultimate merits of respondents' contentions'") (citation omitted); *LSSi Data Corp. v. Comcast Phone LLC*, 696 F.3d 1114, 1120 (11th Cir. 2012) ("The first question before us is whether the District Court abused its discretion in concluding that LSSi has shown 'a substantial likelihood of success on the merits' of its claim.") (internal citation omitted); *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("The district court did not abuse its discretion in determining that Bell-South had established a substantial likelihood of success."); *Cafe 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136, 1137 (11th Cir. 1993) ("Whether the district court's determination of [substantial

likelihood of success] is right or wrong, the record before us indicates no abuse of discretion."); *Di Giorgio v. Causey*, 488 F.2d 527, 528–29 (5th Cir. 1973) ("[On] appeal from a preliminary injunction this Court does not concern itself with the merits of the controversy . . . No attention is paid to the merits of the controversy beyond that necessary to determine the presence or absence of an abuse of discretion.") (citations omitted).

In response to these many cases, the majority says in a footnote that *de novo* review is appropriate because whether a government employee spoke as a citizen presents a question of law. But the former does not follow from the latter—the existence of a legal question in a preliminary injunction appeal does not do away with the abuse of discretion standard on likelihood of success. For example, we have held that whether a law prohibiting nudity violates the First Amendment "is a question of law subject to *de novo* review." *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty.*, 337 F.3d 1251, 1255 (11th Cir. 2003). Nevertheless, in *Cafe 207*, which involved a First Amendment challenge to an anti-nudity ordinance and made its way up to us on the plaintiff's appeal of the denial of a motion for a preliminary injunction, we did not apply plenary review to the district court's ruling on substantial likelihood of success. Instead, we reviewed the district court's determination on issue for abuse of discretion and emphasized that we were not deciding the merits:

> Whether the district court's determination of this point is right or wrong, the record before us indicates no abuse of discretion. Therefore, we will not disturb

> the decision of the district court.  We emphasize that
> "[t]his affirmance is based solely upon the breadth of
> the district court's discretion in this type of matter."
> As a result of the limited scope of our review, "[w]e
> express no opinion as to the likelihood that [Cafe 207]
> will or will not succeed on the merits."

989 F.2d at 1137 (citations omitted).  *Accord Doran*, 422 U.S. at 931–
32 (involving a First Amendment challenge to an ordinance prohib-
iting topless dancing: "But while the standard to be applied by the
district court in deciding whether a plaintiff is entitled to a prelimi-
nary injunction is stringent, the standard of appellate review is
simply whether the issuance of the injunction, in the light of the
applicable standard, constituted an abuse of discretion.").

As I've said before, *see Lebron v. Sec'y, Fla. Dep't of Child. &
Fams.*, 710 F.3d 1202, 1218 (11th Cir. 2013) (Jordan, J., concurring),
and as the Supreme Court has explained, deferential and "limited
[abuse of discretion] review normally is appropriate." *Thornburgh
v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 755 (1986).
I recognize that an appellate court has the authority to decide the
ultimate merits of a claim in an appeal of the grant or denial of a
preliminary injunction.  But that authority is typically exercised
where it is clear that the plaintiff cannot possibly succeed on her
claim: "Adjudication of the merits is most appropriate if the injunc-
tion rests on a question of law and *it is plain that the plaintiff cannot
prevail.*" *Munaf v. Geren*, 553 U.S. 674, 691 (2008) (emphasis added).
Here it is not plain, i.e., not clear, that Ms. Wood's First Amend-
ment claim will fail.

This is a case of first impression in the country; no other court, state or federal, has addressed whether a state can bar a public school teacher from using her preferred personal title and pronouns in the classroom. From my perspective, the district court did not commit a "clear error of judgment," *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc), in concluding that Ms. Wood's use of her preferred title and pronouns was the private speech of a citizen on a matter of public concern. *Cf. HM Florida-Orl, LLC v. Gov. of Fla.*, 2023 WL 6785071, at *4 (11th Cir. Oct. 11, 2023) ("When the governing law is divided or unclear, it is difficult to say that a district court committed a 'clear error of judgment' in choosing one line of authority over another.") (citation omitted).

