IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KATIE WOOD, et al.,

    *Plaintiffs*,

v.                              Case No.: 4:23cv526-MW/MAF

FLORIDA DEPARTMENT OF
EDUCATION, et al.,

    *Defendants*.

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This Court has considered, without hearing, Plaintiffs' combined motion for summary judgment and response in opposition to State Defendants' motion for summary judgment, ECF No. 158, State Defendants' motion for summary judgment, ECF No. 147, Defendant Hillsborough County School Board's ("HCSB") motion for summary judgment, ECF No. 150, Defendant Lee County School Board's ("LCSB") motion for summary judgment, ECF No. 154, and the parties' respective responses and replies. For the reasons stated below, Plaintiffs' motion is due to be granted in part and denied in part and Defendants' motions are due to be granted in part and denied in part.

I

Plaintiffs Katie Wood and Jane Doe are teachers at public schools in Florida. ECF No. 158-1 at 4; ECF No. 148-1 at 15. Ms. Wood has been employed by the

Hillsborough County School Board since the 2021-2022 school year. ECF No. 156-6 ¶ 2. She teaches second-half Algebra I to students who need additional support at Lennard High School. *Id.* She is also the club sponsor for the school's Gender and Sexuality Alliance and coached basketball from 2021-2022. *Id.* ¶¶ 3, 6. Ms. Doe has been employed by the Lee County School Board since the 2018-2019 school year, where she has taught elementary, middle, and high school. ECF No. 156-9 ¶ 5. She is the advisor to Prism, a student group, chaperones field trips, and works on student theater productions. *Id.* ¶ 7.

Ms. Wood and Ms. Doe are both transgender women who socially transitioned in 2020 and 2021, respectively. ECF No. 148-1 at 15. As part of their social transitions, each ceased using male pronouns and began using female pronouns. ECF No. 156-24 at 52:22-56:10; ECF No. 156-8 at 83:13-85:13.

During the 2021-2022 and 2022-2023 school years, Ms. Wood used her pronouns within the school walls as she did outside them. *See* ECF No. 156-6 ¶ 3. She wrote "Ms. Wood," "Miss Wood," and "she/her" on her classroom's whiteboard and syllabi and wore a pin with she/her pronouns on her lanyard. *Id.* ¶ 4. She shared her title and pronouns with her students and corrected students who used the incorrect title and pronouns. *Id.* ¶ 5. Ms. Doe similarly uses her pronouns "at all times" at school, just as in the rest of her life. ECF No. 156-9 ¶ 7. She uses her title and pronouns when she introduces herself to students and includes her title on her

syllabus and on the door of her classroom. *Id.* ¶ 8. She corrects those who use the incorrect title. *Id.* Ms. Wood testified that her female pronouns "are my identity." *See* ECF No. 156-24 at 105:15-18. Similarly, Ms. Doe testified that male pronouns did not correspond to her "true identity." *See* ECF No. 156-8 at 85:6-13.

In 2023, the state of Florida adopted section 1000.071, Florida Statutes (2023), which proclaims that "[i]t shall be the policy of every public K-12 educational institution . . . that a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's sex." § 1000.071(1), Fla. Stat. In furtherance of that policy, "[a]n employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex." *See* § 1000.071(3), Fla. Stat. Violating the statute is grounds for a disciplinary violation, *see* Fla. Admin. Code R. 6A-10.081(2)(a)14. (Aug. 22, 2023), which can in turn lead to suspension or revocation of a teaching certificate, *see* § 1012.795(1)(j), Fla. Stat. (2023), or termination by school boards, *see* § 1012.33(1)(a), Fla. Stat. (2023).

To comply with subsection 3, Ms. Wood erased her pronouns and title from her whiteboard and removed her pronoun pin from her lanyard. ECF No. 156-6 ¶ 12. She began using the title "Teacher" instead of "Ms." with her students. *Id.* ¶ 13. Unlike Ms. Wood, Ms. Doe has not complied with subsection 3 and continues to use

her title and pronouns, despite the "fear that I will lose my job for being myself." ECF No. 156-9 ¶ 10.

Ms. Wood and Ms. Doe sued, challenging section 3 under Title VII, Title IX, the First Amendment, and the Fourteenth Amendment. ECF No. 1. Shortly thereafter, Ms. Wood filed a motion for preliminary injunction, arguing that she was entitled to relief based on her substantive Title VII and First Amendment claims.[1] *See* ECF No. 11. Following a hearing, this Court found Ms. Wood was entitled to a preliminary injunction on her First Amendment claim. *See* ECF No. 82. Specifically, this Court held that when Ms. Wood introduced herself to her class, she spoke as a private citizen and not a government employee, spoke on a matter of public concern, and that her interest in expressing her identity outweighed the state's stated interests. The State Defendants pursued an interlocutory appeal. *See* ECF No. 84. During the pendency of that appeal, Plaintiffs, State Defendants, HCSB, and LCSB filed the present motions for summary judgment. *See* ECF Nos. 148, 150, 154, 158.

Then, last month, the Eleventh Circuit ruled on the State Defendants' appeal. It held, as a matter of first impression, that Ms. Wood was speaking in her capacity as a government employee and not as a private citizen when identifying herself to

---

[1] Plaintiff AV Schwandes was an original party to this case and also moved for a preliminary injunction. *See* ECF No. 45. That motion was denied, *see* ECF No. 82, and the parties subsequently filed a stipulation of dismissal without prejudice as to Mx. Schwandes's claims. *See* ECF No. 134.

her students, vacated this Court's Order, and remanded the case. *See Wood v. Fla. Dep't of Educ.*, 142 F. 4th 1286 (11th Cir. 2025). With the benefit of that ruling, this Court evaluates the parties' summary judgment motions.

## II

Summary judgment is appropriately granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Even when the parties agree on the basic facts, summary judgment is inappropriate if reasonable minds might differ on the inferences to be drawn from those facts." *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986). As it must, this Court accepts the evidence and inferences drawn therefrom in the light most favorable to the nonmoving party and does not weigh conflicting evidence to resolve disputed factual issues. *Id.* The standards governing cross-motions for summary judgment are the same, although this Court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1404 (S.D. Fla. 2014) (citations omitted). Where material facts are not in dispute, this Court may "resolve purely legal questions" at this stage. *Rodriguez v.*

*Procter & Gamble Co.*, 465 F. Supp. 3d 1301, 1314 (S.D. Fla. 2020) (citation omitted).

A

This Court begins with Title VII. Plaintiffs, State Defendants, HCSB[2], and LCSB[3] move for summary judgment as to Plaintiffs' respective Title VII sex discrimination claims. Plaintiffs and each Defendant argue they are entitled to summary judgment on Plaintiffs' claims that Defendants violated Title VII by enforcing subsection 3 against Plaintiffs. *See* ECF No. 158-1 at 6–15. Alternatively, the parties seek summary judgment on Ms. Wood's claim that Defendants subjected her to a hostile work environment in violation of Title VII. *Id.* at 15–22. Finally, Plaintiffs and State Defendants move for summary judgment on Plaintiffs' Title VII preemption claim. *Id.* at 42–43. This Court addresses each issue in turn.

1

Plaintiffs claim Defendants violated Title VII by enforcing subsection 3 against them. *See* ECF No. 158-1 at 6–15. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

---

[2] HCSB joins in the arguments raised by the State Defendants. ECF No. 150 at 5.

[3] LCSB joins in the arguments raised by the State Defendants. ECF No. 154 at 6–7.

of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Plaintiffs' and Defendants' cross-motions dispute two issues at summary judgment. First, the parties disagree as to whether subsection 3 discriminates based on sex. *See* ECF No. 148-1 at 9–21; ECF No. 158-1 at 6–15. Second, if it does, the parties also disagree as to whether that discrimination respects Plaintiffs' "terms, conditions, or privileges of employment." *See* ECF No. 148-1 at 9–21; ECF No. 158-1 at 6–15.

a

Plaintiffs claim subsection 3 discriminates "because of . . . sex," in violation of Title VII, and Defendants disagree. *See* ECF No. 148-1 at 9–21; ECF No. 158-1 at 6–15. The parties do not dispute any material fact and instead offer competing legal argument, "[t]hus, it is appropriate for the Court to resolve the purely legal questions presented by these actions at the summary judgment stage." *Statewide Detective Agency, Inc. v. Miller*, 1998 WL 1785456, at *1 (N.D. Ga. Aug. 12, 1998).

