# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

| | |
|---|---|
| Wood, *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>　　　　v.<br><br>Florida Department of Education, *et al.*,<br><br>　　　　　*Defendants*. | Case No. 4:23-cv-526-MW-MAF |

# STATE DEFENDANTS' SUPPLEMENTAL BRIEF

# IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 2

   I.   Plaintiffs cannot challenge Florida's government speech
       under the Equal Protection Clause. .............................................. 2

       A. Florida has broad freedom to express its views through
          government speech. .................................................................. 2

       B. The Equal Protection Clause does not limit Florida's
          speech. ....................................................................................... 5

       C. The State Defendants are entitled to summary judgment
          on Plaintiffs' equal protection claim. ...................................... 14

   II.  Subsection 3 does not facially discriminate based on sex
       under Title VII. ................................................................................ 16

CONCLUSION ............................................................................................. 23

CERTIFICATE OF SERVICE ................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*Adams v. Me. Mun. Ass'n,*
2013 WL 9246553 (D. Me. Feb. 14) ........................................................ 11

*Am. Atheists, Inc. v. Port Auth. of NY & NJ,*
936 F. Supp. 2d 321 (S.D.N.Y. 2013) ................................................... 10

*Anderson v. Martin,*
375 U.S. 399 (1964) ............................................................... 11, 12, 14

*Atheists of Fla. v. City of Lakeland,*
779 F. Supp. 2d 1330 (M.D. Fla. 2011) ............................................. 9, 10

*Bd. of Regents v. Southworth,*
529 U.S. 217 (2000) ............................................................................. 4

*Bloomberg v. Blocker,*
586 F. Supp. 3d 1251 (M.D. Fla. 2022) ............................................. 5, 9

*Catoosa Cnty. Republican Party v. Catoosa Cnty. Bd. of
Elections & Voter Registration,*
2025 WL 1662455 (11th Cir. June 12) ................................................ 13

*Coleman v. Hamilton County,*
104 F. Supp. 3d 877 (E.D. Tenn. 2015) .............................................. 10

*Coleman v. Miller,*
117 F.3d 527 (11th Cir. 1997) ............................................................. 6

*Corbitt v. Sec'y of the Ala. Law Enforcement Agency,*
115 F.4th 1335 (11th Cir. 2024) .......................................................... 6

*FFRF v. City of Warren,*
707 F.3d 686 (6th Cir. 2013) ............................................................... 8

*Fields v. Speaker of the Pa. House of Reps.,*
936 F.3d 142 (3d Cir. 2019) ........................................................ 5, 9, 11

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) .......................................................... 3, 4, 5, 15

*Golden v. Rossford Exempted Vill. Sch. Dist.,*
445 F. Supp. 2d 820 (N.D. Ohio 2006) ............................................... 10

*Gundy v. City of Jacksonville,*
  50 F.4th 60 (11th Cir. 2022) ............................................................... 2

*Hunter v. Erickson,*
  393 U.S. 385 (1969) ........................................................................ 14

*Johanns v. Livestock Mktg. Ass'n,*
  544 U.S. 550 (2005) .......................................................................... 4

*Johnson v. Poway Unified Sch. Dist.,*
  658 F.3d 954 (9th Cir. 2011)................................................. 5, 6, 7, 15

*Lange v. Houston County,*
  101 F.4th 793 (11th Cir. 2024) ............................................... 19, 21, 22

*Lange v. Houston County,*
  2025 WL 2602633 (11th Cir. Sept. 9)....................... 1, 17, 18, 19, 20, 22

*Moore v. Bryant,*
  853 F.3d 245 (5th Cir. 2017)............................................................ 5, 7

*NAACP v. Hunt,*
  891 F.2d 1555 (11th Cir. 1990)............................................................ 6

*New Mexico v. McAleenan,*
  450 F. Supp. 3d 1130 (D.N.M. 2020)............................................. 11, 12

