# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

Katie Wood, *et al.*,

        *Plaintiffs*,

v.

        No. 4:23-cv-00526-MW-MAF

Florida Department of Education, *et al.*,

        *Defendants*.

_____/

# PLAINTIFFS' RESPONSE TO
# STATE DEFENDANTS' SUPPLEMENTAL BRIEF
# IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Argument...................................................................................................................3

I.     Plaintiffs may still challenge Defendants' enforcement of subsection 3 against them under the Equal Protection Clause....................3

      A.     The Equal Protection Clause protects against the disparate treatment Plaintiffs experience from their government employers. ....................................................................................4

      B.     The Eleventh Circuit and district courts within the circuit have applied the Equal Protection Clause to government speech. ................................................................................................8

      C.     Defendants have not justified summary judgment on Plaintiffs' Equal Protection Clause claims as to Plaintiffs' speech beyond the narrow context considered by the Eleventh Circuit. ...............................................................................12

II.     Subsection 3 discriminates based on sex in violation of Title VII...........13

      A.     *Lange* did not change the law. .......................................................14

      B.     *Lange* simply applied *Skrmetti*, which does not apply here. .........16

      C.     Defendants' arguments fail. ...........................................................19

      D.     Defendants fail to address sex stereotyping. ..................................22

Conclusion ...........................................................................................................24

Certificate of Word Count ...................................................................................26

Pursuant to this Court's orders, Docs. 192, 194, Plaintiffs submit this response to State Defendants' supplemental brief in support of their motion for summary judgment, Doc. 195, which Defendants Hillsborough County School Board and Lee County School Board joined, Docs. 197, 200.

## ARGUMENT

I.    **Plaintiffs may still challenge Defendants' enforcement of subsection 3 against them under the Equal Protection Clause.**

The Eleventh Circuit concluded that Ms. Wood is not substantially likely to succeed on her Free Speech Clause claim because when she uses "her preferred personal title or pronouns," Fla. Stat. § 1000.071(3), to identify herself "when she (1) is interacting with students (2) in the classroom and (3) within the scope of her employment duties," *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1290 (11th Cir. 2025), "she does so pursuant to her official duties and therefore speaks as a government employee, not a citizen," *id.* at 1291-92.[1] Defendants ask this Court to therefore grant them summary judgment on Plaintiffs' separate Equal Protection Clause claim. They argue: (1) the Equal Protection Clause is not a "constitutional check[] on government speech" "because it protects against disparate *treatment*, not disparate *messaging*," Doc. 195 at 2; (2) Plaintiffs' self-identification to students in the classroom

---

[1] Plaintiffs respectfully disagree with the Eleventh Circuit's conclusion and reserve the right to challenge it at an appropriate stage in this case.

is government speech; (3) therefore, the Equal Protection Clause is not a constitutional check on any of Defendants' enforcement of subsection 3 on Plaintiffs.

Defendants' conclusion does not follow from their premises for various reasons. First, Plaintiffs challenge disparate treatment, not mere "disparate messaging," and the Equal Protection Clause remains a check on how government employers treat their employees, even as to those employees' official speech. Second, the Eleventh Circuit and district courts within the circuit have applied the Equal Protection Clause to government speech. Third, Defendants make no attempt to justify extending the Eleventh Circuit's conclusion that Ms. Wood's self-identification to students is government speech in the specific context of the classroom to Plaintiffs' self-identification to students in all contexts, including outside the classroom.

A.    **The Equal Protection Clause protects against the disparate treatment Plaintiffs experience from their government employers.**

Although Defendants attempt to reframe this case as merely about government speech, it is actually about the intersection of government speech and government treatment of its employees—employees who unquestionably maintain equal protection rights in the workplace. Contrary to Defendant's suggestion, Plaintiffs are challenging disparate treatment, not just "disparate messaging." Subsection 3 treats Plaintiffs differently from other employees, on the basis of sex, as to what preferred personal titles and pronouns they may use in the workplace to identify themselves to students. Florida's teachers, including Plaintiffs, must identify themselves to

students using a title, typically Mr. for men and Mrs. or Ms. for women. As for pronouns, they are nearly unavoidable in the English language. By prohibiting Plaintiffs, but not other women, from using Ms. and she/her pronouns, Florida treats Plaintiffs, and only Plaintiffs, differently. Florida conscripts Plaintiffs, but not other teachers, as mouthpieces to deliver to students Florida's discriminatory message that Plaintiffs are not "real" women who may use titles like Ms. and she/her pronouns, even as everyone else remains free to address Plaintiffs as "Ms." or to use female pronouns to refer to them. Plaintiffs certainly disagree with Florida's message about them, but they are not challenging that message per se; nothing in Plaintiffs' challenge to subsection 3 restricts Florida from communicating that message in other ways that do not infringe on Plaintiffs' right to equal protection of the law.