## II

"It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Public school teachers like Ms. Wood therefore "do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Because "a citizen who works for the government is nonetheless a citizen," the First Amendment "limits the ability of [the government] to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Id.* at 419.

The "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of

public concern." *Lindke v. Freed*, 601 U.S. 187, 196–97 (2024) (internal quotation marks and citations omitted). The first step in evaluating the First Amendment claim here is figuring out whether Ms. Wood's use of her preferred personal title and pronouns in the classroom constitutes the private speech of a citizen on a matter of public concern. *See Garcetti*, 547 U.S. at 418 ("The first [inquiry] requires determining whether the employee spoke as a citizen on a matter of public concern.").

## A

The initial question is whether the speech in question "owes its existence to [Ms. Wood's] professional responsibilities." *Garcetti*, 547 U.S. at 421. For a number of reasons, it does not.

1. The statute at issue here, § 1000.071(3), does not target titles conferred by a school or pronouns bestowed by the government. It prohibits (emphasis mine) the use of "preferred *personal* title or pronouns if such preferred personal title or pronouns do not correspond to that person's sex." That distinction is important, for we have held that

> the exception to First Amendment protection in *Garcetti* for 'speech that owes its existence to a public employee's professional responsibilities,' *must be read narrowly* to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment.

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1162
(11th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 421–22) (emphasis
added).

   The preferred personal title and pronouns of a teacher are,
like her name, significant markers of *individual* identity. They exist
outside of, and do not depend on, the school or the government for
their existence. Stated differently, Ms. Wood would still have her
own preferred personal title and pronouns, and would still use
them to identify herself to others, even if she was not a public
school teacher.

   The personal title that Ms. Wood prefers and uses is espe-
cially linked to her individual identity because it is part of her
name; she will be referred to by her title and last name by her stu-
dents every day. In today's parlance, students refer to their teachers
as "Mr. / Ms. / Mrs. / Miss" followed by the teachers' last names, and
Florida has essentially mandated that Ms. Wood go by a different
name before her students than when she clocks out for the day. *Cf.
Hakim v. Hicks*, 223 F.3d 1244, 1246 (11th Cir. 2000) (concluding that
the government's refusal to recognize a condemned prisoner's le-
gally changed religious name within the prison violated his consti-
tutional right to the free exercise of religion under the First and
Fourteenth Amendments).

   The district court explained that Ms. Wood's preferred per-
sonal title and pronouns are "unique[ ] . . . to her" and "identify her
as a woman." *Wood v. Fla. Dep't of Educ.*, 729 F. Supp. 3d 1255, 1276
(N.D. Fla. 2024). I agree. As one commentator has put it:

> [T]he pronouns that educators use for themselves implicate a strong "private citizen" component. After all, teachers use these pronouns at all times, not just when they are at school. Such pronouns should be seen as a personal choice, akin to what the teachers choose to wear and other decisions they make about their self-presentation

Emily Gold Waldman, *From* Garcetti *to* Kennedy: *Teachers, Coaches, and Free Speech in Public Schools*, 11 Belmont L. Rev. 239, 263 (2024) (emphasis omitted). *Cf.* Omi Morgenstern Leissner, *The Name of the Maiden*, 12 Wisc. Women's L. J. 253, 262 (1997) ("[O]ne's own name is one of the most personal belongings of any individual[.]"); Esther Suarez, *A Woman's Freedom to Choose Her Surname: Is It Really a Matter of Choice?*, 18 Women's Rts. L. Rep. 233, 233 (1997) ("Our names are symbols that define our identities.").

2. The majority concludes that Ms. Wood's use of her preferred personal title and pronouns in the classroom constitutes government speech, i.e., the speech of Florida as a state. I think the majority is mistaken.