Plaintiffs argue subsection 3 is squarely controlled by the "straightforward rule" for identifying Title VII violations laid out by the Supreme Court in *Bostock v. Clayton County*. ECF No. 158-1 at 7 (citing *Bostock v. Clayton County*, 590 U.S. 644, 659 (2020)). When reviewing an employer's action, "if changing the employee's sex would have yielded a different choice by the employer—a statutory

violation has occurred." *Bostock*, 590 U.S. at 659–60. So, if an employer fires a transgender employee but retains an "otherwise identical" cisgender employee, "the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. According to Plaintiffs, subsection 3 violates Title VII under *Bostock*'s test because "whether an employee is permitted to use a particular title or pronoun depends entirely, and expressly, on that employee's sex as defined by the statute." ECF No. 158-1 at 7.

Defendants do not dispute that *Bostock*'s test is good law but disagree that it applies here. According to Defendants, *Bostock* held "only that discriminating against a transgender person because of that person's transgender *status* violates Title VII," and "declined to extend its decision to regulating *conduct* that may affect transgender individuals." ECF No. 148-1 at 19 (emphasis in original). Defendants' position is that Plaintiffs' use of pronouns and titles is "mutable conduct that *Bostock* left untouched." *Id.* at 25.

This argument seeks to align this case with pre-*Bostock* Eleventh Circuit precedent holding employers' grooming policies did not run afoul of Title VII because they discriminated based on mutable, not immutable, conduct. *See* ECF No. 148-1 at 22. The distinction was first explained in *Willingham v. Macon Telegraph*, which held that an employer forbidding long hair in men was not actionable under

8

Title VII because "[h]air length is not immutable" and a grooming code "is related more closely to the employer's choice of how to run his business than to equality of employment opportunity." 507 F.2d 1084, 1091 (5th Cir. 1975).[4] This was reaffirmed in *Harper v. Blockbuster Entertainment Corp.*, which evaluated a similar hair length policy. 139 F.3d 1385 (11th Cir. 1998). *Harper* also explained that a but-for test, like the one propounded later in *Bostock*, was inapplicable to grooming policies because such policies discriminated "between members of the same sex based on the neutral characteristic of hair length," unlike discrimination "aimed at a single immutable characteristic," like sex. *Id.* at 1389. Finally, in *Equal Employment Opportunity Commission v. Catastrophe Management Solutions*, the Eleventh Circuit found an employer's ban on dreadlocks was also not actionable under Title VII. 852 F.3d 1018, 1021–22 (11th Cir. 2016). The court recognized that *Willingham*'s "immutable/mutable" distinction "can sometimes be a fine (and difficult) one." *Id.* at 1030. Applying it nonetheless, it found "discrimination on the basis of black hair texture (an immutable characteristic) is prohibited by Title VII, while adverse action on the basis of black hairstyle (a mutable choice) is not." *Id.*

As Defendants would have it, *Bostock* is a "narrow" ruling that "nowhere . . . purport[s] to eliminate all sex-based distinctions in employment." ECF No. 148-1 at

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

21. According to Defendants, *Bostock*'s refusal to address "sex-segregated bathrooms, locker rooms, and dress codes" is a "flat refusal to extend to the decision . . . to conduct," and "[t]o side with Plaintiffs, then, this Court would have to treat the Supreme Court's explicit refusal as an implicit rejection of circuit precedent" affirming grooming policies. *Id.* at 24–25 (citing *Bostock*, 590 U.S. at 681).

Not so. The Supreme Court refrained in *Bostock* from addressing bathrooms, locker rooms, and dress codes because "none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today." *See* 590 U.S. at 681. This Court is not compelled by Defendants' strained characterization of this exercise of judicial modesty. *See A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) (*Bostock* Court "was simply focusing on '[t]he only question before [it],' which did not involve gender-affirming bathroom access") (citation omitted).

So, this Court must decide whether subsection 3, which proscribes certain pronoun and title use, falls within the domain of *Bostock*, or if it should be properly analyzed under the Eleventh Circuit's still-intact grooming policy framework. It finds the former.

Contrary to Defendants' position, *Bostock*'s use of the word "status" does not implicitly create a legal status/conduct dichotomy. Sure, the *Bostock* plaintiffs were fired because of their gay or transgender status. But this was because they engaged

in conduct comporting with that status. Plaintiff Aimee Stephens informed her employer of six years that she "planned to live and work full-time as a woman," and was promptly fired. *Bostock*, 590 U.S. at 654 (internal quotations omitted). Similarly, it was only when Plaintiff Gerald Bostock joined a gay recreational softball league that he was fired for conduct "unbecoming" a county employee. *Id* at 653.

And though *Bostock* did not explicitly address pronouns or titles, its analysis is prescient here. *Bostock* makes clear that the act of identifying oneself as a different gender than assigned at birth is the quintessence of transgender status. It provides the example of "an employer who fires a transgender person who was identified as a male at birth but *who now identifies* as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for *traits or actions* that it tolerates in an employee identified as female at birth." *Id.* at 660 (emphasis added); *see also id.* at 661 ("When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play—*both* the individual's sex *and* something else (the sex to which the individual is attracted or with which the individual identifies).") (emphasis in original). The import is that *identifying* oneself as a different gender than that identified at birth is a trait or action inherent to transgender status. And unlike other traits or actions, like "tardiness or

incompetence or simply supporting the wrong sports team," those inherent to "homosexuality and transgender status are inextricably bound up with sex." *Id.* at 660–661.

*Bostock*'s example governs subsection 3. Plaintiffs, who were identified male at birth and now identify as female, may not use female pronouns. Otherwise identical employees who were identified female at birth may use female pronouns. Subsection 3 therefore "intentionally penalizes a person identified as male at birth for *traits or actions*"—female pronoun and title use—"it tolerates in an employee identified as female at birth." *See id.* at 660. Plaintiffs are discriminated against because they self-identify with female pronouns, which is inherent to their transgender status and inextricably connected to their sex under *Bostock*.[5]

The fact that subsection 3 governs both biological male and biological female teachers does not change the analysis. *Bostock* anticipated this argument. Its but-for test contemplates scenarios in which "two but-for factors combine to yield a result that could have also occurred in some other way." *Id.* at 672. So, for transgender individuals, their sex is one factor, and the sex with which they identify is the second.

---

[5] Defendants also argue that "[i]n any event, Plaintiffs cannot avoid *Adams*'s holding that 'biological sex … is not a stereotype.'" ECF No. 148-1 at 28 (citing *Adams*, 57 F. 4th at 809). *Adams* appears to leave *Bostock* untouched within the Title VII context. *See* 57 F. 4th at 808–09. Moreover, *Adams* explains it "centers on the converse of" *Bostock*'s holding that "discrimination based on . . . transgender status necessarily entails discrimination based on sex," that is "whether discrimination based on biological sex necessarily entails discrimination based on transgender status," which is not at issue here. *See id.* (citing *Bostock*, 590 U.S. at 669).

*Id.* at 671–672. Plaintiffs are forbidden from using their preferred pronouns and titles under subsection 3 because of their biological sex, which is male, and the sex with which they identify, which is female. So, "sex plays an essential but-for role." *Id.* at 672; *but see Texas v. Equal Emp. Opportunity Comm'n*, 2025 WL 1414332, at *10–12 (N.D. Tex. May 15, 2025) (*Bostock* did not govern pronoun usage and such requirements did not run afoul of Title VII in part because "[a]ll sexes are exposed to the same terms and conditions: using sex-specific facilities and complying with sex-specific dress codes and pronouns") (internal quotations omitted).