*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
  414 F.3d 23 (D.C. Cir. 2005)............................................................. 11

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009).............................................................. 2, 3, 4, 5, 11

*Rideout v. Gardner,*
  123 F. Supp. 3d 218 (D.N.H. 2015) .................................................... 13

*Rust v. Sullivan,*
  500 U.S. 173 (1991)........................................................................... 12

*Shurtleff v. City of Boston,*
  596 U.S. 243 (2022)............................................................................. 3

*Simpson v. Chesterfield Cnty. Bd. of Supervisors,*
  404 F.3d 276 (4th Cir. 2005)............................................................ 8, 9

iii

*Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of the Va. DMV,*
288 F.3d 610 (4th Cir. 2002) ................................................................. 12

*Sutliffe v. Epping Sch. Dist.,*
584 F.3d 314 (1st Cir. 2009) ................................................................. 11

*United States v. Jackson,*
55 F.4th 846 (11th Cir. 2022) ........................................................... 6, 12

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
576 U.S. 200 (2015) ............................................................................ 3, 4

*Wooley v. Maynard,*
430 U.S. 705 (1977) ................................................................................ 5

## STATUTES

Fla. Stat. §1000.071(3) ..................................................................... 18, 20

## OTHER AUTHORITIES

Derek T. Muller, *Ballot Speech,*
58 Ariz. L. Rev. 693 (2016) .................................................................. 13

*In Focus: Nonbinary People*, GLAAD,
https://perma.cc/6DZR-NNCF .............................................................. 21

Jessica A. Clarke, *They, Them, and Theirs,*
132 Harv. L. Rev. 894 (2019) ............................................................... 21

Press Release, *1.2 Million LGBTQ Adults in the US Identify as Nonbinary*, UCLA Sch. of Law Williams Inst.,
https://perma.cc/8KEH-HC5Y ............................................................... 21

Sabra L. Katz-Wise, *Gender Fluidity: What It Means and Why Support Matters*, Harvard Health Publ'g (Dec. 3, 2020),
https://perma.cc/4E4Y-W38P ................................................................ 21

Sophie Perry, *What Is a 'Mx' Title, How Is It Used, and Why Are Some People Mad About It?*, PinkNews (Aug. 14, 2025),
https://perma.cc/7622-6QVV .................................................................. 21

## INTRODUCTION

The Eleventh Circuit and this Court have held that Plaintiffs' challenges to Subsection 3 involve government speech. Those holdings foreclose Plaintiffs' claim under the Equal Protection Clause. As this Court observed, courts have concluded that the Equal Protection Clause does not apply to government speech. Dkt.190 at 30 n.14. In fact, it appears that every court to consider the question has so held. Plaintiffs' challenge to government speech is not cognizable under the Equal Protection Clause as a result. The State Defendants are entitled to summary judgment on Count 10.

The en banc Eleventh Circuit's decision in *Lange v. Houston County*, 2025 WL 2602633 (11th Cir. Sept. 9), also forecloses Plaintiffs' Title VII disparate treatment and preemption claims that Subsection 3 unlawfully discriminates based on sex. This Court's conclusion was "dictate[d]" by the reasoning of the vacated panel opinion in *Lange*, Dkt.190 at 14, which the en banc Eleventh Circuit squarely rejected. Under *Lange*, Subsection 3 does not discriminate based on sex or transgender status. The State Defendants are entitled to summary judgment on Counts 1 and 2.

1

## ARGUMENT

**I.    Plaintiffs cannot challenge Florida's government speech under the Equal Protection Clause.**

Governments are entitled to say what they wish and not to espouse views with which they disagree. That freedom includes limiting government employees' speech to ensure clear and consistent messaging. There are only two constitutional checks on government speech. The Equal Protection Clause is not one of them, because it protects against disparate *treatment*, not disparate *messaging*. That rule means individuals cannot base an equal protection claim on government speech. This Court should follow every court to squarely consider the issue and hold that Plaintiffs do not have a viable claim under the Equal Protection Clause to challenge Subsection 3.