Plaintiffs have the right to challenge this disparate treatment under the Equal Protection Clause even though they are government employees. The text of the Equal Protection Clause is clear: no state may "deny to *any person* within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added). It "is 'universal in its application.'" *Students for Fair Admissions, Inc.* ("*SFFA*") *v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). "[A]ny person within its jurisdiction" means "*all* persons within the territorial jurisdiction," *Yick Wo*, 118 U.S. at 369 (emphasis added)—including government employees.

"It is … well settled that [s]tates do not escape the strictures of the Equal Protection Clause in their role as employers." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 597 (2008) (citing cases). The Supreme Court's "cases make clear that the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Id.* at 605. "The … broad statement that [the Supreme Court] 'except[s] state employees from the Fourteenth Amendment's protection against unequal and irrational treatment at the hands of the State' is … plainly not correct." *Id.* (citing *id.* at 2158 (Stevens, J., dissenting)) (brackets and internal citation omitted). There are countless cases applying the Equal Protection Clause to governments' disparate treatment of their employees.[2]

---

[2] *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) (sex-discrimination claim by state employee); *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) (race-discrimination claim by state employee); *Arrington v. Cobb Cnty.*, 139 F.3d 865, 872-76 (11th Cir. 1998) (sex-discrimination claim by county employee); *Braddy v. Fla. Dep't of Lab. & Emp. Sec.*, 133 F.3d 797 (11th Cir. 1998) (sex- and race-discrimination claim by state employee); *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507-08 (11th Cir. 1995) (sex-discrimination claim by state employee); *Busby v. City of Orlando*, 931 F.2d 764, 777-82 (11th Cir. 1991) (race-discrimination claim by city employee); *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478-81 (11th Cir. 1991) (race-discrimination claim by city employee); *Edwards v. Fulton Cnty.*, 363 F. App'x 717 (11th Cir. 2010) (race- and sex-discrimination claims by county employee); *Lawson v. Curry*, 244 F. App'x 986 (11th Cir. 2007) (race-discrimination claim by county employee); *id.* at 988 ("'It is beyond doubt' that there is a federal equal protection right to be free from racial discrimination, that this right is clearly established, and that it extends into the

Given its reach and purpose, the Equal Protection Clause's limits on disparate treatment cannot be evaded simply by invoking the concept of "government speech." The Clause seeks to prevent the use of differences between the sexes to "denigrat[e] … the members of either sex or for artificial constraints on an individual's opportunity." *United States v. Virginia*, 518 U.S. 515, 533 (1996), as well as "eliminat[e] racial discrimination," *SFFA*, 600 U.S. at 206, and discrimination based on other protected characteristics. *See United States v. Skrmetti*, 145 S. Ct. 1816, 1850 (2025) (Barrett, J., concurring) (noting the Supreme Court has recognized alienage classifications are suspect too) (citing *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977)); Skrmetti, 145 S. Ct. at 1862 (Alito, J., concurring) ("The Court has also suggested that religion is a suspect class." (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938))). That is so because a person's sex or race is rarely relevant: "[S]ex 'generally provides no sensible ground for differential treatment,'" *Skrmetti*, 145 S. Ct. at 1828 (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)), and "sex-based lines too often reflect stereotypes or overbroad generalizations about the differences between men and women," *Skrmetti*, 145 S. Ct. at 1816 (citing *Sessions v. Morales-Santana*, 582 U.S. 47, 62 (2017)). Similarly, "racial characteristics so seldom provide a relevant basis for disparate treatment, and …

---

employment context." (quoting *Brown*, 923 F.2d at 1478)); *cf. Davis v. Passman*, 442 U.S. 228, 235-36 (1979) (sex-discrimination claim by federal employee).