"[R]egulated speech is typically private speech, not government speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 178 (2015) (Breyer, J., concurring in the judgment). To determine whether an utterance is private speech or government speech, "we conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022) (citation omitted). That "review is not mechanical; it is driven by a case's context rather than

the rote application of rigid factors." *Id.*  We look to "several types of evidence to guide the analysis, including: the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.*

In *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), the Supreme Court held that a public school football coach's decision to pray on the field after a game ended constituted private speech protected by the First Amendment.  What the Court said about the football coach's prayer can easily be substituted with Ms. Wood's use of her preferred personal title and pronouns in the classroom:

> [Ms. Wood] has demonstrated that h[er] speech was private speech, not government speech.  When [Ms. Wood] uttered [her preferred personal title and pronouns], . . . [s]he was not engaged in speech "ordinarily within the scope" of h[er] duties as a [teacher].  [S]he did not speak pursuant to government policy.  [S]he was not seeking to convey a government-created message.  [S]he was not instructing [students], discussing [the curriculum], encouraging better [classroom] performance, or engaged in any other speech the [school] paid h[er] to produce as a [teacher].  Simply put: [Ms. Wood's use of her title and pronouns] did not "ow[e its] existence" to [Ms. Wood's] responsibilities as a public employee.

*Id.* at 529–30 (2022) (internal citations omitted).

The majority tries to distinguish *Kennedy* on its facts, but it cannot avoid its logic.  At most, Ms. Wood's use of her preferred title and pronouns is "speech that concerns the ordinary responsibilities of her employment," and that metric—as we have expressly held—is insufficient to take the speech completely out of the First Amendment's scope.  *See Alves*, 804 F.3d at 1162.[1]

Even if *Kennedy* is insufficient on its own terms to foreclose application of the government speech doctrine, a teacher's preferred personal title and pronouns simply do not bear any of the characteristics of government speech.  Personal titles and pronouns have not traditionally been used to convey a government message; there is no evidence that the public associates them with the government; and they are not manufactured, owned, or designed by the government. *See Shurtleff*, 596 U.S. at 252–53; *Matal v. Tam*, 582 U.S. 218, 238 (2017) (majority opinion).

3. According to the majority, the use by public school teachers of their preferred personal titles and pronouns in the classroom is government speech because they are used during class time and because schools pay teachers to speak in class.  But not every word uttered by a teacher in the classroom is the speech of the

---

[1] "When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992).  But here there is no claim here that preferred personal titles and pronouns are a category of unprotected speech.

government.  *See Wood*, 729 F. Supp. 3d at 1276 ("*Kennedy* rejects the notion that anything a teacher says at school is automatically government speech.").  Indeed, in *Kennedy* the Supreme Court warned against "commit[ting] the error of positing an excessively broad job description by treating everything teachers and coaches say in the workplace as government speech subject to government control." 597 U.S. at 530–31 (internal quotation marks and citation omitted). *See also Garcetti*, 547 U.S. at 420 ("Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like any member of the general public to hold that all speech within the office is automatically exposed to restriction.") (internal quotation marks and citation omitted).

The majority relies in part on *Johnson v. Poway Unified School District*, 658 F.3d 954, 961 (9th Cir. 2011), where the Ninth Circuit held that a teacher's decision to display banners in his classroom emphasizing God was made in his role as a teacher and not as a private citizen.  The Ninth Circuit concluded in *Johnson* that these banners were government speech because "teachers *necessarily* act as teachers . . . when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official."  *Id.* at 954 (emphasis in original).  The Supreme Court, however, explicitly rejected this rationale in *Kennedy* a decade later. The Ninth Circuit's broad application of the government speech doctrine in *Johnson* turned on the teacher's presence in the classroom or at school, but the Supreme Court recognized that this focus would impermissibly allow a school to "fire a Muslim teacher

24-11239              JORDAN, J., Dissenting              13

for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." *Kennedy*, 597 U.S. at 531.