The Eleventh Circuit reached a similar conclusion in a since-vacated opinion in *Lange v. Houston County, Georgia*, 101 F.4th 793 (11th Cir. 2024), *reh'g en banc granted, opinion vacated*, 110 F.4th 1254 (11th Cir. 2024). In that case, a county's health insurance plan excluded "[d]rugs for sex change surgery" and "[s]ervices and supplies for a sex change and/or the reversal of a sex change." *Id.* at 796 (brackets in original). A transgender employee whose request for coverage was denied sued, seeking relief under Title VII. *Id.* at 797. Applying *Bostock*, the majority held the policy exclusion denied coverage based on transgender status because it denied coverage for gender-affirming surgery, and transgender individuals "are the only participants who would seek gender-affirming surgery." *Id.* at 798–99. It also rejected the dissent's argument that the plan did not discriminate because "it d[id] not draw a line between procedures transgender people need and procedures that

other people need." *Id.* at 805 (Brasher, J., dissenting). "By drawing a line between gender-affirming surgery and other operations, the plan intentionally carves out an exclusion based on one's transgender status." *Id.* at 799.

*Lange*, if binding, would dictate that subsection 3 discriminates based on transgender status because it proscribes using different pronouns from those typically associated with one's biological sex, which only transgender individuals seek to do. However, it was subsequently vacated, and the Eleventh Circuit plans to rehear the case *en banc*. *Lange*, 110 F.4th 1254 (granting rehearing *en banc*). Therefore, it has no precedential value. *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (Vacated opinions "are officially gone. They have no legal effect whatever. They are void. None of the statements made in either of them has any remaining force and cannot be considered to express the view of this Court."). Nonetheless, this Court may find it has persuasive value, and does so here. *See Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1278 (N.D. Ga. 2019) (citing *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009)). Accordingly, informed by *Bostock* and *Lange*, this Court finds Defendants' enforcement of subsection 3 discriminates against Plaintiffs based on sex in violation of Title VII.[6]

---

[6] LCSB also separately argues that "there is no record evidence that LCSB amended Policy 3210 with any discriminatory intent towards any particular sex, let alone Doe's transgender status or that it was applied in a discriminatory manner," ECF No. 154 at 7, and that it "has a legitimate

b

This Court's finding that subsection 3 discriminates based on sex does not end the inquiry. To violate Title VII, an employer must discriminate ". . . with respect to [an individual's] compensation, terms, conditions, or privileges of employment . . ." 42 U.S.C. § 2000e–2(a)(1). So, to prevail on a Title VII claim, Plaintiffs must show (1) some harm (2) respecting the terms, conditions, or privileges of their employment. Again, the parties do not dispute any material fact, so this Court may resolve this legal question at summary judgment. *See Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011) ("When the only question a court must decide is a question of law, summary judgment may be granted.").

This issue is controlled by the Supreme Court's recent holding in *Muldrow v. City of St. Louis*. 601 U.S. 346 (2024). Previously, the Eleventh Circuit required that "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment" to prevail on a Title VII claim. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). But, in *Muldrow*, the Supreme Court held that there is no "significance" requirement to the harm an individual must suffer. 601 U.S. at 355. An individual must simply show that, in some way, they were "treat[ed] worse, here based on sex." *Id.*

---

business interest in complying with" state law, *id.* at 8–9. This Court has already rejected each of these arguments, *see* ECF No. 90 at 4 & ECF No. 82 at 10–11 (rejecting same argument by HCSB), and incorporates its prior analysis as if fully set forth herein.

The parties do not dispute *Muldrow*'s holding that harm suffered need not be significant. *See* ECF No. 148-1 at 10 (Defendants acknowledging "*Muldrow* held that an employee still 'must show some harm respecting an identifiable term or condition of employment.'") (citation omitted). And they do not dispute that Plaintiffs have suffered "some harm" because they must "alter the way they present themselves." *See* ECF No. 158-1 at 13–14; *accord* ECF No. 148-1 at 17–19.

Instead, the parties disagree as to the meaning of "terms, conditions, or privileges" after *Muldrow*. *Muldrow* expanded Title VII's reach to harms previously excluded by the requirement of a serious and material injury. But lower courts have not had time to test the boundaries of *Muldrow* and, therefore, whether a policy like subsection 3 respects Plaintiffs' "terms, conditions, or privileges" is an issue of first impression for this Court.

Plaintiffs argue Title VII "must be given its plain and ordinary meaning, which is 'expansive.'" ECF No. 158-1 at 13 (citation omitted). Under that meaning, they claim "[s]ubsection 3 requires Plaintiffs, on pain of firing and delicensing, to alter the way they present themselves to their students on a daily basis, even in the face of misgendering—a fundamental change to their working conditions." *Id.* at 14. Defendants argue, citing pre-*Muldrow* precedent, that "terms or conditions under Title VII typically concern 'pay,' 'prestige,' or 'responsibility,'" and because "[s]ubsection 3 has not affected [Plaintiffs] pay and benefits or resulted in any formal

penalties," it does not affect the terms and conditions of their employment. ECF No. 148-1 at 17, 19.[7]

This Court is not convinced that only injuries affecting pay, prestige, or responsibility concern the terms and conditions of employment post-*Muldrow*. Indeed, it "[did] not matter" that the *Muldrow* plaintiff's "rank and pay remained the same, or that she still could advance to other jobs." 601 U.S. at 359. What mattered was that the terms and conditions of her employment were "alter[ed]," and that alteration "left her worse off," though not necessarily significantly. *Id.* at 357, 359.

Here, a plain reading of Title VII, informed by the parameters laid out in *Muldrow*, leads this Court to conclude that subsection 3 alters the terms and conditions of Plaintiffs' employment.[8] Compliance with subsection 3 means Plaintiffs, transgender teachers, are forbidden from using their preferred pronouns and titles with students. § 1000.071(3), Fla. Stat. Noncompliance can result in disciplinary violations, which in turn can lead to suspension or revocation of

---

[7] This Court recognizes Defendants rely heavily on this Court's Order on the State Defendants' first motion to dismiss, ECF No. 91, which reached this conclusion for the same reasons. But this Court revisited, and changed, that conclusion in its later Order denying Defendants' motion to dismiss. *See* ECF No. 115.

[8] LCSB argues Ms. Doe testified that she "has never provided her pronouns to students" and therefore "no harmful change has occurred." The import of Ms. Doe's testimony seems to be that she "use[s] [her] Ms. title and pronouns at all times" at school, *see* ECF No. 156-9 ¶¶ 7–8, even if she does not "provide[]" her pronouns, *see* ECF No. 156-8 at 51:25-52:2. Regardless, Ms. Doe's uncontroverted testimony establishes she at least provides her title to students, *see, e.g.*, ECF No. 156-8 at 93:13-94:3, which is proscribed by subsection 3.

Plaintiffs' teaching certifications or termination. *See* § 1012.795(1)(j), Fla. Stat. (2023); § 1012.33(1)(a), Fla. Stat. (2023); *see also Sambrano v. United Airlines, Inc.*, 347 F.R.D. 155, 172–73 (N.D. Tex. 2024) (implying masking and testing policy respected terms, conditions, or employment, but whether harm was more than *de minimis* required a fact-specific inquiry). Because Plaintiffs must comply with subsection 3 or risk their jobs or credentials, that compliance is a condition of employment.

Therefore, because compliance with subsection 3 is a condition of Plaintiffs' employment, and because subsection 3 discriminates based on sex with respect to the terms and conditions of Plaintiffs' employment, it violates Title VII. However, this Court again acknowledges that the Eleventh Circuit plans to rehear *Lange en banc*, the outcome of which could be determinative in this case. *See* 110 F.4th 1254. Judicial economy demands that this Court decline to issue an injunction or try the issue of damages at this juncture and stay this case pending resolution of the *en banc* rehearing in *Lange. See Claire v. Fla. Dep't of Mgmt. Servs.*, Case No.:420cv20, ECF No. 187 (staying different case pending rehearing of *Lange* for similar reasons).

Accordingly, Plaintiffs' motion for summary judgment as to their Title VII discrimination claim is due to be granted inasmuch as subsection 3 violates Title VII as to Plaintiffs. The motion is otherwise denied. Defendants' motions for summary judgment on Plaintiffs' Title VII discrimination claims are due to be denied. Further

consideration of Plaintiffs' Title VII discrimination claims is stayed pending resolution of the Eleventh Circuit's *en banc* rehearing in *Lange*.