**A. Florida has broad freedom to express its views through government speech.**

"A government entity has the right to 'speak for itself.'" *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). "[W]hen the government exercises the right to speak for itself, it can freely select the views that it wants to express, including choosing not to speak and speaking through the removal of speech that the government disapproves." *Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) (cleaned

up). Thus, "when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015).

The freedom for governments to speak is essential for them to function. *Summum*, 555 U.S. at 468. Without it, "government would not work." *Walker*, 576 U.S. at 207. "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). "If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector … ." *Summum*, 555 U.S. at 468.

Government speech is every bit as essential in the context of public employment. As the Supreme Court has recognized, "[g]overnment employers … need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "When they speak out," government employees "can express

3

views that contravene governmental policies or impair the proper performance of governmental functions." *Id.* at 419. Given the "need for substantive consistency and clarity," governments can "ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* at 422-23.

To be sure, there are constraints on the government's freedom to speak. The first is "democratic accountability." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 563 (2005). The "democratic electoral process" is the primary "check on government speech." *Walker*, 576 U.S. at 207. "When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy." *Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000). "If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Summum*, 555 U.S. at 468-69.

There are also two constitutional constraints. "[T]he Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech." *Walker*, 576 U.S. at 208; *accord Wooley v. Maynard*, 430 U.S.

4

705, 716-17 (1977). And "government speech must comport with the Establishment Clause." *Summum*, 555 U.S. at 468.

**B. The Equal Protection Clause does not limit Florida's speech.**

**1.** The Equal Protection Clause, on the other hand, "does not apply to government speech." *Fields v. Speaker of the Pa. House of Reps.*, 936 F.3d 142, 161 (3d Cir. 2019). The clause protects against "differential governmental treatment, not differential governmental messaging." *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017). Individuals thus "have no personal interest in government speech on which to base an equal protection claim." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 970 (9th Cir. 2011). A government's decision on "what [it] is willing to communicate … is fundamentally about its own speech" and "does not inhibit the rights of private citizens." *Bloomberg v. Blocker*, 586 F. Supp. 3d 1251, 1258 (M.D. Fla. 2022). So too in the context of public employment: "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421-22.

5

The Eleventh Circuit has not yet considered whether the Equal Protection Clause applies to government speech.[1] Five circuits and numerous district courts have held, in various contexts including government employment, that a plaintiff cannot challenge government speech under the Equal Protection Clause. The State Defendants are not aware of a single court that has held otherwise.

In *Johnson*, the Ninth Circuit held that a public school teacher didn't have an equal protection claim against directives that he remove from his classroom banners stating "God"—"In God We Trust," "One Nation Under God," among others. 658 F.3d at 957-58. The court first rejected his First Amendment claim on government speech grounds, holding that "he spoke as an employee." *Id.* at 967. That holding "le[ft] little room for discussion" on the equal protection claim. *Id.* at 975. "All the

---

[1] The Eleventh Circuit has rejected equal protection challenges to government speech on the merits. But it did so without considering the threshold question of whether the Equal Protection Clause applies to government speech at all. *See Corbitt v. Sec'y of the Ala. Law Enforcement Agency*, 115 F.4th 1335 (11th Cir. 2024) (sex designations on driver's licenses); *Coleman v. Miller*, 117 F.3d 527 (11th Cir. 1997) (Confederate flag display); *NAACP v. Hunt*, 891 F.2d 1555 (11th Cir. 1990) (same). It thus remains an open question in this circuit. *See, e.g., United States v. Jackson*, 55 F.4th 846, 854 (11th Cir. 2022) ("Unstated assumptions on non-litigated issues are not precedential holdings binding future decisions." (cleaned up)).

speech of which Johnson complains belongs to the government, and the government has the right to 'speak for itself.'" *Id*. "Because Johnson had no individual right to speak for the government, he could not have suffered an equal protection violation." *Id*.