7

classifications based on race are potentially so harmful to the entire body politic." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505 (1989) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 533-34 (1980) (Stevens, J., dissenting)) (brackets omitted).

Despite all this, Defendants ask this Court to hold that the tens of millions of state and local employees across the country, who are otherwise among those entitled to the Equal Protection Clause's "universal … application", *SFFA*, 600 U.S. at 206 (quoting *Yick Wo*, 118 U.S. at 369), lose that equal protection guarantee as to their speech at work—including speech as fundamental as identifying themselves—even if the states regulate that speech based on the speaker's protected characteristics, like race or, as here, sex and sex stereotypes. Such a rule would allow states to turn back the clock at their schools and offices to "that ignoble history" of race- and sex-based discrimination. *SFFA*, 600 U.S. at 203; *see also Virginia*, 518 U.S. at 531 ("[O]ur Nation has had a long and unfortunate history of sex discrimination." (quoting *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973))). Under the rule Defendants seek, Florida could impose all manner of degrading race- and sex-based regulations on how teachers identify themselves to students: for example, a rule that permitted only white or male teachers to use titles like Mr., and Dr., while requiring non-white or female teachers to use their first names.

**B.    The Eleventh Circuit and district courts within the circuit have applied the Equal Protection Clause to government speech.**

Defendants concede that the Eleventh Circuit has applied the familiar Equal

Protection Clause tests to government speech. Doc. 195 at 6 n.1 (citing *Corbitt v. Sec'y of the Ala. Law Enforcement Agency*, 115 F.4th 1335 (11th Cir. 2024) (sex designations on driver's licenses); *Coleman v. Miller*, 117 F.3d 527 (11th Cir. 1997) (Confederate flag display); *NAACP v. Hunt*, 891 F.2d 1555 (11th Cir. 1990) (same)). District courts within the circuit have followed the Eleventh Circuit's lead. *See, e.g.*, *Edgerton v. Augustine*, No. 3:20-CV-941-BJD-PDB, 2023 WL 4687515, at *4-5 (M.D. Fla. Mar. 20, 2023) (analyzing whether there was discriminatory intent to support an equal protection claim even though monument removal is government speech). This Court should do the same.

Although Defendants have previously argued *Corbitt v. Sec'y of the Alabama L. Enf't Agency* should be determinative in this matter, *see, e.g.*, Doc. 148-1 at 44 ("Subsection 3 is also indistinguishable from the policy at issue in *Corbitt* … [which] squarely control[s]."), they now try to gloss past *Corbitt*'s application of regular equal protection principles to government speech. *See* 115 F.4th at 1345-50 (applying Equal Protection Clause); *id.* at 1352 ("[A]ny speech on an Alabama driver's license, including the sex designation, is government speech."). As in *Corbitt*, this case concerns a law dictating the content of government speech with respect to the plaintiff's identity. Therefore, this Court should follow *Corbitt* and analyze whether subsection 3 violates the Equal Protection Clause using the traditional analysis.

The out-of-circuit cases on which Defendants rely are distinguishable. Most

9

concern challenges that were not brought by plaintiffs who were themselves required to speak the government's message, but instead by community members who wished the government would speak their preferred message. *E.g.*, *Fields v. Speaker of Pa. House of Representatives*, 936 F.3d 142, 147 (3d Cir. 2019) (nontheists wishing to provide legislative prayer); *Freedom from Religion Found., Inc. v. City of Warren, Mich.*, 707 F.3d 686, 689 (6th Cir. 2013) (organization challenging city's refusal to erect its proposed sign). Accordingly, these cases did not grapple with the issues affecting a speaker forced to speak the government's words—words that harm them on the basis of a protected characteristic like sex or race. That may be why other circuits considering such claims, including the Eleventh Circuit, have decided those plaintiffs lack standing without holding that no equal protection challenge to government speech could ever lie. *See Coleman*, 117 F.3d at 529-30; *Moore v. Bryant*, 853 F.3d 245, 250-51 (5th Cir. 2017). Here, Plaintiffs themselves are the speakers who are required to convey a government message that harms them. Therefore, there is no question of standing and most of these cases are inapposite.