Given that *Kennedy* tells us that neither of those scenarios involve government speech, I don't see how Florida can discipline a teacher for using her preferred personal title and pronouns in the classroom. And I certainly don't see how the district court abused its discretion in choosing *Kennedy*—a 2022 decision of the Supreme Court—over *Johnson*—a 2011 decision of the Ninth Circuit.

4. We have said that the government has "some authority over the conduct of teachers in and out of the classroom that *significantly bears on the curriculum*." *Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991) (emphasis added). In reviewing the First Amendment claims of public school teachers, some of our sister circuits have similarly focused on whether the speech in question was "curricular" in nature. *See Evans-Marshall v. Bd. of Educ. of Tipp City*, 624 F.3d 332, 334 (6th Cir. 2010) ("[T]he First Amendment does not extend to the in-class curricular speech of teachers in primary and secondary schools[.]"); *Grossman v. S. Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1100 (7th Cir. 2007) ("The First Amendment is not a teacher license for uncontrolled expression at variance with established curricular content.") (internal citation and quotation marks omitted). *Cf. Griswold v. Driscoll*, 616 F.3d 53, 59 (1st Cir. 2010) ("Here there is no denying that the State Board of Education may properly exercise curricular discretion, and the only question on the motion to dismiss is whether the pleadings allow for any doubt

about the status of the [Curriculum] Guide as an element of cur-
riculum.").[2]

There is an "elementary difference between teacher in-class
speech which is curricular, and teacher in-class speech which is non-
curricular . . . In the latter context of teacher in-class noncurricular
speech, the teacher assuredly enjoys some First Amendment pro-
tection. In the former context of teacher in-class curricular speech,
the teacher equally assuredly does not." *Boring v. Buncome Cnty. Bd.
of Educ.*, 136 F.3d 364, 373 (4th Cir. 1998) (en banc) (Luttig, J., con-
curring).

To the extent that Florida tries to shoehorn the use of pre-
ferred personal titles and pronouns into the curricular bucket, that
attempt fails. The Supreme Court has generally defined a school's
curriculum as activities or matters that are "supervised by faculty
members and designed to impart particular knowledge or skills to
student participants and audiences." *Hazelwood Sch. Dist. v.
Kuhlmeier*, 484 U.S. 260, 271 (1988). A teacher's preferred personal
title and pronouns simply do not fit into this understanding. *See*
Waldman, *Teachers, Coaches, and Free Speech in Public Schools*, 11 Bel-
mont L. Rev. at 263 ("The fact that students will become aware of
their educators' pronouns does not transform these pronouns into

---

[2] The Fourth Circuit also considers whether the speech was curricular, but
primarily with respect to the "matter of public concern" prong of the *Garcetti*
inquiry. *See Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 697 (4th Cir. 2007).

employee speech any more than students' awareness of a
teacher['s] prayers transforms the prayers into employee speech.").

Each of the other teacher/First Amendment cases cited by
the majority involved a prototypical curricular dispute. In *Mayer v.
Monroe County Community School Corp.*, 474 F.3d 477, 480 (7th Cir.
2007), the Seventh Circuit held that a teacher's remarks in the class-
room against U.S. intervention in Iraq fell within the teacher's offi-
cial duties. In *Evans-Marshall*, 624 F.3d at 332, the Sixth Circuit ruled
that curricular choices, such as choosing reading assignments, are
not constitutionally protected. In *Johnson*, 658 F.3d at 961, the
Ninth Circuit determined that a teacher's decision to display ban-
ners in his classroom emphasizing God was not private speech. In
*Brown v. Chicago Board of Education*, 824 F.3d 713, 716 (7th Cir. 2016),
the Seventh Circuit concluded that a teacher's use of a racial slur
during a classroom discussion was not protected by the First
Amendment.