2

Alternatively, Ms. Wood claims Defendants subjected her to a hostile work environment in violation of Title VII. ECF No. 158-1 at 15–22. Although Title VII does not explicitly provide for such claims, "[i]t has long been settled that the statutory phrase 'terms, conditions, or privileges of employment' includes within its scope a discriminatorily hostile or abusive environment." *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004). The parties do not dispute any material fact, therefore, this Court evaluates whether Ms. Wood was subjected to a hostile work environment as a matter of law. *See Brown v. Brown & Williamson Tobacco Corp.*, 1996 WL 325890, at *3 (N.D. Fla. Apr. 11, 1996); *Saregama*, 635 F.3d at 1290.

To prevail on a hostile work environment claim, a plaintiff must prove five elements: (1) she belongs to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment, and (5) her employer was responsible for the hostile work environment. *See Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766 (11th Cir. 2024). The severe or pervasive requirement requires the plaintiff "subjectively perceive the

hostile work environment to be abusive" and demonstrate "an environment that a reasonable person would find hostile or abusive." *Id.* at 775.

The parties do not dispute the first and third elements, that Ms. Wood belongs to a protected group and that any harassment was based on a protected characteristic. *See* ECF No. 148-1 at 29; ECF No. 158-1 at 16. They disagree as to whether Ms. Wood' experienced unwelcome harassment, whether it was severe and pervasive enough to alter the conditions of her employment, and whether Defendants are responsible for that environment.

Ms. Wood argues that she experiences harassment because she is "forced to affirmatively deny her gender identity every day at work." ECF No. 158-1 at 16. As a result, misgendering "predictably increased," but Ms. Wood has been forbidden from correcting it, "compounding the injury." *Id.* at 17; *see also* ECF No. 156-6 ¶¶ 4, 13, 14, 15. Defendants claim Ms. Wood's harassment theory fails because having to misgender oneself is "*self*-harassment," unlike harassment "done by another person," and therefore not actionable. *See* ECF No. 148-1 at 31.[9]

---

[9] Defendants also argue Ms. Wood does not have to misgender herself under subsection 3 because she can simply use the gender-neutral title "Teacher Wood" or "Coach." ECF No. 148-1 at 31–32. But Ms. Wood does not claim she was forced to misgender herself by using male pronouns. Instead, having to use terms like "Teacher Wood" is exactly what Ms. Wood challenges. *See* ECF No. 94 ¶ 102 ("Going by Teacher, a non-gendered title that no male or female teachers at her school use, that misidentifies who she is, and that does not come naturally to her when describing herself, instead of Ms., a title that expresses her female gender identity, caused Ms. Wood to feel stigmatized, distressed, and humiliated.").

While employer policies can "create or contribute" to a hostile work environment in some contexts, this Court finds the undisputed facts and inferences drawn in Ms. Wood's favor do not demonstrate a legally cognizable objectively hostile work environment. *See Maldonado v. City of Altus*, 433 F.3d 1294, 1304 (10th Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Although no cases analyze whether a pronoun policy like subsection 3 can create a hostile work environment, this Court finds instructive cases evaluating whether workplace English-only policies do so.

The framework used in these cases is exemplified by two Tenth Circuit decisions, *Maldonado* and *Montes v. Vail Clinic*. *See Maldonado*, 433 F.3d 1294; *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160 (10th Cir. 2007). In *Maldonado*, the court found an English-only policy "itself, and not just the effect of the policy in evoking hostility by co-workers, may create or contribute to the hostility of the work environment." 433 F.3d at 1304–05. Given factual disputes concerning the pervasive nature of the policy, which "extended beyond its written terms to include lunch hours, breaks, and even private telephone conversations," belying any legitimate purpose, and whether it created a hostile atmosphere, the Tenth Circuit reversed the district court's grant of summary judgment with respect to the hostile work environment claim. *See id.* (Plaintiffs "produced evidence that the English-only policy created a hostile atmosphere for Hispanics in their workplace," including that

they had experienced ethnic taunting from a variety of sources and that their employer anticipated harassment as an "expected consequence of the policy.").

In *Montes*, the court declined to extend *Maldonado* to a policy requiring English in operating rooms based upon "the narrowness of the [] policy, its origin in the Clinic's undisputed business necessity, and the absence of any evidence suggesting that the policy was the product of improper motive or that it gave rise to any discriminatory effect." 497 F.3d 1160, 1170–71 (10th Cir. 2007). Other district courts have weighed similar factors, including policy breadth and discriminatory effects, to decide the feasibility of a hostile work environment claim based on an English-only policy. *See Coronado v. Ainsworth Transportation, Inc.*, 2010 WL 11679515, at *8–9 (S.D. Tex. Apr. 15, 2010); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 624–26 (S.D.N.Y. 2009); *Duran Perez v. Capco, LLC*, 2020 WL 12432442, at *10–12 (D. Colo. Dec. 29, 2020); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 348–51 (S.D.N.Y. 2006).

While this Court is persuaded by these cases' framework and agrees that a workplace policy like subsection 3 can create a hostile work environment, drawing all facts and reasonable inferences in Plaintiffs' favor, no reasonable factfinder could conclude subsection 3 actually created one here. *Maldonado* and *Montes* indicate that it matters if a policy is pervasive, rather than narrow, and if it engenders harassment or discriminatory effects. Ms. Wood's evidence does not give rise to a

reasonable inference that such criteria are met here. Subsection 3, which dictates pronoun and title usage, is inherently narrower than a policy controlling the language every word is spoken in. And the policy in question here is circumscribed, like the one in *Montes*, which required English in operating rooms only, as opposed to the near-universal one in *Maldonado*. Subsection 3 only applies when Ms. Wood is speaking to students, not coworkers, superiors, or parents. *See* § 1000.071(3), Fla. Stat.

Further, the undisputed facts do not suggest that the enforcement of subsection 3 has led to harassment or discriminatory effects for Ms. Wood. She is not aware of anyone reporting her for noncompliance and no enforcement action has been taken against her. ECF No. 156-24 at 30:13-33:20. She testified that, to her knowledge, she was not aware of any other adverse instructions from HCSB beyond being told she could not use her preferred pronouns. *Id.* In fact, Ms. Wood testified that both the HCSB and her principal expressed "empathy" or "emotional support" for the impact of subsection 3 on her. *See id.* at 22:1-11; 26:18-27:3.

As for increased misgendering, Ms. Wood claims after subsection 3 went into effect, approximately thirty to forty students unintentionally misgendered her, and subsequently corrected themselves, while an additional ten misgendered her in a way she "understood to be intentional," although she is "not sure" if students who failed to correct themselves did so unintentionally. *Id.* at 70:6-72:6. Ms. Wood could not

think of any examples of a student continuously misgendering her after her attempts to stop them. *Id.* at 77:20-78:6.

Intentional misgendering can give rise to a hostile work environment. *See Copeland v. Georgia Department of Corrections*, 97 F.4th 766, 780–81 (11th Cir. 2024) (daily intentional misgendering, when combined with other factors, created hostile work environment). But, even drawing all facts and reasonable inferences in Ms. Wood's favor, most of the misgendering here was, by her own terms, "unintentional[]," and corrected immediately. ECF No. 156-24 at 70:6-72:6. Ms. Wood provides no legal support for the proposition that unintentional, corrected misgendering can give rise to a hostile work environment, and this Court is not persuaded it does so here.