In *Moore*, the Fifth Circuit held that a plaintiff failed to establish injury in fact for an equal protection challenge to public displays of Mississippi's state flag, which included the Confederate battle emblem. 853 F.3d at 249-51. The court distinguished "Establishment Clause case law" because "the injuries protected against under the Clauses are different." *Id*. at 249-50. The Establishment Clause "directly regulates Government speech if that speech endorses religion," the court explained, so an "Establishment Clause injury can occur when a person encounters the Government's endorsement of religion." *Id*. at 250. But "[t]he same is not true under the Equal Protection Clause: the gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging." *Id*. As a result, the plaintiff's "exposure to a discriminatory message, without a corresponding denial of equal treatment, [wa]s insufficient to plead" an equal protection injury. *Id*.

7

The Sixth Circuit has rejected equal protection challenges to government speech too. In *FFRF v. City of Warren*, the court held that a holiday nativity display "does not violate the Equal Protection Clause." 707 F.3d 686, 698 (6th Cir. 2013). In rejecting the plaintiff's argument "that the City's government speech commemorating the holiday disparately treats its preferred message," the court said "welcome to the crowd." *Id.* The plaintiff remained "free to urge the City to add or remove symbols from the display each year or to try to elect new officials to run the City—the customary answer to permissible government speech." *Id.*

The Fourth and Third Circuits have both rejected equal protection challenges to legislative prayer because it is government speech. In *Simpson v. Chesterfield County Board of Supervisors*, a resident challenged the county's legislative prayer practice after being denied an opportunity to deliver an invocation. 404 F.3d 276, 279-80 (4th Cir. 2005). The Fourth Circuit explained that "th[e] issue turns on the characterization of the invocations as government speech." *Id.* at 288. Applying "the standards for challenges to government speech," the court held that the prayer practice was "subject only to the proscriptions of the Estab-

lishment Clause." *Id.* Similarly, the Third Circuit rejected an equal protection challenge to the Pennsylvania House of Representatives guest chaplain policy, "join[ing] the authority holding that the Equal Protection Clause does not apply to government speech." *Fields*, 936 F.3d at 161.

District courts in this circuit have likewise recognized that the Equal Protection Clause does not limit government speech. In *Bloomberg*, the court rejected an equal protection challenge to a county board's refusal to consider an LGBTQ proclamation. 586 F. Supp. 3d at 1257-58. It explained that decisions about "what the Board is willing to communicate" is "its own speech" and "does not inhibit the rights of private citizens." *Id.* at 1258. "[T]he Board's decision is fundamentally about its own speech, and it is not required to endorse all messages or any particular message." *Id.* In *Atheists of Florida v. City of Lakeland*, the court rejected an equal protection challenge to a city's legislative prayer practice because the prayers were "government speech … 'subject only to the proscriptions of the Establishment Clause.'" 779 F. Supp. 2d 1330, 1342 (M.D. Fla. 2011) (quoting *Simpson*, 404 F.3d at 288). The government

9

speech determination, the court explained, "is simultaneously a recognition that the Establishment Clause, and the Establishment Clause only, governs the conduct at issue in this case." *Id.*

Other district courts have also held that "government speech [is] not subject to a challenge under the Equal Protection Clause." *Am. Atheists, Inc. v. Port Auth. of NY & NJ*, 936 F. Supp. 2d 321, 339 n.19 (S.D.N.Y. 2013), *aff'd*, 760 F.3d 227 (2d Cir. 2014); *see, e.g.*, *Golden v. Rossford Exempted Vill. Sch. Dist.*, 445 F. Supp. 2d 820, 826 (N.D. Ohio 2006) ("Where the speech is government speech, the government … is not subject to the strictures of the Equal Protection Clause, but only to the requirements of the Establishment Clause."); *Coleman v. Hamilton County*, 104 F. Supp. 3d 877, 891 (E.D. Tenn. 2015) (explaining that government speech in the form of legislative prayer is "subject to analysis only under the Establishment Clause of the First Amendment, and not under the Equal Protection Clause").