The only case Defendants cite in which the plaintiff was also the speaker is *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011), but it is materially distinguishable. Johnson, also a teacher, wanted "to preach his own views on the role of God in our Nation's history to the captive students in his mathematics classroom" using two 14-square-foot banners "prominently displayed in [his]

10

classroom." *Id.* at 957-58. The Ninth Circuit held that his school could prohibit him from doing so because he speaks as a government employee when he decorates his classroom. *Id.* at 967. Although the Eleventh Circuit has held that Plaintiffs speak as government employees too when they identify themselves to students in the classroom, they are *required* to identify themselves to students using titles and pronouns, and subsection 3 forces them to identify themselves in a harmful, discriminatory way; Johnson, however, was not required to say anything about God's role in our Nation's history—neither his views nor the government's—and could avoid that topic altogether in his math classes. Properly understood, *Johnson* is more like *Fields*, in which a speaker wished the government would let him speak his preferred religious message, than this case, in which the government is forcing Plaintiffs to speak, on the government's behalf, a discriminatory message that directly harms them.

To apply the Ninth Circuit's holding in *Johnson* to this case in the Eleventh Circuit despite these material differences would amount to holding that no one could ever challenge a government's discriminatory message, not even those required to express it, even if those messages exhibit egregious discrimination, such as that described above, where non-white or female teachers are required to use their first names while white, male teachers are allowed to use Mr. and Dr. As Justice Stevens recognized, the exclusion of government speech from the Free Speech Clause does

11

"not give the government free license to communicate offensive or partisan messages" because "government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 482 (2009) (Stevens, J., concurring).

**C.    Defendants have not justified summary judgment on Plaintiffs' Equal Protection Clause claims as to Plaintiffs' speech beyond the narrow context considered by the Eleventh Circuit.**

Although the Eleventh Circuit's decision was explicitly limited to "when [Ms. Wood] (1) is interacting with students (2) in the classroom and (3) within the scope of her employment duties," 142 F.4th at 1290, and even though Plaintiffs have always challenged *all* of subsection 3's applications to them, including outside the classroom, *see* Doc. 199 at 2-7, Defendants make no attempt to explain how the Eleventh Circuit's narrow holding justifies summary judgment on Plaintiffs' equal-protection claim in its entirety, including outside the classroom. In other words, Defendants have not established that Plaintiffs' self-identification in contexts other than the one considered by the Eleventh Circuit is government speech. Nor could they. *See* Doc. 199 at 8-14. Since there is no question the Equal Protection Clause applies to Florida's conduct as an employer, even if the Court were to conclude that Plaintiffs have no equal protection right to challenge the portion of their self-identification that is classified as government speech, Plaintiffs maintain the right to challenge

12

subsection 3's application to them in contexts beyond the Eleventh Circuit's narrow holding, including under the Equal Protection Clause.[3]

## II.   Subsection 3 discriminates based on sex in violation of Title VII.

Contrary to Defendants' argument, the Eleventh Circuit's *en banc* decision in

---

[3] Additionally, Defendants abandoned any argument that the Court should not evaluate Plaintiffs' equal protection claim using traditional equal protection principles. Although Defendants have consistently argued throughout this case that Plaintiffs' speech was official, government speech, *e.g.*, Doc. 63-1 at 23 (State Defendants' Memorandum of Law in Support of Motion to Dismiss); Doc. 119 at 72 ¶ 6 (State Defendants' Answer to Plaintiffs' Second Amended Complaint; Doc. 148-1 at 29 (State Defendants' Memorandum of Law in Support of Motion for Summary Judgment), until now on supplemental briefing after the close of summary judgment, they have never argued that designation foreclosed proper consideration of Plaintiffs' equal protection claim. Therefore, any argument that Plaintiffs cannot make an equal protection claim because their challenge is to government speech should be deemed abandoned or forfeited. *See, e.g.*, *Wilder v. Paulson*, No. 1:08-CV-1349-BBM, 2009 WL 10702050, at *3 (N.D. Ga. June 3, 2009) ("Arguments made by a party in a subsequent filing, but 'not fairly raised in [a] [d]efendant['s] opening brief,' may not be considered by the court." (citing *Maiz v. Virani*, 253 F.3d 641, 674 (11th Cir. 2001)); *McGill v. Am. Trucking & Transportation, Ins. Co.*, 77 F. Supp. 3d 1261, 1266 (N.D. Ga. 2015) (noting "the familiar principle that arguments raised for the first time in a reply brief are abandoned" and will not be considered "[d]espite any potential merit" (citing *United States v. Carter,* 506 Fed. Appx. 853, 859 (11th Cir. 2013)). This Court's invitation to brief the issue does not resurrect the argument, as the argument cannot be made in good faith for the first time at this stage of the case. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (courts in "civil … cases, in the first instance and on appeal ... rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.") (citation omitted).