There is "no substitute for a case-by-case inquiry into
whether the legitimate interests of the authorities are demonstra-
bly sufficient to circumscribe a teacher's speech." *Bishop*, 926 F.2d
at 1074 (internal quotation marks and citation omitted). The ma-
jority's embrace of the government speech doctrine, which fails to
consider the particular circumstances at issue here, is insufficiently
nuanced.

5. Although the government speech doctrine is "important"
and "essential," it cannot be applied too broadly because it is "sus-
ceptible to dangerous misuse." *Matal*, 582 U.S. at 235. Why?

Because "if private speech could be passed off as government speech by simply affixing a government seal of approval, [the] government could silence or muffle the expression of disfavored participants." *Id.*[3]

That danger exists here in spades.  Through § 1000.071(3), Florida has used "speech acts to instate a sexual binary that privileges the expressive rights of its adherents over those whose identity calls that binary into question." Susan Etta Keller, *Doing Things with the Language of Law and Gender: Using Speech Act Theory to Understand the Meaning and Effect of the Gender Identity Backlash*, 24 Nev. L. J. 413, 471 (2024).  The statute is not only a content-based restriction, but a viewpoint-based prohibition that is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).  "By limiting . . . restrictions to a list of ideas designated as offensive, the [statute] targets speech based on its content.  And by targeting only speech that endorses any of those ideas, it penalizes certain viewpoints—the greatest First Amendment sin." *Honeyfund.com*, 94 F.4th at 1277.

The majority's expansive application of the government speech doctrine essentially leaves the First Amendment on the wrong side of the schoolhouse gate.  As this case demonstrates,

---

[3] The Supreme Court said in *Matal* that *Walker v. Tex. Dev., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)—which held that messages on Texas specialty license plates are government speech—"likely marks the outer bounds of the government-speech doctrine." *Matal*, 582 U.S. at 238.  The majority's application of the doctrine here goes well beyond *Walker*.

"the government speech doctrine [is being] used as a subterfuge for favoring certain private speakers over others based on viewpoint." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 473 (2009). Yet "[c]ompelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command [from *Barnette*], and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed. of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). *See also Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 740 (Va. 2023) ("Compelling an educator's 'speech or silence' on such a divisive issue [i.e., preferred pronouns] would cast 'a pall of orthodoxy over the classroom' on a topic that has 'produced a passionate political and social debate.' Whether at the highest or lowest level, the government has no inherent power to declare by ipse dixit that controversial ideas are now uncontroversial.") (internal citation omitted).

We should be wary of holding that everything that happens in a classroom constitutes government speech outside the ambit of the First Amendment. Those who wield the power of the government today and are on one side of the gender and culture wars will be the ones at risk of being compelled to speak against their beliefs, or silenced, when their opponents are in charge. Today's opinion will then not look as attractive.

## B

The second part of the initial *Garcetti* inquiry is whether Ms. Wood's use of her preferred title and pronouns constituted speech on a matter of public concern. "Speech involves matters of public

concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotation marks and citation omitted). The district court did not abuse its discretion in concluding that Ms. Wood has substantially shown that her use of her preferred personal title and pronouns constitutes private speech on a matter of public concern.

The Supreme Court has identified "gender identity" as a "sensitive political topic[ ]" which is "undoubtedly [a] matter[ ] of profound value and concern to the public." *Janus*, 585 U.S. at 913 (internal quotation marks and citations omitted). And given its political significance, the topic "occupies the highest rung of the hierarchy of First Amendment values." *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). As the Virginia Supreme Court has put it, the "ideological nature of gender-identity-based pronouns involves a palpable 'struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes.'" *Vlaming*, 895 S.E.2d at 740 (internal citation omitted).

In a case in which a professor challenged (on First Amendment free exercise grounds) a university policy requiring that students be referred to by their preferred titles and pronouns, the Sixth Circuit concluded that "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern."

24-11239             Jordan, J., Dissenting                    19

*Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). It explained that "[n]ever before have titles and pronouns been scrutinized as closely as they are today for their power to validate—or invalidate—someone's perceived sex or gender identity." *Id.* at 509. *See also Green v. Miss United States of Am., LLC*, 52 F.4th 773, 784 n.12 (9th Cir. 2022) (agreeing with *Meriwether* about the public "controversies regarding transgenderism").