As to the ten instances of intentional misgendering by students, Ms. Wood claims she "understood" them to be intentional, but was "not sure." *See id.* at 70:6-72:6. Even drawing all facts and reasonable inferences in Ms. Wood's favor, she could not think of any student continuously misgendering her, *see id.* at 77:20-78:6, which indicates that, even if these ten instances were intentional, they were one-off occurrences. Ten separate instances of intentional misgendering by a teacher's students, without more, does not rise to the level of Ms. Wood's primary case, *Copeland*, where the plaintiff was subject to relentless daily misgendering from

superiors and human resources, in addition to other exacerbating factors. *See* 97 F.4th at 771–73, 777–79.[10]

This Court in no way intends to diminish Ms. Wood's experiences and their impact on her. But while Ms. Wood should not be treated worse than anyone under the hostile work environment standard, she is also not entitled to more protection than other plaintiffs who experience deplorable conduct at work.[11] Here, the undisputed facts and inferences drawn in Ms. Wood's favor do not a hostile work environment make. Subsection 3's scope is limited to conversations with students and Ms. Wood's evidence does not amount to discriminatory effects. Accordingly, this Court finds no genuine issue of material fact as to whether Ms. Wood was

---

[10] In *Copeland*, the plaintiff experienced daily intentional misgendering over a prison-wide radio system, which all facility employees could hear, and was subject to a barrage of insults and comments regarding his gender identity. 97 F.4th at 771. He was misgendered and insulted not just by coworkers, but by human resources and his supervisors, which the Eleventh Circuit found made the harassment "more severe." *Id.* at 772–73, 777. He was physically threatened, including a coworker following him with a gun, which made him "fear[] for his life." *Id.* at 772, 779. And his persistent efforts to object to or correct the harassment with his coworkers, HR, and the warden were all unsuccessful. *Id.* at 777. Additionally, the Eleventh Circuit also found that because he worked in the correctional context, which is "dangerous and sometimes violent—dramatically more so than the typical workplace," "the harassment he faced [was] more severe." *Id.* at 778.

[11] This Court notes that the Eleventh Circuit has repeatedly found Black employees exposed to "isolated, sporadic" instances of reprehensible conduct, including racial slurs and nooses left in conspicuous locations, at work were not subjected to a hostile work environment. *See Barrow v. Georgia Pac. Corp.*, 144 F. App'x. 54, 57–58 (11th Cir. 2005) (use of n-word at least three times and noose in employee's locker were not severe or pervasive); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254 (11th Cir. 2014) (hearing the n-word "a few times" and learning about a noose in the break room, in addition to other racist conduct, not severe or pervasive); *Singleton v. Auburn Univ. Montgomery*, 520 F. App'x 844, 849 (11th Cir. 2013) ("racist slurs . . . while deplorable, were not severe or pervasive enough to create a hostile work environment").

subjected to an objectively hostile work environment. On this record, Ms. Wood's motion is due to be denied with respect to this claim. Defendants' motions for summary judgment is due to be granted to the extent they seek summary judgment on Ms. Wood's hostile work environment claim.

3

Plaintiffs and State Defendants also move for summary judgment as to Plaintiffs' Title VII preemption claim. Preemption is a question of law that this Court can resolve at summary judgment. *Alabama State Conf. of NAACP v. Marshall*, 2024 WL 4282082, at *2 (N.D. Ala. Sept. 24, 2024) ("preemption is a question of law"); *Saregama*, 635 F.3d at 1290.

Section 708 of Title VII provides that "[n]othing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." 42 U.S.C. § 2000e-7.

This provision "severely limit[s] Title VII's pre-emptive effect" to state laws that "expressly sanction a practice unlawful under Title VII." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 282, 297 n.29 (1987); *see also Malabed v. N. Slope Borough*, 335 F.3d 864, 870 (9th Cir. 2003) (Section 708 "would provide

26

exemption from a state law that required or permitted acts that would be unlawful employment practices under Title VII"); *Bridgeport Guardians, Inc. v. Delmonte*, 248 F.3d 66, 74 (2d Cir. 2001) ("We have consistently recognized that, in some circumstances, state law requirements may be displaced in order to effectuate Title VII remedies.").

So, the law instructs, and the parties agree, that if subsection 3 violates Title VII, it is also preempted by it. *See* ECF No. 158-1 at 43 (Plaintiffs arguing that if this "Court concludes that State Defendants have violated Title VII by enforcing subsection 3 against them, that ruling also implies that they prevail on their preemption claim."); ECF No. 148-1 at 36–37 (State Defendants arguing that "[f]or the same reasons that Subsection 3 does not violate Title VII . . . there is no actual conflict between Subsection 3 and Title VII."). This Court found, *supra*, that Defendants violated Title VII by enforcing subsection 3 against Plaintiffs. Therefore, subsection 3 "expressly sanction[s]" an unlawful employment practice under Title VII, and is preempted. *See* 42 U.S.C. § 2000e-7; *Guerra*, 479 U.S. at 297 n.29.

So, subsection 3 is unconstitutional under the Supremacy Clause. But what is the remedy? Until recently, a successful facial challenge like this meant the challenged law was "invalid *in toto* —and therefore incapable of any valid application." *United States v. A Single Fam. Residence & Real Prop. Located at 900 Rio Vista Blvd., Fort Lauderdale*, 803 F.2d 625, 630 (11th Cir. 1986); *see also 828*

*Mgmt., LLC v. Broward Cnty.*, 508 F. Supp. 3d 1188, 1195 (S.D. Fla. 2020) ("A preemption challenge is a facial attack on the constitutionality of a legal enactment.") (citing *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019)). Plaintiffs accordingly asked this Court to "declare that subsection 3 . . . conflicts with and is preempted by federal law" and "enjoin Defendant, its officers, agents, servants, employees, attorneys, and successors, and other persons who are in active concert or participation with any such person from enforcing subsection 3 . . . ." ECF No. 94 ¶¶ 152–60.

But this summer, after the present motions were fully briefed, the Supreme Court held that district courts lack authority to universally enjoin the enforcement of an executive or legislative policy. *Trump v. CASA*, 606 U.S. ---, 145 S. Ct. 2540, 2552–54 (2025). Therefore, this Court cannot issue an injunction "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 2562–63.

*CASA*'s "generalized edict . . . leaves many questions unanswered." *United States v. Texas*, 2025 WL 2170007, at *20 (W.D. Tex. July 31, 2025). This Court finds instructive Judge Cardone's thoughtful discussion of this issue in a recent case in the Western District of Texas. Like here, the parties filed pre-*CASA* cross-motions for summary judgment as to whether a state law was preempted by federal law. *Id.* at *2–3, 20. And, like here, the court found the state law was preempted and

"therefore unconstitutional under the Supremacy Clause." *Id.* at \*17. But "[i]n light of *CASA*," a broad injunction was "improper unless Plaintiffs show that it is the least restrictive means to accord them complete relief." *Id.* at \*20 (discussing potential scope of a proper, *CASA*-compliant injunction). Judge Cardone declined to decide "what a proper, plaintiff-specific remedy would look like under *CASA*" without the benefit of further briefing and denied summary judgment in part as to the plaintiffs' request to enjoin the law in its entirety. *Id.*

This Court follows the same approach here and will defer fashioning a remedy until trial. Therefore, Plaintiffs' motion for summary judgment as to their Title VII preemption claim is due to be granted inasmuch as subsection 3 is preempted by Title VII. The motion is otherwise denied. State Defendants' motions for summary judgment on Plaintiffs' Title VII preemption claims are due to be denied.

## B

Next, Plaintiffs, State Defendants, HCSB[12], and LCSB[13] move for summary judgment as to Plaintiffs' respective Equal Protection claims. The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To determine whether

---

[12] HCSB joins in the arguments raised by the State Defendants. ECF No. 150 at 6–7.

[13] LCSB joins in the arguments raised by the State Defendants. ECF No. 154 at 18.

such a violation has occurred, this Court must first "decide whether a state law 'operates to the disadvantage of some suspect class.'" *Corbitt v. Sec'y of the Alabama L. Enf't Agency*, 115 F.4th 1335, 1345 (11th Cir. 2024) (quoting *Maher v. Roe*, 432 U.S. 464 (1977)). If the law draws a sex-based classification, it then must satisfy intermediate scrutiny. *Id.* (quoting *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022)).[14]

1

This Court must "first determine what standard of review applies" to subsection 3. Neither party claims a disputed issue of fact exists, instead, they offer competing legal argument as to whether subsection 3 "discriminates against a suspect class and thus triggers heightened scrutiny." *See Corbitt*, 115 F.4th at 1345. "Thus, it is appropriate for the Court to resolve the purely legal questions presented by these actions at the summary judgment stage." *Statewide Detective Agency, Inc. v. Miller*, 1998 WL 1785456, at *1 (N.D. Ga. Aug. 12, 1998).