**2.** To the State Defendants' knowledge, no court to squarely consider the question has held that the Equal Protection Clause limits government speech. The First and D.C. Circuits have noted that the Equal Protection Clause "may be" a "restraint on government speech," *Sutliffe*

*v. Epping Sch. Dist.*, 584 F.3d 314, 331 n.9 (1st Cir. 2009), or "might" "limit the government as speaker," *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005). But they did so "without deciding and without explanation." *Fields*, 936 F.3d at 160-61. And while Justice Stevens argued that "government speakers are bound by" both "the Establishment and Equal Protection Clauses," he did so in passing without explanation or citation to any authority. *Summum*, 555 U.S. at 482 (Stevens, J., concurring); *see also Adams v. Me. Mun. Ass'n*, 2013 WL 9246553, at *19 (D. Me. Feb. 14) (noting, despite no equal protection claim asserted, that "[i]f government speech is discriminatory, it might be challenged under the Equal Protection Clause" (citing *Summum*, 555 U.S. at 482 (Stevens, J., concurring))).

Only one district court, to the State Defendants' knowledge, has noted in dicta that "the Equal Protection Clause prohibits government speech that promotes discrimination on the basis of race, religion, national origin, or gender." *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1210 (D.N.M. 2020) (citing *Anderson v. Martin*, 375 U.S. 399, 402 (1964)). That note came while considering whether New Mexico and Albuquerque had their own First Amendment rights to allege a retaliation

11

claim against the federal government. *Id.* at 1209. The court "conclude[d] that the First Amendment provides no cause of action for States and municipalities to contest federal retaliation against States and municipalities' speech." *Id.* That holding has no bearing on the issue here.

*McAleenan*'s reliance on *Anderson* for the proposition that the Equal Protection Clause cabins government speech was also misplaced. In *Anderson*, the Supreme Court held that a Louisiana law requiring all ballots to list the race of candidates for elective office violated the Equal Protection Clause. 375 U.S. at 402-04. Nowhere did *Anderson* discuss government speech. Indeed, the case was decided long before the government speech doctrine even existed. It is generally understood that the Supreme Court first articulated the doctrine in *Rust v. Sullivan*, 500 U.S. 173 (1991), nearly three decades after *Anderson*. *See Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of the Va. DMV*, 288 F.3d 610, 617 (4th Cir. 2002) ("*Rust* is considered to have been one of the first cases recognizing the government speech doctrine"). So *Anderson* had no occasion to decide whether ballots are government speech and, if so, whether the Equal Protection Clause applied to that government speech. *See United States v. Jackson*, 55 F.4th 846, 854 (11th Cir. 2022)

12

("Unstated assumptions on non-litigated issues are not precedential holdings binding future decisions." (cleaned up)).

Whether *Anderson* even involved government speech, as it is currently understood, is suspect. The Eleventh Circuit recently held in an unpublished opinion that ballot questions do not convey government speech (based on the complaint's allegations). *See Catoosa Cnty. Republican Party v. Catoosa Cnty. Bd. of Elections & Voter Registration*, 2025 WL 1662455, at *5 (11th Cir. June 12) (concluding that "none of the three factors strongly support a finding that ballot questions in a partisan primary election constitute government speech"); *see also Rideout v. Gardner*, 123 F. Supp. 3d 218, 230 (D.N.H. 2015) ("ballots do not communicate messages from the state; they simply list slates of candidates"), *aff'd*, 838 F.3d 65 (1st Cir. 2016); Derek T. Muller, *Ballot Speech*, 58 Ariz. L. Rev. 693, 735 (2016) ("The ballot has not been traditionally subject to government control, even though the government has seized much control recently. And the words on the ballot concerning candidates and parties are not clearly attributable to the government. Instead, ballot speech is better understood as private speech facilitated by a government-managed channel.").