*Lange v. Houston Cnty., Georgia*, No. 22-13626, 2025 WL 2602633 (11th Cir. Sept. 9, 2025), does nothing to alter this Court's correct determination that subsection 3 discriminates "because of … sex" in violation of Title VII. Doc. 190 at 7-14. That determination followed directly from binding U.S. Supreme Court and Eleventh Circuit precedent and this Court's careful analysis of subsection 3. Although this Court also relied in part on the vacated panel decision in *Lange* as persuasive authority, the subsequent *en banc* decision in *Lange* does not change the law in any respect; instead, the Eleventh Circuit merely applied that existing law (including *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020)) to an employer medical insurance policy that is readily distinguishable from subsection 3. Indeed, as the *en banc* court held, *Lange* was decided based on *Skrmetti*, 145 S. Ct. 1816, an equal protection case upholding a law that this Court has already rightly concluded is not analogous to subsection 3. Doc. 190 at 34-35.

### A.    *Lange* did not change the law.

Nothing in *Lange* changed the law applied by this Court in its summary judgment decision.

First, *Lange* expressly applied *Bostock*, holding that "[u]nder *Bostock*, we apply a 'simple test' for sex discrimination—'change one thing at a time and see if the outcome changes.' … '[I]f changing the employee's sex would have yielded a different choice by the employer,' then the employer has discriminated based on sex."

*Lange*, 2025 WL 2602633, at \*3 (quoting *Bostock*, 590 U.S. at 656, 659-60, 671). That is the same legal test this Court applied in concluding that subsection 3 discriminates based on sex. Doc. 190 at 8. The Eleventh Circuit did not endorse Defendants' incorrect prior characterization of *Bostock* as a "narrow" ruling. *See* Doc. 190 at 9.

Second, *Lange* did not apply (or even mention) the Eleventh Circuit's inapplicable decisions regarding "mutable" versus "immutable" characteristics in the context of grooming policies, on which Defendants have previously relied. *See* Doc. 190 at 8-9; *see Willingham v. Macon Tel. Pub. Co.*, 507 F.2d 1084 (5th Cir. 1975); *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385 (11th Cir. 1998); *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016). That mutable/immutable distinction, had it applied in *Lange*, could have simplified the case, yet the Court of Appeals did not invoke that distinction at all, lending strong support to this Court's conclusion that it is inapposite. Doc. 190 at 10.

Finally, *Lange* nowhere endorsed Defendants' dubious interpretation of *Bostock* as drawing a distinction between "status" and "conduct," which this Court similarly rejected. Doc. 190 at 10-11. While Defendants have argued here that *Bostock* held "only that discriminating against a transgender person because of that person's transgender *status* violates Title VII," Doc. 190 at 8, the Eleventh Circuit held to the contrary that "*Bostock* did not add transgender status, as a category, to the list of

classes protected by Title VII." *Lange*, 2025 WL 2602633, at *4. The proper analysis, therefore, is not whether a law discriminates based on "transgender status," but whether it discriminates based on "sex"—which subsection 3 does, as this Court held. Doc. 190 at 12-13. Again, if Defendants' exceedingly narrow interpretation of *Bostock* were correct, *Lange* would have been decided on the simple ground that gender-affirming care is merely unprotected "conduct." But *Lange* held no such thing.

**B.   *Lange* simply applied *Skrmetti*, which does not apply here.**

Rather than disrupt existing law, the Eleventh Circuit in *Lange* primarily applied the Supreme Court's decision in *Skrmetti*. *See Lange*, 2025 WL 2602633, at *1, *4. But as this Court has already concluded, facially sex-discriminatory policies like subsection 3 are not analogous to laws or employer policies limiting access to gender-affirming medical treatments—such as those in *Skrmetti* and *Lange*.