        The Sixth Circuit's conclusion on this point seems correct to me. First, for years our country has been engaged in a serious (and sometimes divisive) public debate about the use of names, titles, and pronouns in the transgender space. The numerous legal proclamations and articles on the topic confirm this reality. *See, e.g.,* Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025); Kimberly Wehle, *He, She, They: The Pronoun Debate Will Likely Land at the Supreme Court*, Politico (Oct. 1, 2023), https://perma.cc/M95B-TEX6; Brooke Migdon, *Trump Signs Executive Order Recognizing Only 2 Sexes*, The Hill (Jan. 20, 2025), https://perma.cc/8AJL-RA57; Karoun Demirjian, *Federal Workers Ordered to Remove Gender Identity from Email Signatures*, N.Y. Times (Jan. 31, 2025), https://perma.cc/7WU8-3QP9. Second, if Florida did not think this debate was a significant public matter it would not have enacted § 1000.071(3). *See Meriwether*, 992 F.3d at 509 ("And even the university appears to think this pronoun debate is a hot issue. Otherwise, why would it forbid Meriwether from explaining his 'personal and religious beliefs about gender identity' in his syllabus?").

In the district court, moreover, Florida agreed that "the use of preferred pronouns and titles has produced a passionate political and social debate." *Wood*, 729 F. Supp. 3d at 1280 (quoting D.E. 60 at 9) (internal quotation marks and citation omitted). That acknowledgement confirms that Ms. Wood's speech is on a matter of public concern.

## C

Given its conclusion that Ms. Wood's use of her preferred personal title and pronouns in the classroom constitutes government speech, the majority does not "balance . . . the interests of the teacher, as a citizen . . . and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 569 (1968). I submit that the district court did not abuse its discretion in concluding that First Amendment balancing favors Ms. Wood rather than Florida.

For starters, Florida "cite[s] no case that supports the proposition that the [s]tate's interest in furthering its own viewpoint, standing alone, is an adequate justification for restricting *private* speech on a matter of public concern. Nor has [independent] research yielded any decision that approves of [this] novel theory." *Wood*, 729 F. Supp. 3d at 1280.

In conclusory fashion, Florida claims an interest in "prevent[ing] confusion among students over the meaning and usage of pronouns that can disrupt classrooms and the teaching of core subjects." Br. of Appellee at 46. But Ms. Wood is a high school

math teacher, and the Supreme Court "has long recognized . . . that 'secondary school students are mature enough . . . to understand that a school does not endorse . . . speech that it merely permits on a nondiscriminatory basis.'" *Kennedy*, 597 U.S. at 538 (quoting *Bd. of Educ. of Westside Cmty. Schs. v. Mergens ex rel. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion)). Like the district court, I seriously doubt that Ms. Wood's students (who are generally 14 to 18 years old) would view her preferred personal title and pronouns as Florida's endorsement of her being transgender. *See Wood*, 729 F. Supp. 3d at 1279. *See also Mergens*, 496 U.S. at 250 ("The proposition that schools do not endorse everything they fail to censor is not complicated."); *Honeyfund.com,* 94 F.4th at 1281 ("A government's desire to protect the ears of its residents is not enough to overcome the freedom of expression.") (internal quotation marks and citation omitted).

Florida also cites an interest in "advanc[ing] the State's educational policies set forth in the statute's text" viewing sex as an immutable trait. *See* Br. of Appellee at 46. This circular argument, however, proves nothing. Just because Florida calls something curricular does not make it so. *Cf. Honeyfund.com*, 94 F.4th at 1279 (rejecting Florida's attempt to characterize a viewpoint-based restriction on speech as a restriction on conduct: "[Florida] says that even if speech defines the contours of the prohibition, so long as the resulting burden is on the conduct, that conduct is all the state is regulating. That, in turn, means the law does not regulate speech. Remarkable.").