---

[14] As a gating matter, courts have reached different conclusions regarding whether the Equal Protection Clause even applies to government speech. *Compare Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 482 (2009) (Stevens, J., concurring) ("government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses") *with Fields v. Speaker of Pennsylvania House of Representatives*, 936 F.3d 142, 160–61 (3d Cir. 2019) (collecting cases and "join[ing] the authority holding that the Equal Protection Clause does not apply to government speech."). Neither party briefed this issue at summary judgment, so this Court will not address it here. If a party believes it has a good-faith basis to brief this issue before trial, it may file a motion for leave to do so.

Plaintiffs claim subsection 3 triggers heightened scrutiny for two separately sufficient reasons, because it discriminates based on sex, and because it discriminates based on gender nonconformity. ECF No. 158-1 at 33. Defendants disagree. They claim subsection 3 is subject to rational basis review, not heightened scrutiny, because it does not discriminate based on sex or transgender status, and because transgender persons are not a suspect class. ECF No. 148-1 at 51–54.

a

Plaintiffs argue that subsection 3 discriminates on the basis of biological sex because "it prohibits employees like Plaintiffs, whose sex assigned at birth was male, from providing to students the title Ms. and she/her pronouns because they 'do not correspond to … [their] sex,' but it does not similarly prohibit other employees whose sex assigned at birth was female." ECF No. 158-1 at 33–34 (citing § 1000.071(3), Fla. Stat.).

Defendants argue subsection 3 does not discriminate on the basis of sex because it "does not distinguish between men and women," and instead applies to all teachers and "equally to both sexes." ECF No. 148-1 at 51; ECF No. 184 at 2 (quotations omitted).[15] According to Defendants, "[b]ecause Subsection 3 applies

---

[15] This Court notes that Defendants' contention that subsection 3 "does not discriminate based on sex," ECF No. 148-1 at 51, is at odds with their statement a page later that subsection 3 "'facially classifies based on biological sex—not transgender status or gender identity,'" *id.* at 52 (citing *Adams*, 57 F.4th at 808).

equally to a man who wishes to use feminine titles and pronouns and a woman wishing to use masculine titles and pronouns," it does not impose a sex-based classification. ECF No. 148-1 at 52. Defendants claim Eleventh Circuit cases *Corbitt* and *Eknes-Tucker* "squarely control" here. *Id.* (citing *Corbitt*, 115 F.4th 1335 and *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023)). Defendants also submitted a notice of supplemental authority, claiming their position is bolstered by the Supreme Court's recent decision in *United States v. Skrmetti*, 605 U.S. ---, 145 S.Ct. 1816 (2025). ECF No. 184.

In *Corbitt*, the Eleventh Circuit evaluated a policy requiring individuals seeking to change the sex on their driver's license to provide proof of gender reassignment surgery. 115 F.4th at 1346. Because the Equal Protection Clause is "concerned with differential treatment," and the court found the policy's "language is neutral in the sense that it is not gender-based" because "[i]ndividuals wishing to have their sex designation changed from male to female, and individuals wishing to have their sex designation changed from female to male, are all . . . subject to the same requirements," the policy did not trigger heightened scrutiny. *Id.* at 1346–47. And in *Eknes-Tucker*, it found a law restricting minors from using puberty blockers and cross-sex hormone treatment did not discriminate on sex because it did "not establish an unequal regime for males and females," and was instead "best

32

understood as a law that targets specific medical interventions for minors." 80 F.4th at 1227–28.

In *Skrmetti*, the Supreme Court addressed a law prohibiting healthcare providers from providing puberty blockers or hormones to minors for the purpose of gender transitions or treating gender dysphoria. 145 S.Ct. at 1820. The Court noted it had "never suggested that mere reference to sex is sufficient to trigger heightened scrutiny." *Id.* at 1829. And it held that the law in question classified not on the basis of sex, but on the basis of age and "medical use." *Id.*

These cases establish that laws that reference sex do not necessarily discriminate unless they establish "unequal regime[s] for males and females." *Eknes-Tucker*, 80 F.4th at 1228. But they offer little support here, where subsection 3 plainly prohibits different conduct based on biological sex.

Although Defendants rely on *Skrmetti*, where the law at issue was non-discriminatory, the Court took pains to distinguish that law from one like subsection 3 which "prohibit[s] conduct for one sex that it permits for the other," even if conveyed in "abstract terms." *See* 145 S.Ct. at 1831. The Court provided two examples which are instructive here. First, it distinguished the law at issue, which "prohibit[ed] the administration of specific drugs for particular medical uses" from a hypothetical law "prohibiting attendance at a religious service 'inconsistent with' the attendee's religion," and noted the latter "may trigger heightened scrutiny." *Id.*

33

Second, it invoked the antimiscegenation statute invalidated in *Loving v. Virginia*, and admonished that it "would not have shed its race-based classification had it, for example, prohibited '*any* person from marrying an individual of a different race,'" because it "would still have turned on a race-based classification," prohibiting a Black woman from marring a white man while permitting a white woman to do so. *Id.* (emphasis in original).

The Eleventh Circuit's finding of sex discrimination in *Adams ex rel Kasper v. School Board of St. Johns County.*, 57 F.4th 791, 801 (11th Cir. 2022), comports with *Skrmetti*. There, a transgender student challenged a school board's policy requiring "'biological boys' and 'biological girls'—in reference to their sex determined at birth—to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms." *Id.* at 801. The Eleventh Circuit swiftly and succinctly found this to be a sex-based classification because "[s]imply put, Adams seeks access to the male bathrooms, which correspond with the gender Adams identifies with." *Id.*

Subsection 3 falls within the scope of sex discrimination described in *Skrmetti* and *Adams*. It "prohibit[s] conduct for one sex that it permits for the other" because biological males may use male pronouns but not female pronouns, and biological females may use female pronouns but not male pronouns. *See Skrmetti*, 145 S.Ct. at 1831. So, like the hypothetical discriminatory statute in *Skrmetti*, which prohibited

34

attendance at a religious service inconsistent with the attendee's religion, *id.*, subsection 3 prohibits Plaintiffs from using pronouns or titles inconsistent with their sex, *see* § 1000.071(3), Fla. Stat. And like the plaintiff in *Adams*, who sought access to bathrooms corresponding to the gender he identified with, 57 F.4th at 801, Plaintiffs here seek to use the pronouns and titles corresponding to the gender they identify with. This is a sex-based classification.

Defendants' best argument is that subsection 3 "applies equally to a man who wishes to use feminine titles and pronouns and a woman wishing to use masculine titles and pronouns," ECF No. 148-1 at 51, but that example is useless here, as illustrated by the Supreme Court's apt *Loving* example in *Skrmetti*. Defendants' logic is analogous to the proposition that the antimiscegenation statute in *Loving* was nondiscriminatory because Black men could not marry white women just as much as white men could not marry Black women—a proposition the Supreme Court firmly rejected. Accordingly, this Court finds subsection 3 discriminates based on sex.

b

Plaintiffs also claim that subsection 3 "discriminates against Plaintiffs on the basis of their gender nonconformity." ECF No. 158-1 at 34. Defendants in turn argue that subsection 3 "does not discriminate based on transgender or nonbinary status."

ECF No. 148-1 at 52. Again, this Court may resolve this legal question at summary judgment. *See Saregama*, 635 F.3d at 1290.

The parties talk past each other here. Plaintiffs aren't arguing that subsection 3 discriminates on transgender status for purposes of their Equal Protection claim. [16] Instead, they argue it discriminates based on gender nonconformity, which is an entirely different legal theory rooted in different precedent. *See Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Adams*, 57 F.4th at 809 (addressing discrimination based on transgender status and gender nonconformity as separate concepts). Transgender status is not a prerequisite for discrimination based on gender nonconformity. Instead, "[a]ll persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype." *Brumby*, 663 F.3d at 1318.

In *Brumby*, a transgender plaintiff was fired in part for dressing as a woman and wearing makeup at work. *Id.* at 1320–21. Her employer admitted that firing her "was based on 'the sheer fact of the transition.'" *Id.* at 1321. The Eleventh Circuit held that this discrimination, based on "perceived gender-nonconformity," is "a form of sex-based discrimination that is subject to heightened scrutiny under the Equal

---

[16] Plaintiffs do make this argument in the Title VII context, *supra*. As an aside, *Adams* distinguishes *Bostock*'s holding that discrimination based on transgender status is sex discrimination under Title VII by saying the former "is about schools and children—and the school is not the workplace." 57 F.4th at 808. That statement rings somewhat hollow in this case.

Protection Clause." *Id.* at 1319. But in *Adams*, the Eleventh Circuit found the bathroom policy did not discriminate based on gender nonconformity because it did "not depend in any way on how students act or identify," and instead "separate[d] bathrooms based on biological sex, which is not a stereotype." 57 F.4th at 809.

*Adams*'s logic cuts both ways here, where the policy at issue depends on biological sex *and* how Plaintiffs "act or identify." *See id.* Nonetheless, this Court concludes subsection 3 is not based on "the biological differences between the sexes" in the same way a policy dictating bathroom use is. *See id.*; *see also Eknes-Tucker*, 80 F.4th at 1234 (Brasher, J., concurring) (recognition "of biological reality" is distinguishable from a sex-based stereotypes regarding "the way men or women should behave" or "the proper roles of men and women in our society") (cleaned up); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1263 (11th Cir. 2024) (denial of rehearing *en banc*) (Lagoa, J., concurring) ("*Brumby* dealt with sex-based stereotypes about how men should dress, not biological realities"); ECF No. 91 at 13 (Order on First Motion to Dismiss) ("But section 1000.071(3) does not focus on human biology or human bodily functions in the same way. Instead, it regulates preferred pronouns and titles. One's choice of pronouns and titles is not biologically linked to the location of the urethra or the ability to birth children."). Instead, subsection 3 and its enforcement mechanisms punish employees for "failing to adhere to certain expectations and stereotypes associated with the employee's sex,"

that is, for using pronouns and titles which do not correspond to their biological sex. *See Eknes-Tucker*, 80 F.4th at 1229. Therefore, it discriminates based on gender nonconformity.

c

Defendants also argue intermediate scrutiny is "foreclose[d]" because transgender status is not a suspect or quasi-suspect class. *See* ECF No. 148-1 at 53–54. This Court agrees that the Eleventh Circuit "ha[s] never recognized transgender persons as a suspect class and instead ha[s] expressed grave doubt that transgender persons constitute a quasi-suspect class for purposes of the Equal Protection Clause." *Corbitt*, 115 F.4th at 1347 n.9. But Plaintiffs argue that subsection 3 discriminates based on sex, not transgender status, for purposes of their Equal Protection claims. *See* ECF No. 91 at 11 n.7; ECF No. 158-1 at 37 n.7. As this Court explained above, this Court agrees that subsection 3 discriminates based on sex inasmuch as gender nonconformity is a proxy for sex-based discrimination. Accordingly, intermediate scrutiny applies.

2

Because subsection 3 "draw[s] a sex-based classification, it "will pass constitutional muster only if it satisfies intermediate scrutiny." *Adams*, 57 F.4th at 801. To do so, it must "(1) advance an important governmental objective and (2) be substantially related to that objective." *Id.* (citation omitted). "At summary

38

judgment, the Court cannot assume that the Government has a substantial interest in a policy that discriminates against a suspect class." *Morris v. Pompeo*, 706 F. Supp. 3d 1074, 1088 (D. Nev. 2020). Defendants' justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *U.S. v. Virginia*, 518 U.S. 515, 531 (1996). "Defendant has a burden to present *evidence* demonstrating the importance of its interest, and that the Policy significantly furthers that interest." *Morris*, 706 F. Supp. 3d at 1089 (emphasis in original). Here, this Court finds genuine disputes of material fact preclude granting either party's motion for summary judgment.

This Court starts with Defendants' motion and draws all facts and inferences in the light most favorable to Plaintiffs. Defendants cite three objectives to justify subsection 3. They are (1) Florida's educational policy interest that "sex is an immutable biological trait," which is stated in the statute, *see* § 1000.071(3), Fla. Stat., (2) "Florida's educational policy that school employees and contractors use accurate language when communicating with students," and (3) "Florida's interest in preventing confusion among students over the meaning and usage of pronouns that can disrupt classrooms." ECF No. 148-1 at 56.

Plaintiffs' response creates a genuine issue of material fact as to the importance and authenticity of Defendants' stated interests. As to Florida's policies that sex is immutable and in accurate language, Plaintiffs cite evidence that "Florida

law prohibits 'instruction' on 'gender identity' in most contexts," and that "State Defendants could identify no curriculum that requires, or indeed permits, teaching anything about what titles and pronouns transgender people do or do not use." ECF No. 158-1 at 26 (citing ECF No. 148-1 at 3; ECF No. 156-2 at 90:9-11, 91:2-20, 93:4-14). As to Florida's interest in preventing confusion, Plaintiffs cite to Ms. Wood's testimony that the changes caused by subsection 3 resulted in confusion and questions from students, and that she devoted class time to answering their questions. *Id.* at 29 (citing ECF No. 156-24 at 48:11-25, 67:6-68:22, 100:5-101:4). Drawing all reasonable inferences in the light most favorable to Plaintiffs, a reasonable factfinder could find Defendants have not demonstrated the importance or authenticity of their stated objectives. Therefore, Defendants are not entitled to summary judgment.

Next, this Court takes Plaintiffs' motion and draws all facts and inferences in the light most favorable to Defendants. In support of Florida's educational policy interest that sex is immutable, Defendants cite Florida's curriculum, which "defin[es] 'Sex' as reflecting biology" and requires health education classes to "classify males and females." ECF No. 148-1 at 46. In support of Florida's accuracy interest, Defendants again cite the statute's policy, as well as dictionary definitions and a grammar book defining gender. *Id.* (citing ECF 146-12 at 8–10 (citing *id.* at 11–14)). In support of Florida's interest in preventing confusion, Defendants cite testimony from Plaintiffs that they have had to use "class time to address their

pronoun and title usage," including correcting students' pronoun usage and answering questions. *Id.* at 48–49 (citing ECF 146-4 at 85, 95–96; ECF 146-2 at 72–76). Defendants also cite emails from parents, grandparents, and community members which they claim evince disruption caused statewide by the use of "biologically incongruous pronouns" in schools. *Id.* at 50 (citing ECF Nos. 146-1, 146-16, 146-20, 146-22, 146-26.[17]). Drawing all reasonable inferences in favor of Defendants, a reasonable factfinder could find that Defendants have demonstrated that their interests are important and genuine. Therefore, Plaintiffs are not entitled to summary judgment.

Evaluating the legitimacy of Defendants' stated governmental objectives, like "any claim under the Equal Protection Clause . . . is a fact-intensive inquiry spanning multiple issues. *Aiello v. Collier*, 2021 WL 5494784, at *4 (S.D. Tex. Nov. 23, 2021). Here, disputes of fact in the record and what inferences to draw from those facts preclude summary judgment as to either side.

3

Plaintiffs also argue that subsection 3 violates the Equal Protection Clause because it is "motivated at least in part by a desire to discriminate against transgender teachers." ECF No. 158-1 at 40–42. Determining discriminatory intent is a fact-

---

[17] Instead of ECF Nos. 146-20, 146-22, and 146-26, Defendants cite ECF Nos. 146-21, 146-23, and 146-27. *See* ECF No. 148-1 at 49. However, based on the surrounding descriptions and context, this Court assumes Defendants intended to rely on the latter docket entries.

intensive inquiry "guided by an eight-factor test," *see Clark v. Putnam Cnty.*, 293 F.3d 1261, 1266 ("Intentional discrimination is a finding of fact.") (brackets and citation omitted) (11th Cir. 2002); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372–73 (11th Cir. 2022).

Plaintiffs offer evidence that that subsection 3 impacts only transgender individuals, *see* ECF No. 158-1 at 40–41 (citing ECF No. 156-2 at 40:3-6; ECF No. 156-20 at 1; ECF No. 156-19 at 57:3-10, 60:8-13, 82:15-20), which provides at least "some circumstantial evidence of intentional discrimination," *see Lange v. Houston Cnty., Georgia*, 608 F. Supp. 3d 1340, 1356 (M.D. Ga. 2022), and precludes summary judgment for Defendants. However, Plaintiffs' briefing does not fully flesh out how their cited evidence aligns with the Eleventh Circuit's eight-factor test. *See* ECF No. 158-1 at 40–42. And Defendants strongly dispute Plaintiffs' evidence and its import, which precludes summary judgment for Plaintiffs. *See* ECF No. 165 at 51–56. Based on the record before it, the fact-intensive test for determining discriminatory intent, and the conflicting inferences this Court must draw for the non-movants with respect to the cross-motions on this claim, this Court cannot say, as a matter of law, whether the adoption of subsection 3 was motivated by discriminatory intent.

Accordingly, Plaintiffs' motion for summary judgment as to their Equal Protection claims is due to be denied. Defendants' motions for summary judgment on Plaintiffs' Equal Protection claims are due to be denied.

C

Next, Plaintiffs, State Defendants, HCSB[18], and LCSB[19] move for summary judgment as to Plaintiffs' respective First Amendment claims. The parties' motions echo their First Amendment briefing at the preliminary injunction stage. Of course, when the instant motions were filed, the parties did not have the benefit of the Eleventh Circuit's recent ruling that Ms. Wood spoke as a government employee, not a private citizen, when identifying herself to her students. *See Wood*, 142 F.4th at 1286. Now that the Eleventh Circuit has spoken, this Court addresses the parties' motions informed by its ruling.

Plaintiffs allege that "providing [their title] and pronouns to students, within the meaning of subsection 3, was and is speech protected by the First Amendment." ECF No. 94 ¶¶ 209, 220, 232. At the preliminary injunction hearing, Ms. Wood's counsel stated "her First Amendment claim focuses on 'the core application" of section 1000.071(3) on her use of "pronouns in the classroom . . . .'" ECF No. 82 at 55 (citing Tr. at 38). Plaintiffs' motion for summary judgment echoes that focus,

---

[18] HCSB joins in the arguments raised by the State Defendants. ECF No. 150 at 6.

[19] LCSB joins in the arguments raised by the State Defendants. ECF No. 154 at 13.

explaining Plaintiffs "seek to speak in the classroom," including sharing their titles and/or pronouns on their syllabi and whiteboards, introducing themselves by their titles and pronouns, and Ms. Wood wearing a she/her pin. *See* ECF No. 158-1 at 25–26. The parties do not dispute the underlying factual allegations, therefore, this Court may resolve this legal question at summary judgment. *Saregama*, 635 F.3d at 1290.

The governing analysis requires this Court to employ the two-step framework developed in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos,* 547 U.S. 410 (2006). The first step of the *Pickering-Garcetti* analysis is determining whether the speech at issue was made (1) by Plaintiffs as citizens rather than government employees, and (2) about a matter of public concern. *See Wood*, 142 F.4th at 1289–90 (citing *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1160 (11th Cir. 2015)).

The Eleventh Circuit held in this case that "[w]hen a public-school teacher addresses her students within the four walls of a classroom—whether orally or in writing—she is unquestionably acting pursuant to [her] official duties." *Wood*, 142 F.4th at 1290–91 (internal quotations omitted) (second brackets in original). The court's ruling was circumscribed to Ms. Wood's speech in which she "provided her

preferred honorific and pronouns, wrote them on her whiteboard and syllabi, and wore a "she/her" pin." *Id.* at 1292.[20]

The Eleventh Circuit's ruling squarely controls this Court's analysis here. Although the Eleventh Circuit only ruled as to Ms. Wood, Ms. Doe seeks to engage in the same speech, which is therefore also pursuant to her official duties. The distinction between government speech and private speech is "pivotal." *See Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 71 (11th Cir. 2022). Because Plaintiffs' speech is government speech, their "free speech claims must fail because government speech does not enjoy protection under the Free Speech Clause." *See id.*

Therefore, Plaintiffs' motion for summary judgment as to their First Amendment claim is due to be denied. Defendants' motions for summary judgment on Plaintiffs' First Amendment claims are due to be granted.

D

State Defendants, HCSB[21], and LCSB[22] also move for summary judgment as to Plaintiffs' respective Title IX claims. During the pendency of this litigation, the

---

[20] The scope of the Eleventh Circuit's ruling aligns with Ms. Wood's conduct as described in the Second Amended Complaint and stated focus at the preliminary injunction stage on the use of "pronouns in the classroom . . . .'" *See* ECF No. 94 ¶¶ 94, 101; ECF No. 82 at 55 (citing Tr. at 38). This Court therefore does not interpret Plaintiffs' motion to argue that a broader, out-of-classroom, swath of speech is at issue in this case. If Plaintiffs have a good-faith basis to make such an argument, they may file a motion for leave to brief the issue further.

[21] HCSB joins in the arguments raised by the State Defendants. ECF No. 150 at 6.

[22] LCSB joins in the arguments raised by the State Defendants. ECF No. 154 at 13.

Eleventh Circuit held that Title IX "does not create an implied right of action for sex discrimination in employment." *Joseph v. Bd. of Regents of the Univ. Sys. of Georgia*, 121 F.4th 855, 869 (11th Cir. 2024). Defendants' motion cites this precedent, *see* ECF No. 148-1 at 58, and Plaintiffs "do not oppose," although they "reserve the right to challenge the correctness of that precedent in an appropriate petition," *see* ECF No. 158-1 at 4 n.1. Therefore, Defendants' motions for summary judgment on Plaintiffs' Title IX claims are due to be granted.

In sum, summary judgment is due to be granted in favor of Plaintiffs to the extent subsection 3 discriminates based on sex in violation of Title VII and is preempted by Title VII. Summary judgment is due to be granted in favor of Defendants as to Plaintiff Wood's alternative theory of Title VII discrimination based on a hostile work environment, and Plaintiffs' First Amendment and Title IX claims. What survives is (1) the issuance of injunctive relief or award of damages for Plaintiffs' Title VII claims, Counts 1, 3, and 4, (2) the issuance of injunctive relief for Plaintiffs' Title VII preemption claim, Count 2, and (3) Plaintiffs' Equal Protection claims, Counts 10, 11, and 12.

Accordingly,

**IT IS ORDERED:**

1. Plaintiffs' motion for summary judgment, ECF No. 158, is **GRANTED in part** and **DENIED in part**. The motion as to Plaintiffs' Title VII

discrimination claims, Counts 1, 3, and 4, is **GRANTED inasmuch as subsection 3 discriminates based on sex in violation of Title VII**. The motion as to Plaintiffs' Title VII preemption claim, Count 2, is **GRANTED inasmuch as subsection 3 is preempted by Title VII**. The motion is otherwise **DENIED**.

2. State Defendants' cross-motion for summary judgment, ECF No. 147, is **GRANTED in part** and **DENIED in part**. The motion as to Plaintiff Wood's Title VII discrimination claim, Count 1, is **GRANTED with respect to Plaintiff Wood's alternative theory of a hostile work environment**. The motion is also **GRANTED** as to Plaintiffs' First Amendment claim, Count 7, and Plaintiffs' Title IX claim, Count 13. The motion is otherwise **DENIED**.

3. HCSB's cross-motion for summary judgment, ECF No. 150, is **GRANTED in part** and **DENIED in part**. The motion as to Plaintiff Wood's Title VII discrimination claim, Count 3, is **GRANTED with respect to Plaintiff Wood's alternative theory of a hostile work environment**. The motion is also **GRANTED** as to Plaintiff Wood's First Amendment claim, Count 8, and Plaintiff Wood's Title IX claim, Count 14. The motion is otherwise **DENIED**.

4. LCSB's cross-motion for summary judgment, ECF No. 154, is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to Plaintiff Doe's

First Amendment claim, Count 9, and Plaintiff Doe's Title IX claim, Count 15. The motion is otherwise **DENIED**.

5. This Court does *not* direct entry of partial judgment pursuant to Federal Rule of Civil Procedure 54(b).

6. This case is **STAYED** until the Eleventh Circuit renders a decision in the en banc rehearing of *Lange v. Houston County, Georgia*. The parties must file a notice with this Court as soon as the Eleventh Circuit issues in opinion in that case and this Court will set this matter for a telephonic status conference.

**SO ORDERED on August 13, 2025.**

<u>**s/Mark E. Walker**</u>
**United States District Judge**