13

In any event, the government was not espousing any message. "[B]y placing a racial label on a candidate at the most crucial stage in the electoral process—the instant before the vote is cast—the State" sought to "arous[e]" and "induc[e] racial prejudice at the polls," which could "decisively influence" electoral outcomes. *Anderson*, 375 U.S. at 402. The Court viewed the statute as an end-run, indirectly barring blacks from running for office. *Id.* at 404. As the Court later explained, *Anderson* was concerned about interfering with elections; it "place[d] special burden on racial minorities within the governmental process. This is no more permissible than denying them the vote, on an equal basis with others." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969) (citing *Anderson*, 375 U.S. 399). As a result, *Anderson* is far afield and has no application here.

## C. The State Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

Plaintiffs' equal protection claim fails as a matter of law. As the Eleventh Circuit and this Court held, Plaintiffs' usage of personal titles and pronouns while interacting with students in the classroom is government speech. Dkt.190 at 45. And as the above avalanche of cases es-

tablishes, Plaintiffs cannot challenge Subsection 3's restrictions on government speech under the Equal Protection Clause. "[T]he bare fact that the speech belongs to the government is dispositive" and forecloses any equal protection challenge. *Johnson*, 658 F.3d at 970. "Because [Plaintiffs] ha[ve] no individual right to speak for the government, [they] could not have suffered an equal protection violation." *Id.* at 975.

Nor can this case be distinguished because the speech arises in the public employment context. *Johnson*, too, involved a public school teacher challenging restrictions on classroom speech. In this context, as others, "[a]ll the speech of which [the teacher] complains belongs to the government, and the government has the right 'to speak for itself.'" *Id.* As *Garcetti* held, "when public employees make statements pursuant to their official duties, ... the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. Because Plaintiffs' desired usage of titles and pronouns at work is government speech, restricting it "does not infringe any liberties [Plaintiffs] might have enjoyed as a private citizen." *Id.* at 421-22.

15

The Court should follow the apparently unanimous weight of authority that holds the Equal Protection Clause does not apply to government speech. *Supra* II.A. Accordingly, the State Defendants are entitled to summary judgment on Plaintiffs' equal protection claim (Count 10).

## II. Subsection 3 does not facially discriminate based on sex under Title VII.

Subsection 3 does not discriminate based on sex for the same reasons the en banc Eleventh Circuit held that the health insurance plan did not discriminate in *Lange v. Houston County*. This Court relied on the vacated panel opinion of *Lange*, acknowledging that "the outcome" of the en banc rehearing "could be determinative in this case." Dkt.190 at 18. It is. The en banc Eleventh Circuit rejected the panel's reasoning and reached a different outcome. *Lange*, and its application of *Bostock v. Clayton County*, 590 U.S. 644 (2020), confirms Subsection 3 does not facially discriminate based on (1) sex or (2) transgender status under Title VII. The Court should enter summary judgment for the State Defendants on Plaintiffs' Title VII disparate treatment and preemption claims (Counts 1 and 2).

**A.** Start with discrimination based on sex. "Citing *Bostock*," the plaintiff in *Lange* "argue[d] that the plan discriminates based on sex

16

because it would have covered the requested surgery if Lange were born a female and denied coverage only because Lange was born male." *Lange*, 2025 WL 2602633, at *3. The Eleventh Circuit held, however, that "[t]he Supreme Court recently rejected Lange's interpretation of *Bostock* in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025)." *Id.* In *Skrmetti*, "the Court reasoned that the law did not classify based on sex because 'the law does not prohibit conduct for one sex that it permits for the other.'" *Id.* Likewise, the insurance plan in *Lange* "does not pay for a sex change operation for anyone regardless of their biological sex." *Id.* at *4. "Lange is a natal man. If Lange were instead a natal woman who wanted a female-to-male sex change, the insurance policy would not pay for it." *Id.* "Or if Lange were a natal woman who sought coverage for the same male-to-female change … , the County's policy would operate in the same way—it would deny coverage." *Id.* "Nothing about the policy exclusion turns on whether the County's employee is a man or woman." *Id.*

In the same way, Subsection 3 does not facially discriminate based on sex under Title VII. Just as the plan in *Lange* would not cover any sex-change operation, Subsection 3 prohibits usage of any biologically

17

incongruous titles or pronouns with students. Fla. Stat. §1000.071(3). Subsection 3 "does not prohibit conduct for one sex that it permits for the other." *Lange*, 2025 WL 2602633, at \*3. It prohibits both male and female employees from using biologically incongruous titles and pronouns, just as the plan in *Lange* did not cover sex-change procedures for both males and females. Like the plan in *Lange*, Subsection 3 applies to all teachers "regardless of their biological sex." *Id.* at \*4.

In other words, *Lange* adopted the State Defendants' position that policies that apply equally to both sexes do not unlawfully discriminate based on sex under Title VII and *Bostock*. *See* Dkt.165 at 19, 48. Subsection 3's requirement that all public school teachers—men and women alike—use biologically aligned titles and pronouns does not discriminate based on sex. *See Texas v. EEOC*, 2025 WL 1414332, at \*12 (N.D. Tex. May 15) (holding that requiring employees to "us[e] pronouns consistent with an employee's biological sex" does not violate Title VII under *Bostock* because policy applies equally to men and women).

**B.** The outcome is the same through the lens of discrimination based on transgender status. This Court held that Subsection 3 discriminates based on sex under Title VII "because [Plaintiffs] self-identify

18

with female pronouns, which is inherent to their transgender status and inextricably connected to their sex under *Bostock*." Dkt.190 at 12. The Court relied on the "since-vacated" panel opinion in *Lange*. *Id.* at 13. "Applying *Bostock*," the panel held that the plan discriminated "based on transgender status because it denied coverage for gender-affirming surgery, and transgender individuals 'are the only participants who would seek gender-affirming surgery.'" *Id.* (quoting *Lange v. Houston County*, 101 F.4th 793, 798-99 (11th Cir. 2024)). This Court reasoned that "*Lange*, if binding, would dictate that subsection 3 discriminates based on transgender status because it proscribes using different pronouns from those typically associated with one's biological sex, which only transgender individuals seek to do." *Id.* at 14. Thus, "informed by *Bostock* and *Lange*," the Court held that "subsection 3 discriminates against Plaintiffs based on sex in violation of Title VII." *Id.*

But the en banc Eleventh Circuit decided *Lange* differently, rejecting the panel's reasoning. The Eleventh Circuit first explained that transgender status is not "separately protected under Title VII apart from sex." 2025 WL 2602633, at *4. "But, even if this theory were viable under Title VII, the County's plan does not facially discriminate based

19

on transgender status." *Id.* at *4. In *Skrmetti*, "the Court expressly held that the state statute at issue did not discriminate based on transgender status" under *Bostock* "because it did 'not exclude any individual from medical treatments on the basis of transgender status.'" *Id.* "This was so, the Court explained, because 'changing a minor's sex or transgender status does not alter the application' of the challenged statute." *Id.* at *5. In other words, neither a boy nor a transgender boy could obtain the treatment. *Id.* The Eleventh Circuit then applied that reasoning in *Lange*: "The County's policy does not pay for a sex change operation for anyone regardless of their biological sex." *Id.* at *4. "The plan does not say, for example, that transgender employees must pay more than non-transgender employees or that transgender employees or their dependents receive reduced benefits." *Id.* at *5.

Like the plan in *Lange*, Subsection 3 does not discriminate based on sex via "transgender status." *Contra* Dkt.190 at 14. Under Subsection 3, no public-school employee may provide biologically incongruous titles or pronouns to students. Fla. Stat. §1000.071(3). The law applies to all employees regardless of whether their gender identity aligns with their

20

sex. No teacher—transgender or not—can use biologically incongruous pronouns with students.

Moreover, this Court reasoned that "only transgender individuals seek to" use biologically incongruous titles and pronouns, Dkt.190 at 14, following the *Lange* panel's reasoning that "transgender individuals 'are the only participants who would seek gender-affirming surgery,'" *id.* at 13 (quoting 101 F.4th at 798-99). But transgender individuals are not the only people who may choose to use biologically incongruous titles and pronouns.[2] So too, transgender individuals are not the only ones

---

[2] "Gender fluid people may … use 'he' pronouns on some occasions and … 'she' pronouns on others." Jessica A. Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 907 (2019). Yet "some people in the transgender community" view gender fluid people "as 'not really transgender.'" Sabra L. Katz-Wise, *Gender Fluidity: What It Means and Why Support Matters*, Harvard Health Publ'g (Dec. 3, 2020), https://perma.cc/4E4Y-W38P. Similarly, nonbinary people—who may use they/them or neopronouns—"do not" always "call themselves transgender" or "consider themselves part of the transgender community." *In Focus: Nonbinary People*, GLAAD, https://perma.cc/6DZR-NNCF; *see also* Press Release, *1.2 Million LGBTQ Adults in the US Identify as Nonbinary*, UCLA Sch. of Law Williams Inst., https://perma.cc/8KEH-HC5Y ("two nationally representative surveys" revealed only 42% of "all nonbinary LGBTQ adults are … transgender"). And people who are not transgender may use the title "Mx." simply because they generally "oppose gendered categories." Sophie Perry, *What Is a 'Mx' Title, How Is It Used, and Why Are Some People Mad About It?*, PinkNews (Aug. 14, 2025), https://perma.cc/7622-6QVV.

who may seek a sex-change operation. As the en banc court in *Lange* explained, the "plan would cover the procedures that make up a sex change for other purposes, such as treatment for cancer or reconstructive surgery following a car accident, whether or not the employee who needed those procedures was transgender." 2025 WL 2602633, at *5. *Lange*, in other words, rejected the panel's narrow view of the plan as applying only to transgender individuals, the same view this Court took of Subsection 3.

In addition, one's choice to "self-identify" with biologically incongruous titles or pronouns is not "inherent to transgender status" and thus not "inextricably connected to" sex, as this Court concluded. Dkt.190 at 11-12. The *Lange* panel thought the same of procedures that are part of sex-change operations. 101 F.4th at 799. But not all transgender persons use biologically incongruous titles and pronouns. *See, e.g.*, *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring) ("[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex). Quite the opposite."). In fact, only "*some* transgender … people" "choose"

to transition by "changing … pronouns." *Transgender and Non-Binary People FAQ*, Hum. Rts. Campaign, https://perma.cc/9G8TJ3JX (emphasis added); *see also Understanding Pronouns*, Children's Health, https://perma.cc/43KL-2S7V (noting "not all" transgender persons "change their pronoun"). In other words, title and pronoun choice, like the procedures the plan excluded in *Lange*, is independent of transgender status. Subsection 3 does not discriminate based on sex via transgender status.

## CONCLUSION

The Court should enter judgment for the State Defendants on Plaintiffs' equal protection claim in Count 10 and on Plaintiffs' Title VII disparate treatment and preemption claims in Counts 1 and 2.

23

Dated: September 25, 2025         Respectfully submitted,

*/s/ Bryan Weir*

Bryan Weir*
Daniel M. Vitagliano*†
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: 703.243.9423
bryan@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Counsel for the State Defendants*

*Admitted pro hac vice
† Supervised by principals of the firm
admitted to practice in VA

24

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2025, a true and correct copy of this supplemental brief was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Bryan Weir*

25