In *Skrmetti*, the Supreme Court rejected an Equal Protection Clause challenge to a Tennessee law ("SB1") prohibiting healthcare providers from administering puberty blockers or hormones to minors to treat gender dysphoria, gender identity disorder, or gender incongruence. 145 S. Ct. at 1829. The Court held that SB1 was not subject to heightened scrutiny because it drew distinctions only on the permissible bases of "age" and "medical use," and did not classify based on sex. *Id.* The Supreme Court emphasized the "medical context" of the case, pointing out that "[s]ome

16

medical treatments and procedures are uniquely bound up in sex," and therefore "[i]n the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny." *Id.* at 1829-1830. Further underlining this distinctive and narrow context, the Court took care to distinguish discriminatory laws that attempt to "circumvent the Equal Protection Clause by writing in abstract terms." *Id.* at 1831; *see also* Doc. 190 at 33-34 (discussing *Skrmetti*). Finally, assuming but not deciding that *Bostock*'s reasoning applies in the Equal Protection context, the Supreme Court held that SB1 survives *Bostock*'s simple test for discrimination because its distinctions are not sex-based. *Skrmetti*, 145 S. Ct. at 1834-35.[4]

In *Lange*, the Eleventh Circuit engaged in a straightforward application of *Skrmetti*. In *Lange*, a county employee was denied insurance coverage for gender-affirming surgery because such surgery was excluded from her employer's policy, and she sued under Title VII. *Lange*, 2025 WL 2602633, at *2. In rejecting the Title

---

[4] Specifically, the Supreme Court reasoned: "If a transgender boy seeks testosterone to treat his gender dysphoria, SB1 prevents a healthcare provider from administering it to him. If you change his biological sex from female to male, SB1 would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone—such as a congenital defect, precocious puberty, disease, or physical injury. The transgender boy could receive testosterone only if he had one of those permissible diagnoses. And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status. Under the reasoning of *Bostock*, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone." *Skrmetti*, 145 S. Ct. at 1834 (citations omitted).

VII claim, the Eleventh Circuit imported equal protection reasoning into the Title VII context to hold that "[t]he Supreme Court's reasoning in *Skrmetti* applies equally here." *Id.* at *4. Specifically, the Eleventh Circuit concluded that "[t]he County's policy does not pay for a sex change operation for anyone regardless of their biological sex," so therefore "[n]othing about the policy exclusion turns on whether the County's employee is a man or a woman." *Id.* In short, "[t]he County's plan draws a line between certain treatments, which it covers, and other treatments, which it does not," which distinguishes the exclusion at issue in *Lange* from subsection 3. *Id.* at *7.

This Court has already explained why subsection 3 is not analogous to the laws and policies limiting gender-affirming medical treatment in *Skrmetti* and *Lange*. This Court noted that the *Skrmetti* Court "took pains to distinguish [the law at issue] from one like subsection 3 which 'prohibits conduct for one sex that it permits for the other,' even if conveyed in 'abstract terms.'" Doc. 190 at 33. Under *Skrmetti*, subsection 3 "falls within the scope of sex discrimination" because it provides that "biological males may use male pronouns but not female pronouns, and biological females may use female pronouns but not male pronouns." Doc. 190 at 34. This is akin to a discriminatory statute prohibiting "attendance at a religious service inconsistent with the attendee's religion," or an anti-miscegenation statute prohibiting "any person from marrying an individual of a different race." *Id.* (citing

18

*Skrmetti*, 145 S. Ct. at 1831).

### C.   Defendants' arguments fail.

Defendants contend that *Lange* "forecloses Plaintiffs' Title VII" claims, Doc. 195 at 1, but their arguments are unpersuasive and do not even attempt to engage with this Court's prior contrary analysis distinguishing *Skrmetti*. *See* Doc. 190 at 33-35; Doc. 195 at 16-23.

Defendants first argue that subsection 3 does not discriminate based on sex for the same reasons the medical insurance policy was upheld in *Lange*: "Just as the plan in *Lange* would not cover any sex-change operation, subsection 3 prohibits usage of any biologically incongruous titles or pronouns with students." Doc. 195 at 17-18. But the analogy fails. The Eleventh Circuit concluded that the plan in *Lange* (like the law in *Skrmetti*) "classifi[ed] based on medical use" and *not* based on "whether the County's employee is a man or a woman." *Lange*, 2025 WL 2602633, at *4-5. Subsection 3 is the opposite: it draws no distinction based on medical treatments (or anything similar) and instead turns *entirely* on "whether the [State's] employee is a man or a woman." *Id.* at *4. Subsection 3's language is unambiguous: its sole rule is that a teacher may not provide personal titles or pronouns that "*do not correspond to his or her sex*." Fla. Stat. § 1000.071(3). As this Court previously explained, "[t]o know which pronouns section 1000.071(3) demands [a teacher] use, one must know [the teacher's] sex. This is discrimination on the basis of sex." Doc.

88 at 5 (citation omitted). Because of the sex Ms. Wood and Ms. Doe were assigned at birth, they, unlike other teachers, may not use the title "Ms." Thus, in *Lange*'s terms, subsection 3 squarely "prohibit[s] conduct for one sex that it permits for the other." *Lange*, 2025 WL 2602633, at *3 (quoting *Skrmetti*, 145 S. Ct. at 1831).

Defendants appear to argue that subsection 3 turns on a supposedly generally applicable rule about "biologically incongruous titles and pronouns." Doc. 195 at 17-18. But that is the very misdirection identified and rejected by the Supreme Court and this Court: "mask[ing] sex-based classifications" by "writing in abstract terms." *Skrmetti*, 145 S. Ct. at 1831; Doc. 190 at 33. While "[s]ome medical treatments and procedures are uniquely bound up" in biological sex, *Skrmetti*, 145 S. Ct. at 1829, biology has nothing to say about "titles and pronouns." [5] *See* Doc. 190 at 37-38 (this Court's analysis). Indeed, Defendants' theory has no limit, as sex discrimination could frequently be recast as discrimination based on the employee's "biologically incongruous" traits or conduct. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (employee instructed to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry").

Defendants also argue that "*Lange* adopted the State Defendants' position that

---

[5] Justice Alito's concurrence in *Skrmetti* emphasized the "limited scope of SB1," which targets only "medical procedures" and not "other behavior in which minors might engage for the purpose of expressing their gender identity," including "pronouns." *Skrmetti*, 145 S. Ct. at 1859 (Alito, J., concurring).

policies that apply equally to both sexes do not unlawfully discriminate based on sex under Title VII and *Bostock*." Doc. 195 at 18. But *Lange* said no such thing, and *Skrmetti* and *Bostock* both said the exact opposite. *Skrmetti*, 145 S. Ct. at 1831 ("[T]he antimiscegenation law that this Court struck down in *Loving v. Virginia* … would not have shed its race-based classification had it, for example, prohibited '*any* person from marrying an individual of a different race.'"); *Bostock*, 590 U.S. at 662 ("An employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender. … [J]ust as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereo-types doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.").

Finally, Defendants argue that Plaintiffs have not proven discrimination based on "transgender status." Doc. 195 at 18-23. But Plaintiffs' claim is that subsection 3 facially discriminates based on sex, not that it discriminates based on transgender status. *See* Doc. 158-1 at 7, 11. Plaintiffs need not prove that *only* transgender teach-ers will be affected by subsection 3, nor that *all* transgender teachers will be affected. *Contra* Doc. 195 at 21-23 & n.2. Title VII "focuses on discrimination against indi-viduals, not groups." *Bostock*, 590 U.S. at 667. Although Plaintiffs are transgender, what matters under Title VII is that subsection 3 discriminates against them as indi-viduals based on their sex. Plaintiffs understand this Court's prior order as applying,

21

in part, the analysis in the *Lange* panel opinion as supporting the conclusion that subsection 3 discriminates based on transgender status. But Plaintiffs do not understand that reliance on *Lange* as necessary to this Court's conclusion, and this Court need not reach the issue of transgender discrimination. This Court can and should simply affirm its prior analysis with respect to sex discrimination, which is sufficient to show a violation of Title VII:

> Plaintiffs, who were identified male at birth … may not use female pronouns. Otherwise identical employees who were identified female at birth may use female pronouns. Subsection 3 therefore "intentionally penalizes a person identified as male at birth for *traits or actions*"—female pronoun and title use—"it tolerates in an employee identified as female at birth."

Doc. 190 at 12.

### D.      Defendants fail to address sex stereotyping.

Defendants do not address the impact of *Lange* on Plaintiffs' sex stereotyping theory of disparate treatment discrimination under Title VII. But *Lange* reaffirmed that "Title VII forbids treating employees differently because of sex-based stereotypes about men or women." *Lange*, 2025 WL 2602633, at *6 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)). And although *Lange* rejected the sex stereotyping claim at issue there, it did so on grounds that clearly distinguish Plaintiffs' claims here. The Eleventh Circuit reasoned that "[i]f the plan discriminated against participants because of gender stereotypes, it would presumably cover

22

procedures to *align* a participant's physical characteristics with those of his or her biological sex. But it does not do that." *Id.* at *6. Indeed, the policy in *Lange* prohibited coverage not only for "sex change" surgeries, but also for surgeries to *reverse* "a previous … sex change." *Id.* at *4. By contrast here, subsection 3 is not merely a general policy governing titles and pronouns (such as, for instance, a policy requiring all teachers to use the title "Teacher"): instead, it prohibits on its face *all* titles and pronouns that do not conform to the State's sex stereotype, while permitting *any* titles or pronouns consistent with that stereotype. Fla. Stat. § 1000.071(3); Doc. 190 at 37-38 ("subsection 3 and its enforcement mechanisms punish employees for 'failing to adhere to certain expectations and stereotypes associated with the employee's sex,' that is, for using pronouns and titles which do not correspond to their biological sex"…and "[t]herefore, it discriminates based on gender nonconformity.").

Although this Court's prior Title VII analysis at summary judgment did not expressly invoke Plaintiffs' sex-stereotyping theory, Plaintiffs thoroughly briefed that theory and it is a further available ground for this Court to reaffirm its prior conclusions that subsection 3 is discriminatory. Doc. 158-1 at 11-12; Doc. 177 at 6-8; *see also* Doc. 190 at 35-38 (analyzing subsection 3's reliance on stereotypes in the context of equal protection).[6]

---

[6] *Lange* also has no effect on this Court's conclusion that "subsection 3 alters the terms and conditions of Plaintiffs' employment." Doc. 190 at 17.

23

## CONCLUSION

The Court should affirm its prior denial of Defendants' motion for summary judgment on Plaintiffs' Equal Protection Clause and Title VII claims, Docs. 195, 197, 200.

Respectfully submitted.

Date: October 9, 2025

/s/ *Sam Boyd*

Sam Boyd, Fla. Bar No. 1012141
Carli Raben, Fla. Bar No. 1036013
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131
(786) 347-2056
(786) 237-2949 (fax)
sam.boyd@splcenter.org
carli.raben@splcenter.org

Aaron S. Fleisher[*†]
SOUTHERN POVERTY LAW CENTER
1101 17th St NW Ste. 705
Washington, DC 20036
(202) 536-9719
(202) 971-9205 (fax)
aaron.fleisher@splcenter.org
[†] *Not admitted to practice law in DC*

Diego A. Soto[*]
Jessica L. Stone[*]
SOUTHERN POVERTY LAW CENTER
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030
(404) 521-6700
(404) 377-0708 (fax)
diego.soto@splcenter.org
jessica.stone@splcenter.org

24

Simone Chriss, Fla. Bar No. 124062
Jodi Siegel, Fla. Bar No. 511617
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

James M. Finberg[*]
James Baltzer[*]
Jonathan Rosenthal[*]
ALTSHULER BERZON LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
jfinberg@altshulerberzon.com
jbaltzer@altshulerberzon.com
jrosenthal@altshulerberzon.com

*Counsel for Plaintiffs*

[*] *Admitted* pro hac vice

## CERTIFICATE OF WORD COUNT

I certify that this document contains 5584 words, inclusive of headings, foot-

notes, and quotations, according to the word-processing system used to prepare it.

October 9, 2025                                      /s/ *Sam Boyd*
                                                    Sam Boyd