22                          JORDAN, J., Dissenting                          24-11239

The statute at issue here, § 1000.071(3), has nothing to do with curriculum and everything to do with Florida attempting to silence those with whom it disagrees on the matter of transgender identity and status.  Florida cannot justify its viewpoint discrimination by relying on the very reason that such discrimination is constitutionally suspect—that it gets to decide what speech is permissible (the speech it likes) and what speech is prohibited (the speech it disagrees with).  *See Honeyfund.com*, 94 F.4th at 1280 ("Whether Florida is correct that the ideas it targets are odious is irrelevant— the government cannot favor some viewpoints over others without inviting First Amendment scrutiny."); Zechariah Chafee, Jr., *Freedom of Speech 366* (Legal Classics Library ed. 1990) [1920] ("[I]f freedom of speech means anything, it means a willingness to stand by and let people say things with which we disagree, and which do weary us considerably.").[4]

---

[4] Lest anyone think that the dangers posed by Florida's prohibition of preferred titles and pronouns in the classroom are overstated, in the not-too-distant past similar tactics were used as a tool of racial discrimination.  For example, when Constance Baker Motley—later the first Black woman to serve as a federal district judge—was litigating desegregation cases in Mississippi and Alabama, the attorneys for the defendants (and on occasion the judges) sometimes refused to call her "Mrs. Motley," and instead referred to her as "she" or "her" or "the New York Counsel."  Tomiko Brown-Nagin, *Civil Rights Queen: Constance Baker Motley and the Struggle for Equality*, 72, 147, 149 (2022).  On one of these occasions, she told the attorney for the defendants: "If you can't address me as 'Mrs. Motley,' don't address me at all."  Tomiko Brown-Nagin, *Constance Baker Motley Taught the Nation How to Win Justice*, Smithsonian Mag. (Mar. 2022), https://perma.cc/95XA-42N9.

24-11239              JORDAN, J., Dissenting                    23

## III

If the majority opinion is right, and I do not think that it is, Florida can require that married female teachers use the last name of their husbands in the classroom even if they have chosen to keep their maiden names (because it declares as a matter of state policy that it does not like female teachers to appear to students to be independent of their husbands); it can demand that unmarried female teachers use "Mrs." instead of "Ms." in the classroom (because it declares as a matter of state policy that it wants students to think that their female teachers are all married or should aspire to be married); and it can require all teachers to call themselves "Teacher Smith" in the classroom instead of using their actual last names (because it declares as a matter of state policy that any pedagogic individuality is bad). If these possibilities sound "First Amendment crazy," it is because they are.

"In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Tinker*, 393 U.S. at 511. And, as the Supreme Court observed in *Barnette*, "[t]hose who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard. It seems trite but necessary to say that the First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings." 319 U.S. at 641. *Cf.* George Orwell, 1984 at p. 46 (New American Library ed. 1961) [(1949) ("Don't you see that the whole aim of Newspeak is to narrow the range of thought? In the end we

24                         JORDAN, J., Dissenting                    24-11239

shall make thoughtcrime literally impossible, because there will be
no words in which to express it.").

The First Amendment I know, despite its many different
(and sometime dizzying) doctrinal lines, would at least require
some judicial scrutiny, some balancing of interests, before Florida
is allowed to discriminate on the basis of viewpoint. By mistakenly
characterizing a teacher's use of her preferred title and pronouns in
the classroom as government speech, the majority has foreclosed
any meaningful First Amendment review of § 1000.071(3). That is
unfortunate, and I respectfully dissent.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 02, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  24-11239-AA
Case Style:  Katie Wood v. Florida Department of Education, et al
District Court Docket No:  4:23-cv-00526-MW-MAF

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing must include a Certificate of Interested Persons**. See 11th Cir. R. 40-3.

Costs
Costs are taxed against Appellee(s) / Respondent(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion